UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                            )
DAVID B. TRACEY, DANIEL                     )        Civil Action No. 16-cv-11620-NMG
GUENTHER, MARIA T. NICHOLSON,        )
CORRINNE R. FOGG, AND VAHIK          )        **ORAL ARGUMENT REQUESTED**
MINAIYAN, individually and as                 )
representatives of a class of participants and )
beneficiaries on behalf of the MIT            )
 Supplemental 401(k) Plan,                       )
                                                            )
                            *Plaintiffs,*                   )
                                                            )
v.                                                            )
                                                            )
                                                            )
MASSACHUSETTS INSTITUTE OF            )
TECHNOLOGY, THE MIT                        )
SUPPLEMENTAL 401(K) PLAN                )
OVERSIGHT COMMITTEE, THE              )
ADMINISTRATIVE COMMITTEE,             )
ISRAEL RUIZ, MARC BERNSTEIN,          )
GLENN DAVID ELLISON, S.P.               )
KOTHARI, GUNTHER ROLAND,            )
LORRAINE A. GOFFE-RUSH, GLEN         )
SHOR, PAMELA WELDON, THOMAS        )
M. WIEAND, and BARTON ZWIEBACH      )
                                                            )
                            *Defendants.*                 )
_____ )

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Brian D. Boyle (*pro hac vice*)                     Alison V. Douglass (BBO #646861)
Shannon M. Barrett (*pro hac vice*)             GOODWIN PROCTER, LLP
Meaghan VerGow (*pro hac vice*)               100 Northern Avenue
O'MELVENY & MYERS LLP                       Boston, MA 02210
1625 Eye Street, N.W.                                  Tel: (617) 570-1676
Washington, DC 20006
Tel: (202) 383-5300

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND.................................................................................................3

LEGAL STANDARD.............................................................................................................4

ARGUMENT ..........................................................................................................................5

I.      PLAINTIFFS' SUMMARY "DISLOYALTY" CLAIMS MUST BE DISMISSED
        BECAUSE PLAINTIFFS DO NOT PLAUSIBLY ALLEGE ANY
        DISLOYALTY .............................................................................................................5

II.     DEFENDANTS DID NOT ACT IMPRUDENTLY IN OFFERING
        PARTICIPANTS A WIDE ARRAY OF INVESTMENT CHOICES ..............................8

        A.      The Size Of The Plan's Investment Lineup Does Not Support An
                Inference Of An Imprudent Process. ......................................................................8

        B.      Plaintiffs' Ancillary Attacks On The Plan's Investment Lineup Likewise
                Fail. .....................................................................................................................13

III.    PLAINTIFFS HAVE FAILED TO ALLEGE A PLAUSIBLE CLAIM FOR
        EXCESSIVE RECORDKEEPING EXPENSE. ..............................................................16

IV.     PLAINTIFFS DO NOT PLAUSIBLY ALLEGE A PROHIBITED
        TRANSACTION ..........................................................................................................18

V.      PLAINTIFFS' MONITORING CLAIM FAILS .............................................................20

CONCLUSION......................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Andersen v. Lasalle Bank*,
   2016 WL 3093375 (D. Mass 2016) ........................................................ 11

*Armstrong v. LaSalle Bank Nat'l Ass'n*,
   446 F.3d 728 (7th Cir. 2006) .................................................................. 5

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................... 4, 20

*Bauer-Ramazani v. TIAA-CREF*,
   2013 WL 6189802 (D. Vt. 2013) ............................................................ 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................... 4, 7, 13

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ............................................................ 9, 19

*Bunch v. W.R. Grace & Co.*,
   555 F.3d 1 (1st Cir. 2009) ...................................................................... 5

*Cassell v. Vanderbilt Univ.*,
   No. 3:16-cv-02086 (M.D. Tenn. Aug. 10, 2016) .................................... 1

*Cates v. Trustees of Columbia Univ.*,
   No. 1:16-cv-06524-UA (S.D.N.Y. Aug. 18, 2016) ................................. 1

*Clark v. Duke Univ.*,
   No. 1:16-cv-01044 (M.D.N.C. Aug. 10, 2016) ....................................... 1

*Cunningham v. Cornell Univ.*,
   No. 1:16-cv-06525 (S.D.N.Y. Aug. 17, 2016) ........................................ 1

*Difelice v. U.S. Airways, Inc.*,
   497 F.3d 410 (4th Cir. 2007) .................................................................. 7

*Divane v. Northwestern Univ.*,
   No. 1:16-cv-08157 (N.D. Ill. Aug. 17, 2016) ......................................... 1

*Fifth Third Bancorp v. Dudenhoeffer*,
   134 S. Ct. 2459 (2014) ........................................................................... 5

*George v. Kraft Foods Global, Inc.*,
   641 F.3d 786 (7th Cir. 2011) ................................................................ 17

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) ........................................................ *passim*

*Henderson v. Emory Univ.*,
   No. 1:16-cv-02920-MHC (N.D. Ga. Aug. 11, 2016) .............................. 1

*In re Citigroup ERISA Litig.*,
   662 F.3d 128 (2d Cir. 2011) ........................................................................... 7

*Jordan v. Mich. Conference of Teamsters Welfare Fund*,
   207 F.3d 854 (6th Cir. 2000) ...................................................................... 18

*Kelly v. Johns Hopkins Univ.*,
   No. 1:16-cv-02835-GLR (D. Md. Aug. 11, 2016) ...................................... 1

*Kenney v. State Street Corp.*,
   694 F. Supp. 2d 67 (D. Mass. 2010) ............................................................ 5

*Kling v. Fidelity Mgmt. Trust Co.*,
   270 F. Supp. 2d 121 (D. Mass. 2003) .......................................................... 4

*Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*,
   2012 WL 3191961 (S.D.N.Y. 2012) .......................................................... 12

*Leber v. Citigroup*,
   2010 WL 935442 (S.D.N.Y.) ...................................................................... 20

*Lindsay v. Wells Fargo*,
   2013 WL 5010977 (D. Mass. 2013) ........................................................... 11

*Loomis v. Exelon Corp.*,
   658 F.3d 667 (7th Cir. 2011) ....................................................... 5, 9, 10, 11

*Mehling v. N.Y. Life Ins.*,
   163 F.Supp.2d 502 (E.D. Pa. 2001) .......................................................... 20

