UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID B. TRACEY, DANIEL
GUENTHER, MARIA T. NICHOLSON
CORRINNE R. FOGG, AND VAHIK
MINAIYAN, Individually and as
Representatives of a Class of
Participants and Beneficiaries
on behalf of the MIT Supplemental
401(k) Plan,
    Plaintiffs,

    v.                              CIVIL ACTION NO.
                                    16-11620-NMG

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, THE MIT SUPPLEMENTAL
401(K) PLAN OVERSIGHT COMMITTEE,
THE ADMINISTRATIVE COMMITTEE,
ISRAEL RUIZ, MARC BERSTEIN, GLENN
DAVID ELLISON, S.P. KOTHARI,
GUNTHER ROLAND, LORRRAINE A. GOFFE-
RUSH, GLEN SHOR, PAMELA WELDON,
THOMAS M. WIEAND, and BARTON ZWIBACH,
    Defendants.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR**
**FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**
**(DOCKET ENTRY # 38)**

**August 31, 2017**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to dismiss filed by

defendants Massachusetts Institute of Technology ("MIT"), the

MIT Supplemental 401(k) Plan Oversight Committee, the

Administrative Committee, Israel Ruiz, Marc Berstein, Glenn

David Ellison, S.P. Kothari, Gunther Roland, Lorraine A. Goffe-

Rush, Glen Shor, Pamela Weldon, Thomas M. Wieand, and Barton

Zwibach ("defendants") under Fed.R.Civ.P. 12(b)(6) ("Rule

12(b)(6)").  (Docket Entry # 38).

PROCEDURAL BACKGROUND

Plaintiffs David B. Tracey, Daniel Guenther, Maria T.

Nicolson, Corrianne R. Fogg, and Vahik Minaiyan, individually

and as representatives of a class of participants and

beneficiaries ("plaintiffs") on behalf of the MIT Supplemental

401(k) Plan ("the Plan"), filed this action alleging a breach of

fiduciary duties and prohibited transactions under the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§

1101-1461.  Plaintiffs seek "to enforce [d]efendants' personal

liability under 29 U.S.C. § 1109(a) to make good to the Plan all

losses resulting from each breach of fiduciary duty and to

restore to the Plan any profits made through [d]efendants' use

of [the] Plan assets."  (Docket Entry # 32, ¶ 4).  Plaintiffs

allege that "[i]nstead of leveraging the Plan's bargaining power

to benefit participants, [d]efendants allowed a conflicted third

party to dictate Plan decisions . . .."  (Docket Entry # 32, ¶

3).  Thus, defendants allowed MIT donor Fidelity Investment, the

Plan's recordkeeper and primary investment provider, to put

hundreds of its proprietary investment funds in the Plan and to

collect unreasonable and excessive fees, all at the expense of

participants' retirement savings.  The amended complaint sets

out causes of action for breach of fiduciary duties under:  (1)

2

29 U.S.C. § 1104(a) ("section 1104") (Count One); (2) 29 U.S.C. § 1105(a) ("section 1105") (Count Two); (3) 29 U.S.C. § 1106 ("section 1106") (Count Three); and (4) 29 U.S.C. § 1109 ("section 1109") (Count Four).

Defendants move to dismiss the amended complaint under Rule 12(b)(6) because:  (1) plaintiffs do not plausibly allege any disloyalty; (2) defendants did not act imprudently in offering participants a wide array of investment choices; (3) plaintiffs fail to allege a plausible claim for excessive recordkeeping expense; (4) plaintiffs do not plausibly allege a prohibited transaction; and (5) plaintiffs' monitoring claim fails. (Docket Entry # 39).

STANDARD OF REVIEW

The standard of review of a Rule 12(b)(6) motion is well established.  To survive a Rule 12(b)(6) motion to dismiss, the complaint "must contain 'enough facts to state a claim to relief that is plausible on its face'" even if actual proof of the facts is improbable.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556, 570 (2007); Millier v. Town of Wenham Massachusetts, 833 F.3d 46, 51 (1st Cir. 2016).  The "standard is 'not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.'"  Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016); Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2016).

3

Taking the facts in the amended complaint as "true and read in a plaintiff's favor even if seemingly incredible," the complaint "must state a plausible, not a merely conceivable, case for relief."  Sepulveda-Villarini v. Dep't of Educ. Of Puerto Rico, 628 F.3d 25, 29 (1st Cir. 2010); see also Hill v. State St. Corp., No. 09-CV-12146-NG, 2011 WL 3420439, at *31 (D. Mass. 2011) (denying Rule 12(b)(6) motion to dismiss ERISA violations because record required further development). "[A]ccepting as true all well-pleaded facts in the complaint and making all reasonable inferences in the plaintiffs' allegations 'must be enough to raise a right to relief above the speculative level.'"  Gorelik v. Costin, 605 F.3d 118, 121 (1st Cir. 2010). "'[B]ald assertions, . . . unsubstantiated conclusions,'" Fantini v. Salem State College, 557 F.3d 22, 26 (1st Cir. 2009), and legal conclusions, see Dixon v. Shamrock Financial Corp., 522 F.3d 76, 79 (1st Cir. 2008) (rejecting unsupported conclusions or interpretations of law in reviewing Rule 12(b)(6) dismissal), are not part of the Rule 12(b)(6) record.

Generally, the standard of judicial review of an ERISA plan administrator's determination of benefits is de novo.  Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 20 (1st Cir. 2014); Brotherston v. Putnam Instruments, LLC, No. 15-CV-13825-WGY, 2016 WL 1397427, at *1 (D. Mass. Apr. 7, 2016).  If "'the benefit plan gives the administrator or fiduciary discretionary

4

authority to determine eligibility benefits or to construe the terms of the plan,'" however, courts apply a deferential standard of review, upholding the decision of the administrator "'unless it is arbitrary, capricious, or an abuse of discretion.'"   Stephanie C. v. Blue Cross Blue Shield of Massachusetts HMO Blue, Inc., 813 F.3d 420, 427 (1st Cir. 2016) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)); see also Sydney v. Sheet Metal Workers' Pension Fund, No. 15-CV-10786-LTS, 2017 WL 507210, at *7 (D. Mass. Feb. 7, 2017) (applying deferential standard of review where plan grants plan administrator or another fiduciary "discretionary authority to construe the terms of the plan" unless administrator's decision is "arbitrary, capricious or an abuse of discretion"). Furthermore, deference "promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation." Id. (quoting Conkright v. Frommert, 559 U.S. 506, 517 (2010)).

In the case at bar, defendants attach a number of documents to a declaration they filed.  (Docket Entry # 40).  Exhibit A includes the 2015 Form 5500 for the MIT Basic Retirement Plan, as obtained from the United States Department of Labor's website.  (Docket Entry # 40-1).  Exhibit B is a copy of the Plan's November 2011 enrollment guide, which was designed to help Plan beneficiaries understand and enroll in the Plan.

5

(Docket Entry # 40-2).  Exhibit C is a copy of the Plan's November 2012 enrollment guide.  (Docket Entry # 40-3).  Exhibit D is a copy of the Amended and Restated Recordkeeping Agreement between MIT and Fidelity, dated October 22, 2001, and amended as provided from the files of MIT.  (Docket Entry # 40-4).  Exhibit E includes the 2015 Form 990 for the Fidelity Investments Charitable Gift Fund (Docket Entry # 40-5), while Exhibit F contains a copy of the 2014 Form 990-PF for the Fidelity Foundation.  (Docket Entry # 40-6).  Exhibit G is a copy of the 2015 Form 990 for the Fidelity Non-Profit Management Foundation, as obtained through the Foundation Center's website.  (Docket Entry # 40-7).  Exhibit H is a copy of the Trust Agreement, dated January 1, 1999, between MIT and Fidelity, with subsequent amendments.  (Docket Entry ## 40-8, 40-9).  Exhibit I is a December 1, 2013 copy of the Wells Fargo Advantage Large Cap Growth Fund Summary Prospectus, which is publicly available on the U.S. Securities and Exchange Commission ("SEC") website.  (Docket Entry # 40-10).  Exhibit J is a January 31, 2013 copy of the Calvert Equity Portfolio Summary Prospectus, which is also publicly available on the SEC website.  (Docket Entry # 40-11).  Exhibit K is a March 28, 2013 copy of the Vanguard Institutional Index Fund Summary Prospectus, which is publicly available on the SEC website.  (Docket Entry # 40-12).  Finally, Exhibit L is a copy of the Fidelity Large Cap Core Enhanced Index Fund

6

Summary Prospectus, dated April 29, 2013, which is also publicly available on the SEC website.  (Docket Entry # 40-13).

The 2015 Form 5500 for the MIT Basic Retirement Plan (Docket Entry # 40-1) and the last four exhibits (Docket Entry # 40-10 to # 40-13) consist of documents publicly available on a government website.  In adjudicating a Rule 12(b)(6) motion, a court may consider "public disclosure documents required by law to be, and that have been, filed . . .."  In re WorldCom, Inc., 263 F. Supp. 2d 745, 756 (S.D.N.Y. 2003) (citing Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)); see also Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (courts consider "official public records" as part of "narrow exceptions for documents" that they may consider).  In Finn v. Barney, the plaintiffs contended that the district court improperly considered various documents, including:  an SEC Order disclosing auction practices of investment brokers; news articles pertaining to the SEC Order; and sections of a website disclosing descriptions of a broker's auction practices and confirmation documents.  Finn v. Barney, 471 F.App'x 30, 32 (2d Cir. 2012).  The Finn court disagreed with the plaintiffs, holding that district courts can "take judicial notice of documents where the documents 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  Finn, 471 F.App'x 30, 32 (2d Cir. 2012) (quoting Fed.R.Evid. 201(b)(2)).  Accordingly,

Exhibits A, I, J, K, and L are properly considered part of the Rule 12(b)(6) record as public documents.

