**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DAVID B. TRACEY, DANIEL GUENTHER, MARIA T. NICHOLSON, AND CORRINNE R. FOGG, individually and as representatives of a class of participants and beneficiaries on behalf of the MIT Supplemental 401(k) Plan,<br><br>       *Plaintiffs*,<br><br>v.<br><br>MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE MIT SUPPLEMENTAL 401(K) PLAN OVERSIGHT COMMITTEE, THE ADMINISTRATIVE COMMITTEE, ISRAEL RUIZ, ALISON ALDEN, MARC BERNSTEIN, LAWRENCE CANDELL, GLENN DAVID ELLISON, MICHAEL HOWARD, MARTIN KELLY, S.P. KOTHARI, ROBERT C. MERTON, GUNTHER ROLAND, LORRAINE A. GOFFE-RUSH, GLEN SHOR, PAMELA WELDON, THOMAS M. WIEAND, and BARTON ZWIEBACH,<br><br>       *Defendants*. | No. 1:16-cv-11620-NMG<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 2

SUMMARY JUDGMENT STANDARD.................................................................... 3

ARGUMENT .............................................................................................................. 4

I.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' PRUDENCE CLAIMS............................................................ 4

     A.     The Plan's Fiduciaries Acted Prudently In Providing Participants Access To A Broad-Choice Investment Window .................................. 5

          1.     *The Investment Window Was A Sensible Component Of The Plan's Multi-Tiered Investment Structure* ........................................................... 5

          2.     *Defendants' Approach To The Investment Window Was Prudent In The Prevailing Circumstances* ................................................. 9

          3.     *ERISA Did Not Require Defendants To Apply Plaintiffs' Proposed Bright-Line Rules To Trim The Investment Window Menu* ..................... 11

     B.     The Plan's Fiduciaries Prudently Updated The Plan's Administrative Fee Arrangements, Resulting In Reasonable Fees Throughout The Class Period ......................................................................................... 15

          1.     *The Plan's Fiduciaries Worked With Their Consultant, Mercer, To Secure Several Recordkeeping Fee Reductions Over Time* ..................... 16

          2.     *The Plan's Administrative Fees Were In Line With Market Rates* .......... 17

     C.     Undisputed Facts Preclude A Finding That The Plan Suffered A Loss With Respect To Either Investments Or Administrative Fees............................. 18

II.     PLAINTIFFS' PROHIBITED TRANSACTION THEORY IS UNSUSTAINABLE ................................................................................... 19

CONCLUSION.......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................4

*Brotherston v. Putnam Invs., LLC*,
907 F.3d 17 (1st Cir. 2018)..................................................18, 19

*Bunch v. W.R. Grace & Co.*,
555 F.3d 1 (1st Cir. 2009)..................................................4, 8

*Cadle Co. v. Hayes*,
116 F.3d 957 (1st Cir. 1997).................................................4

*Cassell v. Vanderbilt Univ.*,
285 F. Supp. 3d 1056 (M.D. Tenn. 2018)....................................5

*Chao v. Merino*,
452 F.3d 174 (2d Cir. 2006)..................................................5

*Ellis v. Fid. Mgmt. Tr. Co.*,
257 F. Supp. 3d 117 (D. Mass. 2017) ......................................4

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)..........................................................10

*Henderson v. Emory Univ.*,
252 F. Supp. 3d 1344 (N.D. Ga. 2017) ...................................5, 6

*Jenkins v. Yager*,
444 F.3d 916 (7th Cir. 2006) ................................................13

*Kelly v. Johns Hopkins Univ.*,
2017 WL 4310229 (D. Md. Sept. 28, 2017) ..............................5

*Loomis v. Exelon Corp.*,
658 F.3d 667 (7th Cir. 2011) ................................................6

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ................................................8

*Pina v. Children's Place*,
740 F.3d 785 (1st Cir. 2014)..................................................17

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Ringquist v. Gaumond,*
101 F. Supp. 2d 55 (D. Mass. 2000) ....................................................4

*Sacerdote v. NYU,*
2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ..........................................5

*Sacerdote v. NYU,*
328 F. Supp. 3d 273 (S.D.N.Y. 2018) ..................................................19

*Short v. Brown Univ.,*
320 F. Supp. 3d 363 (D.R.I. 2018) .......................................................5

*Tatum v. RJR Pension Inv. Comm.,*
761 F.3d 346 (4th Cir. 2014) .............................................................10

*Taylor v. United Techs. Corp.,*
2009 WL 535779 (D. Conn. Mar. 3, 2009) .............................................18

*Tibble v. Edison Int'l,*
639 F. Supp. 2d 1074 (C.D. Cal. 2009) ................................................11

*Tibble v. Edison Int'l,*
729 F.3d 1110 (9th Cir. 2013) .............................................................6

*Titus v. Town of Nantucket,*
840 F. Supp. 2d 404 (D. Mass. 2011) ....................................................4

*Troudt v. Oracle Corp.,*
2019 WL 1006019 (D. Colo. Mar. 1, 2019) .............................................6

*Tussey v. ABB, Inc.,*
746 F.3d 327 (8th Cir. 2014) .............................................................15

*VanVels v. Betten,*
2007 U.S. Dist. LEXIS 7003 (W.D. Mich. Jan. 31, 2007) .........................18

*Vellali v. Yale Univ.,*
308 F. Supp. 3d 673 (D. Conn. 2018) ....................................................5

*White v. Chevron Corp.,*
2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) .............................13, 15, 17

*Wildman v. Am. Century Servs., LLC,*
362 F. Supp. 3d 685 (W.D. Mo. 2019) ........................................ *passim*

*Wsol v. Fiduciary Mgmt. Assocs., Inc.*,
    266 F.3d 654 (7th Cir. 2001) ................................................................18

**Statutes**

29 U.S.C. § 1104(a)(1)(B) .......................................................................4, 9

29 U.S.C. § 1106(a) ..................................................................................19

29 U.S.C. § 1108(b)(8) .............................................................................20

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................3

# INTRODUCTION

Plaintiffs challenge the past investment structure and administrative fees of the MIT Supplemental 401(k) Plan (the "Plan")—a defined contribution plan that MIT has long offered its employees to supplement a generous university-funded pension plan. The undisputed facts clearly demonstrate that Plaintiffs cannot as a matter of law sustain their claims on either front.

