**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| DAVID B. TRACEY, DANIEL GUENTHER, MARIA T. NICHOLSON, AND CORRINNE R. FOGG, individually and as representatives of a class of participants and beneficiaries on behalf of the MIT Supplemental 401(k) Plan,<br><br>               *Plaintiffs*,<br><br>v.<br><br>MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE MIT SUPPLEMENTAL 401(K) PLAN OVERSIGHT COMMITTEE, THE ADMINISTRATIVE COMMITTEE, ISRAEL RUIZ, ALISON ALDEN, MARC BERNSTEIN, LAWRENCE CANDELL, GLENN DAVID ELLISON, MICHAEL HOWARD, MARTIN KELLY, S.P. KOTHARI, ROBERT C. MERTON, GUNTHER ROLAND, LORRAINE A. GOFFE-RUSH, GLEN SHOR, PAMELA WELDON, THOMAS M. WIEAND, and BARTON ZWIEBACH,<br><br>               *Defendants*. | No. 1:16-cv-11620-NMG<br><br>**ORAL ARGUMENT REQUESTED** |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendants Massachusetts Institute of Technology ("MIT"),

the MIT Supplemental 401(K) Plan Oversight Committee, the Administrative Committee, Israel

Ruiz, Alison Alden, Marc Bernstein, Lawrence Candell, Glenn David Ellison, Michael Howard,

Martin Kelly, S.P. Kothari, Robert C. Merton, Gunther Roland, Lorraine A. Goffe-Rush, Glen

Shor, Pamela Weldon, Thomas M. Wieand, and Barton Zwiebach submit the following

Statement of Undisputed Material Facts in support of their Motion for Summary Judgment:

| | Undisputed Fact | Cite |
|---|---|---|
| 1. | The Massachusetts Institute of Technology ("MIT") is a private, non-profit university whose mission is "to advance knowledge and educate students in science, technology, and other areas of scholarship that will best serve the nation and the world in the 21st century." | Declaration of Shannon Barrett in Support of Defendants' Motion for Summary Judgment ("Barrett Decl."), Ex. 1, MIT Mission Statement; *see* An Act to Incorporate the Massachusetts Institute of Technology, and to Grant Aid to Said Institute and to the Boston Society of Natural History, 1861 Mass. Acts ch. 183 § 1. |
| 2. | MIT offers its employees a traditional pension plan that MIT fully funds. | Barrett Decl., Ex. 2, 2010 Form 5500 for MIT Basic Retirement Plan; *id.*, Ex. 3, 2017 Form 5500 for MIT Basic Retirement Plan. |
| 3. | MIT also offers its employees the ability to participate in the MIT Supplemental 401(k) Plan (the "Plan"), an employer-sponsored defined contribution plan. | Barrett Decl., Ex. 4, 2010 Form 5500 for MIT Supplemental 401(k) Retirement Plan; *id.*, Ex. 5, 2017 Form 5500 for MIT Supplemental 401(k) Retirement Plan. |
| 4. | The Plan is funded through employee contributions and matching contributions from MIT. | Second Amended Complaint, ECF No. 98 ("SAC") ¶¶ 8-11; Declaration of Kenneth Davies in Support of Defendants' Motion for Summary Judgment ("Davies Decl."), Ex. 6, MIT Supplemental 401(k) Plan, 2008 Restatement at MIT-0005019-22; *id.*, Ex. 18, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-00023080. |

| | | |
|---|---|---|
| 5. | The MIT Supplemental 401(k) Plan Oversight Committee ("Oversight Committee" or "Committee") oversees the Plan's investment lineup. | SAC ¶¶ 20-22. |
| 6. | Members of the Oversight Committee include MIT's Executive Vice President and Treasurer and senior MIT faculty and administrators. | SAC ¶¶ 21-22; Davies Decl. ¶¶ 3, 4; *see* Barrett Decl., Ex. 6, Deposition of Israel Ruiz ("Ruiz Dep.") 18:18-19:11; *id.*, Ex. 7, Deposition of Theresa Stone ("Stone Dep.") 94:14-22; *id.*, Ex. 8, Deposition of Glenn Ellison ("Ellison Dep.") 9:17-10:8. |
| 7. | Among the past or present Oversight Committee members named as individual defendants are a Nobel Laureate professor of finance, the former head of MIT's Department of Economics, a former director of MIT's investment management company, and a senior member of the global investment staff responsible for managing MIT's endowment. | Davies Decl. ¶ 4. |
| 8. | The members of the Oversight Committee serve on a voluntary basis. | Davies Decl. ¶ 3. |
| 9. | Plan participants may allocate the assets in their Plan accounts among various investment options. | Davies Decl., Ex. 6, MIT Supplemental 401(k) Plan, 2008 Restatement at MIT0005023-24; *id.*, Ex. 18, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0023079. |
| 10. | During the class period before July 2015, the Plan offered four tiers of investment options. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150827, MIT-0150831-40. |
| 11. | Tier 1 consisted during the class period of low-risk, low-expense Vanguard Target Retirement Trusts, which were designed to allow participants to invest in a single product whose assets would be automatically reallocated as the employee's retirement date approached. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150827, MIT-0150831; *see* Declaration of Russell R. Wermers in Support of Defendants' Motion for Summary Judgment ("Wermers Decl."), Ex. 1, Wermers Report ¶ 28. |
| 12. | Tier 2 included during the class period seven investment options with varying risk/return profiles covering "the primary asset classes," including a money market account, a bond fund, a diversified stock fund, a | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150827, MIT-0150833. |

