**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

DAVID B. TRACEY, *et al*.,

Plaintiffs,

v.

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, *et al*.,

Defendants.

No. 16-cv-11620-NMG

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [DOC. 204]**

# TABLE OF CONTENTS

Legal Standard ............................................................................................................. 4

I.      Summary Judgment Standard ........................................................................ 4

II.     ERISA's Fiduciary Duties—the Highest Known to the Law ............................ 4

Argument ..................................................................................................................... 6

I.      The Court Cannot Disregard Plaintiffs' Experts.............................................. 6

        A.      Expert Disputes Create Issues of Fact ................................................ 6

        B.      Credibility Determinations at Summary Judgment are Reversible Error .............. 7

II.     Defendants Caused Participants to Pay Fidelity Excessive and Unreasonable
        Recordkeeping Fees from the Plan (Count II) ................................................ 8

        A.      Defendants Refused to Cap Fidelity's Revenue at Reasonable Levels ................. 9

        B.      Participants Lost Millions of Their Retirement Savings...................................... 12

III.    Defendants Breached Their Fiduciary Duties by Failing to Monitor All Designated
        Investment Alternatives (Count I) ................................................................ 14

        A.      Failure to Monitor All Plan Investments Was a Fiduciary Breach ...................... 14

        B.      Participants Suffered Losses as a Result of Defendants' Failure to Monitor ....... 17

        C.      Defendants Have Not Met Their Burden to Demonstrate Objective Prudence .... 18

        D.      The Share Class Damages Are Not Entirely Offset by Recordkeeping................ 19

IV.     Abundant Evidence Supports Plaintiffs' Prohibited Transaction Claim (Count III)........ 20

# TABLE OF AUTHORITIES

**Cases**

*Allen v. GreatBanc Tr. Co.,*
   835 F.3d 670 (7th Cir. 2016) ................................................................. 20

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)............................................................................. 4

*Braden v. Wal-Mart Stores, Inc.,*
   588 F.3d 585 (8th Cir. 2009) ............................................................... 20

*Brotherston v. Putnam Inv., LLC,*
   907 F.3d 17 (1st Cir. 2018)......................................................... 4, 8, 18

*Bunch v. W.R. Grace & Co.,*
   532 F. Supp. 2d 283 (D. Mass. 2008) ................................................... 14

*Bunch v. W.R. Grace & Co.,*
   555 F.3d 1 (1st Cir. 2009) .................................................................... 5

*Casas Office Machines, Inc. v. Mita Copystar Am., Inc.,*
   42 F.3d 668 (1st Cir. 1994).................................................................. 6

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)............................................................................. 4

*Cortes-Irizarry v. Corporacion Insular De Seguros,*
   111 F.3d 184 (1st Cir. 1997)........................................................... 8, 14

*Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.,*
   613 F.3d 54 (1st Cir. 2010).................................................................. 8

*Den Norske Bank AS v. First Nat. Bank of Bos.,*
   75 F.3d 49 (1st Cir. 1996)........................................................... 6, 7, 8

*DiFelice v. U.S. Airways, Inc.,*
   497 F.3d 410 (4th Cir. 2007) ............................................................... 5

*Donovan v. Bierwirth,*
   680 F.2d 263 (2d Cir.1982) ........................................................... 4, 18

*Donovan v. Cunningham,*
   716 F.2d 1455 (5th Cir. 1983) .................................................. 5, 16, 20

*Evans v. Akers,*
   534 F.3d 65 (1st Cir. 2008)................................................................ 18

*George v. Kraft Foods Global, Inc.,*
   641 F.3d 786 (7th Cir. 2011) .......................................................... 6, 12

*Harper v. Booth,*
   382 F. Supp. 3d 124 (D. Mass. 2019) ................................................... 4

*Hill v. State St. Corp.,*
   No. 09-12146 (NG), 2011 WL 3420439 (D. Mass. Aug. 3, 2011)............ 4

*Howard v. Shay*,
  100 F.3d 1484 (9th Cir.1996) ................................................................. 20

*In re Meridian Funds Grp. Sec. & ERISA Litig.*,
  917 F. Supp. 2d 231 (S.D.N.Y. 2013) ............................................... 5, 11

*Katsaros v. Cody*,
  744 F.2d 270 (2d Cir. 1984) ................................................................. 16

*Lowen v. Tower Asset Mgmt., Inc.*,
  829 F.2d 1209 (2d Cir.1987) ................................................................. 20

*Meinhardt v. Unisys Corp. (In re Unisys Sav. Plan Litig.)*,
  74 F.3d 420 (3d Cir. 1996) ................................................................... 16

*Milward v. Acuity Specialty Prod. Grp., Inc.*,
  639 F.3d 11 (1st Cir. 2011) ............................................................... 8, 14

*O'Connor v. Steeves*,
  994 F.2d 905 (1st Cir. 1993) ................................................................... 4

*Schapker v. Waddell & Reed Fin., Inc.*,
  No. 17-2365, 2018 WL 1033277 (D. Kan. Feb. 22, 2018) ...................... 5

*Spano v. The Boeing Co.*,
  125 F. Supp. 3d 848 (S.D. Ill. 2014) ..................................................... 12

*Sweda v. Univ. of Penn.*,
  923 F.3d 320 (3rd Cir. 2019) ........................................................... 5, 11

*Tatum v. RJR Pension Inv. Comm.*,
  761 F.3d 346 (4th Cir. 2014) ................................................................. 17

*Tibble v. Edison Int'l*,
  135 S. Ct. 1823 (2015) ................................................................. 5, 7, 14

*Tibble v. Edison Int'l*,
  843 F.3d 1187 (9th Cir. 2016) ................................................................. 9

*Tracey v. Mass. Inst. of Tech.*,
  No. 16-11620 (NMG), 2017 WL 4478239 (D. Mass. Oct. 4, 2017) ....... 12

*Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
  843 F.3d 561 (2d Cir. 2016) ................................................................. 18