*Munro v. Univ. of S. Cal.*,
   No. 2:16-cv-06191 (C.D. Cal. Aug. 17, 2016) ........................................... 1

*PBGC. ex rel. St. Vincent Catholic Med. Ctrs. Retirement Plan v.*
   *Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705 (2d Cir. 2013) .............. 17

*Reich v. Compton*,
   57 F.3d 270 (3d Cir. 1995) ......................................................................... 18

*Renfro v. Unisys Corp.*,
   671 F.3d 314 (3d Cir. 2011) ........................................................... 5, 9, 11

*Rinehart v. Akers*,
   722 F.3d 137 (2d Cir. 2013) ...................................................................... 20

*Sacerdote v. N.Y. Univ.*,
   No. 1:16-cv-06284 (S.D.N.Y. Aug. 9, 2016) .............................................. 1

*SEC v. Tambone*,
   597 F.3d 436 (1st Cir. 2010) ........................................................................ 5

*Sweda v. Univ. of Pa.*,
   No. 2:16-cv-04329-GEKP (E.D. Pa. Aug. 10, 2016) ................................. 1

*Tibble v. Edison Int'l*,
   729 F.3d 1110 (9th Cir. 2013) ............................................................. 9, 11

*Vellani v. Yale Univ.*,
   No. 3:16-cv-01345 (D. Conn. Aug. 9, 2016) ................................................................ 1

*White v. Chevron Corp.*,
   2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ....................................................... *passim*

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
   325 F. App'x 31 (2d Cir. 2009) ................................................................................. 17

**Statutes**

29 U.S.C. § 1002(14) .................................................................................................... 18

29 U.S.C. § 1002(21)(B) .............................................................................................. 18

29 U.S.C. § 1021(a) ...................................................................................................... 17

29 U.S.C. § 1106 .......................................................................................................... 20

29 U.S.C. § 1106(a) ...................................................................................................... 17

29 U.S.C. § 1106(a)(1)(A) ............................................................................................ 18

29 U.S.C. § 1106(a)(1)(B) ............................................................................................ 19

29 U.S.C. § 1106(a)(1)(C) ............................................................................................ 19

29 U.S.C. § 1106(a)(1)(D) ............................................................................................ 18

29 U.S.C. § 1108(b)(2) ................................................................................................. 19

29 U.S.C. § 1108(c)(3) .................................................................................................... 7

29 U.S.C. § 1113 ............................................................................................................. 7

An Act to Incorporate the Massachusetts Institute of Technology, and to Grant Aid to Said
   Institute and to the Boston Society of Natural History, 1861 Mass. Acts ch. 183 § 1 .............. 3

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................................. 4

**Administrative Material**

75 FR 56564 (Sept. 16, 2010) ...................................................................................... 19

**Other Authorities**

MIT News, *Fidelity Chosen to Manage MIT Supplemental 401(k) Plan
   as of April 1* (Dec. 16, 1998) ...................................................................................... 6

SEC, Off. of Investor Educ. and Advocacy,*Mutual Funds: A Guide for Investors* ...................... 19

## INTRODUCTION

This case is one of twelve lawsuits brought by the same plaintiffs' counsel within a ten-day span, targeting many of the leading private universities in the country.[1]  These cases contend that the universities violated ERISA fiduciary duties by offering plan participants too many investment choices, rather than confining participants to a smaller set of investment options that plaintiffs deem preferable.  The cases also claim that the defendants caused the universities' plans to bear excessive expenses for administrative services.  In every single one of these cases, including this one, the plaintiffs try to tarnish the defendants with accusations that their decisions in managing the university's retirement plan were motivated by disloyalty.[2]

The assembly-line claims in this case do not withstand the barest scrutiny.  The Massachusetts Institute of Technology ("MIT") is an independent, coeducational, privately endowed university whose mission is to advance knowledge and educate students in science, technology, and other areas of scholarship.  For nearly two decades, MIT has offered the MIT Supplemental 401(k) Plan (the "Plan") as a supplement to the other retirement benefits it provides its thousands of employees, including a separate defined benefit pension plan available to all employees that the university fully funds.  Since its creation, the Plan has offered MIT employees a diverse array of investment options, allowing participants to tailor their investment strategies to meet their individual goals and retirement plans.  The investment options were

---

[1] *See Cates v. Trs. of Columbia Univ.*, No. 1:16-cv-06524-UA (S.D.N.Y.); *Cunningham v. Cornell Univ.*, No. 1:16-cv-06525 (S.D.N.Y.); *Divane v. Nw. Univ.*, No. 1:16-cv-08157 (N.D. Ill.); *Munro v. U.S.C.*, No. 2:16-cv-06191 (C.D. Cal.); *Henderson v. Emory Univ.*, No. 1:16-cv-02920-MHC (N.D. Ga.); *Kelly v. Johns Hopkins Univ.*, No. 1:16-cv-02835-GLR (D. Md.); *Cassell v. Vanderbilt Univ.*, No. 3:16-cv-02086 (M.D. Tenn.); *Clark v. Duke Univ.*, No. 1:16-cv-01044 (M.D.N.C.); *Sweda v. Univ. of Pa.*, No. 2:16-cv-04329-GEKP (E.D. Pa.); *Sacerdote v. N.Y.U.*, No. 1:16-cv-06284 (S.D.N.Y.); *Vellali v. Yale Univ.*, No. 3:16-cv-01345 (D. Conn.).

[2] The defendants are the Massachusetts Institute of Technology, the MIT Supplemental 401(k) Plan Oversight Committee ("Oversight Committee"), the Administrative Committee, and the individual members currently serving on the Oversight Committee.

continually monitored by the participants' own peers—economics professors and other MIT employees.  Over the relevant period, those fiduciaries frequently adjusted the Plan's investment options in response to market conditions and their best assessment of employee needs.

Against this backdrop, plaintiffs claim that the Plan's fiduciaries breached their duty of loyalty to their fellow participants by causing the Plan to buy Fidelity products and services not because they were good choices, but because Fidelity was one of MIT's countless donors, and because, years after Fidelity's initial retention, Fidelity's CEO joined nearly 70 others on MIT's Board of Trustees, the "MIT Corporation."  Plaintiffs offer no plausible facts to support this speculation, and the Complaint and key Plan documents dispose of it, as they show that—far from favoring Fidelity—the Plan's fiduciaries progressively removed Fidelity products, replaced them with the products of Fidelity's competitors, and negotiated fee concessions from Fidelity.