Turning to the remaining documents, plaintiffs oppose the inclusion of documents outside the complaint. (Docket Entry # 46). They argue that MIT's utilization of recordkeeping contracts "is improper because the complaint does not refer to them, they are not central to Plaintiffs' claims, and they are not public records."[1] (Docket Entry # 46, p. 25). Plaintiffs oppose the inclusion of Fidelity's recordkeeping and administrative contract with the Plan. (Docket Entry # 46). Plaintiffs maintain that it affords them no opportunity to cross-examine MIT as to the circumstances of the negotiations and that Fidelity plausibly initiated token amendments to the agreements because of ongoing litigation pertaining to excessive administrative and recordkeeping fees.[2] (Docket Entry # 46, pp. 25-26). Plaintiffs cite Kruger v. Novant Health, Inc. to support their assertion that it is improper to consider the administrative fee arrangements. (Docket Entry # 46). In

---

[1] Plaintiffs' reliance on In re Fidelity ERISA Float Litig., 829 F.3d 55, 60-61 (1st Cir. 2016), is inappropriate inasmuch as it does not address the admissibility of recordkeeping contracts.

[2] Plaintiffs cite Tussey v. ABB, Inc., in which the court upheld the district court's decision that "the ABB fiduciaries breached their duties to the Plan by failing diligently to investigate Fidelity and monitor Plan recordkeeping costs based on the ABB fiduciaries' specific failings in the case." Tussey v. ABB, Inc., 746 F.3d 327, 336 (8th Cir. 2014).

Kruger, the plaintiffs alleged that the defendant plan administrators breached their fiduciary duty when they allowed the plan to compensate the president of the brokerage firm at unreasonable and excessive levels while also lacking a prudent process to assess the reasonableness of that compensation. Kruger v. Novant Health, Inc., 131 F.Supp. 3d 470, 479 (M.D.N.C. 2015). The plaintiffs challenged the admissibility of documents cited by the defendants. Id. at 480. The Kruger court did not admit these documents because they had neither been filed publicly, nor referenced specifically in the complaint. Id.

Defendants maintain that, while plaintiffs criticize Fidelity's recordkeeping and administrative arrangement with the Plan, plaintiffs have deliberately avoided explicit mention of the contracts establishing that arrangement. (Docket Entry # 49, pp. 11-12). Defendants rely on Beddall v. State St. Bank & Trust Co., in which the court held that its inquiry into the viability of a plaintiff's allegations "should not be hamstrung simply because the plaintiff fails to append to the complaint the very document upon which *by her own admission* the allegations rest." Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998) (emphasis in original). A plaintiff cannot "thwart the consideration of a critical document merely by omitting it from the complaint." Id. The Beddall court doubted that the drafters of the Federal Rules of Civil

Procedure would have accepted any such approach that "would seriously hinder recourse to Rule 12 motions." Id.

Defendants emphasize that the recordkeeping and administrative contracts between Fidelity and MIT are central to the plaintiffs' claims attacking that arrangement's very terms. (Docket Entry # 49). They cite Watterson v. Page in support of their contention that courts may consider "documents central to plaintiffs' claim; or . . . documents sufficiently referred to in the complaint." Watterson, 987 F.2d at 3. In Watterson, the plaintiffs attached public documents to an opposition they filed to a 12(b)(6) motion. Id. As explained in Watterson, courts "have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents referred to in the complaint." Id. The Watterson court determined that these elements were not only present, but that the plaintiffs also had introduced the documents themselves, eliminating the lack of notice typically faced by similarly situated plaintiffs when a court reviews extraneous material to a complaint. Id. at 4. The court, therefore, treated the documents attached by the plaintiffs as part of the pleadings. Id.; see also Columbia Air Servs., Inc. v. Fidelity Mgmt. Trust Co., No. 07-CV-11344-GAO 2008 WL 4457861, at *2 (D. Mass. 2008) (courts can consider "any documents to which the

10

complaint's factual allegations are linked" since they "effectively merge" into pleadings); <u>Kinsella v. Wyman Charter Corp.</u>, 417 F.Supp. 2d 159 (D. Mass. 2006) ("authentic documents, official public records and documents that are either pivotal to the plaintiff's claim or sufficiently referred to in the complaint" are admissible).

In evaluating a Rule 12(b)(6) motion, the court may consider a limited category of documents outside the complaint without converting the motion into one for summary judgment.  As indicated in <u>Watterson</u>, such documents include public records and documents sufficiently referred to in the complaint.  <u>See Butler v. Balolia</u>, 736 F.3d 609, 611 (1st Cir. 2013) (supplementing facts in complaint "by examining 'documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice'"); <u>Freeman v. Town of Hudson</u>, 714 F.3d 29, 36 (1st Cir. 2013) (court may consider "'official public records; documents central to plaintiffs' claim; and documents sufficiently referred to in the complaint'") (ellipses and internal brackets omitted); <u>Giragosian v. Ryan</u>, 547 F.3d 59, 65-66 (1st Cir. 2008) (can consider documents relied on in complaint, public records, and other documents subject to judicial notice).

Narrow exceptions therefore exist "'for documents the authenticity of which are not disputed by the parties; for

official public records; for documents central to plaintiffs'
claim; or for documents sufficiently referred to in the
complaint.'" Alternative Energy, Inc. v. St. Paul Fire & Marine
Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (quoting Watterson,
987 F.2d at 3); see also Foley v. Wells Fargo Bank, N.A., 772
F.3d 63, 72 (1st Cir. 2014) (courts have leeway to consider
documents outside complaint to promote judicial efficiency).  A
defendant may also introduce an exhibit as part of his or her
motion attacking a plaintiff's pleading "'when [the] plaintiff
fails to introduce a pertinent document as part of his [or her]
pleading.'" O'Rourke v. Hampshire Council of Governments, 121
F.Supp. 3d 264, 276 (D. Mass. 2015) (quoting Fudge v. Penthouse
Int'l, Ltd., 840 F.2d 1012, 1015 (1st Cir. 1988)).

     The First Circuit in Beddall v. State St. Bank & Trust Co.
opted for a "practical, commonsense approach" that does not
"elevate form over substance" with regards to the district
court's authority to consider a trust agreement that was not
appended to a complaint when dismissing an ERISA complaint.
Beddall, 137 F.3d at 16.  The court held that, when "a
complaint's factual allegations are expressly linked to — and
admittedly dependent upon – a document (that authenticity of
which is not challenged), that document effectively merges into
the pleadings" and can be reviewed by a trial court in deciding
a Rule 12(b)(6) motion.  Id.  The court reasoned that a district

court should not be prevented from evaluating the sufficiency of a complaint's alleged facts simply because the plaintiff failed to attach the document upon which his or her allegation depends on.  Id.; see also Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993) (documents attached to motion to dismiss considered part of pleadings if referred to in complaint and central to plaintiff's claim).

A document whose authenticity is not challenged by the parties "'merges into the pleadings'" and can be considered by the court under a motion to dismiss.  Alternative Energy, Inc., 267 F.3d at 33 (quoting Beddall, 137 F.3d at 17).  Thus, the court in Clorox Co. P.R. v. Proctor & Gamble Commercial Co. examined "hundreds of pages of exhibits appended to the various complaints and submitted in support of motions to dismiss and motions for and against preliminary injunction."  Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000).  These exhibits included internal company memoranda, letters between the parties, consumer survey data, and depositions of expert witnesses.  Id.  The court held that on a 12(b)(6) motion to dismiss, it "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment."  Id.; see also Cortec Indus., Inc. v. Sum Holding

13

L.P., 949 F.2d 42, 48 (2d Cir. 1991) ("Where plaintiff has
actual notice of all the information in the movant's papers and
has relied upon these documents in framing the complaint the
necessity of translating a Rule 12(b)(6) motion into one under
Rule 56 is largely dissipated").

This Court agrees with defendants that the recordkeeping
and administrative contracts between Fidelity and MIT are
central to plaintiffs' claims, which attack the agreements' very
terms.  In the case at bar, unlike Watterson, defendants, rather
than plaintiffs, attached extraneous documents in a 12(b)(6)
motion.  Watterson, 987 F.2d at 3.  Nevertheless, like the
admitted exhibits in Watterson, the authenticity of the Plan's
contracts, amendments, and literature are not at question.  The
entirety of these documents is unquestionably central to
plaintiffs' claims and are necessary to investigate the nature
of the relationship between MIT and Fidelity as it relates to
the Plan's beneficiaries, whether or not MIT entered into token
agreements that hurt plaintiffs, and whether or not the Plan's
agreements manifest prudent care.  Furthermore, because ERISA
"make[s] explicit and repeated reference to plan documents" with
respect to fiduciary duties, it is appropriate to consider such
documents at the dismissal stage.  Kling v. Fidelity Mgmt. Trust
Co., 270 F.Supp. 2d 132, 127—28 (D. Mass. 2004).  Thus, if this
court were to deny admission of defendants' documents, it would

hamstring the court's inquiry into the viability of plaintiffs'
own allegations.  See Beddall, at 17.  Accordingly, these
documents are part of the Rule 12(b)(6) record.

## FACTUAL BACKGROUND

In December 1998, defendants appointed Fidelity Investments
to render recordkeeping and administrative services to the Plan.
(Docket Entry # 32, p. 30, ¶ 77).  Fidelity, which remains the
Plan's recordkeeper and continues to be compensated for its
services, is a privately-owned, Boston-based financial services
company providing investment services to individual and
institutional clients.  (Docket Entry # 32, p. 29, ¶ 76).
Edward C. Johnson II founded the company and the Johnson family
has continued to preside over it.  (Docket Entry # 32, p. 29, ¶
76).  Abigail Johnson is Fidelity's current chief executive
officer ("CEO"), having taken over for her father, Edward C.
Johnson III, who served as CEO until 2014.  (Docket Entry # 32,
p. 29, ¶ 76).