At the pleadings stage, the Court dismissed some of Plaintiffs' central theories but allowed their attack on the Plan's investment structure to go forward based on the allegation that the Plan "include[d] higher fee options when identical lower fee options were available." ECF No. 79 at 5. That theory, however, has largely fallen by the wayside in discovery. Instead, Plaintiffs have focused their investment claims principally on a theory already rejected by the Court—that it was improper to offer participants a wide range of investment choices through the Plan's "Investment Window," one of four tiers of investment options included in the Plan before 2015. Plaintiffs' further critiques of the investment lineup rest on the assertion of arbitrary, categorical rules that are contradicted not only by case law and common fiduciary practice, but also by the practices of one of Plaintiffs' own experts.

Plaintiffs' challenge to the Plan's administrative fees is also unsustainable on the undisputed facts. In the period when Plaintiffs allege the Plan's fees were allowed to increase unchecked, Defendants undertook an expert-advised process to secure lower fees and moved to the very type of per-participant fee arrangement Plaintiffs favor. While Plaintiffs specifically criticize Defendants for not seeking competitive bids as part of that process, ERISA does not inflexibly require competitive bidding, and the Plan's fiduciaries made a reasoned decision that it was unwarranted in the particular circumstances here. And the only probative evidence shows that Defendants' actual processes produced reasonable fees during the class period.

Accordingly, Defendants are entitled to summary judgment on all of Plaintiffs' claims.

# BACKGROUND

MIT is a private, non-profit university whose mission is "to advance knowledge and educate students in science, technology, and other areas of scholarship that will best serve the nation and the world." SUMF ¶ 1. MIT offers its employees a generous set of benefits: Alongside a traditional pension plan that MIT fully funds, MIT offers employees the opportunity to participate in the defined-contribution Plan, which is funded through employee contributions and matching contributions from MIT. SUMF ¶¶ 2-4. The MIT Supplemental 401(k) Plan Oversight Committee (the "Committee"), whose members include MIT's Executive Vice President and Treasurer and other senior faculty and administrators who volunteer their time, oversees the Plan's investment lineup. SUMF ¶¶ 5-6, 8.[1]

Since 2010, the Plan has undergone two significant changes: (1) a restructuring of the Plan's investment lineup, and (2) a shift from a model in which the Plan recordkeeper's compensation was defrayed through revenue sharing from Plan investments to one specifying flat annual per-participant recordkeeping fees. Both transitions were preceded by careful study by the Plan's fiduciaries, aided by professional advice and input from the MIT community.

Before July 2015, the Plan offered four tiers of investment options, giving participants from MIT's diverse community of employees a choice as to how actively they wanted to manage their accounts. SUMF ¶ 10. Plaintiffs' investment-related claims focus solely on Tier 3, the "MIT Investment Window," which was one of two broad-choice menus designed for "investors with an understanding of how to research and evaluate individual investments." SUMF ¶ 19. Although the Investment Window offered a wider range of options than the core Tier 1 and 2

---

[1] Among the past or present Committee members named as individual defendants are a Nobel Laureate professor of finance, the former head of MIT's Department of Economics, a former director of MIT's investment management company, and a senior member of the global investment staff responsible for managing MIT's endowment. SUMF ¶ 7.

menus that Plaintiffs do not challenge—functioning much like the Tier 4 brokerage window (which offered access to nearly every other fund), SUMF ¶¶ 14, 22—the Committee took steps to ensure that the Investment Window menu was appropriate in light of its role in the overall lineup, consistent with guidance provided by outside counsel in 2007. SUMF ¶¶ 42-45, 53.

MIT later retained different outside counsel who opined that the Committee had greater responsibility concerning the Investment Window than previous counsel had advised. SUMF ¶ 46. This new legal advice set in motion a collaborative process of deliberation, during which the Committee debated potential changes to the Plan's investment structure, formally solicited views from participants in the MIT community, and formed an expert sub-committee charged with conducting an intensive fund-by-fund analysis. SUMF ¶¶ 48-52. That process culminated in the Committee's decision to reorganize the Plan's investment lineup, broadening Tiers 1 and 2 to include 37 "core" investment options and folding most of the remainder of the Investment Window menu into the Tier 4 brokerage window. SUMF ¶ 54.

While the investment redesign was underway, the fiduciaries also revised the Plan's fee arrangement with its recordkeeper, Fidelity. Before 2014, Fidelity was compensated for its administrative services through revenue sharing paid by the Plan's mutual fund investments. SUMF ¶ 91. Beginning in 2011, Fidelity offered rebates, or "credits," to the Plan in the amount by which those payments were estimated to exceed a revenue target. SUMF ¶¶ 93, 98. And in 2014, the Plan secured an agreement setting Fidelity's compensation at an annual per-participant rate and reserving any revenue sharing above that amount for the Plan's benefit. SUMF ¶ 99.