|     | Vanguard index trust, and institutional shares of three Vanguard mutual funds. |     |
| --- | --- | --- |
| 13. | During the class period before July 2015, Tier 3, known as the "MIT Investment Window," offered a wide array of mutual funds, including index funds and funds focused on various business sectors and foreign markets. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150827, MIT-0150834-39. |
| 14. | Tier 4 was a self-directed brokerage window, called "BrokerageLink," which provided participants who chose to create a brokerage account with Fidelity with access to a large portion of the mutual funds available for 401(k) investment on the market. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150827, MIT-0150840; *see* Wermers Decl., Ex. 1, Wermers Report ¶ 45. |
| 15. | Tiers 1 and 2 provided simple solutions for participants without the inclination or ability to select from a larger assortment of funds and included a variety of low-cost institutional investment options. | *See* Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150831-33; Wermers Decl., Ex. 1, Wermers Report ¶¶ 44-45. |
| 16. | The majority of Plan assets were invested in Tiers 1 and 2 from the start of the class period through the July 2015 reconfiguration of the Plan's investment lineup. | *See* Davies Decl., Ex. 20, Mercer's 2010 Second Quarter Defined Contribution Performance Evaluation at MIT-0112242; *id.*, Ex. 24, Mercer's 2013 Fourth Quarter Defined Contribution Performance Evaluation at MIT-0003950; *id.*, Ex. 25, Mercer's 2015 Second Quarter Defined Contribution Performance Evaluation at MIT-0112965. |
| 17. | Human Resources personnel at MIT received comments from some Plan participants expressing a desire for a greater range of investment options than those available through Tiers 1 and 2. | Barrett Decl., Ex. 9, Deposition of Maureen Ratigan ("Ratigan Dep.") 58:9-17. |
| 18. | The Oversight Committee intended Tiers 3 and 4 of the Plan menu to cater to participants who wanted a greater range of choice than was available in Tiers 1 and 2. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150834, MIT-0150840; *see* Barrett Decl., Ex. 7, Stone Dep. 104:4-105:17. |
| 19. | MIT informed participants that the Tier 3 Investment Window was directed toward "investors with an understanding of how to research and evaluate individual investments." | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150834. |

| | | |
|---|---|---|
| 20. | MIT informed participants that the Tier 4 brokerage window was directed toward "investor[s] who [were] willing to take on the potential for more risk" and were "prepared to assume the responsibility of more closely monitoring this portion of [their] portfolio." | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150840. |
| 21. | Plaintiffs' expert Wendy Dominguez has recognized that the inclusion of brokerage windows in defined contribution plans is common and appropriate. | Barrett Decl., Ex. 11, Wendy Dominguez Report ¶¶ 21, 30 & Ex. 9; *id.*, Ex. 10, Deposition of Wendy Dominguez ("Dominguez Dep.") 113:4-20. |
| 22. | The Oversight Committee intended the Investment Window to operate in conjunction with BrokerageLink to offer participants ready access to an expanded range of investment choices in the period relevant to this case. | *See* Barrett Decl., Ex. 6, Ruiz Dep. 117:20-118:3 ("[T]he investment window … was an appendage to the brokerage window"). |
| 23. | When the Investment Window was introduced to the Plan, it included all Fidelity mutual funds available to 401(k) plans, as well as a set of non-Fidelity funds that included many funds requested by Fidelity's 401(k) plan clients.  These funds were known as the "FundsNet" funds. | Declaration of Francis Petrangelo in Support of Defendants' Motion for Summary Judgment ("Petrangelo Decl.") ¶ 4; *see* Davies Decl., Ex. 30, Amended and Restated Recordkeeping Agreement Between Massachusetts Institute of Technology and Fidelity Investments Institutional Operations Company, Inc., dated October 22, 2001 ("Recordkeeping Agreement") at MIT-0117077; Barrett Decl., Ex. 7, Stone Dep. 110:18-112:3. |
| 24. | Fidelity is one of the most experienced fund complexes in the plan-servicing business, offering investments that are widely held in defined-contribution plans. | *See* Petrangelo Decl. ¶ 3; Wermers Decl., Ex. 1, Wermers Report ¶¶ 49-51 & Exs. 5, 6, 7A-B. |
| 25. | BrokerageLink provided Plan participants access to many of the same funds that were available through the Investment Window. | Davies Decl., Ex. 22, 2012 MIT 401(k) Plan Investment Structure Process Presentation at MIT-0001771, MIT-0001776-94; *see* Wermers Decl., Ex. 1, Wermers Report ¶ 61. |