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014) ....................................................... 6, 9, 11, 12

*Tussey v. ABB, Inc.*,
  No. 06-04305, 2012 WL 1113291 (W.D. Mo. March 31, 2012) .............. 13

*White v. Chevron Corp.*,
  No. 16-793, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) .................... 12

*Wildman v. Am. Century Servs.*,
  237 F. Supp. 3d 902 (W.D. Mo. 2017) ................................................... 12

*Wildman v. Am. Century Servs., LLC,*
362 F. Supp. 3d 685 (W.D. Mo. 2019) ...................................................................................... 5

**Statutes**

29 U.S.C. § 1002(21) .............................................................................................................. 5

29 U.S.C. § 1102(a)(2) ........................................................................................................... 5

29 U.S.C. § 1104(a)(1) ........................................................................................................... 5

29 U.S.C. § 1104(a)(1)(A) ...................................................................................................... 4

29 U.S.C. § 1104(a)(1)(B) ...................................................................................................... 4

29 U.S.C. § 1104(c)(4)(B) ...................................................................................................... 18

29 U.S.C. § 1106(a)(1)(C) ...................................................................................................... 20

29 U.S.C. § 1108(b)(8) ........................................................................................................... 20

29 U.S.C. § 1109(a) ............................................................................................................. 4, 5

**Rules**

Federal Rule of Civil Procedure 56 ....................................................................................... 4

For years, Defendants ensured that Fidelity continued to receive millions of dollars of excessive revenue from the Plan. Purposefully favoring its business relationship and admitted "partnership" with Fidelity over its fiduciary duties exclusively owed to participants, Defendants defied the advice of consultants, lawyers, and numerous MIT policies and procedures in place to prevent precisely this type of misconduct. MIT and Fidelity's "partnership" began when MIT hired Fidelity and placed, among others, *all* of Fidelity's investment options in the Plan. PSUMF[1] ¶¶23, 89, 223. The result was that the Plan paid Fidelity between $8 and $11 million yearly in the early part of the class period. *Id.* ¶134. In return, MIT leveraged Fidelity's revenue stream from the Plan to secure numerous donations (over $23 million since Fidelity became the recordkeeper), partnerships, and other business relationships. *Id.* ¶171.

To accomplish this, Defendants set aside advice from the Plan's consultants, outside counsel, and violated MIT policies and procedures. *Id.* ¶¶121–72. First, to halt the excessive administrative fees that were almost 300% more than the market rate being paid by the Plan to Fidelity, Mercer, MIT's chosen consultant, repeatedly advised MIT and its fiduciary committee to engage in a competitive bidding process through a Request for Proposal ("RFP") or Request for Information ("RFI") for the Plan's recordkeeping and administrative services. *Id.* ¶¶123, 126, 156–60. Participants paid these excessive fees to Fidelity through revenue sharing from hundreds of unmonitored Plan investments. *Id.* ¶123. Mercer also recommended repeatedly that MIT appropriately monitor all of the Plan's designated investment alternatives. *Id.* ¶155. Indeed, Groom Law Group repeatedly counseled Defendants to monitor all of the designated investment

---

[1] The following paragraphs are a summary of the facts. Plaintiffs provide the full evidentiary support for their claims in Plaintiffs' Response to the Statement of Undisputed Material Facts in Support Defendants' Motion for Summary Judgment and Counterstatement of Undisputed Material Facts ("PSUMF"). Plaintiffs' Motion for Leave to File a Third Amended Complaint (Doc. 193) reasserting a breach of loyalty claim is currently pending. Even if an amendment is not allowed, evidence regarding Defendants' motivation is relevant to whether they breached their fiduciary duties under the duty of prudence, which requires an examination of the totality of the circumstances.

alternatives in the Plan or face the likelihood of a DOL audit and lawsuit from Defendants'
failure to perform as fiduciaries. *Id.* ¶¶135–139, 155, 165. However, Defendants ceased
consideration of the removal of all the unmonitored funds when Fidelity informed them that it
would significantly reduce its recordkeeping revenue and require a discussion at the most senior
level between MIT and Fidelity. *Id.* ¶¶135–46.  Rather than monitoring and removing the
imprudent funds, Defendants allowed these funds to remain in the Plan to protect Fidelity's
enormous revenue stream. *Id.*

Abigail Johnson, the Chief Executive Officer and co-owner of Fidelity, was a large part of
the reason MIT abandoned its own employees. *Id.* ¶¶127–131, 141, 147, 164, 170–71. Top
executives at MIT protected its relationship with Ms. Johnson, a lifetime member of the Board of
Trustees, whose family and associated foundations have donated millions of dollars to
MIT. *Id.* ¶¶128, 171. Every time they received advice to move assets or revenue away from
Fidelity, MIT executives ended the conversation, and nothing changed. *Id.* ¶¶121–72. Then,
repeatedly, Fidelity's foundation donated to MIT. In 2009, when MIT rejected Mercer's advice
to solicit competitive bids for recordkeeping, Fidelity's Nonprofit Foundation donated over $3
million to MIT. *Id.* ¶171. Again, in 2013, MIT rejected Mercer's recommendation of competitive
bidding, which would have jeopardized Fidelity's role as recordkeeper. *Id.* ¶¶156–63.  In return,
Fidelity, through its foundation, donated another $3 million. *Id.* ¶163. In 2015, when MIT
consolidated its investment options but again did not conduct competitive bidding, the Dean of
the Sloan School of Management precisely summed up the relationship: "But if we are not
switching to Vanguard or TIAA-CREF, *I am going to expect something big and good coming to
MIT from the Johnson family.*" *Id.* ¶170. Soon thereafter, Fidelity donated $5 million to MIT—
its largest donation in over 15 years. *Id.* ¶171. This clear linking of failures to act in the best

2

interest of the Plan to Fidelity donations to MIT demonstrates an egregious absence of a prudent process in plan decision making and is prohibited under the Employee Retirement Income Security Act of 1974 ("ERISA").