Plaintiffs' imprudence claims are no better founded.  Plaintiffs' central criticism of the Plan's investment structure is that the Plan offered them "too many choices," and failed to leverage its buying power to provide them access to allegedly lower-cost products and share classes.  Fatal to this claim, however, is that the Plan's fiduciaries *did* provide participants access to exactly the low-cost options plaintiffs prefer.  Plaintiffs' criticism thus reduces to a challenge to the Plan fiduciaries' decision *also* to offer participants a broader array of options, across a broader range of investment categories.  Defendants cannot reasonably be faulted for granting participants such autonomy.  Courts have emphasized that ERISA encourages meaningful participant choice, and a plan's fiduciaries need not—indeed cannot—treat cost as the sole determinative factor in designing a plan's investment lineup.  Plaintiffs' other criticisms of the Plan's investment options are merely variants of plaintiffs' core attack on the breadth of choice offered in the Plan lineup; none withstands the application of logic or prevailing legal authority.

Plaintiffs also challenge the Plan's recordkeeping arrangement with Fidelity.  But they offer no factual support for their conclusory assertion that Fidelity's compensation was too high, and their theory that defendants allowed Fidelity's asset-based compensation to rise to unreasonable levels is contradicted by the governing contract terms.

By its own terms and measured against well-established ERISA principles, plaintiffs' Complaint permits no plausible, legally cognizable inference of any wrongdoing.  As explained further below, the action should be dismissed in its entirety.

## FACTUAL BACKGROUND

MIT, a non-profit institute dedicated to "the advancement, development and practical application of science,"[3] offers its employees a variety of retirement benefits.  In addition to a defined benefit program (*i.e.*, a pension plan) that is fully funded by MIT,[4] employees may also participate in an employer-sponsored, individual-account, defined contribution plan.  The Plan is funded through employees' contributions, with matching contributions from MIT of up to 5% of an employee's salary.  VerGow Decl., Exs. D, E (MIT Supplemental 401(k) Plan Enrollment Guides, 2011–2012).  The Oversight Committee, which is comprised of MIT's Executive Vice President and Treasurer and selected faculty members and other employees who volunteer their time to serve on the committee, oversees the Plan's investment offerings.  Compl. ¶ 18.  Fidelity has served as the Plan's recordkeeper since 1999.  *Id.* ¶¶ 30, 39.

Prior to July 2015, the Plan offered four tiers, or levels, of investment options, giving participants a choice regarding how active they wanted to be in managing their accounts.  Tier 1 consisted of low-risk, low-expense Vanguard Target Retirement Trusts, collective trusts

---

[3] An Act to Incorporate the Massachusetts Institute of Technology, and to Grant Aid to Said Institute and to the Boston Society of Natural History, 1861 Mass. Acts ch. 183 § 1.

[4] Declaration of Meaghan VerGow ("VerGow Decl."), Ex. A (MIT Plan Form 5500).

designed to allow participants to invest in a single product whose assets get reallocated over time as their retirement date approaches.  VerGow Decl., Ex. C (Recordkeeping Agmt.), 7th Am., at 1.[5]  Tier 2 allowed participants to allocate their accounts among a set of seven investment options with varying risk/return profiles, including a money market account, two institutional separate accounts (one invested primarily in bonds, one in equity), a Vanguard index trust, and institutional shares of Vanguard funds.  *Id.* at 3.  Tier 3, called the "MIT Investment Window," offered a broader range of products for participants "with an understanding of how to research and evaluate individual investments."  *Id.*, Ex. E (2012 Enrollment Guide) at 14.  These included a wide array of Fidelity and non-Fidelity funds, including index funds and funds focused on various business sectors and foreign markets.  *See, e.g.*, *id.*, Ex. C (Recordkeeping Agmt.), 7th Am., at 2–5.  Finally, Tier 4 was a "brokerage window," through which participants could invest in the broader mutual fund market via a brokerage account.  *See id.*, Ex. E (Enrollment Guide), at 20.  In July 2015, the Committee reorganized the Plan, removing Tier 3 and expanding Tier 2 to include 37 investment options—36 of which are non-Fidelity funds.  *See* Compl. ¶ 51.

## LEGAL STANDARD

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v.*

---

[5] Although the Complaint does not refer explicitly to the Plan's governing documents, the Court is free to consider them on a Rule 12(b)(6) motion relating to breach of ERISA's fiduciary duties.  *See Kling v. Fidelity Mgmt. Trust Co.*, 270 F. Supp. 2d 121, 127–28 (D. Mass. 2003) (such documents may be considered at the dismissal stage, because ERISA "make[s] explicit and repeated reference to plan documents" with respect to fiduciary duties).

*Twombly*, 550 U.S. 544, 555 (2007).  While the Court must accept well-pleaded facts as true, it need not accept allegations that are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture."  *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010).  Instead, the allegations "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555 (citations and quotations omitted).

These standards take on particular significance in the context of the ERISA claims here. An imprudence claim under ERISA requires a plaintiff to allege facts demonstrating the fiduciary did not act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." *Kenney v. State St. Corp.*, 694 F. Supp. 2d 67, 73 (D. Mass. 2010) (dismissing imprudence claim).  "The test of prudence . . . is one of *conduct*, and not a test of the result of the performance of the investment."  *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009) (quotation and alteration omitted).  Moreover, a fiduciary's decisions are ordinarily reviewed "deferentially" for an "abuse of discretion," *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006), and on a motion to dismiss imprudence allegations must be judged in light of "the circumstances . . . prevailing at the time the fiduciary act[ed]," *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014) (quotations omitted).  Applying these standards, courts have dismissed ERISA claims brought by plaintiffs' counsel that closely mirror the claims here, including a decision just two months ago.[6]

---

[6] *See, e.g.*, *White v. Chevron Corp.*, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016); *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011); *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011); *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009).

**ARGUMENT**

**I.     PLAINTIFFS' SUMMARY "DISLOYALTY" CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT PLAUSIBLY ALLEGE ANY DISLOYALTY**

In an apparent effort to elude the deferential standard afforded fiduciary decision-making, plaintiffs strain to cast defendants as not only imprudent but also disloyal and blinded by conflicts. *See, e.g.*, Compl. ¶¶ 32–39.  Plaintiffs claim, in particular, that the members of the Plan's fiduciary committee betrayed their fellow employees and Plan participants in an effort to favor the interests of Fidelity and its CEO Abigail Johnson.  This accusation of disloyalty, however, relies on distortion and pure conjecture and should be rejected out of hand.