Abigail Johnson has served as a member of MIT's Board of
Trustees since 2007.  (Docket Entry # 32, p. 32, ¶ 83).  She
chairs the visiting committee of the MIT Sloan School of
Management and is tasked with maximizing the school's revenue.
(Docket Entry # 32, pp. 32-33, ¶¶ 83, 85).  The Board of

Trustees, which is the named fiduciary to the Plan,[3] "'hold[s] a
fiduciary duty to govern MIT, to oversee the stewardship of
MIT's assets for MIT's present and perpetual well-being and
stability, and to ensure that MIT adheres to the purposes for
which it was established.'"  (Docket Entry # 32, p. 32, ¶ 83).
Abigail Johnson has facilitated donations to MIT from her family
and Fidelity.  (Docket Entry # 32, pp. 32-33, ¶ 85).  According
to MIT's President, L. Rafael Reif, Abigail Johnson gave the
university "'high-level guidance on the financial situation'" in
the aftermath of the 2008 financial crisis.  (Docket Entry # 32,
p. 32, ¶ 84).

Fidelity has utilized its philanthropic arm, Fidelity
Foundation, to donate funds to MIT and many other nonprofit
organizations and universities.  (Docket Entry # 40-6).  In
2014, Fidelity Foundation donated grants and assistance in the
amount of $14,028,753.31.  (Docket Entry # 40-6, p. 99).  That
same year, Fidelity donated $3,500 to defendants for the purpose

---

[3]  MIT's Board of Trustees is the fiduciary of the Plan.  (Docket
Entry # 40-4).  In a trust agreement between MIT and Fidelity,
the two parties agree that "the Massachusetts Institute of
Technology (the 'Named Fiduciary') is the named fiduciary of the
Plan (within the meaning of Section 402(a) of the Employee
Retirement Income Security Act of 1974, as amended . . .."
(Docket Entry # 40-8, p. 5).  Furthermore, they agree that
Fidelity "shall not perform any service that Fidelity, in its
sole judgment, considers might cause Fidelity to be treated as a
'Fiduciary' of the Plan (within the meaning of Section 3(21)(A)
of ERISA)."  (Docket Entry # 40-4, p. 3).

of "Operating Support." (Docket Entry # 40-6, p. 92). In addition, in 2014, the Fidelity Investments Charitable Gift Fund granted $2,812,198,298 to 103,015 different section 501(C)(3) domestic organizations and government organizations. (Docket Entry # 40-5, p. 36).

The Plan is a defined-contribution plan covering all of defendants' employees, except "those employees specifically excluded by the Plan Document," as governed by the Internal Revenue Code (the "IRS"), 26 U.S.C. §§ 401(a) and 501(a). (Docket Entry # 40-1, p. 32).[4] The Plan's administrative costs are "limited to outside service provider expenses, including fees for investment advisors, benefit payment administrators,

---

[4] According to the 2015 Form 5500 for the MIT Basic Retirement Plan, the "Plan and its related Trust are intended to qualify as a defined benefit plan and trust under the Internal Revenue Code (the 'IRC') sections 401(a) and 501(a)." (Docket Entry # 40-1, p. 32). Certain defined-benefit plans are treated as defined-contribution plans, 26 U.S.C. § 414(k), and such is the case here. A defined-contribution plan is a "pension plan which provides for an individual account for each participant and for benefits based solely on the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34); 26 U.S.C. § 414(i). Both the employer and employee may contribute to the plan and "'the employer's contribution is fixed and the employee receives whatever level of benefits the amount contributed on his behalf will provide.'" Hughes Aircraft Co. v. Johnson, 525 U.S. 432, 439 (1999) (quoting Nachman Corp. v. Pension Ben. Guar. Corp., 446 U.S. 359, 364 (1980)). Since MIT makes a matching contribution of up to 5% of the employee's salary (Docket Entry # 40-2, pp. 4-5), the Plan therefore qualifies as a defined-contribution plan.

the custodian, actuary, attorneys and auditors." (Docket Entry # 40-1, p. 37). The Plan's 2011 enrollment guide informed beneficiaries that "[f]or every dollar . . . contribute[d] to MIT's 401(k) Plan, MIT will make a matching contribution up to the first 5% of . . . [the beneficiary's] salary." (Docket Entry # 40-2, p. 4). For instance, if an employee contributes 5%, defendants match that contribution for a total contribution of 10%. (Docket Entry # 40-2, p. 4). By July 2015, the Plan consisted of 340 investment options and over 18,000 participants. (Docket Entry # 32, p. 28, ¶ 70) (Docket Entry # 32, pp. 99-100, ¶ 145).

The record-keeping agreement between defendants and Fidelity indicates that it is subject to amendment or modification by either party at any time. (Docket Entry # 40-4, p. 7). As of October 2015, the two parties had amended their agreement 13 times. (Docket Entry # 40-9). The twelfth amendment to the trust agreement between Fidelity and defendants, signed in April 2014, adopted a $33 annual participant fee, billed and payable quarterly. (Docket Entry # 40-9, p. 24). The thirteenth amendment to the trust agreement between Fidelity and defendants increased the annual participant fee to $52 per participant. (Docket Entry # 40-9, pp. 39-40).

Prior to April 1, 1999, defendants had incurred all the Plan's investment expense charges. (Docket Entry # 32, p. 30, ¶

18

78).  Effective April 1, 1999, Fidelity started providing its administrative and recordkeeping services to the Plan, becoming the Plan's primary provider of mutual fund options for 16 years. (Docket Entry # 32, p. 30, ¶ 79).  In addition, on that date, defendants transferred to the Plan's participants the responsibility for payment of investment expense charges. (Docket Entry # 32, p. 30, ¶ 78).  These expense payments largely manifested as additional fees paid to Fidelity.  (Docket Entry # 32, p. 30, ¶ 78).  Plaintiffs allege that defendants also permitted Fidelity to incorporate many of its proprietary investment funds into the Plan, which in turn, generated investment management fees paid out to Fidelity.  (Docket Entry # 32, p. 30, ¶ 79).  By 2013, the cost of investing $10,000 in Fidelity's shares for a 5% annual return was as follows:  $46 at year one; $144 at year three; $252 at year five; and $567 at year ten.  (Docket Entry # 40-13, p. 2).[5]

The Plan's investment options included the following asset classes:  "target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, fixed income, money market,

_____

[5]  By contrast, in the same calendar year, the cost of investing $10,000 in Vanguard Institutional Index Fund's Institutional Shares at a return of 5% annual return was as follows:  $4 at year one; $13 at year three; $23 at year five; and $51 at year ten.  (Docket Entry # 40-12, p. 5).

real estate, sector funds, and stable value." (Docket Entry #
32, p. 28, ¶ 70). The Plan contained four categories, or tiers,
consisting of the aforementioned investment options: "Life
Cycle Options, MIT Asset Class Options, MIT Investment Window,
and BrokerageLink." (Docket Entry # 40-2, p. 12). The first
tier, Life Cycle Options, was composed of low risk, low expense
collective trusts. (Docket Entry # 39, p. 9). It was "designed
for investors expecting to retire around the year indicated in
each investment option's name. The investment options are
managed to gradually become more conservative over time."
(Docket Entry # 40-2, p. 9). The Vanguard Target Retirement
Trusts that fell under the life cycle investment options helped
take the guesswork out of the employee's investing by giving the
employee "broad diversification" that was appropriate for the
employee's "age and life stage, up to and including retirement,
in one investment option." (Docket Entry # 40-2, p. 12) (Docket
Entry # 40-3, p. 12). The second tier, MIT Asset Class Options,
offered an employee seven investment options composed of the
primary asset classes (stocks, bonds, and short-term
investments) ranging from options with less investment risk and
more inflation risk to those that posed more investment risk and
less inflation risk. (Docket Entry # 40-2, p. 14) (Docket Entry
# 40-3, p. 14). The third plan, MIT Investment Window, offered
a wide range of investments for an employee who understood how

20

to research and analyze his or her own investments.  (Docket
Entry # 40-2, pp. 15-20) (Docket Entry # 40-3, pp. 15-20).
Finally, Fidelity BrokerageLink was a self-directed brokerage
account that provided an employee the opportunity to more
actively manage his or her retirement account over an expanded
menu of investment choices.  (Docket Entry # 40-2, p. 21)
(Docket Entry # 40-3, p. 21).

Defendants' investment packages included various options
from every investment style and major asset class.  (Docket
Entry # 32, p. 38, ¶ 97).  Prior to July 2015, the Plan had 340
options, more than 300 of which were mutual funds, while many
others were retail share classes.  (Docket Entry # 32, p. 28, ¶¶
70-72).  By comparison, in 2014, defined contribution plans had
an average of 15 investment options, excluding target date
funds, according to Callan Investments Institute's 2015 Defined
Contribution Trends survey.  (Docket Entry # 32, pp. 34-35, ¶
90).  Of those 300 mutual funds, 180 were managed by Fidelity.
(Docket Entry # 32, p. 28, ¶ 71).  The Plan's other investment
options include collective trusts and two custom funds, which
also invest in underlying mutual funds or collective trusts.
(Docket Entry # 32, p. 29, ¶ 74).