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether

there is a genuine need for trial.'" *Ringquist v. Gaumond*, 101 F. Supp. 2d 55, 57 (D. Mass. 2000) (Gorton, J.) (quotation omitted).  Once the moving party has carried its initial burden, "the opposing party can only avoid summary judgment by providing properly supported evidence of disputed material facts sufficient to require trial." *Titus v. Town of Nantucket*, 840 F. Supp. 2d 404, 410 (D. Mass. 2011) (Gorton, J.).  "[T]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997) (quotation omitted); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (evidence must be "significantly probative").

## ARGUMENT

## I.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' PRUDENCE CLAIMS

ERISA requires plan fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  "To determine whether an ERISA fiduciary has breached the duty of prudence, courts consider both the substantive reasonableness of the fiduciary's actions and the procedures by which the fiduciary made its decision, focusing on whether the fiduciary employed proper methods to investigate and evaluate decisions." *Ellis v. Fid. Mgmt. Tr. Co.*, 257 F. Supp. 3d 117, 128-29 (D. Mass. 2017) (quotations omitted), *aff'd*, 883 F.3d 1 (1st Cir. 2018).  Prudence "involves a balancing of competing interests under conditions of uncertainty," and the inquiry accordingly focuses on "how the fiduciary acted viewed from the perspective of the time of the challenged decision." *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009) (quotations omitted).  "[S]o long as the 'prudent person' standard is met, ERISA does not impose

a duty to take any particular course of action if another approach seems preferable." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (quotation omitted).

The undisputed record in this case clearly demonstrates that Defendants made reasonable decisions concerning the Plan's investment lineup and administrative-fee arrangements, and arrived at those decisions through a reasoned investigatory process. Defendants are accordingly entitled to summary judgment on Plaintiffs' prudence claims.[2]

## A. The Plan's Fiduciaries Acted Prudently In Providing Participants Access To A Broad-Choice Investment Window

### 1. *The Investment Window Was A Sensible Component Of The Plan's Multi-Tiered Investment Structure*

Plaintiffs' critiques of the Plan's investment options largely reduce to the theory that the Committee should have restructured the lineup and reduced the number of investment options sooner than it did. *See, e.g.*, ECF No. 98 (SAC) ¶¶ 68-69. At the dismissal stage, however, this Court rejected Plaintiffs' theory that the pre-2015 Plan simply contained too many investment options in its expanded-choice menus. *See* ECF No. 70 at 32, 36; ECF No. 79 at 11. Other courts have broadly agreed that "[a]llegedly offering too many investment options for participants does not suffice for a breach of ERISA's duty of prudence." *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 369 (D.R.I. 2018); *see, e.g.*, *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 687 (D. Conn. 2018); *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1066-67 (M.D. Tenn. 2018); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1350 (N.D. Ga. 2017); *Kelly v. Johns Hopkins Univ.*, 2017 WL 4310229, at *1 (D. Md. Sept. 28, 2017); *Sacerdote v. NYU*, 2017 WL 3701482, at *11 (S.D.N.Y. Aug. 25, 2017). As these courts and others have recognized, providing "many

---

[2] Plaintiffs have also tried to reintroduce their previously dismissed loyalty claim. *See* ECF No. 193-1. Because that claim is not in the case, Defendants do not address it here. Defendants note, however, that for all the reasons Plaintiffs' proposed amendment would be futile, *see* ECF No. 195 at 7-13, Plaintiffs' loyalty claim, if allowed, would fail as a matter of law.

options does not hurt [a plan's] participants, but instead provides them opportunities to choose the investments that they prefer." *Henderson*, 252 F. Supp. 3d at 1350 (citing *Loomis v. Exelon Corp.*, 658 F.3d 667, 673-74 (7th Cir. 2011)). Such "participant choice is the centerpiece of what ERISA envisions for defined-contribution plans." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1134-35 (9th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015).

Plaintiffs' already-dismissed "too many funds" theory remains as fundamentally flawed as it has always been, and there is no basis for permitting them to revive it now. Plaintiffs' criticism of the number of funds in the Investment Window is especially misguided in that it ignores that menu's role within the Plan's broader investment structure. *See Troudt v. Oracle Corp.*, 2019 WL 1006019, *11 (D. Colo. Mar. 1, 2019) (prudence of investment "not assessed in isolation" but as the investment "relates to the portfolio as a whole"). The Investment Window here was one component of a multi-tiered investment structure that balanced the needs of different types of investors among the Plan's diverse participants. Tiers 1 and 2, in which the majority of assets were invested, SUMF ¶ 16, contained the very types of low-cost institutional investment options that Plaintiffs champion, providing simple solutions for participants without the inclination or ability to select from a larger assortment of funds, SUMF ¶¶ 11-12, 15. Plaintiffs do not challenge either of those investment tiers.

While Tiers 1 and 2 were sufficient for some participants, the MIT community includes individuals with considerable financial expertise, such as members of the Economics Department and Sloan School of Management, and some participants expressed a desire for a greater range of options. SUMF ¶ 17. Rather than paternalistically restrict those participants to a narrow set of choices, the Committee chose to offer participants who wanted to take a more active role in designing their retirement portfolio the opportunity to do so. The Committee arranged two

expanded-choice menus to meet that need. SUMF ¶ 18. The Investment Window—Tier 3—included a wide range of Fidelity funds, along with a selection of non-Fidelity funds that included funds historically requested by Fidelity's 401(k) plan clients (the "FundsNet" funds). SUMF ¶¶ 13, 23. The Tier 4 brokerage window, BrokerageLink, offered access to a large portion of the mutual funds available for 401(k) investment. SUMF ¶ 14. MIT informed participants that Tiers 3 and 4 were intended for investors with the desire and ability to evaluate individual investment options. SUMF ¶¶ 19-20.