| 26. | In 2012, the Plan's third-party investment consultant, Mercer LLC ("Mercer"), determined that 64 of the funds available in both the Investment Window and BrokerageLink were available in a lower-cost share class in the Investment Window relative to the share class available through BrokerageLink. | Davies Decl., Ex. 22, 2012 MIT 401(k) Plan Investment Structure Process Presentation at MIT-0001789-93; *see* Wermers Decl., Ex. 1, Wermers Report ¶ 61. |
|---|---|---|
| 27. | Plan participants investing in the Investment Window were not charged transaction fees or commissions in connection with their investments, whereas participants investing through BrokerageLink were charged transaction fees for investing in certain funds offered through that service. | Davies Decl., Ex. 1, Fidelity BrokerageLink Participant Acknowledgment Form at MIT-0008452; *id.*, Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150840; *id.*, Ex. 7, April 30, 2012 Minutes of the Meeting of the MIT Supplemental 401(k) Plan Oversight Committee at MIT-0001511; Barrett Decl., Ex. 10, Dominguez Dep. 145:10-21, 169:7-10; *see* Wermers Decl., Ex. 1, Wermers Report ¶ 61. |
| 28. | Plan participants are required to complete a Fidelity BrokerageLink Participant Acknowledgement Form in order to invest through BrokerageLink. | Davies Decl., Ex. 1, Fidelity BrokerageLink Participant Acknowledgment Form at MIT-0008442-52. |
| 29. | By completing a Fidelity BrokerageLink Participant Acknowledgement Form, Plan participants agree to a series of terms and conditions which include limitations of liability, potential fees for low account activity or failure to maintain minimum account balances, and the arbitration of any disputes. | Davies Decl., Ex. 1, Fidelity BrokerageLink Participant Acknowledgment Form at MIT-0008449, MIT-0008451-52; *see also* Barrett Decl., Ex. 10, Dominguez Dep. 153:1-20, 157:14-158:9, 162:21-164:1. |
| 30. | By completing a Fidelity BrokerageLink Participant Acknowledgement Form, Plan participants also acknowledge that they bear the burden of notifying Fidelity of erroneous or incorrect orders. | Davies Decl., Ex. 1, Fidelity BrokerageLink Participant Acknowledgment Form at MIT-0008448-49; *see also* Barrett Decl., Ex. 10, Dominguez Dep. 158:10-161:6. |
| 31. | As a result of the agreements and acknowledgements required to invest through BrokerageLink, participants investing through BrokerageLink who fail to immediately | Davies Decl., Ex. 1, Fidelity BrokerageLink Participant Acknowledgment Form at |

| | | |
|---|---|---|
| | notify Fidelity of erroneous or inaccurate trades may not be subsequently made whole if and when they notice and later notify Fidelity of any such errors. | MIT-0008448-49; *see* Barrett Decl., Ex. 10, Dominguez Dep. 158:10-161:6. |
| 32. | Participants wishing to invest their participant account balances through the Investment Window were not required to sign an acknowledgement form, nor were they otherwise required to agree to limitations of liability, potential fees for low account activity or failure to maintain minimum account balances, or the arbitration of any disputes. | Davies Decl. ¶ 7; *see* Barrett Decl., Ex. 10, Dominguez Dep. 135:21-137:23. |
| 33. | Plaintiffs' expert Wendy Dominguez testified that the steps required to invest through brokerage windows benefit participants because they deter participants from completing them. | *See* Barrett Decl., Ex. 10, Dominguez Dep. 131:4-7, 135:21-136:15, 137:8-138:6, 154:22-155:16, 162:14-20, 164:2-11. |
| 34. | On a dollar-weighted basis, participants' investments in the Investment Window during the class period delivered returns that were within $395,898 of the returns participants would have achieved had they been able to make the same investment allocations directly in the funds' benchmarks, and earn the full measure of benchmark returns, instead. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶¶ 27-28 & Ex. 2. |
| 35. | It is not possible to invest directly in a prospectus benchmark, and investing in a fund that seeks to track a benchmark index comes with investment management costs that are not accounted for in reporting the performance of the benchmark index itself. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 28. |
| 36. | Participants' investments in the Investment Window funds during the class period delivered returns that exceeded the returns participants would likely have achieved had they instead invested in funds seeking to track the Investment Window funds' benchmarks, taking into the account the likely costs of investing in an actual fund tracking the benchmark. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 28. |
| 37. | On a dollar-weighted basis, participants' investments in the funds in the Investment Window delivered returns that were more than $40 million higher than the participants would have achieved had they been able to make the same investment allocations in a fund delivering the median returns of each Investment Window fund's peer group. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 31 & Ex. 4. |
| 38. | For each year from 2010 through 2015, the majority of the actively managed mutual funds in the Investment | Wermers Decl., Ex. 1, Wermers Report ¶ 84 & Exs. 17A-17C. |

| | | |
|---|---|---|
| | Window had one-, three-, and five-year returns in the top two quartiles of their respective mutual fund peer groups. | |
| 39. | Many of the Vanguard funds used by Plaintiffs' expert Gerald Buetow as comparators for the Investment Window options are in different asset classes than the challenged Investment Window funds. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶¶ 25-26 & Exs. 1A-1B. |
| 40. | Plaintiffs' expert Gerald Buetow has acknowledged that there was no way, at the beginning of the class period, for the Committee to identify which funds within the Investment Window would outperform their benchmarks during the class period and which funds would not. | Barrett Decl., Ex. 12, Deposition of Gerald Buetow ("Buetow Dep.") 224:18-225:23. |
| 41. | The Oversight Committee on multiple occasions sought counsel on its fiduciary responsibilities with respect to selection and monitoring of the Plan's various investment options, including the Investment Window. | Davies Decl., Ex. 27, Letter From R. Gaudreau, Jr., to P. Callahan Fay, MIT-0123435; *id.*, Ex. 8, May 24, 2010 Minutes of the Meeting of the MIT Supplemental 401(k) Plan Oversight Committee at MIT-005196. |
| 42. | In 2007, the Committee received legal advice from outside lawyers, which the outside lawyers represented to have been confirmed with the Department of Labor, stating that it had a "diluted level of fiduciary responsibility with respect to Tier 3 investment options," "significantly lower than its role with respect to Tiers 1 and 2." | Davies Decl., Ex. 27, Letter From R. Gaudreau, Jr., to P. Callahan Fay at MIT-0123439. |
| 43. | Counsel advised that the Committee was required to ensure that the Investment Window menu was competitive with similar mutual-fund-window offerings from other vendors. | Davies Decl., Ex. 27, Letter From R. Gaudreau, Jr., to P. Callahan Fay at MIT-0123439. |
| 44. | Counsel reported that "DOL suggested that the Oversight Committee should consider" "periodically monitoring the funds available under Tier 3 using information provided by the vendor in order to identify any funds that are underperforming," "advising participants of any funds that are underperforming," and "in the event that a large number of funds offered by the vendor are underperforming, selecting a new vendor." | Davies Decl., Ex. 27, Letter From R. Gaudreau, Jr., to P. Callahan Fay at MIT-0123439. |
| 45. | Counsel stated that "DOL's position [wa]s consistent with" the approach then followed by the Oversight Committee "of utilizing Fidelity to (1) provide information the Oversight Committee may use to monitor Tier 3 investment options, (2) help develop a 'watch list' of underperforming investment options under Tier 3 and (3) assist with notifying participants of any such underperforming investment options." | Davies Decl., Ex. 27, Letter From R. Gaudreau, Jr., to P. Callahan Fay at MIT-0123439. |