In addition to donations, Fidelity sponsored numerous outings for MIT executives and their families, including providing tickets to game 5 of the 2010 NBA Finals. *Id.* ¶141. These lavish gifts were in direct violation of existing MIT policies and procedures against accepting gifts and purchasing goods and services (requiring competitive bids and "clear and robust supporting documentation"). *Id.* ¶¶141, 180. MIT's policy on competitive bidding required that the Institution base any expenditure solely on considerations of quality, service, and competitive pricing. *Id.* ¶180. MIT policies explicitly banned gifts of any kind from vendors, including entertainment. *Id.* ¶141. Defendants entirely disregarded these policies. *Id.* ¶¶141, 172, 180. The fees the Plan paid to Fidelity were so excessive that Fidelity began to offer unsolicited reimbursement credits (mere fractions of these excessive fees) from the Plan's investments, which MIT used to avoid paying Plan related expenses that it previously paid. *Id.* ¶¶148–53.

This symbiotic relationship between MIT and Fidelity, however, came at great expense to the Plan and its participants. Since the fall of 2010, the Plan has lost over $15.8 million[2] because of Fidelity's excessive recordkeeping fees singularly derived from the unmonitored investments. *Id.* ¶202. Retaining inappropriate, underperforming, excessively priced investments further caused the Plan to incur additional losses of over $30 million. *Id.* ¶¶227, 238, 243, 252, 265. Thus, tens of millions of dollars were lost from retirement accounts of the employees who trusted MIT to fulfill the highest fiduciary duties under the law.

---

[2] The recordkeeping damages are as of the third quarter of 2018. Plaintiffs will bring forward the recordkeeping damages prior to trial.

## LEGAL STANDARD

### I.  Summary Judgment Standard

Defendants must demonstrate that there "'is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Harper v. Booth,* 382 F. Supp. 3d 124, 128 (D. Mass. 2019)(quoting (Fed. R. Civ. P. 56)). An issue is material when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only if the moving party meets its burden must the non-moving party demonstrate a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The Court must view the entire record in the light most favorable to the nonmoving party and indulge all reasonable inferences in that party's favor." *Harper*, 382 F. Supp. 3d at 128 (citing *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993)).

### II.  ERISA's Fiduciary Duties—the Highest Known to the Law

Fiduciary obligations owed to participants and beneficiaries of a plan under ERISA are "'*the highest known to the law.*'" *Hill v. State St. Corp.*, No. 09-12146 (NG), 2011 WL 3420439, at *28 (D. Mass. Aug. 3, 2011)(emphasis added)(quoting *Donovan v. Bierwirth,* 680 F.2d 263, 272 n. 8 (2d Cir.1982)). Under ERISA, "a fiduciary must act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use'"—the duty of prudence. *Brotherston v. Putnam Inv., LLC*, 907 F.3d 17, 30 (1st Cir. 2018)(quoting 29 U.S.C. § 1104(a)(1)(B)), *pet. for cert. pending*, No. 18-926 (Jan. 11, 2019). A fiduciary must act "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"—the duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). If a fiduciary breaches its duties, it "must 'make good' to the plan 'any losses to the plan resulting'" from the breach. *Brotherston*, 907 F.3d at 30 (quoting 29 U.S.C. § 1109(a)).

Plaintiffs bear the burden to show "a breach of fiduciary duty and loss to the plan."[3] *Id.* at 39. "[T]he burden [then] shifts to the fiduciary to prove that such loss was not caused by its breach, that is, to prove that the resulting investment decision was objectively prudent." *Id.*

"'[T]he test of prudence—the Prudent Man Rule—is one of *conduct,* and not a test of the result of performance of the investment.'" *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009)(alteration in original)(quoting *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir. 1983)). ERISA judges the fiduciary's conduct based upon "'the totality of the circumstances.'" *Bunch*, 555 F.3d at 6 (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007)). Reasonableness requires "'the care, skill, prudence, and diligence'" of a person "'acting in a like capacity and familiar with such matters.'" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015)(quoting 29 U.S.C. § 1104(a)(1))(handled by undersigned counsel). "[P]rudence is measured against hypothetical sophisticated and prudent investment professionals." *In re Meridian Funds Grp. Sec. & ERISA Litig.*, 917 F. Supp. 2d 231, 240 (S.D.N.Y. 2013); *see also Sweda v. Univ. of Penn.*, 923 F.3d 320, 329 (3rd Cir. 2019)("A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field."); *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 703 (W.D. Mo. 2019)("In determining if a breach of fiduciary duty has occurred, the Court looks to what a prudent investor under similar circumstances would have done.") A fiduciary's obligations under ERISA are a "fact intensive" inquiry, which typically cannot be resolved on summary judgment. *Schapker v. Waddell & Reed Fin., Inc.*, No. 17-2365, 2018 WL 1033277, at *9 (D. Kan. Feb. 22, 2018)(quoting *Tussey v.*

---

[3] Only a fiduciary may be liable for a fiduciary breach. *See* 29 U.S.C. § 1109(a). Defendants do not contest their status as fiduciaries. Def. Mem. in Supp. of Mot. for Summ. J., Doc. 205. Regardless, MIT is the named fiduciary, plan administrator and is a fiduciary under ERISA. *See* PSUMF ¶ 113; 29 U.S.C. § 1102(a)(2). The MIT Supplemental 401(k) Plan Oversight Committee ("POC") and individual defendants, as members of the POC, are fiduciaries because they exercise "discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21).

*ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014)(handled by undersigned counsel)). Overwhelming evidence demonstrates that the Defendants failed to comply with any of their obligations under ERISA.