Plaintiffs attempt to pin their disloyalty theory in part on a 1998 article, which they wrongly suggest shows that defendants chose Fidelity because it did business with MIT or was headquartered locally.  *Id.* ¶ 32.  The article says no such thing.  While it notes these facts about the five vendors invited to submit proposals for the Plan's business, it does not suggest that they drove the fiduciaries' ultimate decision.[7]  To the contrary, the article notes that each vendor was a "leader in the defined contribution services market" and the finalists were evaluated across multiple criteria, including price and quality of services.  Moreover, even if the article had said that MIT's prior experience with or proximity to the vendors played a role in the selection process, plaintiffs do not explain why consideration of such factors would be a sign of disloyalty; prior experience is a proper basis to assess a vendor, and proximity can be a useful benefit in a service relationship.  Finally, the article provides no insight into the motives of those responsible for Plan decision-making during the limitations period—which began more than ten years later.

---

[7] *See* MIT News, *Fidelity Chosen to Manage MIT Supplemental 401(k) Plan as of April 1* (Dec. 16, 1998) http://news.mit.edu/1998/401k-1216 (cited at Compl. ¶ 32 n.3).

*See* 29 U.S.C. § 1113.  There is no indication that the fiduciary committee members during the limitations period took part in those earlier decisions or that the earlier decisions were flawed.

Beyond this distorted use of an eighteen-year-old news article, plaintiffs' disloyalty theories consist of no more than rank speculation that the MIT employees who have served as fiduciaries must have improperly favored Fidelity's interests over that of their colleagues because Fidelity was one of MIT's many donors, and because Ms. Johnson serves as one of MIT's trustees—a position she assumed years *after* Fidelity became the Plan's recordkeeper, *see* Compl. ¶ 35.  Courts have rejected precisely this sort of guilt-by-association conjecture.  *See, e.g.*, *In re Citigroup ERISA Litig.*, 662 F.3d 128, 145–46 (2d Cir. 2011) (affirming dismissal of claims that fiduciaries acted disloyally by retaining plan's investment in their employer's stock); *Difelice v. U.S. Airways, Inc*., 497 F.3d 410, 421 n.6 (4th Cir. 2007) ("Mere officer or director status does not create an imputed breach of the duty of loyalty simply because an officer or director has an understandable interest in positive performance of company stock.").[8]

Such conjecture is particularly misplaced here given the steps the Plan's fiduciaries took *against* Fidelity's interests.  As the Complaint reflects, before July 2015, the fiduciaries included over 150 non-Fidelity investment options to compete with the Fidelity alternatives.  Compl. ¶ 40.  And, when the Oversight Committee consolidated the Plan's lineup in 2015, it eliminated all but one Fidelity investment option.  *Id.* ¶ 51.  Armed only with their illogical, unsupported speculation, plaintiffs "have not nudged their [disloyalty] claims across the line from conceivable to plausible," and those claims should be dismissed.  *Twombly*, 550 U.S. at 570.

---

[8] ERISA itself contemplates that employees can faithfully separate their plan's interests from those of their employer by expressly authorizing employees to act as fiduciaries to their employers' plans.  29 U.S.C. § 1108(c)(3).

II.     **DEFENDANTS DID NOT ACT IMPRUDENTLY IN OFFERING PARTICIPANTS A WIDE ARRAY OF INVESTMENT CHOICES**

Plaintiffs' prudence claims are no better supported.  Plaintiffs assert in Count I that defendants breached fiduciary duties by causing the Plan to offer investments that plaintiffs allege both provided poor performance and bore excessive fees.  Compl. ¶¶ 120–129.  Plaintiffs offer no plausible allegations to support either theory.

A.     **The Size Of The Plan's Investment Lineup Does Not Support An Inference Of An Imprudent Process.**

Plaintiffs' principal criticism—that the size of the Plan's investment lineup shows defendants were imprudent—cannot survive a motion to dismiss.  Plaintiffs contend that by offering participants a wide range of investment options, defendants confused participants and prevented the Plan from leveraging its size to obtain lower-cost options, such as separate accounts, collective trusts, or lower-cost share classes in mutual funds.  *Id.* ¶¶ 42–45.  But plaintiffs overlook that the Plan offered participants *exactly* those types of investment products.

Indeed, plaintiffs' Complaint conveniently ignores the actual structure of the Plan's offerings.  As described above, *supra* at 3–4, the Plan had four tiers of investment options tailored to people with different levels of investment sophistication.  *See also* VerGow Decl., Ex. E, at 11–31.  Participants seeking a simple way to invest their accounts could choose from either of the first two tiers, which offered participants exactly what plaintiffs say the Plan should have offered: a limited range of collective trusts, separate accounts, and institutional shares in Vanguard funds.  *Id.* at 11–13, 21–31.[9]  For participants "with an understanding of how to research and evaluate individual investments," *id.* at 14—a segment of the MIT community that

---

[9] Notably, those institutional shares included shares in the very class that plaintiffs suggest the Plan should have offered.  *Compare id.* at 30 (listing Institutional Plus share class) *with* Compl. p. 68 (identifying Institutional Plus as "Lower Cost" Vanguard fund).

may have included its economists, mathematicians, and others with experience in quantitative analysis—the third tier's "investment window" offered participants the additional choice of 300 or so fund options (including many institutional share classes). *Id.* at 14–19. This third tier is the apparent focal point of plaintiffs' allegations of confusing or overpriced investment options. But the Plan did not require participants to invest in—or even consider—the options in that tier.