The Plan's mutual funds incur various investment management
costs.  (Docket Entry # 32, pp. 28-29, ¶ 73).  Some of these
mutual funds' management charges include marketing and

21

distributions costs.  (Docket Entry # 32, pp. 28-29, ¶ 73).  The
Plan's participants are among all of the mutual fund
shareholders who pay for the fees associated with marketing the
funds' retirement plan to the general public.  (Docket Entry #
32, pp. 28-29, ¶ 73).  Other mutual funds that did not include
such marketing costs were allegedly available to defendants.
(Docket Entry # 32, pp. 28-29, ¶ 73).

Defendants included multiple passively and actively managed
investment options in the Plan.  (Docket Entry # 32, p. 38, ¶¶
97-98).  Generally, the investment manager of a passively
managed, or "index," fund does not handpick individual
securities and instead relies on securities automatically
selected to mirror an index.  (Docket Entry # 32, pp. 16-17, ¶
44).  The Plan's large cap blend asset class contained five
index funds, including three managed by Fidelity.  (Docket Entry
# 32, p. 38, ¶ 98).  By contrast, an investment manager
overlooking an actively managed fund utilizes his or her
judgment to purchase and sell individual securities in order to
generate returns that beat a benchmark index.  (Docket Entry #
32, pp. 16-17, ¶ 44).  Index fund fees are lower than those of
actively managed options because they do not entail any
individualized stock selection or research.  (Docket Entry # 32,
p. 38, ¶ 98).

On July 20, 2015, defendants removed hundreds of mutual funds from tier three of the Plan, transforming the 340-option menu into one containing 37 core options. (Docket Entry # 32, p. 39, ¶ 101). Only one of those core investment options is managed by Fidelity. (Docket Entry # 32, p. 113, ¶ 170). In the process, defendants picked several actively managed mutual fund options. (Docket Entry # 32, pp. 95-96, ¶ 132). Some of the investment managers, such as Dimensional Fund Advisors LLP and Dodge & Cox, offer separately managed accounts in the same investment styles at lower costs than those of the Plan from Fidelity. (Docket Entry # 32, pp. 95-96, ¶ 132).

On July 20, 2015, defendants also removed 41 Fidelity sector (or "select") funds and ten Fidelity international specialty funds and mapped their assets to the Vanguard target date funds, which cost less. (Docket Entry # 32, pp. 65-66, ¶ 106). Fidelity select funds invest in securities issued by companies concentrated in a specific economic sector. (Docket Entry # 32, pp. 65-66, ¶ 106). Examples of the Fidelity select funds include: the Fidelity Select Energy Fund, the Fidelity Select Energy Services Fund, the Fidelity Select Gold Fund, the Fidelity Select Natural Gas Fund, and the Fidelity Select Natural Resources Fund. (Docket Entry # 32, pp. 65-66, ¶ 106). The Fidelity international specialty funds invest in companies situated in specific countries or global regions. (Docket Entry

# 32, pp. 65-66, ¶ 106).   Examples of the Fidelity international
specialty funds include:  the Fidelity Canada Fund, the Fidelity
China Region Fund, the Fidelity Emerging Asia Fund, the Fidelity
Europe Fund, the Fidelity Japan Fund, and the Fidelity Latin
American Fund.  (Docket Entry # 32, pp. 65-66, ¶ 106).

Defendants have packaged collective trusts, such as the
target date funds called Target Retirement Trust II funds, in
the Plan since at least 2010.  (Docket Entry # 32, p. 98, ¶
140).  Such collective trusts commonly feature in large 401(k)
plans and entail lower investment management fees than the
Plan's mutual funds.  (Docket Entry # 32, p. 97, ¶ 136).
Defendants started including the Retirement Trust Plus Funds,
which incur 36% less in fees than the Target Retirement Trust II
funds, in 2015.  (Docket Entry # 32, p. 98, ¶ 140).  Moreover,
the Fidelity Freedom Funds charged between 39 and 84 bps before
they were removed in July 2015.  (Docket Entry # 32, p. 98, ¶
140).

In addition, between 2009 and 2014, the Plan's assets
increased from $2.02 billion to at least $3.8 billion.  (Docket
Entry # 32, pp. 102-103, ¶ 154).  Both the Plan's Form 5500,
which is filed with the Department of Labor, and the rates of
revenue-sharing paid to Fidelity for recordkeeping indicate that
the Plan annually paid Fidelity up to $3 million between 2010
and 2014.  (Docket Entry # 32, p. 102, ¶ 153).  Fidelity's

compensation has been based on direct payments from the Plan, as well as revenue sharing payments from its investment options. (Docket Entry # 32, p. 21, ¶ 54).  Fidelity and non-Fidelity mutual fund options generated between three and 55 bps in revenue sharing for Fidelity.  (Docket Entry # 32, p. 101, ¶ 149).  Furthermore, Fidelity received compensation from securities lending revenue, distribution fees, redemption fees, and indirect compensation, including float.  (Docket Entry # 32, p. 101, ¶ 150).

Defendants cited three reasons for the Plan's changes in 2015:  (1) to "[p]osition MIT for increasingly demanding legal and regulatory standards applicable to 401(k) plans"; (2) to "[c]reate opportunities for lower investment costs and higher overall value to participants by consolidating assets into fewer funds"; and (3) to "offer enough choices to accommodate [MIT's] diverse community while making it easier for participants to choose cost-effective options that fit their personal goals, financial profile and risk tolerance."  (Docket Entry # 32, pp. 67-68, ¶ 110).  Defendants justified the Plan's revised investment lineup, stating it allowed the Plan to "'[l]everage MIT's institutional purchasing power to offer both passively and actively managed options at the best possible cost for participants,'" and to provide funds "'in a better share class

with lower fees'" in some cases.  (Docket Entry # 32) (emphasis omitted).

## DISCUSSION

### A.  ERISA Fiduciary Standards

ERISA, a "comprehensive and reticulated statute," governs private employee benefit systems, including retirement plans. Mertens v. Hewitt Assocs., 508 U.S. 248, 251 (1993).  It was designed by Congress to "promote the interests of employees and their beneficiaries in employee benefit plans."  Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983).  The Supreme Court in Nachman observed ERISA's assurance that, "if a worker has been promised a defined pension benefit upon retirement-and if he has fulfilled whatever conditions are required to obtain a vested benefit-he actually will receive it."  Nachman Corp. v. Pension Ben. Guar. Corp., 446 U.S. 359, 375 (1980).  Plan fiduciaries under ERISA "'are assigned a number of detailed duties and responsibilities, which include the proper management, administration and investment of plan assets, the maintenance of proper records, the disclosure of specific information, and the avoidance of conflicts of interest.'"  DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 417 (4th Cir. 2007) (quoting Mertens, 508 U.S. at 251 (internal quotation marks and alterations omitted)).

### B.  Excessive Investment Management Fees and Prudent Man Standard of Care (Count One)

26

In Count One, plaintiffs allege that defendants' investment management fees and performance losses were unreasonable under section 1104(a), thereby breaching the twin fiduciaries duties of prudence and loyalty to the Plan's beneficiaries.  Plaintiffs assert that defendants selected and retained Plan investment options with excessive investment management fees instead of identical, lower-cost share classes of the same funds. Furthermore, plaintiffs claim that defendants knew or should have known that providing numerous actively managed funds in the same investment style would result in high fees and significant underperformance.  Defendants assert that they did not breach their fiduciary duty because the Plan offered an array of different investment options with a wide range of expenses.

ERISA establishes a prudent man standard of care, requiring that a fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—for the exclusive purpose of:  providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A) (2000); see also Johnson v. Fujitsu Tech. & Bus. Of Am., Inc., 2017 U.S.Dist. LEXIS 73132, at *10-11 (N.D. Cal. Apr. 11, 2017) (fiduciaries' general duties include performance of duties with prudence and only in participants' interest for exclusive purpose of providing participants their benefits).  Furthermore,

a fiduciary shall act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  The prudent person standard in section 1104 is an objective standard "that focuses on the fiduciary's conduct preceding the challenged decision."  Braden v. Wal-Mart Stores, Inc. 588 F.3d 585, 595 (8th Cir. 2009); Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 917 (8th Cir. 1994) (citing Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984)).

In order to state a claim under this provision, plaintiffs must establish a prima facie showing:  (1) that defendants acted as the Plan's fiduciary; (2) that defendants breached their fiduciary duties; and (3) that the breach caused a loss to the Plan.[6]  Pegram v. Herdich, 530 U.S. 211, 225-26 (2000); Braden,

---

[6]  Under 29 U.S.C. § 1132(a)(2), a beneficiary may seek appropriate relief from a breach in a fiduciary's liability to a plan pursuant to section 1109.  Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial

588 F.3d at 594.  Here, neither party disputes that "the Massachusetts Institute of Technology ('the Named Fiduciary') is the named fiduciary of the Plan []within the meaning of Section 402(a) of the Employee Retirement Income Security Act of 1974, as amended . . .."  (Docket Entry # 40-8, p. 5).  Therefore, only the issue of breach is in dispute here.[7]

In evaluating whether or not a fiduciary acted prudently, courts focus on the fiduciary's decision-making process rather than the results of those decisions.  See Braden, 588 F.3d at 595; Glass Dimensions, Inc. v. State Street Bank & Trust Co., 931 F.Supp. 2d 296, 305 (D. Mass. 2013); see also Howard v. Shay, 100 F.3d 1484, 1488 (9th Cir. 1996) ("court focuses not only on the merits of [a] transaction, but also on the thoroughness of the investigation into the merits of [that] investigation"); Schaefer v. Ark. Med. Soc'y, 853 F.2d 1487, 1492 (8th Cir. 1988) (fiduciaries must "investigate all decisions that will affect the pension plan").  Moreover, good faith is not a sufficient defense to a claim of breach of fiduciary duties.  See DiFelice, 497 F.3d at 418.  Simply

---

relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

[7]  Plaintiffs assert that Plan losses resulting from a breach in fiduciary duty are continuing and will be determined at trial after discovery is complete.  (Docket Entry # 32, p. 114, ¶ 173).

stated, "a pure heart and an empty head are not enough." Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983).