Despite the brokerage window's even more expansive range of options—including many of the *same* funds as the Investment Window, SUMF ¶ 25—Plaintiffs do not challenge its inclusion in the Plan, and one of Plaintiffs' own experts agrees that brokerage windows are a common and acceptable plan feature, SUMF ¶ 21. Plaintiffs instead focus their investment-related allegations solely on the Investment Window. The Investment Window, however, provided clear advantages to participants. Many funds were available at lower cost through the Investment Window than they were through the brokerage window. SUMF ¶ 26. And investing through the Investment Window did not come with the same conditions attached to the brokerage window, including agreements to arbitrate disputes, limit the platform provider's liability, and bear fees for account inactivity or for failing to meet a minimum balance. SUMF ¶¶ 27-32.[3]

Nor can Plaintiffs contend that the Investment Window fund offerings were inferior to those available through a brokerage window. To the contrary, the FundsNet origin of the non-Fidelity options in the Investment Window meant that the funds were frequently in demand from

---

[3] Plaintiffs' expert Wendy Dominguez tries to frame these terms as a benefit to participants on the theory that they are so onerous as to prevent participants from investing through the brokerage window. SUMF ¶ 33. But Plaintiffs cannot seriously contend that Defendants were required to restrict participants seeking a wide range of choice to an investment channel whose terms they assert are so unfavorable as to prevent participants from using it.

fiduciaries of other plans.  *See* SUMF ¶ 23.  And, as for the menu's line of Fidelity funds,

Fidelity is one of the most experienced fund complexes in the plan-servicing business, offering

investments that are widely held in defined-contribution plans.  SUMF ¶¶ 23-24.

The soundness of the overall Investment Window was borne out in its performance.

While prudence cannot be measured in hindsight, *Bunch*, 555 F.3d at 7, the undisputed facts

confirm that the Investment Window included a high-quality subset of 401(k)-eligible fund

offerings: as a whole, the funds greatly outperformed (by more than $40 million) the median

returns of peer funds over the class period and were disproportionately concentrated in their peer

groups' top two quartiles.  SUMF ¶¶ 37-38.  Plaintiffs' assertion that the menu was substandard,

by contrast, rests on an arbitrary comparison to a set of Vanguard funds selected by their expert

in hindsight, many of which are in entirely different asset classes than the challenged funds.

Buetow Report ¶¶ 87-88; SUMF ¶ 39.[4]  That inapt comparison has no bearing on the prudence of

the funds offered in the Investment Window.  *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820,

823 (8th Cir. 2018) (comparison to performance of "one fund with a different investment

strategy … does not establish anything" about prudence of challenged funds).

By offering the more accessible Investment Window as a companion to the industry-

spanning brokerage window, Defendants gave the many participants who wanted choices beyond

the low-cost offerings in Tiers 1 and 2 access to a high-quality cross-section of the industry's

---

[4] The skewed effect of Plaintiffs' arbitrary comparisons is exemplified by their assignment of roughly $11 million in Plan "losses" to the inclusion of mutual funds concentrated in particular domestic economic sectors or international regions.  *See* Buetow Report ¶ 101.  In fact, over the relevant period, aggregate participant returns in the Plan's sector funds exceeded the return of the Vanguard Total Stock Market Index Trust, and participant returns in the Plan's regional funds matched those of the Vanguard Total International Stock Index.  SUMF ¶¶ 61-62.

401(k)-eligible investment options on better terms than the brokerage window alone would have offered.  Defendants cannot be faulted for doing so.

        2.     *Defendants' Approach To The Investment Window Was Prudent In The Prevailing Circumstances*

With their "too many funds" theory out of the case, Plaintiffs have attempted to restyle their investment-related claims as a challenge to the adequacy of Defendants' monitoring of the Investment Window.  *See, e.g.*, ECF No. 142 at 2, 5.  ERISA, however, requires that a fiduciary's prudence be assessed in light of the circumstances prevailing at the time.  29 U.S.C. § 1104(a)(1)(B).  And the record demonstrates that Defendants' actions with respect to the Investment Window were reasonable in the circumstances here, taking into account the nature of the Investment Window and its role within the overall Plan investment structure.

The Committee, in fact, on multiple occasions sought professional advice on its fiduciary duties with respect to selection and monitoring of the Plan's various investment options, including the Investment Window.  SUMF ¶ 41.  In 2007, the Committee received legal advice—confirmed with the Department of Labor—stating that it was simply required to monitor the Investment Window funds to identify any performance problems and, in turn, supply participants with information about funds that were trailing peers and benchmarks over sustained periods, and to generally ensure that the Investment Window menu was competitive with similar mutual-fund-window offerings from other vendors.  SUMF ¶¶ 42-45.  The Committee did exactly that—collecting data on the performance of Investment Window options and maintaining a "watch list" of funds with outlying performance, which it regularly shared with participants.  SUMF ¶¶ 45, 53.