| 46. | In 2010, different outside counsel advised that the Committee's fiduciary responsibility for the Investment Window required curation of individual Investment Window funds as with Tiers 1 and 2. | *See* Barrett Decl., Ex. 7, Stone Dep. 126:9-11. |
|---|---|---|
| 47. | The Committee decided to comply with this later advice, notwithstanding the conflict with earlier guidance. | *See* Barrett Decl., Ex. 7, Stone Dep. 125:11-128:8 . |
| 48. | After deciding to comply with the later advice of counsel concerning its fiduciary responsibility with respect to the Investment Window, the Committee declined to jettison the Investment Window without a well-considered plan for what structure should take its place given the advantages that menu afforded Plan participants and participants' stated interest in the expanded choices that menu provided. | *See* Barrett Decl., Ex. 7, Stone Dep. 62:15-63:16; *id.*, Ex. 6, Ruiz Dep. 68:9-69:5, 69:23-70:15. |
| 49. | The Committee engaged in extensive deliberations about the overall structure that the Plan's investment lineup could take without the presence of the Investment Window and received input from its investment consultant, Mercer, on this subject. | Barrett Decl., Ex. 6, Ruiz Dep. 37:10-17, 63:14-64:4; *see, e.g.*, Davies Decl., Ex. 21, May 31, 2012 MIT 401(k) Plan Investment Structure Process Presentation, MIT-0001718; *id.*, Ex. 22, September 27, 2012 MIT 401(k) Plan Investment Structure Process Presentation, MIT-0001767; *id.*, Ex. 23, December 11, 2012 MIT 401(k) Plan Investment Structure Review Presentation, MIT-0000470. |
| 50. | As part of its process for determining the structure of the Plan's investment lineup without the Investment Window, the Committee elicited feedback from members of the MIT participant community to help ensure that the Plan's offerings remained responsive to participant needs. | Davies Decl., Ex. 10, Feb. 27, 2014 Presentation on Community Feedback on the Proposal to Streamline 401(k) Plan Investment Line-up, MIT-0000541-49; *id.*, Ex. 26, MIT 401(k) Fund Investment Line-up Change Presentation, MIT-0001886; *id.*, Ex. 11, MIT 401(k) Proposed Investment Structure Feedback, MIT-0001902-05; *id.*, Ex. 12, MIT Plan Investment Line-up Change, MIT-0001914; *id.*, Ex. 13, November 21, 2013 401(k) Investment |

| | | Line-up Preview Sessions, MIT-0002090-94. |
|---|---|---|
| 51. | Once the Committee settled on the general parameters it preferred for the Plan's investment menu going forward, it formed a Fund Selection Subcommittee of financially sophisticated Committee members and charged them with developing proposals about which specific investment options to include in the core lineup and how to map assets from funds that were being removed. | Davies Decl., Ex. 14, September 12, 2013 E-mail from K. Davies to D. Chused at MIT-0133220; Barrett Decl., Ex. 8, Ellison Dep. 36:14-38:8. |
| 52. | The Fund Selection Subcommittee met numerous times, reviewing detailed information regarding individual investment options, including information provided by Mercer, and discussing possible mapping strategies. | Barrett Decl., Ex. 9, Ratigan Dep. 92:21-93:16; *id.*, Ex. 8, Ellison Dep. 40:5-22, 70:21-72:4, 81:7-82:2, 85:11-17; 90:7-91:2. |
| 53. | While this process was underway, the Committee continued to monitor the Investment Window funds in the manner its prior counsel had advised was appropriate, maintaining a "watch list" of funds with potential concerns, which the Committee shared with participants on the Plan's web page. | Davies Decl. ¶ 8; *see id.*, Ex. 2, Fidelity's 2010 Second Quarter Performance Evaluation at MIT-0000775-846; *id.*, Ex. 3, Fidelity's 2010 Fourth Quarter Performance Evaluation at MIT-0001094-181; *id.*, Ex. 4, Fidelity's May 31, 2012 Performance Evaluation at MIT-0000406-65; *id.*, Ex. 5, Fidelity's May 15, 2013 Performance Evaluation at MIT-0002003-57; Barrett Decl., Ex. 6, Ruiz Dep. 27:7-17, 30:10-31:2, 93:9-22; *id.*, Ex. 15, Deposition of Martin Kelly 52:3-14. |
| 54. | Following the completion of the Subcommittee's work, the Committee in February 2015 voted to reorganize and streamline the Plan's lineup into thirty-seven "core" investment options while eliminating the Investment Window as a separate expanded-choice menu and requiring participants seeking broader choices to pursue them through the Plan's BrokerageLink option. | Davies Decl., Ex. 9, January 20, 2015 Minutes of the Meeting of the MIT Supplemental 401(k) Plan Oversight Committee at MIT-0002406-36 (noting subsequent Feb. 12, 2015 vote to restructure investment lineup); *see generally id.*, Ex. 15, MIT 2015 401(k) Investment Transition Guide, MIT-0012173; *id.*, Ex. 16, Letter from I. Ruiz to MIT 401(k) |