## ARGUMENT

### I.  The Court Cannot Disregard Plaintiffs' Experts

#### A.  Expert Disputes Create Issues of Fact

The disputes between Plaintiffs' experts and Defendants' experts regarding whether the Plan paid unreasonable fees and included imprudent investment options are alone sufficient to create issues of fact. Defendants do not challenge the admissibility of Plaintiffs' experts' opinions. Rather, Defendants ask the Court to make improper credibility determinations. Doc. 205 at 11–15, 17–19.  When the moving party does not challenge the admissibility of expert opinion, disputes between experts create issues of fact. *Den Norske Bank AS v. First Nat. Bank of Bos.*, 75 F.3d 49, 58 (1st Cir. 1996)("At summary judgment, moreover, courts normally assume that the trier of fact would credit the expert testimony proffered by the nonmovant (i.e., Den norske)."); *Casas Office Machines, Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 685–86 (1st Cir. 1994). In *George*, a 401(k) excessive fees case, the Seventh Circuit held the expert's opinion that "defendants acted imprudently by extending the contract without first soliciting bids from other recordkeepers" and a claim that "a reasonable fee for the kind of recordkeeping services the Plan needed" was less than the plan paid created triable issues of fact. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798-800 (7th Cir. 2011)(handled by undersigned counsel).

Martin Schmidt has decades of experience advising plan sponsors on monitoring, pricing, and negotiation of recordkeeping fees. PSUMF ¶198. Schmidt opined MIT imprudently failed to conduct an RFP every three to five years, failed to calculate fees per-participant, and lacked understanding of the Plan's total fees. *Id.* ¶¶173–77, 181–83, 190, 197. Schmidt opined that a

reasonable fee for the recordkeeping services for the Plan was between $37 and $43 dollar per-participant. *Id.* ¶197. Schmidt found that the Plan's excessive fees caused participants to lose $15.8 million in retirement savings. *Id.* ¶202.

Dr. Gerald Buetow has a doctorate in finance and econometrics and has over 25 years of experience designing and monitoring numerous portfolios of investments, including defined contribution plans. *Id.* ¶212. Dr. Buetow opined that Defendants' inclusion of hundreds of unmonitored designated investment alternatives in the Plan violated prudent practices of an investment professional. *Id.* ¶¶210–16. Dr. Buetow found numerous imprudent funds within the unmonitored designated investment alternatives including: (1) 58 funds with underperformance dictating removal in September 2010; (2) 58 excessively risky and volatile sector or regional funds; (3) 32 funds without the five years of performance history that investment professionals require; and (4) a duplicative set of underperforming target date funds, the Fidelity Freedom Funds. *Id.* ¶¶225–52. The inclusion of these imprudent funds resulted in losses of over $30 million in retirement savings to Plan participants. *Id.* Dr. Buetow also opined that the Plan included numerous investment options in higher-cost share classes when identical lower-cost share classes were available to a multi-billion dollar plan the size of the Plan. *Id.* ¶¶253–65. The inclusion of higher-cost share class funds cost participants $4.4 in retirement savings. *Id.; see also Tibble*, 135 S. Ct. at 1828–29 (ruling for plan participants who challenged the use of higher-cost share classes in an investment window). Similar to *George*, Schmidt and Buetow's opinions create genuine issues of material fact.

### B.  Credibility Determinations at Summary Judgment Are Reversible Error

Defendants improperly ask the Court to disregard Plaintiffs' experts' opinions. Doc. 205 at 11–15, 17–19. At summary judgment, the Court may not assess "witness credibility, bias, and the weight of the [expert] evidence," "these are matters for the factfinder." *Den Norske Bank AS*,

75 F.3d at 58; *accord Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.*, 613 F.3d 54, 59 (1st Cir.

2010); *Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 22 (1st Cir. 2011). Moreover,

granting summary judgment because the evidence supporting an expert's opinion is "weak" or

"thin" is reversible error. *Milward*, 639 F.3d at 22; *Cortes-Irizarry v. Corporacion Insular De

*Seguros*, 111 F.3d 184, 192 (1st Cir. 1997).

   Defendants premise much of their motion on inappropriate credibility attacks. For example,

Defendants argue that industry standards favor their experts' opinions over Plaintiffs' experts.

Doc. 205 at 11–15, 17. Defendants' arguments are unfounded. The Plan's consultant, Mercer,

and the Plan's outside counsel both advised MIT using the same industry standard as Plaintiffs'

experts. PSUMF ¶¶173–87, 210–52. Moreover, as to recordkeeping, the Department of Labor

("DOL") states that a plan sponsor normally conducts a RFP every three to five years, which is

consistent with Plaintiffs' expert Schmidt. *Id.* ¶178. Further, the weight of academic literature

supports Plaintiffs' experts. PSUMF ¶¶157–60, 173–87, 210–52. Even if Defendants' attacks had

merit, they effect the weight of an expert's opinion. *Milward*, 639 F.3d at 22; *Den Norske Bank*

*AS*, 75 F.3d at 58.

## II. Defendants Caused Participants to Pay Fidelity Excessive and Unreasonable Recordkeeping Fees from the Plan (Count II)

   Defendants breached their fiduciary duties by causing participants to pay Fidelity excessive

and unreasonable fees for recordkeeping and administrative services. To succeed on this claim,

Plaintiffs must demonstrate a breach of fiduciary duty and a loss to the plan. *Brotherston*, 907

F.3d at 39. Then, "the burden shifts to the fiduciary to prove that such loss was not caused by its

breach"—objective prudence. *Id.* Ample evidence demonstrates a breach of fiduciary duty and

loss regarding the Plan's recordkeeping fees.