Plaintiffs' real criticism, then, is not that defendants failed to provide access to low-cost institutional products and share classes or that defendants failed to present those low-cost products in an easily digestible format. Rather, plaintiffs' claim is that defendants did not deprive participants who wished to choose from a wider range of investment options the opportunity to do so. *See Loomis*, 658 F.3d at 671 (rejecting challenge to the offering of higher-cost retail mutual funds in part because "[a]ny participant who wants a fund with expenses under 0.1% can get it through [the defendant's] Plan"). That paternalistic critique is at odds with ERISA. As multiple courts have recognized, ERISA encourages participant choice.[10] These courts have thus pointed to a plan's inclusion of a broad mix of investments as a factor *favoring* dismissal of challenges to a defined contribution plan's lineup.[11]

---

[10] *Tibble v. Edison Int'l*, 729 F.3d 1110, 1134–35 (9th Cir. 2013) ("Because participant choice is the centerpiece of what ERISA envisions for defined-contribution plans, these sorts of paternalistic arguments have had little traction."), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Renfro*, 671 F.3d at 327; *Loomis*, 658 F.3d at 673 (ERISA "encourages sponsors to allow more choice to participants.").

[11] *See Hecker*, 556 F.3d at 586 ("[E]ven if . . .there is a fiduciary duty . . . to furnish an acceptable array of investment vehicles, no rational trier of fact could find . . . that Deere failed to satisfy that duty. . . . [T]here was a wide range of expense ratios among the twenty Fidelity mutual funds and the 2,500 other funds available through BrokerageLink."); *Renfro*, 671 F.3d at 327 ("[T]he plan contained seventy-three distinct investment options. . . . In light of the reasonable mix and range of investment options in the Unisys plan, plaintiffs' factual allegations about Unisys's conduct do not plausibly support their claims."); *cf. Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 n.6 (8th Cir. 2009) ("The far narrower range of investment options available in this case makes more plausible the claim that this Plan was imprudently managed.").

To be sure, some options in the investment window had higher expense ratios than similar options in the first two tiers. But "[f]iduciaries have latitude to value investment features other than price (and indeed, are required to do so), as recognized by the courts." *White*, 2016 WL 4502808, at *10 (citing cases); *see also Loomis*, 658 F.3d at 672–75 (affirming dismissal of claims that fiduciaries failed to leverage plan's buying power by restricting plan's lineup to lower cost institutional products). Prudent fiduciaries could conclude that some added expense was a reasonable trade-off for greater choice. And no participant was committed or directed to the more expensive options; they were merely allowed to make those decisions themselves.[12]

Plaintiffs try to undermine the recognized value of participant choice by misleadingly claiming that defendants offered dozens of "duplicative" investment options. *See* Compl. ¶¶ 46, 52, 53, 55. But plaintiffs never allege—nor could they—that these investment options expected or experienced the same returns. Indeed, many of the so-called "duplicative" investments plaintiffs point to had *expressly different objectives* and (therefore unsurprisingly) expected different outcomes. For instance, plaintiffs allege the Plan offered roughly 75 "duplicative" "large cap domestic equities" funds. *Id.* ¶ 46. Yet plaintiffs notably omit that these funds were presented in three groups to cater to different risk appetites—relatively conservative "large value" funds, more aggressive "large growth" funds, and middle-ground "large blend" funds. VerGow Decl., Ex. E, at 9, 15–17. And even within these different risk categories, the funds varied significantly in their investment approaches and management.[13]

---

[12] Tellingly, though plaintiffs claim the variety of options in the investment window "cause[d] participant confusion," Compl. ¶ 125, the Complaint does not contain a single allegation of any participant ever having been *actually* confused.

[13] *Compare, e.g.*, *id.*, Ex. F (Wells Fargo Large Cap Grown Fund Summary Prospectus (Dec. 1, 2013)) ("We focus on companies that dominate their market, . . . or are undergoing dynamic change.") with *id.*, Ex. G (Calvert Equity Portfolio Prospectus (Jan. 31, 2013))

Plaintiffs similarly attempt to cast the Plan's 41 sector funds and approximately 50 international funds as "duplicative."  Compl. ¶ 46.  But, by plaintiffs' own description, "sector funds refer to investments that focus on *one particular segment* of the economy," and "international specialty funds . . . invest in companies *concentrated in a particular region or country*."  *Id.* ¶ 56 (emphases added).  Plaintiffs thus ask the Court to accept, for example, that investments in gold were interchangeable with investments in healthcare, and that a fund focused on Europe was "duplicative" of one invested in the Pacific Basin.  *See* VerGow Decl., Ex. E, at 18–19.  The Court need not credit such implausible assertions.

Far from stuffing the Plan with "duplicative" options, even a cursory view of the Plan's investment lineup reveals that it offered participants meaningful choice.  The lineup offered options from 40 mutual fund complexes that varied in asset categories, strategies, expense ratios, and other variables.  *Id.* at 7, 14–19.  The Plan also provided participants a choice between mutual funds and institutional options, such as separate accounts and collective trusts.  *Id.*  And, while plaintiffs contend that defendants should have restricted participants to the latter, courts have repeatedly rejected that position, recognizing that mutual funds offer valuable features that other investments do not.[14]  By offering a broad array of investments and informing participants of their costs and relative risk, defendants "left choice to the people who have the most interest in the outcome, and [they] cannot be faulted for doing this."  *Loomis*, 658 F.3d at 673–74.

---

("Investments are first selected for financial soundness and then evaluated according to the Fund's sustainable and socially responsible investment criteria.").  Prospectuses and similar materials are judicially noticeable.  *See, e.g.*, *Andersen v. Lasalle Bank*, 2016 WL 3093375, at *1 (D. Mass. 2016); *Lindsay v. Wells Fargo*, 2013 WL 5010977, at *3 (D. Mass. 2013).

[14] *See, e.g.*, *Loomis*, 658 F.3d at 671-73; *Tibble*, 729 F.3d at 1134 ("Mutual funds, however, have a variety of unique regulatory and transparency features that make it an apples-to-oranges comparison to judge them against [separate accounts and collective trusts].."); *Renfro*, 671 F.3d at 318 (mutual funds are subject to "reporting, governance, and transparency requirements that do not apply to other investment vehicles"); *White*, 2016 WL 4502808, at *12.