The Third, Seventh, and Eight Circuits have adopted an analytical framework to evaluate an ERISA breach of fiduciary duty claim pertaining to the selection and maintenance of investment options in a defined contribution plan. See Renfro v. Unisys Corp., 671 F.3d 314, 326-27 (3rd Cir. 2012). For example, in Hecker v. Deere & Co., 556 F.3d 575 (7th Cir. 2009), Braden, and Renfro, the courts measured the "characteristics of the mix and range of options and then evaluated the plausibility of claims challenging fund selection against the backdrop of the reasonableness of the mix and range of investment options." Renfro v. Unisys Corp., 671 F.3d at 326-27.

In Hecker, the plaintiff employees contended that the defendant employer breached its fiduciary duty by selecting investment options with excessive fees. Hecker, 556 F.3d at 586. The employer offered its employees 20 Fidelity mutual funds and 2,500 other funds – all also offered to investors in the general public – with a wide range of expense ratios, ranging from .07% to just over 1%. Id. The court held that, "the fact that some other fund might have lower expense ratios is beside the point." Id. By offering a wide range of options that were also offered publicly, the defendant's plan complied with ERISA. Id. Nothing in ERISA requires a fiduciary to

"'scour the market to find and offer the cheapest possible fund,'" which itself might be beset by other flaws.  Loomis v. Exelon Corp., 658 F.3d 667, 670 (7th Cir. 2011) (quoting Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009)); accord Brotherston v. Putnam Investments, LLC, No. 15-CV-13825-WGY, 2017 WL 1196648, at *6 (D. Mass. Mar. 30, 2017).  By contrast, the court in Braden examined a plan that contained ten mutual funds, Wal-Mart common stock, a common/collective trust, and a stable value fund.  Braden, 588 F.3d at 589, 596.  The court determined that a far narrower range of investment options like those presented posed a more plausible claim for imprudent management.  Id.

In Renfro, the plan at issue contained 73 different investment options, which included company stock, commingled funds, and retail mutual funds with various risk and fee profiles.  Renfro, 671 F.3d at 327.  The court observed that the range of investment options more closely resembled the extensive plan analyzed by the Hecker court than the narrower menu of options offered by the plan in Braden.  Id.  In light of this reasonable range of investment options, the Renfro court held that the plaintiffs asserted conclusory assertions and fell short of plausibly alleging a breach of fiduciary duty.  Id. at 328.

31

Accordingly, the "range of investment options and the characteristics of those included options" can be very pertinent, and "readily ascertainable facts against which the plausibility of claims challenging the overall composition of a plan's mix and range of investment options should be measured." Renfro, 671 F.3d at 327; see also Brotherston v. Putnam Investments, LLC, 2017 WL 1196648, at *6 (noting, in context of summary judgment motion, that "[i]mportantly, ERISA does not require a fiduciary to maximize the value of investments or 'follow a detailed step by step process to analyze investment options'").  In the case at bar, defendants' four tiers of investment packages included various options from every investment style and major asset class.  (Docket Entry # 32, p. 37, ¶ 96).  Prior to July 2015, the Plan had 340 options, more than 300 of which were mutual funds, while many others were retail share classes.  (Docket Entry # 32, p. 28, ¶¶ 71-72).  Of those 300 mutual funds, 180 were managed by Fidelity.  (Docket Entry # 32, p. 28, ¶ 71).  Hence, the range of investment options offered by defendants more closely resembles the extensive plans analyzed by the courts in Hecker and Renfro than the narrower menu of options observed by the Braden court. Thus, any blanket assertion by plaintiffs that defendants acted imprudently by offering too many options and thereby causing consumers decision paralysis lacks merit.

32

Defendants, however, correctly assert that the Seventh Circuit decisions in Hecker and Loomis are not controlling in all circumstances.  In Bell v. Pension Comm. Of ATH Holding Co., the defendants restructured a defined contribution plan that offered 26 various investment options and replaced higher-cost share classes with lower-cost alternatives.  Bell v. Pension Comm. Of ATH Holding Co., No. 15-2062, 2017 U.S.Dist.LEXIS 42107, at *2-4 (S.D.Ind. Mar. 23, 2017).  The defendants in Bell filed a motion to dismiss against five of the plaintiff's charges, including the assertion that the defendants breached their fiduciary duty by causing the plan to pay unreasonable investment management expenses during the relevant period.  Id.  The court held that the allegations set forth were sufficient to survive a motion to dismiss because neither the court in Hecker nor the court in Loomis addressed "whether a defendant violates their fiduciary duty in selecting high-cost investment options where *identical* investment options are available at a lower-cost."  Id. at *11 (emphasis in original).

In Terraza v. Safeway Inc., the court further distinguishes the Seventh Court decisions in Hecker and Loomis by discussing "several infirmities" in the argument.  Terraza v. Safeway Inc., No. 16-3994, 2017 U.S.Dist.LEXIS 35732, at *40-48 (N.D. Cal. Mar. 13, 2017).  First, the Terraza court noted that presumptions of prudence in ERISA cases, opting instead for

33

"'careful, context-sensitive scrutiny of a complaint's allegations'" in order to "'divide the plausible sheep from the meritless goats.'"  Id. at *41 (quoting Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2470 (2014)).  Second, the Terraza court explained that Hecker and Loomis entailed challenges to the overall range of each respective investment portfolio instead of a challenge to the fiduciary's decision to include a specific investment option in the plan.  Id. at *44. For example, the Renfro plaintiffs contested not "'the prudence of the inclusion of any particular investment option,'" but instead the "plan's mix and range of investment options.'"  Id. (quoting Renfro, 671 F.3d at 325-28).  In addition, the courts in Hecker and Loomis held that the range of the investment plans' expense ratios was reasonable, but did not address how a fiduciary's decision to include a specific option with an expense ratio within a reasonable range is always reasonable as a matter of law.  Id. at *45.  By contrast, the Terraza plaintiff's allegations pertaining to excessive fees revolved around the inclusion of specific investment options, rendering the overall expense ratio range less relevant to that case.  Id. at 45-46.

In the case at bar, plaintiffs' allegations more closely resemble those of the Terraza plaintiff.  Here, for example, plaintiffs assert that defendants used higher-cost, retail-class

mutual funds instead of identical, lower-cost alternatives, such
as institutional share classes, separate accounts, or collective
trusts.  (Docket Entry # 32).  Plaintiffs point out, for
example, that defendants did not start including the Retirement
Trust Plus Funds, which incur 36% less in fees than the Target
Retirement Trust II funds, until 2015.  (Docket Entry # 32).
Therefore, viewing the Rule 12(b)(6) record in plaintiffs'
favor, plaintiffs' allegations that defendants failed to obtain
identical, lower-cost investment options as substitutes for
specific funds in the Plan allow a reasonable inference that
defendants acted imprudently by keeping the more expensive
options.

The court in Braden correctly articulates the inherent and
notable disadvantages faced by ERISA plaintiffs:  "No matter how
clever or diligent, ERISA plaintiffs generally lack the insider
information necessary to make out their claims in detail unless
and until discovery commences."  Braden, 588 F.3d at 598.  The
court addressed the practical ramifications of the denial of
further discovery:  "If plaintiffs cannot state a claim without
pleading facts with tend systemically to be in the sole
possession of defendants, the remedial scheme of the statute
will fail, and the crucial rights secured by ERISA will suffer."
Id.  Here too, plaintiffs' limited access to crucial information
warrants similar consideration.

Overall, drawing reasonable inferences in plaintiffs' favor, the excessive fees claim in Count One, based on a breach of the duty of prudence, survives defendants' motion to dismiss except with respect to the assertion that defendants acted imprudently by offering too many investment options in the Plan. See Fantini, 557 F.3d at 26.

C.   Duty of Loyalty (Counts One and Two)

In counts one and two, plaintiffs allege that defendants breached the duty of loyalty by enriching Fidelity at the expense of the Plan's beneficiaries.  Specifically, plaintiffs assert the following:  (1) since hiring Fidelity over 17 years ago, defendants have used nearly all of Fidelity's funds in the Plan; (2) defendants have not sought out competitive bidding for the Plan's recordkeeping, administration, and investment management, which have been exclusively performed by Fidelity; and (3) defendants' policies benefit Fidelity and the Johnson family, who have donated to MIT and have held trusteeships at the university, at the expense of the Plan's participants. (Docket Entry # 32, p. 33, ¶ 86).

Plaintiffs rely on Terraza to support their argument that defendants breached a duty of loyalty.  In Terraza, the plaintiff alleged that the defendant-fiduciaries of the Safeway, Inc. plan ("Safeway") breached their duty of loyalty by allowing the plan's recordkeeper and third-party, J.P. Morgan Chase Bank

N.A. ("J.P. Morgan"), to influence Safeway's decision to include J.P. Morgan's proprietary funds in its plan. Terraza, 2017 U.S.Dist.LEXIS 35732, at *22-23.  The plaintiff also alleged that the defendants tasked J.P. Morgan with "confirming the value of its own Common Trusts, an obviously profound conflict-of-interest, which is especially dangerous, as these Common Trusts are unregistered and not publicly traded." Id.  Finally, the plaintiff asserted that J.P. Morgan notoriously engaged in such unlawful product-steering practice to influence customers' investments in the past. Id.  The court ruled that the plaintiff's allegations were plausible, holding that the complaint included separate loyalty-based allegations rather than "'[hinging] entirely on the prudence-based allegations.'" Id. at *22 (quoting Romero v. Nokia, Inc., 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013)).