In 2010, new outside counsel offered a different opinion, advising that the Committee should curate the individual Investment Window funds like they do with Tiers 1 and 2.  SUMF

¶ 46.  The Committee decided to credit this more conservative advice, despite the conflict with earlier guidance.  SUMF ¶ 47.  Given the advantages of the Investment Window, however, the Committee declined to jettison it without a well-considered plan for what structure should take its place.  SUMF ¶ 48.  Instead, the Committee commenced a careful process that included discussions with participants, appointment of a subcommittee of investment experts, and scrutiny of candidate funds with the assistance of the Plan's outside investment consultant, Mercer.  SUMF ¶¶ 49-52.  That process culminated in an expansion of the core menu to include 37 options and consolidation of the Plan's expanded-choice menus in BrokerageLink.  SUMF ¶ 54.

Plaintiffs complain that this process was *too* deliberative, and that the transition should have occurred more quickly.  But ERISA does not impose rigid timelines or require rash decision-making.  *See, e.g.*, *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 708-09 (W.D. Mo. 2019) (alleged delay in moving to lower-cost share class not imprudent where fiduciaries "thoroughly discussed" the issue and "took into account all reasonable information"); *see also Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) ("[T]he content of the duty of prudence turns on 'the circumstances ... prevailing' at the time the fiduciary acts." (quotation omitted)).  The Committee acted reasonably in thoroughly considering its options before making significant changes to the Plan's lineup, and in continuing to monitor the Investment Window as its prior counsel had advised while that deliberative process was underway, *see* SUMF ¶ 53.  "[F]iduciaries who act reasonably—*i.e.*, who appropriately investigate the merits of an investment decision prior to acting—easily clear th[e prudence] bar." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 358 (4th Cir. 2014).  The Committee performed exactly the type of thoughtful investigation that ERISA requires.

3. *ERISA Did Not Require Defendants To Apply Plaintiffs' Proposed Bright-Line Rules To Trim The Investment Window Menu*

Plaintiffs' effort to recast their attack on the Investment Window as a "failure to monitor" is also defeated by the indisputable fact that the Committee collected and considered information about each fund's performance. What Plaintiffs really object to is not the Committee's **monitoring** protocol, but rather its decision to **retain** the full Investment Window menu in light of the information it received. Neither ERISA nor industry practice required Defendants to reflexively remove funds from the Investment Window according to any of the four bright-line rules Plaintiffs espouse.

**First**, Plaintiffs' expert Gerald Buetow asserts that the Investment Window's sector funds (whose portfolios are concentrated in specific economic sectors, like technology) and regional funds (which do the same but for geographic regions) were *per se* inappropriate for any part of a defined contribution plan menu because they are "overly-concentrated." Buetow Report ¶¶ 92-101. Courts, however, have explicitly refused to recognize any such *per se* rule regarding regional and sector funds, even when used in plans' core menus. *See Wildman*, 362 F. Supp. 3d at 705 ("merely because sector funds carry with them an inherent risk does not mean that offering them in the lineup was imprudent"); *Tibble v. Edison Int'l*, 639 F. Supp. 2d 1074, 1117 (C.D. Cal. 2009) (rejecting argument that it is "generally imprudent" to include sector funds in 401(k) plan). Such a rule would also be at odds with prevailing fiduciary practice, as sector and regional funds were prevalent even in more limited core menus offered in 401(k) plans during the class period. SUMF ¶ 59; *see also Tibble*, 639 F. Supp. 2d at 1117 ("[S]ector funds are a common component of many defined contribution plans.").[5]

---

[5] In addition, Plaintiffs' expert Dr. Buetow himself acknowledges that sector and regional funds are available through brokerage windows, SUMF ¶ 60, which, like the Investment Window, are designed to provide participants access to a wide range of options.

**Second**, Plaintiffs' contention that the Committee acted imprudently by not automatically excluding any fund whose trailing three-year performance fell below its benchmark at any point in the prior ten years (SUMF ¶ 63) is similarly unsupported. Plaintiffs offer **no** evidence that **any** actual plan fiduciaries follow that rule in any context, let alone that it is a widespread practice. To the contrary, Dr. Buetow admits that his proffered rule is not used to cull funds from the brokerage window offerings that are analogous to the Investment Window. SUMF ¶ 64. And Ms. Dominguez testified that her investment firm does not follow any such bright-line rule to recommend the removal of funds even from the curated core lineups used by her plan clients. SUMF ¶ 65. Data on actual fiduciary practice convincingly disproves Plaintiffs' rule: Each of the funds targeted by Plaintiffs' theory was favored by fiduciaries of other plans, even through the periods of "underperformance" on which Plaintiffs focus. SUMF ¶ 66. Indeed, it is undisputed that **every one** of the actively managed funds among the 100 most popular mutual funds in 401(k) plans today would be disqualified under Plaintiffs' rule. SUMF ¶ 67. The continued retention of those funds in 401(k) plans shows how far from reality Plaintiffs' imagined rule is. *See Wildman*, 362 F. Supp. 3d at 696 (rejecting testimony of expert who admitted that his "approach has not won wide acceptance in the retirement plan industry").

Notably, the fact that a fund's trailing three-year performance is below that of its benchmark does not mean that a fund has consistently underperformed its benchmark throughout that three-year period. A fund that outperforms for most of a three-year period could still show negative performance on a trailing three-year basis if it experiences a temporary but significant downturn at some point. Under Plaintiffs' approach, however, that fund would automatically be eliminated based on that short-term dip in performance. Courts have consistently rejected similar imprudence claims based on short-term underperformance, recognizing that there are

sound reasons for plan fiduciaries to decide to stay the course. *See, e.g.*, *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (fiduciaries can reasonably choose to retain investments "even during years of lower performance"); *Wildman*, 362 F. Supp. 3d at 707 ("Were the Committee to adopt a strategy of removing funds based on short-term underperformance, Plan participants would be forced to sell their shares at a lower price and miss out on any subsequent improved performance."); *White v. Chevron Corp.*, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016) ("a fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy").