| | | |
|---|---|---|
| | | Plan Participants, MIT-0000566. |
| 55. | Amounts the Plan had invested in each fund that was removed from the Plan as part of the 2015 redesign were "mapped" to a specified option in the new lineup, unless participants elected to reallocate their accounts differently. | *See* Davies Decl., Ex. 15, MIT 2015 401(k) Investment Transition Guide at MIT-0012182. |
| 56. | Most of the former Investment Window options that were not carried into the core lineup remained available to participants through BrokerageLink. | Davies Decl., Ex. 22, September 27, 2012 MIT 401(k) Plan Investment Window Analysis Presentation at MIT-0001769-71, MIT-0001794 (of 320 Investment Window funds, only 25 "do not exist in BrokerageLink"); Wermers Decl., Ex. 1, Wermers Report ¶ 59 ("after the 2015 Mapping, some Plan participants chose to continue to diversify and tailor their portfolios to their individual needs and risk tolerances by using BrokerageLink to invest in funds removed from the Plan's lineup during the 2015 Mapping"). |
| 57. | Sector funds provide investors the ability to make targeted investments in a particular economic sector while maintaining diversification across firms in that sector. | Wermers Decl., Ex. 1, Wermers Report ¶ 55; *id.*, Ex. 2, Wermers Rebuttal Report ¶ 46; *see also* SAC ¶ 107 ("Fidelity select or sector funds focus on one particular segment of the economy and invest in securities issues by companies concentrated in that segment."). |
| 58. | Regional funds invest in companies concentrated in a particular geographic region or country. | SAC ¶ 107 ("The Fidelity international specialty funds refer to investments that invest in companies concentrated in a particular region or country located throughout the world."). |

| 59. | Sector and regional funds like those offered through the Investment Window were common in core investment option menus offered in other defined contribution plans in the period from 2010 through 2015. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 48 & Ex. 7. |
|---|---|---|
| 60. | Plaintiffs' expert Gerald Buetow testified that sector and regional funds are available to defined-contribution-plan participants through plan brokerage windows. | Barrett Decl., Ex. 12, Buetow Dep. 130:19-131:8. |
| 61. | From August 2010 through July 2015, Plan participants' investments in the sector funds available in the Investment Window earned returns that, on a dollar-weighted basis, exceeded the returns participants would have achieved had all of their sector fund allocations instead been invested in an investment product offering exposure to all economic sectors, such as the Vanguard Total Stock Market Index Trust. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 51 & Ex. 8A. |
| 62. | From August 2010 through July 2015, Plan participants' investments in the regional funds available in the Investment Window earned returns that, on a dollar-weighted basis, were equivalent to the returns participants would have achieved had all of their regional fund allocations instead been invested in an investment product offering exposure to all international regions, such as the Vanguard Total International Stock Index. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 51 & Ex. 8B. |
| 63. | Plaintiffs' expert Gerald Buetow has offered the opinion that any fund that experiences trailing three-year performance below that of its benchmark should automatically be removed from a defined-contribution-plan investment lineup, and that any fund that has experienced trailing three-year performance below that of its benchmark at any time in the prior ten years should not be considered for a defined-contribution-plan menu. | Barrett Decl., Ex. 13, Buetow Report ¶¶ 38-39; *id.*, Ex. 12, Buetow Dep. 230:2-237:4. |
| 64. | Plaintiffs' expert Gerald Buetow admits that his proffered rule that any fund whose trailing three-year performance falls below that of its benchmark should be automatically removed from a defined contribution plan's investment lineup is not used by defined contribution plan fiduciaries to cull funds from brokerage window offerings. | Barrett Decl., Ex. 12, Buetow Dep. 127:22-128:14. |
| 65. | Plaintiffs' expert Wendy Dominguez testified that her investment consulting firm does not follow a bright-line rule of recommending removal of funds from core plan investment lineups merely because their trailing three-year performance is below their benchmarks. | Barrett Decl., Ex. 10, Dominguez Dep. 97:8-98:12. |
| 66. | Each of the funds that Plaintiffs' expert Gerald Buetow has identified as failing his proposed rule requiring removal whenever the funds' trailing three-year performance is below their benchmarks was offered in | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 52. |