**A.  Defendants Refused to Cap Fidelity's Revenue at Reasonable Levels**

Defendants failed to comply with their fiduciary duties to ensure the Plan paid only reasonable recordkeeping fees. A fiduciary must "'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016)(en banc)(unanimous)(quoting RESTATEMENT (THIRD) OF TRUSTS §90(c)(3)). "'Wasting beneficiaries' money is imprudent [and] . . . trustees are obliged to minimize costs.'" *Tibble*, 843 F.3d at 1198 (quoting Unif. Prudent Investor Act §7). This includes a duty to use "the power the trust wields" to obtain fees that are more favorable. *Id.* at 1198. Because of this, a fiduciary breaches its duty if it fails to "diligently . . . investigate" and "monitor" recordkeeping costs. *Tussey*, 746 F.3d at 336. *Tussey* upheld a district court's ruling that a fiduciary breached its duties by failing to:

> (1) calculate the amount the Plan was paying Fidelity for recordkeeping through revenue sharing,
> (2) determine whether Fidelity's pricing was competitive,
> (3) adequately leverage the Plan's size to reduce fees, and
> (4) make a good faith effort to prevent the subsidization of administration costs of ABB corporate services with Plan assets. . . .

*Id.* Defendants' conduct is indistinguishable from the defendant in *Tussey*.

*First*, as early as 2009, Defendants' chosen consultant (Mercer) told them that the Plan was paying Fidelity more than three times the industry standard. PSUMF ¶123. After reminding the Defendants that "[f]iduciaries are required to demonstrate continued due diligence around the total scope of services to ensure excess revenue is benefiting participants rather than the service provider," Mercer recommended that Defendants negotiate a fee schedule and service contract with Fidelity that included, among others:

> • A revenue cap based upon the number of participants in the Plan;
> • An ERISA expense budget that captures any excess revenue from the Plan's investments that is used to pay other Plan expenses;

- Performance guarantees with fees at risk; and
- A contractual requirement to disclose all sources of revenue.

*Id.* ¶¶125–26. Defendants set aside this advice and failed to act for the sole benefit of participants and consistent with prudent practices of those knowledgeable, as ERISA requires. Defendants noted in their meeting minutes the importance of MIT and Fidelity's partnership, based on:

(1) the Institute's decade long plus relationship with Fidelity and
(2) Ms. Abigail P. Johnson is a member of both the MIT corporation and MITMCO's Board of Trustees. She is Chair of the Board that oversees Fidelity's 161 fixed income and asset allocations funds . . .

*Id.* ¶127. MIT's procedures, requiring competitive pricing for products or services over $250,000, when MIT's funds are involved, were entirely absent from the Defendants' consideration even though Mercer recommended they initiate competitive bidding. PSUMF ¶180.

The source of these excessive payments by the Plan to Fidelity for its recordkeeping and administrative services was uncapped, asset-based intercompany transfers from proprietary Fidelity investments. PSUMF ¶123. As the contributions and investment gains increased asset amounts in the proprietary Fidelity investments, the Plan's excessive payments to Fidelity similarly increased. Such increases cannot be justified because recordkeeping costs have no bearing on the asset size of a participant's account. *Id.* ¶183. MIT was aware of these intercompany payments from each Fidelity proprietary fund, commonly referred to as revenue sharing, from a spreadsheet sent to MIT on a quarterly basis. *Id.* ¶123.

MIT admittedly wholly ignored monitoring these funds. Indeed, in 2010, Plan counsel, Groom Law Group, repeatedly cautioned Defendants against continuing to fail to monitor the hundreds of Fidelity investments in the Plan. *Id.* ¶¶135–139, 155, 165.  Knowing that the hundreds of Fidelity investments contribute significantly to Fidelity's recordkeeping revenue, the

Defendants again directly faced fiduciary decisions that could reduce Fidelity's revenue from the Plan. *Id.* ¶138. In the middle of these discussions, Fidelity took Stone (EVP&T and Chair of the Committee) and her family to the Celtics' NBA Finals' game, where Fidelity emphasized its partnership with MIT and kept "Abby" Johnson apprised of their outing and discussion. *Id.* ¶¶140–41. After continued discussions about Fidelity's "significant revenue loss," Fidelity made clear that if Defendants decided to move the proprietary Fidelity investments out of the Plan, then strategic discussions "with leadership from Fidelity and MIT" would be required. *Id.* ¶¶142–45. Not surprisingly, the Defendants did not disturb any of the Fidelity investment options, leaving them all in the Plan even though many were underperforming, in excessively risky asset classes, or lacked the basic five years of performance history.[4] *Id.* ¶¶145–46.

*Second*, and again to Fidelity's benefit, Defendants refused to "determine whether Fidelity's pricing was competitive" at any point during the class period. *Tussey*, 746 F.3d at 336. In violation of MIT policy and against the advice of the Plan's consultant, Defendants have failed to conduct a single RFP in almost 20 years. *See* PSUMF ¶189. Industry accepted practices (including Mercer) required competitive bidding to ensure fees are reasonable. *Id.* ¶¶173–80.

Defendants argue that ERISA does not require competitive bidding. Doc. 205 at 17. However, "prudence is measured against hypothetical sophisticated and prudent investment professionals" or "expert[s] in the field." *Meridian Funds*, 917 F. Supp. 2d at 240; *Sweda*, 923 F.3d at 329. To accept the Defendants' premise, the Court must reject MIT's own policies, the Plan consultant's statements about industry practice at the time, Plaintiffs' expert, and case law.

---

[4] Interestingly, a few months after the discussion regarding the proprietary Fidelity funds, Fidelity offered to reimburse MIT for expenses it was paying that related to the Plan. *Id.* ¶149. ████████████████████
████████████████████████████████████████████████████  *Id.* ¶152.

*Compare* Doc. 205 at 17 *with* PSUMF ¶¶173–80. Courts regularly hold that failure to engage in an RFP creates an issue of fact as to prudence. *See George*, 641 F.3d at 798–800 (reversing summary judgment on recordkeeping claim when no RFP was conducted); *Spano v. The Boeing Co.*, 125 F. Supp. 3d 848, 864–66 (S.D. Ill. 2014). Defendants' sole authority that competitive bidding was not required is a district court's dismissal decision observing, "plaintiffs [did] not even allege that a competitive bid would have benefitted the Plan" or "the Plan fiduciaries could have obtained less-expensive recordkeeping services." *White v. Chevron Corp.*, No. 16-793, 2016 WL 4502808, at *14–15 (N.D. Cal. Aug. 29, 2016).[5] *White* is contrary to this Court's prior rejection of a similar argument in Defendants' Motion to Dismiss. *Tracey v. Mass. Inst. of Tech.*, No. 16-11620 (NMG), 2017 WL 4478239, at *1, *3 (D. Mass. Oct. 4, 2017)(Doc. 79).