In addition, plaintiffs seek to put fiduciaries in an untenable position—asking the Court to infer imprudence both from the committee's decision to make changes at some points and its failure to do so in others.  The Oversight Committee's decision to restructure the Plan's investment lineup effective July 2015 does not support plaintiffs' claims.  *See* Compl. ¶¶ 51–53, 58–65.  "Allegations regarding subsequent, prudent conduct do not serve as evidence that prior conduct was imprudent," and a fiduciary's "decision to change funds [does] not sustain allegations that [any fund] was an imprudent choice previously."  *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, 2012 WL 3191961, at *3 (S.D.N.Y. 2012) (quotation and alteration omitted) ("It would turn the law on its head were we to embrace a concept where a plaintiff could use allegations of prudent measures to prove a defendant's imprudence: a trustee might hesitate to replace a fund in its plan out of fears that such action could later be used to sustain a claim for breach of fiduciary duty."), *aff'd*, 513 F. App'x 78 (2d Cir. 2013).[15]  "[N]othing in [ERISA] requires plan fiduciaries to include any particular mix of investment vehicles in their plan," *Hecker*, 556 F.3d at 586, and it is unsurprising that fiduciaries might make different decisions concerning its investment options at different times.  The Plan adjustment in 2015 was just the most recent of changes the fiduciaries made to the Plan over time.[16]  And the Plan communication describing the 2015 changes—far from admitting prior imprudence, as plaintiffs

---

[15] Just two months ago, a district court found that similar changes fiduciaries had made to a plan's investment line-up "created a plausible inference that the Plan fiduciaries *were attentively monitoring* the fund."  *White*, 2016 WL 4502808, at *17 (emphasis added).

[16] Plaintiffs speculate in particular that, until 2015, defendants never "conducted a review of the Plan's investment decision structure" to modify the Plan's lineup. Compl. ¶ 53.  Such conjecture, however, is contradicted by the Plan documents, which reflect a substantial restructuring of the Plan's investment options on December 31, 2009, and further changes throughout the limitations period. *See, e.g.*, VerGow Decl., Ex. C (Recordkeeping Agmt.), 7th Am. (removing two Fidelity options among other changes)); *id.*, Ex. B (Trust Agmt.), 8th Am. (moving to different share classes in several Fidelity funds)); *id.*, Ex. C (Recordkeeping Agmt.), 9th Am. (adding two new institutional class investments to Investment Window)).

contend, *see* Compl. ¶¶ 58–59—reflects that the fiduciaries were monitoring evolving regulatory requirements, seeking participant feedback, and making changes in response.  Such measures indicate a diligent fiduciary process.[17]

**B.    Plaintiffs' Ancillary Attacks On The Plan's Investment Lineup Likewise Fail.**

In addition to their general grievance concerning the number of Plan investment options, plaintiffs pepper their Complaint with ancillary criticism of the Plan's investment structure. Plaintiffs claim, for example, that defendants acted imprudently because they did not remove funds from the Plan that allegedly performed poorly.  Yet plaintiffs do not allege *which* funds underperformed, by what measure, or why a prudent fiduciary would have found such performance—of unspecified magnitude and duration—a sufficient reason to remove the funds from the Plan's lineup.  Plaintiffs' barebones assertion of underperformance cannot survive dismissal.  *See Twombly*, 550 U.S. at 555.

Plaintiffs' other theories of imprudence fare no better.  They first contend that offering multiple actively-managed fund options within the same investment style was imprudent because it created a "shadow index," in which returns across the funds would supposedly average out to index levels.  Compl. ¶ 125; *see also id.* ¶ 47.  But, of course, no individual plan participant experiences any such averaging—each will see returns commensurate solely with the performance of the fund (or mix of funds) she has selected.

Plaintiffs likewise ignore market realities by alleging that "having multiple index funds in the Plan provides no benefit to participants."  *Id.* ¶ 49.  Contrary to this unsubstantiated assertion, index funds in the same asset class do *not* uniformly hold "the same stocks in the same

---

[17] Plaintiffs also assert that the investment lineup constructed in 2015 is itself imprudent—apparently because the Oversight Committee has continued to offer some mutual fund options.  Compl. ¶¶ 84–87.  As discussed earlier, this attack on the inclusion of *any* mutual fund investment options in the Plan's line-up fails as a matter of law.  *See supra* at 11 & n.14.

proportions as the index." *Id.*  For example, the Vanguard Institutional Index Fund "attempts to *replicate* the [S&P 500] index by . . . holding each stock in *approximately the same proportion as its weighting in the index.*"  VerGow Decl., Ex. H at 4 (Vanguard Institutional Index Fund Summary Prospectus (Mar. 28, 2013) (emphasis added).  By contrast, the Fidelity Large Cap Core Enhanced Index Fund, another index in the same asset class, attempts to "provide a *higher return* than that of the S&P 500® Index" by "using computer-aided, quantitative analysis of historical valuation, growth, profitability, and other factors to select a broadly diversified group of stocks." *Id.*, Ex. I at 1 (Fidelity Large Cap Core Enhanced Index Fund Prospectus (Apr. 29, 2013)) (emphasis added).  Different managers, in short, invest differently, and there is nothing unreasonable in giving participants a choice as to which manager to trust in that endeavor.

Plaintiffs also suggest that defendants acted imprudently by offering retail class shares in some of the mutual fund options or otherwise providing one share class in certain funds where a cheaper share class allegedly was available.  *See* Compl. ¶¶ 73–75, 78.  Courts, however, have rejected the notion "that the mere inclusion of a fund with an expense ratio that is higher than that of the lowest share class violates the duty of prudence."  *White*, 2016 WL 4502808, at *11.  As the Complaint itself indicates, mutual fund companies commonly condition the availability of lower expense share classes on the ability of an investor to commit a minimum level of investment.  Compl. ¶ 42.  Yet the Complaint does not allege any instances in which the Plan invested in one class of mutual fund shares at a level that met the requirements for a less expensive class.  Furthermore, plaintiffs' speculation that defendants "failed to consider" institutional share classes, *id.* ¶ 78, is refuted by the fact that the Plan offered institutional share classes in many of the mutual fund options, including many in the investment window.  *See, e.g.*, *id.* ¶¶ 25, 87; *see also* VerGow Decl., Ex. C (Recordkeeping Agmt.) at 11–12.  Indeed, in 2011,

14

the Plan shifted its investments in over 30 Fidelity mutual fund options to "Class K" shares—the very "lower cost" institutional share class plaintiffs suggest the Plan should have offered. *See id.*, Ex. C (Recordkeeping Agmt.), 8th Am., at 1–2; Compl. ¶ 76 (identifying Class K shares as "lower cost" alternative to many Plan investment options).