Defendants, however, correctly assert that, "Mere officer or director status does not create an imputed breach of the duty of loyalty simply because an officer or director has an understandable interest in positive performance of company stock." DiFelice, 497 F.3d at 421.  In DiFelice, despite the plaintiffs' allegations that corporate plan fiduciaries exhibited a conflict of interest, the court found no evidence of any such indicators of a breach "that high-ranking company officials sold company stock while using the Company Fund to

purchase more shares, or that the Company Fund was being used for the purpose of propping up the stock price in the market." Id. at 422.  The court held that more than a "bare allegation of conflict based on the corporate position of the plan fiduciary" was required to prove that the defendants' defined contribution plan served anything less than the best interests of its beneficiaries.  Id. at 421.  Thus, courts reject a conjectural, guilty-by-association notion that mere officer or director status creates an imputed breach of the duty of loyalty under ERISA.[8]  See id.; see also In re ING Groep, N.V. ERISA Litig., 749 F.Supp. 2d 1338, 1351 (N.D. Ga. 2010) (holding that plaintiff did not state conflict of interest claim since "ERISA explicitly allows employers and corporate officers to be fiduciaries"); Pegram, 530 U.S. at 225 (explaining that it is not fatal that plan fiduciary has "financial interests adverse to beneficiaries"); In re McKesson HBOC, Inc. ERISA Litig., 391 F.Supp. 2d  812 (N.D. Cal. 2005) (holding that while fiduciaries may have financial interests that are adverse to beneficiaries, they cannot face liability for "merely creating the *potential* for a conflict of interest") (emphasis in original).

---

[8]  According to 29 U.S.C. § 1108(c)(3), nothing in section 1106 prohibits any fiduciary from "serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest."

In the case at bar, defendants maintain that plaintiffs' disloyalty theories constitute speculation.  Defendants assert that, while Abigail Johnson serves on MIT's Board of Trustees, she does not deliberate in the decision-making regarding the Plan's choice of Fidelity or Fidelity funds.  (Docket Entry # 39, pp. 12-13).  Defendants also indicate that Johnson did not assume her position as a trustee until approximately eight years after defendants and Fidelity entered into the recordkeeping and administrative agreement.  (Docket Entry # 39, pp. 12-13).  In addition, the Oversight Committee – not the Board of Trustees – was responsible for defendants' "'selection, monitoring, and retention of Plan investment options.'"  (Docket Entry # 39, pp. 12-13).  Furthermore, according to defendants, while the Fidelity Foundation has donated funds to defendants, it has also donated funds to many other nonprofit organizations and universities as well.  (Docket Entry # 40-6).  For instance, in 2014, Fidelity Foundation donated only $3,500 to defendants for "Operating Support," while its overall grants and assistance totaled $14,028,753.31.  (Docket Entry # 40-6, pp. 92, 99).

Defendants also point to the fact that they acted in a manner inconsistent with benefitting Fidelity at the expense of the Plan's beneficiaries.  In Hecker, the plaintiffs contended that the defendant improperly restricted the investment options to Fidelity mutual funds.  Hecker, 556 F.3d at 586.  The court

determined that no statute or regulation prohibited a fiduciary from choosing investment options from only one company, reasoning that "many prudent investors limit themselves to funds offered by one company and diversify within the available investment options." Id. Here, defendants did not restrict the Plan to that approach. Instead, they included more than 150 non-Fidelity investment options to compete with those 180 Plan options that were offered by Fidelity. (Docket Entry # 32, p. 27). Furthermore, in 2015, defendants eliminated hundreds of overpriced and underperforming Plan options and implemented a new investment lineup of 37 core options, only one of which was managed by Fidelity, when they consolidated the Plan's lineup. (Docket Entry # 32, pp. 27-28, ¶ 68).

Thus, in light of such facts, the claim for breach of the duty of loyalty "'"hinge[s] entirely" on the prudence-based allegations.'" Terraza, 2017 U.S.Dist.LEXIS 35732, at *22 (quoting Romero v. Nokia, Inc., 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013)). The duty of loyalty claims in counts one and two are therefore subject to dismissal.

D. Excessive Administrative Fees (Count Two)

In Count Two, plaintiffs allege that the Plan's beneficiaries paid excessive administrative fees for recordkeeping services due to the fiduciaries' paying excessive revenue sharing and defendants' failure to regulate

recordkeeping fees.  (Docket Entry # 32, pp. 114-116).
Defendants contend that the Plan's fiduciaries reduced
Fidelity's recordkeeping compensation by increasing rebates to
the Plan and then converting Fidelity's compensation to a flat,
per-participant fee.  (Docket Entry # 39, pp. 23-24) (Docket
Entry # 66, p. 4).  More specifically, the relevant contracts
and amendments to such contracts that increased rebates followed
by a 2014 conversion to a flat fee belie the plausibility that
defendants allowed Fidelity to receive excessive recordkeeping
fees, according to defendants.  (Docket Entry # 39, pp. 22-24).
Defendants further maintain that revenue sharing is "a common
and acceptable" method for compensating the Plan's
administrators.  (Docket Entry # 66) (quoting White v. Chevron
Corp., No. 16-CV-0793-PJH, 2016 WL 4502808, at *14 (N.D. Cal.
Aug. 29, 2016)); see also Hecker, 556 F.3d at 585 (holding that
revenue sharing "violates no statute or regulation").

Plaintiffs and defendants both turn to George v. Kraft
Foods Global, Inc., 641 F.3d 786, 798 (7th Cir. 2011), to
support their claims.  (Docket Entry ## 32, 39).  Plaintiffs
contend that the George court held that the only true way to
ascertain the true market price of recordkeeping fees is to
obtain competitive bids from other service providers every three
years.  (Docket Entry # 32, p. 24, ¶ 62).  Defendants, by
contrast, insist that the George court created no such

41

requirement and that it instead held that "a triable issue of fact existed regarding fiduciaries' decisions not to solicit competitive bids." (Docket Entry # 39).

This court agrees with defendants' assertion that George does not require fiduciaries to obtain bids from other service providers every three years. In George, the plaintiffs, beneficiaries in Kraft Foods Global, Inc.'s ("Kraft") defined contribution plan, claimed that Kraft, the plan's fiduciary, overpaid the plan's recordkeeper, Hewitt Associates ("Hewitt"), out of the plan's assets. George v. Kraft Foods Global, Inc., 641 F.3d at 798. Kraft, since appointing Hewitt as the plan's recordkeeper in 1995, had not solicited bids from any competitors, but it had asked several consultants for advice regarding the reasonableness of Hewitt's fees. Id. Like plaintiffs in the case at bar, the George plaintiffs argued that "prudent fiduciaries would have solicited competitive bids for recordkeeping services on a periodic basis – about once every three years . . .." Id. Kraft countered that "prudence did not require them to solicit bids before extending Hewitt's contract" and that its engagement of various consultants satisfied the duty to maintain reasonable recordkeeping fees. Id. The George court reversed and remanded the district court's granting of summary judgment to the defendants, holding, as defendants in the case at bar contend, that "a trier of fact could reasonably

42

conclude that [the] defendants did not satisfy their duty to ensure that Hewitt's fees were reasonable." Id. at 799. The court reasoned that while the defendants exemplified prudence by seeking consultants' advice, the reliance on such advice "is not sufficient to entitle [the] defendants to judgment as a matter of law." Id.

The case at bar is similar to Spano v. The Boeing Co., where the plaintiff similarly asserted that the administrative fees paid to State Street were excessive and that the defendants' unwillingness to solicit competitive bids for a ten-year period caused the plan to pay excessive administrative fees. Spano v. The Boeing Co., 125 F.Supp. 3d 848, 864 (S.D. Ill. 2014). The plaintiff alleged that the excessive fees were a manifestation of the defendants' desire to foster a closer relationship with State Street. Id. The Spano court denied summary judgment on the issue of administrative fees because factual disputes regarding whether or not the defendants benefited their corporate ties to State Street by charging high administrative fees still existed. Id. at 866. The Spano court contextualized Hecker, stating that the Hecker court held that the total fee charged to the beneficiary, rather than "the internal, post-collection distribution of the fee," is the information that a plan's beneficiaries needed to know in order to act responsibly. Id. at 865. Furthermore, "'at a

43

fundamental level, Hecker says nothing regarding the duty a
fiduciary holds with respect to a 401(k) investment plan's
administrative services fees.'"  Id. at 866 (quoting George v.
Kraft Foods Global, Inc., 674 F.Supp. 2d 1031, 1048 (N.D.III
2009)).

In the case at bar, Fidelity has provided administrative
and recordkeeping services to the Plan since April 1, 1999.
(Docket Entry # 32, p. 30, ¶ 77) (Docket Entry # 32, pp. 100-
101, ¶ 148).  During the same period of time, defendants also
allowed Fidelity to include many of its investment funds in the
Plan, allowed Abigail Johnson to serve on MIT's Board of
Trustees, and did not obtain any other competitive bids for the
Plan's administrative and recordkeeping services.  (Docket Entry
# 32, p. 30, ¶ 79) (Docket Entry # 32, pp. 100-101, ¶ 148).
Between 2010 and 2014, the Plan paid as much as $3 million per
year in recordkeeping services.  (Docket Entry # 32, p. 102, ¶
153).  Between 2009 and 2014, the Plan's assets increased from
$2 billion to an excess of $3.8 billion, causing the asset-based
revenue sharing paid to Fidelity to increase as Fidelity's
administrative services to the Plan remained the same.  (Docket
Entry # 32, pp. 102-103, ¶ 154).