*Third*, Plaintiffs' assertion that no defined-contribution menu should ever include funds with less than five years of performance history contradicts their own position in this case, and is inconsistent with real-world fiduciary practice. Plaintiffs have criticized Defendants for providing participants access to mutual funds rather than restricting them to collective trusts and separate accounts. SAC ¶¶ 130-43. To that end, Dr. Buetow touts the common use of "collective trusts or other non-mutual fund type of investments" in plan lineups. Buetow Rebuttal Report ¶ 50. Yet, because separate accounts are specific to a particular plan, they have no performance history until they are added to a plan's lineup. SUMF ¶ 68. And collective trusts have no performance history until a plan invests in them. SUMF ¶ 69. Thus, neither investment vehicle could exist in any plan menu—whether a core lineup or an expanded-choice window—under Plaintiffs' five-year rule. In reality, in the absence of significant performance history for a specific fund, fiduciaries can and do look to the experience and credentials of the fund's investment advisers to assess its prudence. SUMF ¶ 70. All of the funds challenged for lack of a five-year performance history were offered by deeply experienced advisers with substantial assets under management. SUMF ¶¶ 71-75. And they were widely offered in the

core menus of other large retirement plans during the same period, SUMF ¶ 76, demonstrating that numerous other plan fiduciaries likewise concluded that they were appropriate options for 401(k) plans. Like Plaintiffs' other investment theories, their rigid five-year performance-history rule is unfounded. *See Wildman*, 362 F. Supp. 3d at 705 (rejecting claim that plan imprudently offered fund "without an established record" and noting absence of "authority holding that the implementation of a fund without a long performance history is per se imprudent").

*Fourth*, and finally, Plaintiffs argue that it was imprudent to allow Plan participants access to an actively managed target-date fund series (the Fidelity Freedom Funds) in the Investment Window while designating another target-date suite—the Vanguard Retirement Trusts—as the Plan's default investment option in Tier 1. Buetow Report ¶¶ 117-22. But Plaintiffs offer no evidence that these fund series were "duplicative" beyond the fact that they are both sets of "target-date funds." Courts have recognized that such high-level descriptions do not tell the whole story. *See Wildman*, 362 F. Supp. 3d at 706 (discussing differences that can reasonably justify offering multiple funds in the same "asset class or style box"). And undisputed evidence shows that the two target-date series at issue here differ across multiple dimensions, including investment objective, portfolio composition, the inclusion of actively managed options as underlying funds, and the aggressiveness of their glide paths. SUMF ¶¶ 79-81. In light of these differences—and the broad popularity of the Fidelity Freedom Funds in the retirement plan market, SUMF ¶¶ 82-84—it was entirely reasonable for the Committee to allow participants to select the actively managed Freedom Funds if those funds best served their needs.

In sum, none of Plaintiffs' supposed bright-line rules calls into question the Committee's decision to offer the full Investment Window lineup alongside Tiers 1 and 2. All that remains, then, is Plaintiffs' contention that some Investment Window funds were available in lower-cost

share classes.  SAC ¶¶ 73, 92, 118; Buetow Report ¶ 124 ("There is no prudent reason … to use a more expensive share class[.]").  Plaintiffs, however, elsewhere acknowledge that more expensive share classes often offer revenue sharing to defray plan recordkeeping costs, SAC ¶¶ 60-61, and uncontradicted evidence shows that the Investment Window funds paid over $21 million in revenue sharing in the class period, SUMF ¶ 85.  These payments vastly exceed the share-class expense differences cited by Plaintiffs, and it is undisputed that they were used to pay the Plan's recordkeeper (with sums in excess of agreed recordkeeping compensation reserved for the Plan).  SUMF ¶¶ 86-87.  "Revenue sharing is a 'common' and 'acceptable' investment industry practice that 'frequently inure[s] to the benefit of ERISA plans.'"  *White*, 2016 WL 4502808, at *14 (quoting *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014)).  Yet Plaintiffs' share-class complaint ignores it entirely.

### B.     The Plan's Fiduciaries Prudently Updated The Plan's Administrative Fee Arrangements, Resulting In Reasonable Fees Throughout The Class Period

Plaintiffs' challenge to the administrative fees the Plan paid to Fidelity rests on the contention that Defendants "failed to control recordkeeping costs as Plan assets grew" and should have "capped the amount of revenue sharing at a reasonable fee level to ensure that all amounts above a reasonable fee for recordkeeping services were returned to the Plan."  SAC ¶ 155.  But the record shows that the Plan's fiduciaries *did* obtain from Fidelity revenue-sharing rebates, or credits, as Plaintiffs assert they should have.  SUMF ¶ 98.  And effective in early 2014, they restructured Fidelity's compensation entirely, obtaining a flat per-participant rate of $33 per year and reserving any revenue sharing above that amount for future recordkeeping charges or for credit to participant accounts.  SUMF ¶ 99.[6]  This record defeats Plaintiffs' core

---

[6] As explained above, the Plan's investment lineup was changed in 2015, significantly reducing the presence of Fidelity-managed investments and thus Fidelity's overall compensation. SUMF ¶ 101.  Under the agreement negotiated with Fidelity, the Plan's annual per-participant

allegation that Defendants "failed to control recordkeeping costs." SAC ¶ 155. The Plan's

fiduciaries engaged in a prudent process with respect to administrative fees, and that process

indisputably produced fees in line with those paid by comparable plans for similar services.