| | | |
|---|---|---|
| | other defined contribution plan core lineups even through the periods of "underperformance" on which Plaintiffs focus. | |
| 67. | Every one of the actively managed funds included in BrightScope's 2018 list of the most popular mutual funds among 401(k) plans (measured by 401(k) assets under management) had underperformed its benchmark on a trailing three-year basis either during the class period, or at some point during the preceding ten years, and would have been disqualified from 401(k) plan investing for all or much of the class period under Dr. Buetow's three-year performance rule. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 55 & Ex. 9 & Supp. Ex. 9. |
| 68. | Separate accounts are investment accounts specifically created for a single plan, and have no performance history when they are added to a plan's lineup. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 58 n.95; *see* SAC ¶ 130. |
| 69. | Collective trusts are investment vehicles that are open only to tax-qualified investors like 401(k) plans.  For collective trusts to exist, some plans must invest in them at a point when they have less than five years of performance history. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 58 n.95; *see* SAC ¶ 137. |
| 70. | In the absence of a significant performance history for a specific fund, investors look to the experience and qualifications of the funds' investment advisers to assess the prudence of the fund. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶¶ 58-60 & n.95. |
| 71. | All of the funds challenged by Plaintiffs for lack of a five-year performance history were managed by Calvert, Fidelity, or Schroder.  All three of these mutual fund complexes had a long history of providing investment management services to investors in the United States prior to the class period. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 59 & Ex. 11. |
| 72. | Fidelity was one of the largest investment advisors in the world based on assets under management at the inception of the class period, with more than $1.8 trillion in worldwide assets under management as of year-end 2010. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶¶ 58-59; *see id.*, Ex. 1, Wermers Report, Ex. 5. |
| 73. | Calvert had $14.7 billion in worldwide assets under management as of year-end 2010. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 59; *see id.*, Ex. 1, Wermers Report, Ex. 5. |
| 74. | Schroder had $307.9 billion in worldwide assets under management as of year-end 2010. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 59. |
| 75. | The portfolio managers of the funds challenged by Plaintiffs for lack of a five-year performance history had, on average, fourteen years of experience as portfolio managers as of 2010. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 60 & Ex. 11. |

| | | |
|---|---|---|
| 76. | During the period from August 9, 2010 to July 19, 2015, between 84.6 and 97.5 percent (depending on the year) of the funds challenged by Plaintiffs for lack of a five-year performance history were offered by at least one other large plan (*i.e.*, a plan with $1 billion or more in assets), and between 52.6 percent and 69.4 percent (depending on the year) were offered by at least three other plans with $1 billion or more in assets. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 61 & Ex. 12. |
| 77. | Prior to the 2015 reorganization of the Plan's investment lineup, there were two target-date series offered in the Plan: the Vanguard Retirement Trusts, which were the Plan's default investment options, and the Fidelity Freedom Funds, which were included in the Investment Window. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150827, MIT-0150831, MIT-0150834; *see* Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 65. |
| 78. | The target-date series offered by Vanguard and Fidelity are both reasonable candidates for serving as target-date funds in a defined contribution plan. | *See* Barrett Decl., Ex., 10, Dominguez Dep. 27:17-28:15. |
| 79. | As Plaintiffs' expert agrees, different target date series offered by different providers have different characteristics, including divergent glide paths, different asset allocations, and different underlying investment construction (*i.e.*, actively or passively managed underlying funds). | *See* Barrett Decl., Ex. 10, Dominguez Dep. 18:15-23:22, 27:17-28:9. |
| 80. | The Vanguard Retirement Trusts were comprised of three to five underlying funds, most of which were passively managed, did not invest in commodity sector funds, and had, relative to the Fidelity Freedom Funds, a greater glide path allocation to equities prior to the target retirement date. | *See* Barrett Decl., Ex. 10, Dominguez Dep. 27:17-28:9; Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 66 & Exs. 13A-B. |
| 81. | The Fidelity Freedom Funds were comprised of twenty-eight underlying mutual funds and asset management programs, most of which were actively managed, invested in commodity sector funds among other funds, and had, relative to the Vanguard Retirement Trusts, a smaller glide path allocation to equities prior to the target retirement date. | *See* Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 66 & Exs. 13A-B. |
| 82. | At least 25 other large defined contribution plans (*i.e.*, plans with $1 billion or more in assets) offered Fidelity Freedom Funds in their plan investment lineups in the period from 2010 to 2014. | Wermers Decl., Ex. 1, Wermers Report, Ex. 8A. |
| 83. | As of the end of 2015, more than 30 defined contribution plans with more than $1 billion in assets that were recordkept by Fidelity offered the Fidelity Freedom K series of funds as investment options in their plans. | Petrangelo Decl. ¶ 7. |