*Third*, Defendants never adequately leveraged the Plan's size to reduce fees. *Tussey*, 746 F.3d at 336. Defendants knew that Fidelity's revenue for recordkeeping services was excessive (by a factor of 3) but failed to discuss recordkeeping pricing tied to the Plan's size to maintain MIT's mutually beneficial relationship with Fidelity. PSUMF ¶¶123–34. Even after Defendants' belated acceptance of plan-specific pricing in 2014 and removal of Fidelity's proprietary investments in 2015, Defendants still did not issue competitive bidding for recordkeeping and administrative services. *Id.* ¶189. At most, Defendants and Mercer merely asked Fidelity for their "best" price, knowing that the best prices only come with competitive pressure. *Id.* ¶160–61.

### B. Participants Lost Millions of Their Retirement Savings

Plan participants lost over $15.8 million from their retirement savings because of Defendants' fiduciary failures. Schmidt opines that the fees the Plan could have achieved were

---

[5] Courts have distinguished *White* on these grounds. *See, e.g., Wildman v. Am. Century Servs.*, 237 F. Supp. 3d 902, 915 (W.D. Mo. 2017).

$37 to $43 per-participant. PSUMF ¶197. ███████████████████████

███████████████████████████████. *Id.* ¶199. Harvard,

MIT's chosen comparator, paid $37 per-participant to Fidelity from 2015 to 2017. *Id.* ¶200.

MIT's corporate representative admitted that the market price for the same services was a

fraction of what the Plan was paying Fidelity from 2010 to 2012. *Id.* ¶195.

Defendants contend the Plan's fees were within market rates. Doc. 205 at 18–19. However,

Defendants improperly ask the Court to discredit Schmidt's opinion. *See supra* at 6–8. In

addition, Defendants ignore Mercer's testimony, Harvard's fees and its own admissions. Even

considering only the evidence upon which Defendants rely, substantial issues of fact remain as to

loss to the Plan. Even Defendants' purported and discredited expert, Steven Gissiner,[6]

demonstrates that the Plan's fees were unreasonable and participants suffered a loss. PSUMF

¶196.

Defendants also argue that the Court should ignore Schmidt's reasonable fees because he

cannot identify any similar plans that paid them. Doc. 205 at 17–19. Defendants mischaracterize

Schmidt's testimony and ignore examples in his report. *Id.* at 17–19. Schmidt did not testify that

he was not aware of any comparable plans. *Id.* He testified that there is no "perfect comparator

for this or any other year because again you need to look at the specifics to the plan and then how

the fees are structured from that point and how -- what the services that are being offered."

Schmidt Dep., Doc. 207-6, at 154:21–155:2. While Schmidt recognizes that there is no prefect

comparator for any plan, he identified three similarly sized plans and three competitive bidding

---

[6] In practice, Gissiner was informing clients and potential clients of the perils of uncapped, asset-based fees that he deems prudent in his report as early as 2007. PSUMF ¶184. Despite advising clients and potential clients that they must "peel the onion" and evaluate investment management, recordkeeping and other fees separately, Gissiner improperly relies on an analysis of the Plan's total fees. *Id.* The court rejected his similar analysis in *Tussey*. *Tussey v. ABB, Inc.*, No. 06-04305, 2012 WL 1113291, at *10–13 (W.D. Mo. March 31, 2012).

results from clients that support his reasonable fees. M. Schmidt Expert Report, Doc. 207-7, ¶¶85–88, Exhibits 3–5. Again, Defendants' argument regarding the weight of the evidence Schmidt relies upon cannot justify summary judgment. *Milward*, 639 F.3d at 22; *Cortes-Irizarry*, 111 F.3d at 192.

### III. Defendants Breached Their Fiduciary Duties by Failing to Monitor All Designated Investment Alternatives (Count I)

The Supreme Court unanimously ruled in the landmark, first, excessive fee case that an ERISA "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828. Prudence requires a review at "regular intervals." *Id.* (quotation omitted). "That is, a fiduciary initially must determine and continue to monitor the prudence of each investment option available to plan participants." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 289 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009). Defendants did nothing to evaluate *hundreds* of investment options for years to ensure that Fidelity continued to collect millions of dollars of excessive fees from those funds. *See* PSUMF ¶¶203–52.

### A. Failure to Monitor All Plan Investments Was a Fiduciary Breach

When MIT first hired Fidelity to be the Plan's recordkeeper, it permitted Fidelity to place every Fidelity fund in existence in the Plan and committed to add subsequently created funds sight unseen. *Id.* ¶¶23, 89, 223. While Defendants referred to these funds as the "Investment Window," the options were indistinguishable from any of the other options when participants were making investment decisions. PSUMF ¶¶203–4. In early 2010, the Plan's outside counsel expressed a "high level of discomfort" and advised Defendants that they were not fulfilling their fiduciary duty by failing to monitor over $840 million of retirement savings. *Id.* ¶139.

As soon as Fidelity reminded Defendants that the hundreds of Fidelity proprietary funds in the "Investment Window" provided significant revenue to Fidelity's recordkeeping division and

that any decisions to remove these funds would require a discussion "with leadership from Fidelity and MIT," all conversation regarding removing the "Investment Window" ceased. PSUMF ¶¶143–45. Defendants briefly considered monitoring these proprietary funds and even received proposals from three consultants (including Mercer) for how to accomplish this task. *Id.* ¶146. Upon learning that monitoring these funds meant removing imprudent funds, the Defendants quickly stopped any further consideration of this option. *Id.* Mercer informed Defendants that 41 funds underperformed; 10 funds had inappropriate benchmarks; and 16 funds lacked the requisite 5-year performance history. *Id.* ¶219. Another investment advisor, Fiduciary Investment Advisors ("FIA"), identified 60 underperforming investments. *Id.* ¶146.