Finally, plaintiffs attempt to establish the imprudence of the Plan's pre-2015 investment options by comparing the expense ratio of each of those options to the expense ratios of the post-2015 investment options those assets were transferred to after the restructuring. *Id.* ¶ 52. But this comparison proves nothing. Because the investment lineup was condensed in July 2015, the Oversight Committee had to move participants' assets from investments that were no longer offered to those that were. That does not mean the eliminated funds were meant to be equivalent to the funds their assets were mapped to. Thus, plaintiffs rely on apples-to-oranges comparisons, including those between active and passive investment funds, mutual funds and collective trusts, funds in different asset categories, and funds with entirely different investment managers, and these comparisons say nothing about whether the earlier options were imprudent.[18]

In short, "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund," *Hecker*, 556 F.3d at 586, and nothing precluded the Plan's

---

[18] The comparison also ignores the conceded fact that the Plan paid Fidelity's recordkeeping fees through revenue sharing, Compl. ¶ 101, under which "a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the plan's recordkeeper," *id.* ¶ 99. A portion of the fees from the pre-2015 investments was thus used to defray necessary recordkeeping costs the Plan would have otherwise had to bear. Indeed, before 2014, the Plan paid no explicit recordkeeping fees to Fidelity due to revenue sharing, and after 2014, revenue sharing was used to directly offset the per-participant fee paid to Fidelity. *See, e.g.*, VerGow Decl., Ex. B (Trust Agmt.), 12th Am., at 7, 10. Plaintiffs did not and cannot allege that this cost defrayment was possible with the Vanguard alternatives they claim the Plan should have offered.

fiduciaries from allowing (while not requiring) participants to invest their accounts in higher-cost options in order to obtain the unique features those investments offered.

## III.   PLAINTIFFS HAVE FAILED TO ALLEGE A PLAUSIBLE CLAIM FOR EXCESSIVE RECORDKEEPING EXPENSE.

Plaintiffs' assert in Count II that defendants allowed Fidelity to receive excessive compensation for its administrative services.  Compl. ¶¶ 95–107, 131–138.  Plaintiffs contend that Fidelity received revenue sharing—asset-based fees from the Plan's investment options or the options' managers[19]—and that, as the Plan's assets grew, that compensation grew beyond the limits of what a prudent fiduciary would have paid.  The Complaint, however, contains no allegations to support plaintiffs' *ipse dixit* that $35 per participant is the bound of a reasonable fee.  Moreover, plaintiffs wholly ignore that revenue sharing arrangements "frequently inure to the benefit of ERISA plans," *White*, 2016 WL 4502808, at *14 (quotation and alteration omitted), because when total assets in a revenue-sharing investment option decrease, compensation to the recordkeeper decreases as well.

More important, plaintiffs' contention about defendants' alleged failure to keep Fidelity's fees at reasonable levels is directly contradicted by the relevant contracts.  During the time plaintiffs claim Fidelity's asset-based fees were growing unchecked, Fidelity and the Plan's fiduciaries repeatedly amended their contractual agreements to provide a series of increasing rebates, or "revenue credits," from Fidelity to the Plan.[20]  And, effective early 2014, the fiduciaries and Fidelity restructured Fidelity's compensation entirely, setting Fidelity's

---

[19] Revenue sharing is "a common and acceptable" method for compensating plan administrative service providers. *White*, 2016 WL 4502808, at *14 (quotation omitted); *see also Hecker*, 556 F.3d at 585 (revenue sharing "violates no statute or regulation").

[20] *See* VerGow Decl., Ex. C (Recordkeeping Agmt.), 8th Am., at 8 ($100,000 revenue credit)); *id.*, 10th Am., at 1 ($1.1 million revenue credit)); *id.*, Ex. B (Trust Agmt.), 12th Am., at 11 ($1.2 million rebate).

compensation at a flat per-participant rate and remitting any revenue sharing above that amount to the Plan.[21]  Those contractual amendments—all of which plaintiffs could have readily obtained before filing the Complaint[22]—flatly negate plaintiffs' central theory that defendants imprudently failed "to obtain a reduction in recordkeeping fees, and to rebate any excess expenses paid" through revenue sharing back to the Plan.  Compl. ¶ 106.  And they render implausible plaintiffs' suggested inference that defendants "failed to prudently monitor and control the compensation paid for recordkeeping and administrative services[.]"  *Id.* ¶ 107.

Plaintiffs' unsupported assertion that defendants should have engaged in a competitive bidding process cannot salvage this claim.  As the court recently explained in dismissing similar claims in *White*, 2016 WL 4502808, at *14, ERISA does not require fiduciaries to obtain competitive bids for recordkeepers, and, contrary to the Complaint's suggestion, *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786 (7th Cir. 2011), created no such requirement either.  In *George*, the court simply held that a triable issue of fact existed regarding the fiduciaries' decision not to solicit competitive bids based on extensive evidence that had been adduced in that case.  *Id.* at 798.  *George*'s analysis has no application here, where plaintiffs do not adequately allege that a competitive bid would have done any good, because they allege no facts from which to infer that the same services were available for less expense.  *See*, *e.g.*, *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (Sotomayor, J.) (dismissing excessive fee claim where plaintiffs "fail[ed] to allege that the fees were excessive relative to the services rendered").

---

[21] *Id.* at 7 (setting $33 per-participant fee); *id.*, 13th Am. (setting $52 per-participant fee).

[22] ERISA requires plan administrators to disclose these documents to participants upon request.  *See* 29 U.S.C. § 1021(a).  The very purpose of that requirement is to "giv[e] plan beneficiaries (*i.e.*, prospective plaintiffs) the opportunity to" find the facts necessary to determine whether or not they have a claim.  *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Retirement Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 720 (2d Cir. 2013).

## IV.    PLAINTIFFS DO NOT PLAUSIBLY ALLEGE A PROHIBITED TRANSACTION

Count III asserts that defendants caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a), 29 U.S.C. § 1106(a) by contracting for Fidelity to provide Plan recordkeeping services and causing the Plan to invest in Fidelity-managed mutual funds.

Plaintiffs' claims that defendants violated ERISA § 406(a)(1)(D)—which prohibits a fiduciary from causing a plan to engage in a direct or indirect "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan"[23]—fail, because plaintiffs do not adequately allege that the Plan's fiduciaries intended to benefit Fidelity as opposed to the Plan and its participants.  In contrast to some of ERISA's other prohibited transaction provisions, a fiduciary only violates ERISA § 406(a)(1)(D) if he subjectively intends to benefit a party in interest.[24]  Plaintiffs have not plausibly alleged any such subjective intent here.  The only reasonable inference from defendants' conduct is that they entered into the challenged transactions in order to obtain valuable services and traditional investment options for the Plan, as they were obligated to do.  And this is precisely what the transactions accomplished.  As discussed above, the Court need not credit plaintiffs' irrational speculation that defendants, Fidelity, and Abigail Johnson colluded to benefit Fidelity at participants' expense.  *Supra* at 6–7.