Here, viewing the record in plaintiffs' favor, a plausible
claim exists that defendants were charged excessive
administrative fees.  Indeed, despite discovery and the

crediting of experts from both parties, the Spano court could not sufficiently resolve factual disputes.  Spano, 125 F.Supp. 3d at 866.  The claim in Count Two as to excessive administrative fees is not subject to dismissal.

E.  Prohibited Transactions under Section 1106(a) (Count Three)

In Count Three, plaintiffs allege that all defendants breached section 1106(a)(1)(C) and (D), which prohibits transactions between a plan and a "party in interest."  The statute provides that a:

> (1) fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
> (C) furnishing of goods, services, or facilities between the plan and a party in interest;
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . ..

29 U.S.C. § 1106(a)(1).[9]

With respect to section 1106(a)(1)(D), defendants assert that plaintiffs "do not adequately allege that the Plan's fiduciaries intended to benefit Fidelity as opposed to the plan and its participants."  (Docket Entry # 39, p. 25).  Defendants argue that a fiduciary only violates section 1106(a)(1)(D) if he

---

[9]  Defendants also seek to dismiss a section 1006(a)(1)(A) claim in Count Three.  (Docket Entry # 39, pp. 25-27).  Count Three, however, does not cite or set out a section 1006(a)(1)(A) claim. Rather, it quotes and relies on defendants' liability under sections 1106(a)(1)(C) and (D).  (Docket Entry # 32, p. 117, ¶ 187) (Docket Entry # 32, p. 118, ¶ 190) (Docket Entry # 32, p. 118, ¶ 191).

or she has the subjective intent to benefit a party in interest. (Docket Entry # 39, p. 25).  Defendants contend that plaintiffs irrationally speculate that defendants, Fidelity, and Abigail Johnson colluded to the detriment of the Plan's beneficiaries. (Docket Entry # 39, p. 25).  They cite Jordan v. Mich. Conference of Teamsters Welfare Fund, 207 F.3d 854, 860-61 (6th Cir. 2000), in which the court holds that section 1106(a)(1)(D) provides:

> a fiduciary breach occurs when the following five elements are satisfied 1) the person or entity is "[a] fiduciary with respect to [the] plan"; 2) the fiduciary "cause[s]" the plan to engage in the transaction at issue; 3) the transaction "use[s]" plan assets; 4) the transaction's use of the assets is "for the benefit of" a party in interest; and 5) the fiduciary "knows or should know" that elements three and four are satisfied.

Jordan v. Mich. Conference of Teamsters Welfare Fund, 207 F.3d 854, 860-61 (6th Cir. 2000) (quoting Reich v. Compton, 57 F.3d 270, 278 (3d Cir. 1995)); see also Bauer-Ramazani v. TIAA-CREF, No. 1:09-CV-190, 2013 WL 6189802, at *9 (D. Vt. Nov. 27, 2013) (rejecting section 1106(a)(1)(D) claim because "[p]laintiffs have not pointed to any facts demonstrating Defendants knew or should have known the [challenged] practice was a prohibited transaction").

Plaintiffs assert that defendants mistakenly dispute the adequacy of plaintiffs' allegations that MIT "'subjectively intended'" to benefit Fidelity.  (Docket Entry # 46, pp. 27-28).

Plaintiffs contend that "MIT drove excessive fees to Fidelity based on MIT's subjective desire to maintain its beneficial relationship with Fidelity." (Docket Entry # 46, p. 28).

Defendants also contend that Fidelity mutual funds are not parties in interest within the meaning of section 1106(a)(1)(C). As argued by defendants, when the Plan invests in a Fidelity mutual fund, it is not engaging in a sale or exchange with Fidelity itself. (Docket Entry # 39, pp. 25-26). Defendants reason that a plan "pays monies to the fund in return for shares issued by the mutual fund itself." (Docket Entry # 39, p. 26). They submit that under section 1002(21)(B), neither the mutual fund nor its manager is a party in interest to a plan investing in the mutual fund's shares. (Docket Entry # 39, p. 26).[10] Therefore, a payment by a plan to a mutual fund is not a

---

[10]  Section 1002(21)(B) provides:

If any money or other property of an employee benefit plan is invested in securities issued by an investment company registered under the Investment Company Act of 1940 [15 U.S.C.A. § 80a-1 et seq.], such investment shall not by itself cause such investment company or such investment company's investment adviser or principal underwriter to be deemed to be a fiduciary or a party in interest as those terms are defined in this subchapter, except insofar as such investment company or its investment adviser or principal underwriter acts in connection with an employee benefit plan covering employees of the investment company, the investment adviser, or its principal underwriter.

29 U.S.C. § 1002(21)(B).

furnishing of services between a plan and a party in interest, according to defendants.  (Docket Entry # 39, p. 26).

Addressing defendants' section 1106(a)(1)(D) argument, the claim requires a subjective intent to benefit a party in interest.  Jordan v. Mich. Conference of Teamsters Welfare Fund, 207 F.3d 854, 860-61 (6th Cir. 2000); Reich v. Compton, 57 F.3d 270, 279 (3d Cir. 1995).  Moreover, plaintiffs do not challenge defendants' contention that section 1106(a)(1)(D) requires a showing that the fiduciary, MIT, subjectively intend to benefit the party in interest, Fidelity.  (Docket Entry # 46, pp. 27-28).

In the case at bar, plaintiffs' section 1106(a)(1)(D) claim plausibly supports the presence of such subjective intent. First, since Fidelity was appointed to render recordkeeping and administrative services to the Plan, the Fidelity Foundation, the Fidelity Non-Profit Management Foundation, and the Johnson family have collectively contributed millions of dollars to MIT. (Docket Entry # 32, pp. 31-32, ¶ 82).  Second, in the same time frame, defendants "drove substantial revenue from Plan participants' retirement savings to Fidelity and the Johnson family." (Docket Entry # 32, p. 118, ¶ 192).  It is, therefore, plausible that MIT excessively compensated Fidelity based on a subjective desire to foster a beneficial relationship with Fidelity.

48

Turning to the section 1106(a)(1)(C) claim, the amended complaint alleges that defendants caused the Plan to use Fidelity as the Plan's recordkeeper and, as recordkeeper, Fidelity engaged in prohibited transactions that defendant knew or should have known constituted furnishing "services" to the Plan. (Docket Entry # 32, p. 118, ¶ 190). In seeking to dismiss the claim, defendants maintain that "the Plan's investments" in mutual funds managed by Fidelity do not violate section 1106(a)(1)(C) because they do not involve "'furnishing goods, services, or facilities between the plan and a party in interest.'" (Docket Entry # 39, p. 26) (quoting section 1106(a)(1)(C)). Other than quoting the statute, defendants rely on an exemption for mutual funds in 29 U.S.C. § 1002(21)(B) ("section 1002(21)(B)") as barring their liability under section 1106(a)(1)(C). (Docket Entry # 39, p. 26). More specifically, defendants submit that section 1002(21)(B) provides that "neither the mutual fund nor its manager is a fiduciary or *party in interest* to the plans that invest in its shares." (Docket Entry # 39, p. 26) (emphasis added). Defendants also argue that the amended complaint does not allege that the mutual funds provided any plan services as opposed to the original argument that the investments did not involve furnishing services within the meaning of section 1106(a)(1)(C). (Docket Entry # 39, pp. 25-27).

Plaintiffs contend that any exemption afforded under section 1002(21) applies to a plan's investment of any "'money or other property'" in a mutual fund, language that implicates section 1106(a)(1)(A) (prohibiting "sale or exchange, or leasing, of any *property* between the plan and a party in interest") (emphasis added), as opposed to "services" in section 1106(a)(1)(C) (prohibiting "furnishing of goods, services, or facilities between the plan and a party in interest"). (Docket Entry # 46). Second, plaintiffs assert that it is improper to address the issue on a Rule 12(b)(6) motion because the exemption for mutual funds in section 1002(21)(B) is an affirmative defense. Plaintiffs also point out that "MIT's Forms 5500 filed with the Department of Labor acknowledge that the Plan's investments in Fidelity mutual funds are party-in-interest transactions." (Docket Entry # 46, p. 28).

Plaintiffs' assertion that defendants cannot raise an affirmative defense to dismiss the claim is misplaced. In the First Circuit, "an affirmative defense may serve as a basis for dismissal under Rule 12(b)(6)." U.S. ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 207 (1st Cir. 2016). As to plaintiffs' other argument, the case law below uniformly applies the section 1002(21) exemption to a section 1106(a)(1)(C) cause of action. Hence, the exemption is not limited to causes of action under section 1106(a)(1)(C). ERISA defines "'party in

interest' to include nine classes of individuals or entities, 29 U.S.C. § 1002(14), but the general concept 'encompass[es] those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries.'" Natl. Sec. Sys., Inc. v. Iola, 700 F.3d 65, 88 (3d Cir. 2012) (quoting Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 242 (2000)). Congress defined a "party in interest" to involve those "entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as service providers, employers, and other fiduciaries. Harris Tr. & Sav. Bank, 530 U.S. at 242.

Defendants' contention that the Plan's investments in Fidelity mutual funds do not violate section 1106(a)(1)(C) is correct. Under the exemption articulated in section 1002(21)(B), "investment in a mutual fund 'shall not by itself cause such investment company or such investment company's investment adviser' to be a party in interest." IATSE Local 33 Section 401(K) Plan Bd. of Trustees v. Bullock, No. CV 08-3949 AHM SSX, 2008 WL 4838490, at *6 (C.D. Cal. Nov. 5, 2008) (quoting Boeckman, 2007 WL 4225740, at *3). When an investment adviser provides "'the opportunity to invest'" in mutual funds in exchange for a fee, such a transaction cannot constitute an exception to this exemption because it is not adequately distinct from the investment itself. Id. Courts have also observed that:

> "the Plan's payment of a broad range of costs normally
> associated with mutual fund transactions, including
> shareholder service fees, transfer agent fees, Rule 12b-1
> fees, administrative fees, registration and reporting fees,
> expenses for reports to shareholders, postage and
> stationery fees, audit and legal fees, custodian fees, and
> state and local taxes" are "normal incidents of investment
> in mutual fund shares."