1. *The Plan's Fiduciaries Worked With Their Consultant, Mercer, To Secure Several Recordkeeping Fee Reductions Over Time*

Contrary to Plaintiffs' claim that the Plan's fiduciaries did not act to monitor and reduce

Plan administrative fees, the record demonstrates a pattern of prudent engagement on the topic.

At the beginning of the class period, the Plan enjoyed a fully bundled arrangement in which

revenue sharing from the Investment Window funds was the sole source of compensation for the

administrative services performed by the Plan's recordkeeper, Fidelity. SUMF ¶ 91. The Plan's

fiduciaries obtained information on the range of administrative fees borne by comparable plans

at that time through consultation with an external consultant, Mercer. SUMF ¶ 92.

While the Plan's fiduciaries were examining the Plan's administrative fee arrangements,

Fidelity began to offer substantial revenue credits (essentially, rebates of revenue sharing

amounts to the Plan) that reduced effective fees. SUMF ¶ 93. At the same time, as explained

above, the Committee was exploring a possible restructuring of the Plan's investment lineup,

which would require close coordination with the Plan's recordkeeper and have potentially

significant implications for the Plan's administrative pricing arrangements depending on which

investments remained in the lineup. SUMF ¶ 94. In light of those potential changes, Fidelity's

revenue-credit concessions, and MIT's overall satisfaction with Fidelity's services in that period,

the Plan's fiduciaries reasonably decided not to proceed with any formal competitive process at

that time. SUMF ¶ 95; *see Wildman*, 362 F. Supp. 3d at 708-09 (fiduciary decisions judged in

---

administrative fee increased to $52 at that time, which was still within the market range. SUMF
¶¶ 102-03. In 2018, the Plan negotiated a further reduction in Plan administrative fees. SUMF
¶ 104.

light of "totality of the circumstances," which may include consideration of "other changes to the Plan at the time"). Instead, MIT retained Mercer to assist in negotiating with Fidelity concerning its administrative fees. SUMF ¶ 96. This process resulted in confirmation of revenue credits that substantially reduced Fidelity's compensation, and it ultimately produced an agreement to fix recordkeeping fees at a $33-per-participant level that even Plaintiffs' expert considers reasonable. SUMF ¶¶ 98-100.

Plaintiffs nevertheless contend that MIT was required to use a formal bidding process to evaluate its recordkeeping arrangement with Fidelity. *See* SAC ¶ 63; Schmidt Report ¶¶ 74-88. An RFP can certainly be *one* means of prudently evaluating recordkeeping fees, but ERISA does not require Plan fiduciaries to undertake an RFP, RFI, or other formal benchmarking measures in any and all circumstances. *See White*, 2016 WL 4502808, at *14 ("[N]othing in ERISA compels periodic competitive bidding."). Administrative fees are commonly monitored by other means that are at least as effective and often much more efficient. SUMF ¶ 105. Indeed, Plaintiffs' recordkeeping expert Martin Schmidt did not conduct an RFP to determine expected fees for the Plan, SUMF ¶ 106, contradicting his assertion that an RFP is the *only* way to identify what is reasonable. As explained, MIT had sound reasons for taking a different approach, and that approach allowed MIT to secure a concededly reasonable rate of $33 per participant in 2014 and obtain millions in revenue credits before then.

2. *The Plan's Administrative Fees Were In Line With Market Rates*

Plaintiffs rely entirely on testimony from Mr. Schmidt to suggest that the Plan's administrative fees were unreasonably high, but his opinions lack the factual support needed to rise above mere conjecture. *See Pina v. Children's Place*, 740 F.3d 785, 802 (1st Cir. 2014) ("judges cannot allow conjecture to substitute for the evidence necessary to survive summary judgment"). Most fundamentally, Mr. Schmidt admits that he does not know of *any* plan with

the range of choices offered by MIT that paid lower administrative fees.  SUMF ¶ 107.   That alone fatally undercuts his assertion that the Plan's administrative fees were too high.

The analysis performed by Defendants' expert Steven Gissiner, moreover, reveals that Mr. Schmidt's unsupported contention that the Plan paid outsize fees is incorrect.  Mr. Gissiner compared the Plan's administrative fees against a robust database based on numerous defined-contribution-plan fee benchmarking projects, confirming that the Plan's administrative fees were consistently well within the range of fees paid by comparable plans and in many periods were well below the median.  SUMF ¶ 108.  The Plan's administrative fees were also well below the average fees for comparable university plans and fully in line with those of comparable corporate plans in the 2015 to 2017 period (the only period for which public data was available), and they compare favorably against information disclosed in industry surveys.  SUMF ¶¶ 109-110.  Under ERISA, fees within the range of prices paid in a competitive market are judged reasonable.[7]

### C. Undisputed Facts Preclude A Finding That The Plan Suffered A Loss With Respect To Either Investments Or Administrative Fees

Even if Plaintiffs could establish a fiduciary breach (and they cannot), their claims would still fail as a matter of law because the record does not support a finding that the Plan suffered any loss—an essential element of their claims distinct from breach.  *See Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 30, 32 (1st Cir. 2018) (prudence claim has "three elements: breach, loss, and causation," and breach finding "does not mean that the Plan necessarily suffered any loss").