| | | |
|---|---|---|
| 84. | *Prior to the changes to the Plan lineup in July 2015, more Plan participants elected to invest in the Fidelity Freedom Funds than in the Vanguard Retirement Trusts, and Plan participants invested more money in the Fidelity Freedom Funds than in the Vanguard Retirement Trusts, even though the Vanguard Retirement Trusts were the default investment options.* | *See* Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶¶ 67-68 & Ex. 14. |
| 85. | The Investment Window funds paid more than $21 million in revenue sharing as compensation to the Plan's recordkeeper for recordkeeping and administrative services provided to the Plan during the class period. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 36 & Ex. 5; *see also* Barrett Decl., Ex. 17, Schmidt Report ¶ 101. |
| 86. | Revenue sharing payments from the Investment Window funds exceeded the share-class-expense differences that Plaintiffs' expert Dr. Buetow identifies as "damage" to the Plan by more than $15 million. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 36 & Ex. 5 (revenue sharing amounts from Investment Window options based on Schmidt analysis totaled approximately $21.5 million); Barrett Decl., Ex. 13, Buetow Report ¶ 130 (asserting $5,283,869.23 loss from share-class issue). |
| 87. | Up until April 2014, revenue-sharing payments from Investment Window funds were used to compensate the Plan's recordkeeper for its administrative services to the Plan, net of revenue credits that were paid by Fidelity to the Plan to defray future Plan costs.  After April 2014, revenue-sharing payments from the Investment Window funds were used to offset the Plan's per-participant recordkeeping fee on a dollar-for-dollar basis, with the remainder reserved to defray future Plan costs. | *See* Wermers Decl., Ex. 1, Wermers Report ¶ 77; Barrett Decl., Ex. 17, Schmidt Report ¶ 61; *see also id.*, Ex. 6, Ruiz Dep. 138:17-21, 146:16-18. |
| 88. | Plan investments made through the brokerage window did not generate revenue-sharing credits for the Plan to be used as compensation for the Plan's recordkeeping services. | Davies Decl., Ex. 28, Trust Agreement between Massachusetts Institute of Technology and Fidelity Management Trust Company ("Trust Agreement"), Twelfth Amendment, Schedule B at MIT-0004713 ("No offsets are available for assets held in BrokerageLink."). |
| 89. | Fidelity Investments ("Fidelity") has served as the Plan's recordkeeper and directed trustee since 1999. | SAC ¶ 78; Davies Decl., Ex. 30, Recordkeeping Agreement at MIT-0117066; |

| | | *id.*, Ex. 28, Trust Agreement at MIT-0004624-27. |
|---|---|---|
| 90. | MIT selected Fidelity as the Plan's recordkeeper after issuing a formal Request for Proposals and evaluating competing bids. | Barrett Decl., Ex. 6, Ruiz Dep. 121:9-18. |
| 91. | From the outset of the class period until 2014, the Plan had a bundled fee arrangement with Fidelity under which Fidelity received revenue sharing from the mutual funds in the Investment Window as compensation for the administrative services it provided to the Plan, in lieu of any separate or explicit charge for such services. | Barrett Decl., Ex. 6, Ruiz Dep. 104:5-18, 122:2-123:11, 138:17-21, 146:16-18; *id.*, Ex. 7, Stone Dep. 92:13-93:3, 95:15-96:1, 98:6-99:7; Davies Decl., Ex. 30, Recordkeeping Agreement at MIT-0117076-84. |
| 92. | At the beginning of the class period, Plan fiduciaries received information on the range of administrative fees borne by other defined contribution plans through consultation with Mercer, which provided an understanding of where the range of market prices was based on its client base. | Barrett Decl., Ex. 6, Ruiz Dep. 123:19–125:5. |
| 93. | In 2011, Fidelity approached MIT with an offer to provide a credit, or rebate, to the Plan tied to the amount by which revenue sharing was expected to exceed a revenue target, which would reduce effective Plan administrative fees. | Davies Decl., Ex. 30, Recordkeeping Agreement, Eighth Amendment at MIT-0133378 (showing $100,000 credit); *see* Barrett Decl., Ex. 6, Ruiz Dep. 135:18-137:5. |
| 94. | During the period when MIT was negotiating a new recordkeeping fee arrangement with Fidelity, the Plan's fiduciaries were aware that the Committee was exploring a possible restructuring of the Plan's investment lineup and that such a restructuring would require close coordination with the Plan's recordkeeper and could have significant implications for the Plan's recordkeeping pricing arrangements depending on which investments remained in the lineup. | Declaration of Israel Ruiz in Support of Defendants' Motion for Summary Judgment ("Ruiz Decl.") ¶¶ 6-7. |
| 95. | In light of the potential changes to the Plan's investment lineup, MIT's overall satisfaction with Fidelity's services at the time, and the extent of Fidelity's price concessions, the Plan's fiduciaries concluded that a formal competitive bidding process was not warranted at the time. | Ruiz Decl. ¶¶ 5-9. |
| 96. | In 2012, MIT retained Mercer to assist in negotiating the compensation received by Fidelity for providing recordkeeping and other administrative services to the Plan. | Ruiz Decl. ¶ 3. |
| 97. | The Plan fiduciaries' communications with Mercer led them to believe that once Fidelity's compensation | Ruiz Decl. ¶ 5. |

| | arrangement had been renegotiated, a competitive bidding process was not likely to result in any materially different level of fees for the administrative services the Plan required. | |
|---|---|---|
| 98. | The negotiation process resulted in confirmation of arrangements in which Fidelity agreed to rebate to the Plan revenue sharing from the Plan's mutual fund investments in amounts estimated to exceed revenue targets in a contract year, which substantially reduced Fidelity's compensation. | Ruiz Decl. ¶ 4; *see* Davies Decl., Ex. 30, Recordkeeping Agreement, Tenth Amendment at MIT-0004611 ($1.1 million credit); *id.*, Ex. 28, Trust Agreement, Twelfth Amendment at MIT-0004713 ($1.2 million credit). |
| 99. | In addition, with Mercer's assistance, the Plan secured a new recordkeeping fee arrangement with Fidelity, effective April 2014, under which the Plan agreed to pay a flat annual rate of $33 per participant and any revenue sharing from the Plan's investment options would be applied to offset that per-participant fee and would otherwise be remitted to the Plan's expense reimbursement account to be used to defray Plan expenses or credited to participants. | Ruiz Decl. ¶ 4; Davies Decl., Ex. 30, Recordkeeping Agreement, Eleventh Amendment at MIT-0004617; *id.*, Ex. 28, Trust Agreement, Twelfth Amendment at MIT-0004709. |
| 100. | Plaintiffs' expert Martin Schmidt has acknowledged that $33 per participant was a reasonable rate for the recordkeeping services provided to the Plan at that time. | Barrett Decl., Ex. 17, Schmidt Report ¶ 145. |
| 101. | When the Plan's investment lineup was changed in 2015, the number of Fidelity-managed investment options was greatly reduced, which caused Fidelity's overall compensation to decline. | Davies Decl., Ex. 9, January 20, 2015 Minutes of the Meeting of the MIT Supplemental 401(k) Plan Oversight Committee at MIT-002406, MIT-002418-19 (New Core Investment Lineup), MIT-0002420-32 (mapping proposal showing old and new investment options). |
| 102. | Under the recordkeeping contract that the Plan had with Fidelity, the Plan's annual per-participant administrative fee increased to $52 when the Plan's investment lineup was revised in 2015. | Davies Decl., Ex. 28, Trust Agreement, Thirteenth Amendment at MIT-0004724. |
| 103. | The $52 per-participant per-year rate paid by the Plan from 2015 to 2018 was within market rates. | *See* Declaration of Steven K. Gissiner in Support of Defendants' Motion for Summary Judgment ("Gissiner Decl."), Ex. 1, |