Defendants had to admit that they did not monitor hundreds of designated investment alternatives. *Id.* ¶217–23. Defendants had no process for removing funds and never removed a single fund from the hundreds of funds in the "Investment Window". *Id.* Defendants performed no due diligence before adding designated investment alternatives to the Plan. *Id.* This is directly contrary to Supreme Court and First Circuit authority that a fiduciary must regularly analyze each investment option and remove those that are imprudent. *See supra* at 14.

Defendants mistakenly argue that Plaintiffs only alleged that the group of funds in the "Investment Window" were imprudent because it contained too many funds. Doc. 205 at 5–10. Defendants ignore the allegations that the Plan included numerous unmonitored designated investment options that were imprudent because: (1) they included underperforming funds; (2) they included unnecessarily risky and imprudent sector and regional funds without a plan specific justification for their inclusion; and (3) they imprudently included funds without a sufficient performance history. Doc. 98 at ¶¶101, 103, 106–7, 170. While the Court dismissed the "too many funds claim" and duty of loyalty claim in Count I, it did not dismiss claims related

to the inclusion of underperforming or improper investment options. Doc. 79 at 5–6.

Defendants cannot rely on Fidelity to monitor its own funds through a "watch list" that they did not review. PSUMF ¶219. To do so is a breach of Defendants' fiduciary duties. A fiduciary's reliance upon representations of an investment provider as to the strength of its own investment is "wholly inadequate inquiry and deliberation," and the fiduciary must engage in its own investigation of whether investment is reasonable. *Katsaros v. Cody*, 744 F.2d 270, 279–80 (2d Cir. 1984)(holding that a fiduciary acted imprudently by relying solely on a representations of a vendor). Even an independent consultant must be monitored. *Meinhardt v. Unisys Corp. (In re Unisys Sav. Plan Litig.)*, 74 F.3d 420, 435 (3d Cir. 1996)("ERISA's duty to investigate requires fiduciaries to review the data a consultant gathers, to assess its significance and to supplement it where necessary."); *Cunningham*, 716 F.2d at 1474 (stating that "[a]n independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their responsibilities are fulfilled").

Defendants suggest that they did not have a duty to monitor all the designated investment alternatives in the Plan because of a March 2007 memorandum from Ropes & Gray. Doc. 205 at 9. First, Defendants terminated the relationship with Ropes & Gray ███ making their claimed reliance on this advice during the class period misplaced. PSUMF ¶136. Second, Defendants conveniently ignore the timing of the contrary advice they received from Groom Law Group. On January 12, 2010, Groom advised MIT that all designated investment alternatives, including the "Investment Window," needed to be regularly monitored and imprudent investments removed. *Id.* Groom repeatedly gave this advice to Defendants between 2010 and 2015. *Id.* ¶¶135–139, 155, 165.

Defendants also argue that the Court must dismiss Plaintiffs' claims related to the sector and regional funds because they are not per se imprudent. Doc. 205 at 11. Defendants are mistaken. Plaintiffs allege that excessive risky sector and regional funds are imprudent for a long-term retirement plan unless there is a plan specific reason justifying their inclusion. Doc. 98 at ¶107. The conclusion that these types of funds are too risky for the Plan is not just Plaintiffs' experts' conclusion; *Defendants reached the same conclusion* when they finally conducted their own analysis. PSUMF ¶228–35. Although "the risk level of an investment does not alone make the investment per se prudent or per se imprudent," it is a relevant consideration in determining whether an investment should be retained—a decision that can only be made (i) after the investment is deemed "to further the purposes of the plan," and (ii) "upon appropriate consideration of the surrounding facts and circumstances" of a particular plan—inherently questions of fact. *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 367 (4th Cir. 2014)(internal citations, quotations and emphasis omitted). Defendants made no determination that these funds were appropriate to further the purposes of the Plan; rather, they included them because they contractually agreed to include any Fidelity fund. PSUMF ¶¶223, 228–37.

### B.  Participants Suffered Losses as a Result of Defendants' Failure to Monitor

Defendants argue Plaintiffs cannot demonstrate loss because the entire "Investment Window" purportedly exceeded the returns of their benchmarks. Doc. 205 at 19. However, this argument mischaracterizes the Plaintiffs' allegations and the law. As Defendants note, the Court dismissed claims related to the Plan having too many funds. *Id.* Plaintiffs' live allegations are not that Defendants' retention of the window's hundreds of funds was imprudent but that Defendants' failure to monitor any of the designated investment alternatives was a fiduciary breach. Therefore, Defendants' allegations that the "Investment Window" as a whole did not produce losses does not preclude individual findings of losses as mandated by the Supreme Court

17

in *Tibble*. Because of Defendants' failures, the Plan included underperforming or inappropriate

funds resulting in millions of dollars of lost retirement savings for participants. *See supra* at 7.

Defendants also misconstrue how loss is determined under ERISA. Loss is determined "by

comparing the performance of the imprudent investments with the performance of a prudently

invested portfolio." *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008). While *Brotherston* found

mapping to index funds of similar assets classes was sufficient, Courts do not require an exact

match for all mapped investments, as Defendants claim. The Second Circuit's hallmark decision

of *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985), provides "[w]here several alternative

investment strategies were equally plausible, the court should presume that the funds would have

been used in the most profitable of these." [7] *Id.* at 1056. The Court should resolve "[a]ny doubt or

ambiguity" regarding damages against the fiduciary. *Id.* Applying these principles, courts use the

most profitable "plausible" replacement funds to calculate damages. *Id.*; *Trs. of the Upstate N.Y.*

*Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016). Defendants' self-

serving requirement of exact matches to passive indexes is nonsensical when a portion of the

breach relates to investment in inappropriately risky asset classes. Defendants do not contend

that Dr. Buetow's mapping opinions were implausible or not reasonably similar.