Plaintiffs' claims, in turn, that defendants violated § 406(a)(1)(A) or (C) by causing the Plan to invest in Fidelity-managed mutual funds misapprehends the nature of those transactions. ERISA § 406(a)(1)(A) prohibits the sale or exchange of property between a plan and a party in

---

[23] ERISA § 3(14), 29 U.S.C. § 1002(14), defines "parties in interest" to include several categories of entities and individuals, including service providers to a plan.

[24] *See, e.g.*, *Jordan v. Mich. Conference of Teamsters Welfare Fund*, 207 F.3d 854, 860–61 (6th Cir. 2000)); *Reich v. Compton*, 57 F.3d 270, 279 (3d Cir. 1995); *see also Bauer-Ramazani v. TIAA-CREF*, 2013 WL 6189802, at *9 (D. Vt. 2013) (rejecting § 406(a)(1)(D) claim because "[p]laintiffs have not pointed to any facts demonstrating Defendants knew or should have known the [challenged] practice was a prohibited transaction").

interest.  But when a plan invests in a Fidelity mutual fund, it does not engage in any sale or exchange with Fidelity itself.  As a matter of law, a mutual fund is a standalone "investment company," a distinct legal entity with its own board, separate and apart from its investment manager.  *See, e.g.*, SEC, Off. of Investor Educ. and Advocacy, *Mutual Funds: A Guide for Investors*, at 5–6.  When a plan invests in a mutual fund, it pays monies to the fund in return for shares issued by the investment company itself.  *Id.* at 4.  Such investment is not a sale or exchange between a plan and party in interest because, under ERISA § 3(21)(B), neither the investment company nor its manager is a fiduciary nor party in interest to the plans that invest in its shares.  Likewise, the Plan's investments in Fidelity-managed mutual funds do not violate ERISA § 406(a)(1)(C) because they do not involve any "furnishing of goods, services, or facilities between the plan and a party in interest[.]"  29 U.S.C. § 1106(a)(1)(C).[25]

Finally, plaintiffs' claims that defendants engaged in prohibited transactions by causing the Plan to retain Fidelity's recordkeeping services fail, because ERISA supplies an exemption to its prohibited transaction rules that specifically permits such retentions.  In particular, ERISA § 408(b)(2) exempts reasonable arrangements for plan services so long as no more than reasonable compensation is paid.  While some courts have held that prohibited transaction exemptions are affirmative defenses, *see Braden*, 588 F.3d at 600–01, others have dismissed

---

[25] The Department of Labor has confirmed this interpretation in ruling that a payment by a plan to a mutual fund was not an "exchange of property" with a party in interest, while also noting that the same principle would hold true with respect to ERISA's "furnishing services" prohibition.  *See* 75 FR 56564, 56567 (Sept. 16, 2010) ("[I]t is the Department's view that the [mutual funds] are not parties in interest under [ERISA] with respect to the Plan. . . . A similar analysis would apply to sections 406(a)(1)(B) and (C).").

ERISA § 406 claims on the basis of such exemptions.[26]  Defendants submit that where, as here, plaintiffs allege no basis for extracting their prohibited transaction claims from the safe harbor of a statutory exemption, the claims should be dismissed.  Plaintiffs' only attempt to negate the exemption's application here is to contend that Fidelity's compensation was unreasonable, but, as discussed above, *supra* at 16–17, that theory is speculative and contradicted by the Plan documents.

## V.      PLAINTIFFS' MONITORING CLAIM FAILS

Plaintiffs' final count, Count IV, alleges that defendants breached fiduciary duties by failing to monitor those to whom they delegated fiduciary responsibility.  Compl. ¶¶ 148–154.  Because plaintiffs have failed to show any underlying fiduciary breach, this derivative claim crumbles.  *See, e.g.*, *Rinehart v. Akers*, 722 F.3d 137, 154 (2d Cir. 2013) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor . . .  absent an underlying breach of the duties imposed under ERISA."), *vacated by* 134 S. Ct. 2900 (2014); *White*, 2016 WL 4502808, at *19 (monitoring claims dependent on other claims must be dismissed if others are dismissed).

Count IV should be dismissed even if the other claims survived.  Its conclusory allegation that defendants failed to monitor "[t]o the extent any of MIT's fiduciary responsibilities were delegated to another fiduciary" shows plaintiffs cannot point to any *specific* delegee defendants failed to monitor—a fatal deficiency.  Compl. ¶ 152  Count IV simply lists how the duty to monitor might have been breached, offering no specific allegations.  *See, e.g.*, *id.* ¶ 153 (MIT "fail[ed] to monitor its appointees" or "have a system in place for doing so").  This unadorned recitation of the elements cannot survive dismissal.  *Iqbal*, 556 U.S. at 678.

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed with prejudice.

---

[26] *Leber v. Citigroup*, 2010 WL 935442, at *10 (S.D.N.Y.) ("[W]here the complaint does not allege any basis for presuming that a defendant's conduct fell outside a statutory exemption . . . it is deficient."); *Mehling v. N.Y. Life Ins.*, 163 F. Supp. 2d 502, 510–11 (E.D. Pa. 2001).

Dated:  October 5, 2016

Respectfully Submitted,

DEFENDANTS

By their attorneys,


/s/ Meaghan VerGow
Brian D. Boyle (*pro hac vice*)
Shannon M. Barrett (*pro hac vice*)
Meaghan VerGow (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC, 20006
T: (202) 383-5300
F: (202) 383-5414
bboyle@omm.com
sbarrett@omm.com
mvergow@omm.com

Alison V. Douglass (BBO #646861)
GOODWIN PROCTER, LLP
100 Northern Avenue
Boston, MA 02210
T: (617) 570-1676
F: (617) 523-1231
adouglass@goodwinlaw.com


*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, Meaghan VerGow, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on October 5, 2016.

/s/ Meaghan VerGow
Meaghan VerGow
*Attorney for Defendants*