IATSE Local 33 Section 401(K) Plan Bd. of Trustees, 2008 WL

4838490, at *6 (quoting Boeckman, 2007 WL 4225740, at *3).

Congress has further indicated in the legislative history of

section 1002(21)(B) that it "did not want mutual funds generally

to be held liable under ERISA."  IATSE Local 33 Section 401(K)

Plan Bd. of Trustees, 2008 WL 4838490, at *6.[11]

In Henderson v. Emory University, the Emory plans at issue

had various investment options that included the following:

mutual funds, annuities, bond accounts, and real estate

accounts.  Henderson v. Emory Univ., No. 1:16-CV-2920-CAP, 2017

WL 2558565, at *8 (N.D. Ga. May 10, 2017).  The defendant

fiduciaries, similar to the defendants in the case at bar,

argued that a mutual fund is exempted from being a party in

---

[11]  Even though "the language of the exemption [under section
1002(21)(B)] is broad, it is not absolute."  Boeckman v.
Edwards, 461 F.Supp. 2d 801, 817 (S.D. Ill. 2006).  For
instance, "transactions in which plans invest in mutual funds in
the first place" are not exempted under section 1002(21)(B).
Id.  In some instances, "a transaction between a mutual fund and
a third-party service provider to the fund" may be considered to
constitute "an indirect prohibited transaction where the third
party is a party in interest of a plan."  Id.  (internal
quotation marks omitted).

interest.  Id.  The plaintiffs, by contrast, alleged that "[b]y placing [all] investment options in the Plans in investment options managed by TIAA-CREF, Fidelity, and Vanguard . . .[,] the Defendants caused the plans to engage in" prohibited transactions.  Id.  The Henderson court held that the exception from section 1002(21)(B) was applicable to the mutual funds in the case, reasoning that the Investment Company Act of 1940 regulates mutual funds.  Id.

In light of the foregoing case law, defendants' argument that the Plan's investment in mutual funds does not constitute furnishing "goods, services or facilities between the plan and a party in interest," 29 U.S.C. § 1106(a)(1)(C), is well taken. The amended complaint, however, fails to indicate that all of the investments consisted of transactions with mutual funds.  In fact, prior to July 2015, over 300 of the Plan's 340 investment options were mutual funds, 180 of which were managed by Fidelity, thereby implying that 40 of the investment options were not mutual funds.  (Docket Entry # 32, p. 28, ¶ 71).  As of July 2015, the investment lineup comprises 37 options, including the Fidelity Growth Fund and various Vanguard funds.  (Docket Entry # 32, p. 39, ¶ 101).  The amended complaint therefore indicates that prior to July 2015 a number of the Plan's investment options were not mutual funds.  The section 1106(a)(1)(C) claim in Count Three is therefore dismissed only

as to transactions between the Plan and mutual funds.  As
explained above, the section 1106(a)(1)(D) claim in Count Three
survives dismissal.

B.  Failure to Monitor (Count Four)

     With respect to Count Four, plaintiffs maintain that MIT
had the ultimate responsibility to control and manage the Plan's
operation and administration.  (Docket Entry # 32, p. 119, ¶
197).  As a "monitoring fiduciary," MIT is purportedly liable
for failing to monitor its appointed fiduciaries or have a
system in place to perform adequate monitoring.  (Docket Entry #
32, p. 119, ¶ 198) (Docket Entry # 32, pp. 119-120, ¶ 200).
Defendants assert that Count Four is subject to dismissal
because plaintiffs fail to show any underlying fiduciary breach,
which a derivative duty to monitor claim requires.  (Docket
Entry # 39, p. 27).

     Ordinarily, a duty to monitor other fiduciaries is
derivative of plaintiffs' other claims.  Slaymon v. SLM Corp.,
506 F.App'x. 61, 2012 WL 6684564, at *3 (2d Cir. Dec. 26, 2012)
(unpublished).  A party with this duty to monitor is obligated
to take action upon discovering that appointed fiduciaries are
performing less than properly.  Kling, 323 F.Supp. 2d at 142;
Liss v. Smith, 991 F.Supp. 278, 311 (S.D.N.Y. 1998).  In Bunch
v. W.R. Grace & Co., the plan beneficiaries claimed that the
investment manager breached its fiduciary duties by imprudently

54

selling company stock.  Bunch v. W.R. Grace & Co., 532 F.Supp.2d
283, 286 (D. Mass. 2008).  The court held that, because State
Street did not commit a breach, defendant W.R. Grace & Co. also
did not fail in selecting and monitoring State Street.  Id. at
292; see also In re Coca-Cola Enter., Inc. ERISA Litig., No.
1:06-CV-0953 (TWT), 2007 WL 1810211, at *16 (N.D.Ga. June 20,
2007) (holding that duty to monitor lies against appointing
fiduciary only when primary breach of fiduciary duties has
occurred); see also White, 2016 WL 4502808, at *19 (holding that
plaintiffs' monitoring claims that are dependent on other claims
must be dismissed if others are dismissed).

In the case at bar, drawing reasonable inferences in
plaintiffs' favor, the excessive fees claim in Count One, based
on a breach of the duty of prudence, fails only with respect to
the assertion that defendants acted imprudently by offering too
many investment options in the Plan.  Plaintiffs' duty of
loyalty claims in counts one and two are also subject to
dismissal.  Plaintiffs' section 1106(a)(1)(C) claim in Count
Three also fails only as to transactions between the Plan and
mutual funds.  Any corresponding duty to monitor claim is
likewise dismissed.

Defendants additionally argue that Count Four should be
dismissed because plaintiffs raised the conclusory allegation
that defendants failed to monitor those to whom they appointed

fiduciary responsibility.  (Docket Entry # 39, p. 27).
Defendants argue that, "plaintiffs cannot point to any specific
delegee that defendants failed to monitor" and that plaintiffs
offered no specific allegations in their amended complaint.
(Docket Entry # 39, p. 27) (emphasis omitted).

In order for a party to "survive a motion to dismiss, a
complaint must include 'enough facts to state a claim to relief
that is plausible on its face.'"  In re ARIAD Pharms. Sec.
Litig., 842 F.3d 744, 756 (1st Cir. 2016) (quoting Twombly, 550
U.S. at 570).  "[W]here a complaint pleads facts that are merely
consistent with a defendant's liability, it stops short of the
line between possibility and plausibility of entitlement to
relief."  Id. (internal quotation marks omitted) (quoting
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  For example, in
White v. Chevron Corp., the court held that the plaintiff's
inability to specify which appointees that the defendants failed
to monitor, resulting in the dismissal of the plaintiff's duty
to monitor claim.  White v. Chevron Corp., No. 16-CV-0793-PJH,
2016 WL 4502808, at *18 (N.D.Cal. Aug. 29, 2016).

In addition, "the tenet that a court must accept as true
all of the allegations contained in a complaint is inapplicable
to legal conclusions."  Labor Relations Div. of Constr. Indus.
Of Mass., Inc. v. Healey, 844 F.3d 318, 327 (1st Cir. 2016)
(quoting Iqbal, 556 U.S. at 678).  "'Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice'" in distinguishing a particular case from other hypothetically possible cases.  Id. (quoting Iqbal, 556 U.S. at 678); Swanson v. Citibank, N.A., 614 F.3d 400, 405 (7th Cir. 2010).  Courts "'are not bound to accept as true a legal conclusion couched as a factual allegation,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted), nor do courts consider "'naked assertion[s] devoid of further factual enhancement.'"  Id. (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted); San Geronimo Caribe Project, Inc. v. Acevedo-Vila, 687 F.3d 465, 471 (1st Cir. 2012).

The amended complaint states that MIT failed to monitor the fiduciaries managing the Plan.  (Docket Entry # 32, pp. 119-121, ¶¶ 197, 198, 199, 200).  As a rationale, the amended complaint reflects that the President of MIT has authority over the Administrative Committee, as well as the power to appoint the members of the Oversight Committee, which selects, monitors, and retains the Plan's menu of investment options.  (Docket Entry # 32, p. 119, ¶ 197).  The amended complaint further alleges that MIT neglected to do the following:  (1) to monitor its appointees, to evaluate their job performance, or to establish a system for performance evaluations; (2) to monitor its appointees' fiduciary process for potentially excessive

investment management and administrative fees; (3) to establish a process evaluating and regulating "all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments"; (4) to monitor the market rate for recordkeeping and administrative services provided to the Plan; (5) to ensure that appointees screened the marketplace for comparable or potentially better-performing investment options with lower fees and expenses; and (6) to discharge appointees whose job performance was inadequate.  (Docket Entry # 32, pp. 119-120, ¶ 200).  These alleged acts or failures to act plausibly resulted in the Plan's monetary losses and, subsequently, the loss of tens of millions of dollars of Plan beneficiaries' retirement savings.

In light of the above detail, defendants' argument characterizing the duty to monitor claim as conclusory and that the amended complaint provides no specific allegations is misguided.  Accordingly, Count Four is not subject to dismissal on that basis.

CONCLUSION

In accordance with the foregoing discussion, this court therefore **RECOMMENDS**[12] that defendants' motion to dismiss under

---

[12]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  <u>See</u> Fed.R.Civ.P. 72(b).  Any party may respond

Rule 12(b)(6) be **ALLOWED** in part and **DENIED** in part.


    /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.