---

[7] *See Wsol v. Fiduciary Mgmt. Assocs., Inc.*, 266 F.3d 654, 657 (7th Cir. 2001) (no fiduciary breach in retaining broker where the amount paid was "as good as what it could have bought in a market free of kickbacks and undue influence"); *Taylor v. United Techs. Corp.*, 2009 WL 535779, at *11 (D. Conn. Mar. 3, 2009) ("plaintiffs have failed to proffer evidence evincing that Fidelity's receipt of its negotiated base fee and sub-transfer agent fees was materially unreasonable and beyond the market rate"); *VanVels v. Betten*, 2007 U.S. Dist. LEXIS 7003, at *18-19 (W.D. Mich. Jan. 31, 2007) (amounts paid for brokerage services not unreasonable where the "record show[ed] that [the defendant] was offered and paid market rates for investment services").

First, it is undisputed that, over the class period, the Investment Window funds collectively (1) delivered returns in excess of what participants would have received had they instead invested in products tracking the funds' benchmarks, SUMF ¶ 36; and (2) delivered returns exceeding the median returns of peer funds by more than $40 million, SUMF ¶ 37. Given that Plaintiffs challenge the retention of the Investment Window as a whole, the Investment Window funds must be considered together when examining whether Plaintiffs have established a loss to the Plan. *See Brotherston*, 907 F.3d at 34 (where theory is that "entire portfolio of investment options" was selected by "imprudent means," relevant comparison is to portfolio-wide returns of benchmarks or comparable funds).[8]  So analyzed, Plaintiffs cannot establish a "loss" based on the inclusion of the Investment Window in the Plan prior to 2015.

The undisputed evidence likewise precludes a finding of "loss" from the Plan's administrative-fee arrangements, because the record provides no reasonable basis to find that the Plan could have secured lower fees.  Plaintiffs' only evidence to support their contention that the Plan could have paid less is the testimony of Mr. Schmidt.  But as noted above, Mr. Schmidt has not identified ***any*** comparable plan that paid less for comparable services during the relevant period.  *See Sacerdote v. NYU*, 328 F. Supp. 3d 273, 307 (S.D.N.Y. 2018) (absent evidence that "any comparable Plan" paid fees "within th[e] [asserted] range," plaintiffs "ha[d] not met their burden of proof").  Uncontradicted testimony from Mr. Gissiner, meanwhile, establishes that the Plan's recordkeeping fees were within market range across the class period.  *See supra* at 17-18.

## II. PLAINTIFFS' PROHIBITED TRANSACTION THEORY IS UNSUSTAINABLE

In addition to their fiduciary-breach claims, Plaintiffs have asserted that Defendants caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a), 29 U.S.C.

---

[8] This conclusion is fortified by Plaintiffs' expert's acknowledgment that there was no way, *ex ante*, to pick "winners and losers" among the Investment Window funds.  SUMF ¶ 40.

§ 1106(a), by causing the Plan to invest in certain non-mutual-fund investment options offered by Fidelity.  *See* ECF No. 82 at 2; ECF No. 79 at 7-9 (dismissing other prohibited transaction claims).  The non-mutual fund options in the Plan's lineup during the class period, however, indisputably satisfied the conditions of the prohibited-transaction exemption in ERISA § 408(b)(8), 29 U.S.C. § 1108(b)(8), which permits investment of plan assets in collective trusts and pooled accounts managed by a "party in interest" so long as the bank or trust company "receives not more than reasonable compensation" and the "transaction is expressly permitted … by a fiduciary (other than the bank, trust company, or insurance company, or an affiliate thereof)[.]"  29 U.S.C. § 1108(b)(8).  Here, the Plan's investment in non-mutual-fund options was expressly permitted the Plan's fiduciaries.  SUMF ¶ 111.  And there is no genuine dispute that the expense ratios of those options were generally less than or comparable to the fees of similar investments.  SUMF ¶ 112.[9]

## CONCLUSION

The undisputed facts show that the Plan's fiduciaries followed careful, deliberative processes in making decisions about the Plan, resulting in a reasonable selection of investment options and Plan administrative fees that were consistent with market rates.  Applying the law to those facts, Defendants are entitled to summary judgment on each of Plaintiffs' claims.

Dated:  July 15, 2019

Respectfully submitted,

*/s/ Shannon M. Barrett*
Shannon M. Barrett (*pro hac vice*)
Brian D. Boyle (*pro hac vice*)
Gregory F. Jacob (*pro hac vice*)
Meaghan Vergow (*pro hac vice*)
Deanna M. Rice (*pro hac vice*)

---

[9] Plaintiffs also allege that MIT failed to monitor the other Defendants.  SAC ¶¶ 194-200.  As the Court recognized at the dismissal stage, this monitoring claim is derivative of Plaintiffs' other claims, *see* ECF No. 79 at 10, and it therefore fails along with them.

O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC, 20006
T: 202-383-5300
F: 202-383-5414
sbarrett@omm.com
bboyle@omm.com
gjacob@omm.com
mvergow@omm.com
derice@omm.com

Catalina J. Vergara (*pro hac vice*)
Natasha S. Fedder (*pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071-2899
T: 213-430-6000
F: 213-430-6407
cvergara@omm.com
nfedder@omm.com

Alison V. Douglass (BBO # 646861)
Roberto M. Braceras (BBO# 566816)
GOODWIN PROCTER, LLP
100 Northern Avenue
Boston, MA 02210
T: 617-570-1676
F: 617-523-1231
adouglass@goodwinlaw.com
rbraceras@goodwinlaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system on July 15, 2019, and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Shannon M. Barrett
Shannon M. Barrett (*pro hac vice*)

*Attorney for Defendants*