| | |
|---|---|
| | Gissiner Rebuttal Report ¶ 105-07 & Exs. 5-7. |
| 104. Effective July 2018, the Plan's annual per-participant administrative fee was further reduced below the $52 per-participant rate. | Davies Decl., Ex. 29, Trust Agreement, Fourteenth Amendment at MIT-0152166. |
| 105. Administrative fees are often monitored by defined contribution plan fiduciaries by means other than competitive bidding. | Gissiner Decl., Ex. 1, Gissiner Rebuttal Report ¶¶ 40-44. |
| 106. Plaintiffs' expert Martin Schmidt did not conduct a request for proposal ("RFP") or request for information ("RFI") in reaching his opinion as to what would have been a reasonable rate for recordkeeping services provided to the Plan. | Barrett Decl., Ex. 17, Schmidt Report ¶ 74; *id.*, Ex. 16, Deposition of Martin Schmidt ("Schmidt Dep.") 109:21-23. |
| 107. Plaintiffs' expert Martin Schmidt has admitted that he does not know of any plan with the range of investment choices offered by MIT that paid lower administrative fees than the Plan did. | Barrett Decl., Ex. 17, Schmidt Dep. 155:18-156:3. |
| 108. Defendants' expert Steven Gissiner compared the fees paid by the Plan during the class period against a database based on numerous defined-contribution-plan benchmarking projects and determined that the Plan's administrative fees were within the range of fees paid by the comparable plans within the database and were, in many periods, well below the median. | Gissiner Decl., Ex. 1, Gissiner Rebuttal Report ¶¶ 105-06 & Exs. 5-7. |
| 109. Mr. Gissiner also determined, based on available data, that the Plan's fees were well below the average fees for comparable university plans and in line with those of comparable corporate plans during the 2015 to 2017 period, the only period for which public data was available. | Gissiner Decl., Ex. 1, Gissiner Rebuttal Report ¶¶ 98, 110-16. |
| 110. With one exception, the Plan's per-participant administrative fees have been lower than the median per-participant fees reported by the consulting firm NEPC in each year since 2012. | Gissiner Decl., Ex. 1, Gissiner Rebuttal Report ¶ 115 & Ex. 5. |
| 111. The Plan's investment in non-mutual-fund options was expressly permitted by the Plan's fiduciaries. | *See, e.g.*, Davies Decl., Ex. 28, Trust Agreement at MIT-0004630 (listing "collective investment funds" among available investment options), MIT-0004642 (reflecting sponsor agreement to participate in Fidelity Group Trust), MIT-0004652 (including maintenance of |

| | |
|---|---|
| | "commingled pools" as plan investment options among administrative services to be provided by Fidelity); *id.*, Ex. 28, Trust Agreement, Fourth Amendment at MIT-0004668; *id.*, Ex. 28, Trust Agreement, Eighth Amendment at MIT-0004674. |
| 112.  The expense ratios of the Plan's non-mutual-fund investment options were generally less than or comparable to the fees of similar investments throughout the class period. | Wermers Decl., Ex. 1, Wermers Report ¶¶ 92-95 & Exs. 20-21. |

Dated:  July 15, 2019

Respectfully submitted,

*/s/ Shannon M. Barrett*
Shannon M. Barrett (*pro hac vice*)
Brian D. Boyle (*pro hac vice*)
Gregory F. Jacob (*pro hac vice*)
Meaghan Vergow (*pro hac vice*)
Deanna M. Rice (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC, 20006
T: 202-383-5300
F: 202-383-5414
sbarrett@omm.com
bboyle@omm.com
gjacob@omm.com
mvergow@omm.com
derice@omm.com

Catalina J. Vergara (*pro hac vice*)
Natasha S. Fedder (*pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071-2899
T: 213-430-6000
F: 213-430-6407
cvergara@omm.com
nfedder@omm.com

Alison V. Douglass (BBO # 646861)

Roberto M. Braceras (BBO# 566816)
GOODWIN PROCTER, LLP
100 Northern Avenue
Boston, MA 02210
T: 617-570-1676
F: 617-523-1231
adouglass@goodwinlaw.com
rbraceras@goodwinlaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system on July 15, 2019, and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Shannon M. Barrett*
Shannon M. Barrett (*pro hac vice*)

*Attorney for Defendants*