### C.  Defendants Have Not Met Their Burden to Demonstrate Objective Prudence

Defendants argue that Plaintiffs have failed to establish breach because many of the funds at

issue were popular or included in other plans. Doc. 205 at 11–14. Defendants confuse the

Plaintiffs' burden to demonstrate breach with the fiduciary's burden to demonstrate objective

prudence. The First Circuit squarely held in *Brotherston* that it is Defendants' burden "to prove

---

[7] Similarly, the Pension Protection Act allows mapping of investments to "reasonably similar" investments or to the
default investment option. 29 U.S.C. § 1104(c)(4)(B).

that such loss was not caused by its breach, that is, to prove that the resulting investment decision was objectively prudent." 907 F.3d at 39. Moreover, Defendants' own process and the advice of its consultants not only create issues of fact as to objective prudence, but also demonstrate imprudence. For example, Mercer and FIA identified many of the same funds as having performance issues in 2010. PSUMF ¶¶146, 219. Further, *Defendants* found sector funds too risky and inappropriate for the Plan when they finally considered them in 2014-2015. *Id.* ¶¶228–30. Mercer advised Defendants in 2010 that funds with under five years of performance were inappropriate. *Id.* ¶219. Finally, Defendants themselves found that having multiple target date funds was inappropriate and removed the Fidelity Freedom Funds in 2015. *Id.* ¶251. Finally, Dr. Buetow opined that all of these investments were inappropriate. *Id.* ¶¶225–252. Defendants have simply not come close to meeting their burden.

### D. The Share Class Damages Are Not Entirely Offset by Recordkeeping

Count I also includes claims that Defendants allowed the Plan to imprudently include higher-cost share class funds when identical lower-cost share classes were available because of the enormous size of the Plan. Defendants failed to move numerous funds to readily available lower-cost share classes. PSUMF ¶¶253–64. Failure to adopt these lower-cost share classes resulted in participants losing $4.4 million in retirement savings. *Id.* ¶265

Defendants do not dispute that their failure to adopt the identical lower-cost share classes of these funds was a breach. *See e.g.* Doc. 205. Defendants argue that loss from the higher fees is offset because part of the expense ratio was used to pay recordkeeping fees through revenue sharing. Doc. 205 at 14–15. Yet, Defendants offer no evidence that the portion of the higher expense ratio attributed to revenue sharing completely set off the damages. *Id.* Defendants offer no calculation of what portion of the over $4 million of share class damages is attributable to revenue sharing. *Id.* The $21 million calculation Defendants claim is the total revenue sharing is

19

actually the total revenue share plus a weighted rate of return from Dr. Buetow's proposed lineup. PSUMF ¶85. Additionally, Defendants ignore that 45 of the funds used in Dr. Buetow's share class damages have no revenue sharing for recordkeeping, and the lower-cost share class Fidelity funds still include some revenue share for recordkeeping that would need to be included Defendants' mistaken calculation. *Id.* ¶¶261–62.

## IV. Abundant Evidence Supports Plaintiffs' Prohibited Transaction Claim (Count III)

"Section 1106(a)(1)(C) prohibits a 'direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest.'" Doc. 79 at 9 (quoting 29 U.S.C. § 1106(a)(1)(C)). Defendants do not challenge that the fees paid for non-mutual fund investments violate section 1006(a)(1)(c). Doc. 205 at 19–20. Rather, Defendants argue that Plaintiffs' prohibited transactions claims are barred because the fees are "reasonable" under 29 U.S.C. § 1108(b)(8).[8] *Id.* Defendants rely entirely on Dr. Wermers' opinion that the total expense ratios are "reasonable." *Id.* at 20 (citing Doc. 206 ¶112). However, Defendants ignore that the Plan's Trust Agreement sets forth the revenue sharing from non-mutual fund options, including commingled pools and stable value funds, to pay for recordkeeping fees. These explicit charges in the Trust Agreement contribute to the already excessive and unreasonable fees the Plan pays Fidelity for recordkeeping and administrative services. PSUMF ¶112.

## CONCLUSION

Overwhelming evidence demonstrates that the Defendants breached their fiduciary duties to participants, and the Court should deny Defendants' Motion for Summary Judgment (Doc. 204).

---

[8] "It is the defendant who bears the burden of proving a [29 U.S.C. § 1108] exemption." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 676 (7th Cir. 2016); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009); *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir.1996); *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1215 (2d Cir.1987); *Cunningham*, 716 F.2d at 1467–68.

August 5, 2019

/s/ Jerome J. Schlichter
SCHLICHTER BOGARD & DENTON LLP
Jerome J. Schlichter (admitted *pro hac vice*)
Heather Lea (admitted *pro hac vice*)
Joel D. Rohlf (admitted *pro hac vice*)
Scott T. Apking (admitted *pro hac vice*)
100 South Fourth Street, Suite 1200
St. Louis, MO, 63102
(314) 621-6115
(314) 621-5934 (fax)
jschlichter@uselaws.com
hlea@uselaws.com
jrohlf@uselaws.com
sapking@uselaws.com
*Lead Counsel for Plaintiffs*

Michael M. Mulder (admitted *pro hac vice*)
Elena N. Liveris (admitted *pro hac vice*)
Law Offices of Michael M. Mulder
1603 Orrington Avenue, Suite 600
Evanston, Illinois 60201
(312) 263-0272
(847) 563-2301 (fax)
mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com
*Counsel for Plaintiffs*

Stephen Churchill, BBO#564158
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3260
(617) 488-2261 (fax)
steve@fairworklaw.com
*Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 5, 2019.

/s/ Jerome J. Schlichter