**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DAVID B. TRACEY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MASSACHUSETTS INSTITUTE OF TECHNOLOGY, *et al.*,<br><br>Defendants. | No. 16-cv-11620-NMG |

**PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS'
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Local Rule 56.1, Plaintiffs submit their responses to Defendants' Statement of

Undisputed Material Facts (Doc. 206) and provide additional material facts.

| 1. | The Massachusetts Institute of Technology ("MIT") is a private, non-profit university whose mission is "to advance knowledge and educate students in science, technology, and other areas of scholarship that will best serve the nation and the world in the 21st century." | Declaration of Shannon Barrett in Support of Defendants' Motion for Summary Judgment ("Barrett Decl."), Ex. 1, MIT Mission Statement; *see* An Act to Incorporate the Massachusetts Institute of Technology, and to Grant Aid to Said Institute and to the Boston Society of Natural History, 1861 Mass. Acts ch. 183 § 1. |
|---|---|---|

**RESPONSE:** Paragraph 1 is not material to Defendants' Motion for Summary Judgment

because it is irrelevant to whether Defendants breached their fiduciary duties by causing the MIT

Supplemental 401(k) plan ("Plan") to pay unreasonable recordkeeping fees or retaining

imprudent investment options. Regardless of industry, non-profit status or "mission," a defined

contribution plan sponsor is held responsible to its employees pursuant to a consistent standard

under ERISA. "ERISA fiduciaries are held to one standard under § 1104" and cannot be adjusted "to accommodate subcategories of sponsors and fiduciaries." *Sweda v. Univ. of Penn.*, 923 F.3d 320, 333 n.9 (3d Cir. 2019). Fidelity's assumptions about the profitability of a defined contribution plan remain constant regardless of the plan sponsor's status.[1]

| | | |
|---|---|---|
| 2. | MIT offers its employees a traditional pension plan that MIT fully funds. | Barrett Decl., Ex. 2, 2010 Form 5500 for MIT Basic Retirement Plan; *id.*, Ex. 3, 2017 Form 5500 for MIT Basic Retirement Plan. |

**RESPONSE:** Paragraph 2 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by causing the Plan to pay unreasonable recordkeeping fees or retaining imprudent investment options.

| | | |
|---|---|---|
| 3. | MIT also offers its employees the ability to participate in the MIT Supplemental 401(k) Plan (the "Plan"), an employer-sponsored defined contribution plan. | Barrett Decl., Ex. 4, 2010 Form 5500 for MIT Supplemental 401(k) Retirement Plan; *id.*, Ex. 5, 2017 Form 5500 for MIT Supplemental 401(k) Retirement Plan. |

**RESPONSE:** Plaintiffs do not dispute paragraph 3.

| | | |
|---|---|---|
| 4. | The Plan is funded through employee contributions and matching contributions from MIT. | Second Amended Complaint, ECF No. 98 ("SAC") ¶¶ 8-11; Declaration of Kenneth Davies in Support of Defendants' Motion for Summary Judgment ("Davies Decl."), Ex. 6, MIT Supplemental 401(k) Plan, 2008 Restatement at MIT-0005019-22; *id.*, Ex. 18, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-00023080. |

---

[1] Ex. P1, Howard Dep. 24:15-26:6, 75:22-79:19.

**RESPONSE:** Plaintiffs do not dispute paragraph 4.

| | | |
|---|---|---|
| 5. | The MIT Supplemental 401(k) Plan Oversight Committee ("Oversight Committee" or "Committee") oversees the Plan's investment lineup. | SAC ¶¶ 20-22. |

**RESPONSE:** Plaintiffs admit that the Oversight Committee has the responsibility for the selection, monitoring, retention and removal of Plan investment options.[2] Plaintiffs deny that Defendants fulfilled these responsibilities. MIT permitted Fidelity to add all of its funds as designated investment alternatives to the Plan without any review or any process to determine whether the designated investment alternatives were appropriate for MIT's Plan.[3] MIT did not monitor each designated investment alternative in the Plan.[4]

| | | |
|---|---|---|
| 6. | Members of the Oversight Committee include MIT's Executive Vice President and Treasurer and senior MIT faculty and administrators. | SAC ¶¶ 21-22; Davies Decl. ¶¶ 3, 4; *see* Barrett Decl., Ex. 6, Deposition of Israel Ruiz ("Ruiz Dep.") 18:18-19:11; *id.*, Ex. 7, Deposition of Theresa Stone ("Stone Dep.") 94:14-22; *id.*, Ex. 8, Deposition of Glenn Ellison ("Ellison Dep.") 9:17-10:8. |

**RESPONSE:** Paragraph 6 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by causing the Plan to pay unreasonable recordkeeping fees or retaining imprudent investment options. Plaintiffs otherwise do not dispute paragraph 6.

---

[2] Ex. P2, Sept. 14, 1998 Letter to Rice at 1-2.
[3] Ex. P3, Stone Dep. 81:23-84:9; Ex. P5, Recordkeeping Agreement Comp. at 47, 51, 53, 61; Ex. P8, Email from Dean.
[4] Ex. P3, Stone Dep. 74:11-24, 75:16-76:6, 82:24-84:9; Ex. P7, Ruiz Dep. 39:8-40:8.

| 7. | Among the past or present Oversight Committee members named as individual defendants are a Nobel Laureate professor of finance, the former head of MIT's Department of Economics, a former director of MIT's investment management company, and a senior member of the global investment staff responsible for managing MIT's endowment. | Davies Decl. ¶ 4. |
|---|---|---|

**RESPONSE:** Paragraph 7 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by causing the Plan to pay unreasonable recordkeeping fees or retaining imprudent investment options. Plaintiffs otherwise do not dispute paragraph 7.

| 8. | The members of the Oversight Committee serve on a voluntary basis. | Davies Decl. ¶ 3. |
|---|---|---|

**RESPONSE:** Paragraph 8 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by causing the Plan to pay unreasonable recordkeeping fees or retaining imprudent investment options. Plaintiffs otherwise dispute paragraph 8. Members of the Oversight Committee are salaried employees of MIT, not volunteers.[5] MIT appoints Members of the Oversight Committee.[6]

| 9. | Plan participants may allocate the assets in their Plan accounts among various investment options. | Davies Decl., Ex. 6, MIT Supplemental 401(k) Plan, 2008 Restatement at MIT0005023-24; *id.*, Ex. 18, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0023079. |
|---|---|---|

**RESPONSE:** Plaintiffs do not dispute paragraph 9.

---

[5] Defendants' Statement of Undisputed Material Fact ¶¶6-7.
[6] Ex. P2, Sept. 14, 1998 Letter to Rice at 1; Doc. 208-06, 401(k) Plan Document 2008 Restatement at 12.

| | |
|---|---|
| 10. During the class period before July 2015, the Plan offered four tiers of investment options. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150827, MIT-0150831-40. |

**RESPONSE:** Paragraph 10 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of ***each*** investment option available to plan participants." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 289 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009) (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez v. Massachusetts Fin. Servs. Co.*, 320 F. Supp. 3d 252, 259 (D. Mass. 2018)(quoting *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1829 (2015)). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. From the beginning of the class period to today, MIT maintains two broad categories of investment choices for Plan participants: (1) designated investment alternatives within the Plan and (2) brokerage account investment options outside of the Plan.[7] From the beginning of the class period to today, once a Plan participant joins the Plan, there were/are no additional barriers to the Plan participant investing in any of the designated investment alternatives.[8] All of the investments (whether or not MIT internally characterized them as residing in a different Tier) were and are listed as options on the Plan's website that participants can invest in.[9] Throughout

---

[7] Ex. P15, Groom Law Group Memorandum at 3; Ex. P16, Email Eller to Chused; Ex. P17, Plan Participant 2012 Disclosure at 2-3, 5-43; Ex. P18, Plan Participant 2013 Disclosure at 5-39; Ex. P19, Email Davies to Chused.
[8] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶32; Ex. P3, Stone Dep. 89:6-20.
[9] Ex. P21, Ratigan Dep. 20:4-9; Ex. P22, Email Davies to Ellison; Ex. P23, 2014 Screenshot of Website; Ex. P24, 2009 Participant Communication at 32-33.

the class period, the display, internal MIT tier grouping and explanation of the designated

investment alternatives on the Plan's Fidelity website were very poor.[10]

| 11. | Tier 1 consisted during the class period of low-risk, low-expense Vanguard Target Retirement Trusts, which were designed to allow participants to invest in a single product whose assets would be automatically reallocated as the employee's retirement date approached. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150827, MIT-0150831; *see* Declaration of Russell R. Wermers in Support of Defendants' Motion for Summary Judgment ("Wermers Decl."), Ex. 1, Wermers Report ¶ 28. |
| --- | --- | --- |

**RESPONSE:** Paragraph 11 is not material to Defendants' Motion for Summary Judgment

because it is irrelevant to whether Defendants breached their fiduciary duties by failing to

monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A]

fiduciary initially must determine and continue to monitor the prudence of ***each*** investment

option available to plan participants." *Bunch,* 532 F. Supp. 2d at 289 (emphasis added). "A

fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent

ones.'" *Velazquez,* 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides

that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones."

*Tibble*, 135 S.Ct. at 1828. From the beginning of the class period to today, MIT maintains two

broad categories of investment choices for Plan participants: (1) designated investment

alternatives within the Plan and (2) brokerage account investment options outside of the Plan.[11]

From the beginning of the class period to today, once a Plan participant joins the Plan, there

were/are no additional barriers to the Plan participant investing in any of the designated

---

[10] Ex. P25, Preliminary Interview Results; Ex. P26, Alden Dep. 82:6-21, 83:15-22; Ex. P28, February 25, 2014 Community Feedback at 2-3; Ex. P22, Email Davies to Ellison.

[11] Ex. P15, Groom Law Group Memorandum at 3; Ex. P16, Email Eller to Chused; Ex. P17, Plan Participant 2012 Disclosure at 2-3, 5-43; Ex. P18, Plan Participant 2013 Disclosure at 5-39; Ex. P19, Email Davies to Chused.

investment alternatives.[12] All of the investments (whether or not MIT internally characterized them as residing in a different Tier) were and are listed as options on the Plan's website that participants can invest in. Throughout the class period, the display, internal MIT tier grouping and explanation of the designated investment alternatives on the Plan's Fidelity website were very poor.

| 12. Tier 2 included during the class period seven investment options with varying risk/return profiles covering "the primary asset classes," including a money market account, a bond fund, a diversified stock fund, a Vanguard index trust, and institutional shares of three Vanguard mutual funds. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150827, MIT-0150833. |
|---|---|

**RESPONSE:** Paragraph 12 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of ***each*** investment option available to plan participants." *Bunch,* 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez,* 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. From the beginning of the class period to today, MIT maintains two broad categories of investment choices for Plan participants: (1) designated investment alternatives within the Plan and (2) brokerage account investment options outside of the Plan.[13] From the beginning of the class period to today, once a Plan participant joins the Plan, there were/are no additional barriers to the Plan participant investing in any of the designated

---

[12] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶32; Ex. P3, Stone Dep. 89:6-20.
[13] Ex. P15, Groom Law Group Memorandum at 3; Ex. P16, Email Eller to Chused; Ex. P17, Plan Participant 2012 Disclosure at 2-3, 5-43; Ex. P18, Plan Participant 2013 Disclosure at 5-39; Ex. P19, Email Davies to Chused.

investment alternatives.[14] All of the investments (whether or not MIT internally characterized them as residing in a different Tier) were and are listed as options on the Plan's website that participants can invest in.[15] Throughout the class period, the display, internal MIT tier grouping and explanation of the designated investment alternatives on the Plan's Fidelity website was very poor.[16]

| 13. During the class period before July 2015, Tier 3, known as the "MIT Investment Window," offered a wide array of mutual funds, including index funds and funds focused on various business sectors and foreign markets. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150827, MIT-0150834-39. |
|---|---|

**RESPONSE:** Paragraph 13 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. From the beginning of the class period to today, MIT maintains two broad categories of investment choices for Plan participants: (1) designated investment alternatives within the Plan and (2) brokerage account investment options outside of the Plan.[17] From the beginning of the class period to today, once a Plan participant joins the Plan, there

---

[14] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶32; Ex. P3, Stone Dep. 89:6-20.

[15] Ex. P21, Ratigan Dep. 20:4-9; Ex. P22, Email Davies to Ellison; Ex. P23, 2014 Screenshot of Website; Ex. P24, 2009 Participant Communication at 32-33.

[16] Ex. P25, Preliminary Interview Results; Ex. P26, Alden Dep. 82:6-21, 83:15-22; Ex. P28, February 25, 2014 Community Feedback at 3-4; Ex. P22, Email Davies to Ellison.

[17] Ex. P15, Groom Law Group Memorandum at 3; Ex. P16, Email Eller to Chused; Ex. P17, Plan Participant 2012 Disclosure at 2-3, 5-43; Ex. P18, Plan Participant 2013 Disclosure at 5-39; Ex. P19, Email Davies to Chused.

were/are no additional barriers to the Plan participant investing in any of the designated investment alternatives.[18] All of the investments (whether or not MIT internally characterized them as residing in a different Tier) were and are listed as options on the Plan's website that participants can invest in.[19] Throughout the class period, the display, internal MIT tier grouping and explanation of the designated investment alternatives on the Plan's Fidelity website were very poor.[20]

| | | |
|---|---|---|
| 14. | Tier 4 was a self-directed brokerage window, called "BrokerageLink," which provided participants who chose to create a brokerage account with Fidelity with access to a large portion of the mutual funds available for 401(k) investment on the market. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150827, MIT-0150840; *see* Wermers Decl., Ex. 1, Wermers Report ¶ 45. |

**RESPONSE:** Paragraph 14 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. From the beginning of the class period to today, MIT maintains two broad categories of investment choices for Plan participants: (1) designated investment

[18] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶32; Ex. P3, Stone Dep. 89:6-20.
[19] Ex. P21, Ratigan Dep. 20:4-9; Ex. P22, Email Davies to Ellison; Ex. P23, 2014 Screenshot of Website; Ex. P24, 2009 Participant Communication at 32-33.
[20] Ex. P25, Preliminary Interview Results; Ex. P26, Alden Dep. 82:6-21, 83:15-22; Ex. P28, February 25, 2014 Community Feedback at 3-4; Ex. P22, Email Davies to Ellison.

alternatives within the Plan and (2) brokerage account investment options outside of the Plan.[21]

From the beginning of the class period to today, once a Plan participant joins the Plan, there

were/are no additional barriers to the Plan participant investing in any of the designated

investment alternatives.[22] All of the investments (whether or not MIT internally characterized

them as residing in a different Tier) were and are listed as options on the Plan's website that

participants can invest in.[23] Throughout the class period, the display, internal MIT tier grouping

and explanation of the designated investment alternatives on the Plan's Fidelity website were

very poor.[24]

| 15. | Tiers 1 and 2 provided simple solutions for participants without the inclination or ability to select from a larger assortment of funds and included a variety of low-cost institutional investment options. | *See* Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150831-33; Wermers Decl., Ex. 1, Wermers Report ¶¶ 44-45. |
|---|---|---|

**RESPONSE:** Paragraph 15 is not material to Defendants' Motion for Summary Judgment

because it is irrelevant to whether Defendants breached their fiduciary duties by failing to

monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A]

fiduciary initially must determine and continue to monitor the prudence of ***each*** investment

option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A

fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent

ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides

that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones."

---

[21] Ex. P15, Groom Law Group Memorandum at 3; Ex. P16, Email Eller to Chused; Ex. P17, Plan Participant 2012 Disclosure at 2-3, 5-43; Ex. P18, Plan Participant 2013 Disclosure at 5-39; Ex. P19, Email Davies to Chused.
[22] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶32; Ex. P3, Stone Dep. 89:6-20.
[23] Ex. P21, Ratigan Dep. 20:4-9; Ex. P22, Email Davies to Ellison re: Draft Update; Ex. P23, 2014 Screenshot of Website; Ex. P24, 2009 Participant Communication at 32-33.
[24] Ex. P25, Preliminary Interview Results; Ex. P26, Alden Dep. 82:6-21, 83:15-22; Ex. P28, February 25, 2014 Community Feedback at 3-4; Ex. P22, Email Davies to Ellison.

*Tibble*, 135 S.Ct. at 1828. From the beginning of the class period to today, MIT maintains two

broad categories of investment choices for Plan participants: (1) designated investment

alternatives within the Plan and (2) brokerage account investment options outside of the Plan.[25]

From the beginning of the class period to today, once a Plan participant joins the Plan, there

were/are no additional barriers to the Plan participant investing in any of the designated

investment alternatives.[26] All of the investments (whether or not MIT internally characterized

them as residing in a different Tier) were and are listed as options on the Plan's website that

participants can invest in.[27] Throughout the class period, the display, internal MIT tier grouping

and explanation of the designated investment alternatives on the Plan's Fidelity website were

very poor.[28]

| 16. | The majority of Plan assets were invested in Tiers 1 and 2 from the start of the class period through the July 2015 reconfiguration of the Plan's investment lineup. | *See* Davies Decl., Ex. 20, Mercer's 2010 Second Quarter Defined Contribution Performance Evaluation at MIT-0112242; *id.*, Ex. 24, Mercer's 2013 Fourth Quarter Defined Contribution Performance Evaluation at MIT-0003950; *id.*, Ex. 25, Mercer's 2015 Second Quarter Defined Contribution Performance Evaluation at MIT-0112965. |

**RESPONSE:** Paragraph 16 is not material to Defendants' Motion for Summary Judgment

because it is irrelevant to whether Defendants breached their fiduciary duties by failing to

---

[25] Ex. P15, Groom Law Group Memorandum at 3; Ex. P16, Email Eller to Chused; Ex. P17, Plan Participant 2012 Disclosure at 2-3, 5-43; Ex. P18, Plan Participant 2013 Disclosure at 5-39; Ex. P19, Email Davies to Chused.
[26] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶32; Ex. P3, Stone Dep. 89:6-20.
[27] Ex. P21, Ratigan Dep. 20:4-9; Ex. P22, Email Davies to Ellison re: Draft Update; Ex. P23, 2014 Screenshot of Website; Ex. P24, 2009 Participant Communication at 32-33.
[28] Ex. P25, Preliminary Interview Results; Ex. P26, Alden Dep. 82:6-21, 83:15-22; Ex. P28, February 25, 2014 Community Feedback at 3-4; Ex. P22, Email Davies to Ellison.

monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A]

fiduciary initially must determine and continue to monitor the prudence of **each** investment

option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A

fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent

ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quo*ting Tibble*, 135 S.Ct. at 1829). ERISA provides

that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones."

*Tibble*, 135 S.Ct. at 1828. As of June 2010, $829.3 million was invested in designated

investment alternatives that Defendants internally characterized as "Investment Window"

choices.[29] By June 2014, $1.49 billion was invested in unmonitored designated investment

alternatives that Defendants characterized as investment window options.[30]

| 17. | Human Resources personnel at MIT received comments from some Plan participants expressing a desire for a greater range of investment options than those available through Tiers 1 and 2. | Barrett Decl., Ex. 9, Deposition of Maureen Ratigan ("Ratigan Dep.") 58:9-17. |
|---|---|---|

**RESPONSE:** Paragraph 17 is not material to Defendants' Motion for Summary Judgment

because it is irrelevant to whether Defendants breached their fiduciary duties by failing to

monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A]

fiduciary initially must determine and continue to monitor the prudence of **each** investment

option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A

fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent

ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides

that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones."

*Tibble*, 135 S.Ct. at 1828. Defendants' citation does not support its proposition. In the section

---

[29] Ex. P30, October 20, 2010 Fidelity Presentation at 4.
[30] Ex. P57, August 28, 2014 Fidelity Presentation at 4.

Defendants rely upon, Ms. Ratigan was responding to a question about a February 2014 e-mail related to an attempt by MIT to enact a fiduciary waiver and responded that "actually *one* of the faculty members that we met with, I think he was from the Department of Economics, suggested this approach, that we retain the existing structure and just ask for participants to sign a waiver."[31] In actuality, only a "small minority [of Plan participants were] concerned that sophisticated investors may be penalized" but "Faculty and staff generally support the proposal to streamline the investment line-up and agree with the rationale for change."[32] Random Plan participants are not fiduciaries of the Plan.

| 18. | The Oversight Committee intended Tiers 3 and 4 of the Plan menu to cater to participants who wanted a greater range of choice than was available in Tiers 1 and 2. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150834, MIT-0150840; *see* Barrett Decl., Ex. 7, Stone Dep. 104:4-105:17. |
| --- | --- | --- |

**RESPONSE:** Paragraph 18 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of ***each*** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828.

---

[31] Ex. P21, Ratigan Dep. 57:14-17 (emphasis added); Ex. P31, Email Ratigan to Davies.
[32] Doc. 208-10 at 7; Ex. P26, Alden Dep. 82:6-21.

Plaintiffs otherwise dispute paragraph 18. Defendants retained Tier 3 because removing it would cause "significant revenue loss for Fidelity's workplace product [PWI] based on how they currently price their defined contribution business."[33] To remove investments designated as investment window funds, Fidelity and MIT "would need to discuss this piece strategically with leadership from Fidelity and MIT[.]"[34] MIT also understood that eliminating the investments designated as investment window funds would necessarily be simplified.[35]

At a June 11, 2009 meeting, Mercer told the Plan's fiduciaries on the MIT 401(k) Plan Oversight Committee ("POC") that "[b]ased on available information (16,500 participants), Mercer estimated that recordkeeping costs per participant is $189 (vs. industry standards of $50 to $125)."[36] MIT noted in its meeting minutes that "[t]hrough intercompany transfers, Fidelity receives fees to offset the cost of MIT's recordkeeping. Revenue is high."[37] Mercer calculated that Fidelity received a total of $6,074,402.53 in revenue from the Plan and that $3,132,940.96 was paid to Fidelity's Personal and Workplace Investing (PWI) department for recordkeeping fees.[38]   Abigail Johnson headed PWI at this time and had, "major focus on the PWI business[.]"[39] As the June 11, 2009 meeting concluded, the POC Chair, Theresa Stone, commented that:

> MIT must be sensitive to two facts: (1) the Institute's 'decades long plus' relationship with Fidelity and (2) **Ms. Abigail P. Johnson** is a member of both the **MIT Corporation** and **MITIMCo's Board of Trustees**. She is Chair of the Board that oversees Fidelity's 161 fixed income and asset allocation funds which handle about $650 billion of the more than $1.2 trillion managed by Fidelity.[40]

[33] Ex. P32, Email Harrington to Samuelson.
[34] *Id.*
[35] Ex. P7, Ruiz Dep. 195:7-13.
[36] Ex. P11, June 11, 2009 Mtg. Min. Comp. at 14-15.
[37] *Id.* at 15; Ex. P78, Delivorias Dep. 27:10-22 ("intercompany transfer relates to crediting revenue internally between two divisions of a company, in this case asset management or investment management and recordkeeping").
[38] Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 4.
[39] Ex. P35, Email Harrington to Samuelson.
[40] Ex. P11, June 11, 2009 Mtg. Min. Comp. at 15 (Emphasis added).

Stone served on the MIT Corporation's Board of Trustees for "a couple of decades" and is currently a "life trustee."[41] During the same period that Stone served as a trustee, Abigail Johnson was a MIT Corporation trustee and is also currently a life trustee.[42] While on the MIT Corporation's Board of Trustees, and prior to the class period, Stone was the person responsible for actually creating the MIT Investment Management Company ("MITIMCo") and served as chair of MITIMCo's Board of Trustees.[43] Johnson was appointed to MITIMCo's Board of Trustees.[44] Stone and Johnson served together on MITIMCo's Board of Trustees.[45] Stone described Abigail Johnson as "an *honored* member of the board."[46] Abigail Johnson is the Chairman and CEO of Fidelity.[47] Other POC members at the time Stone made her comments understood that Abigail Johnson was CEO of Fidelity and an MIT donor.[48] The POC members were appointed by Stone.[49]

Outside of MIT, Stone was a Trustee of the Museum of Fine Arts ("MFA") in Boston, which was supported by high-level Fidelity employees, including Abigail Johnson's family in 2010 and 2011.[50] During the class period, at least one discussion of Fidelity's retirement plan services to the Plan took place during an e-mail conversation regarding Fidelity's contributions to the MFA.[51] In that exchange, Stone wrote to John Ragnoni, the Executive Vice President of Fidelity's Tax-Exempt 403(b) Market, praising Fidelity: "We know how much Fidelity has

---

[41] Ex. P3, Stone Dep. 10:10-11:21; Ex. P36, MIT Corporation Members *available at* https://corporation.mit.edu/all-members/theresa-m-stone.
[42] Ex. P37, MIT Corporation Members *available at* https://corporation.mit.edu/all-members/abigail-p-johnson.
[43] Ex. P3, Stone Dep. 12:5-18; 120:22-121:3.
[44] Ex. P11, June 11, 2009 Mtg. Min. Comp at 15.
[45] Ex. P3, Stone Dep. 120:22–121:8.
[46] *Id.* at 122:2-123:24.
[47] Ex. P37, MIT Corporation Members *available at* https://corporation.mit.edu/all-members/abigail-p-johnson.
[48] Ex. P10, Kelly Dep. 97:4-21.
[49] Ex. P38, 2009 MIT Faculty Newsletter at 1; ██████████████████████████
[50] Ex. P40, Email Stone to Ragnoni at 2.
[51] *Id.*

meant to the success of the Wing, so it was special to experience and enjoy the achievement of

the MFA with you, your colleagues and your good customers. You are fortunate to be part of

such a high quality organization; and we are fortunate to be your partners."[52] Fidelity's Ragnoni

responded to Stone: "As a trustee, I'm sure you are quite proud of what has been accomplished at

the museum and it was wonderful to have the Johnson family have a chance to share it with so

many of our valued clients. I am looking forward to seeing you next week to discuss some of our

ideas around plan sponsor retirement income dynamics."[53]

| 19. | MIT informed participants that the Tier 3 Investment Window was directed toward "investors with an understanding of how to research and evaluate individual investments." | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150834. |
|---|---|---|

**RESPONSE:** Paragraph 19 is not material to Defendants' Motion for Summary Judgment

because it is irrelevant to whether Defendants breached their fiduciary duties by failing to

monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A]

fiduciary initially must determine and continue to monitor the prudence of *each* investment

option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A

fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent

ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides

that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones."

*Tibble*, 135 S.Ct. at 1828. The existence of both designated investment alternatives within the

Plan, that have no barriers to entry and BrokerageLink, with barriers to entry, conveys to

participants that a sensible fund screening process by "seasoned investment professionals" has

taken place for each and every "specific" designated investment alternative.[54] Communications

---

[52] *Id.*
[53] *Id.*
[54] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶35; Ex. P38, 2009 MIT Faculty Newsletter at 1-2, 4.

with Plan participants reinforced the perception that MIT monitored all designated investment alternatives in the Plan.[55] Plaintiffs otherwise do no dispute that the 401(k) Plan Enrollment Guide contained the cited language.

| 20. | MIT informed participants that the Tier 4 brokerage window was directed toward "investor[s] who [were] willing to take on the potential for more risk" and were "prepared to assume the responsibility of more closely monitoring this portion of [their] portfolio." | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150840. |
|---|---|---|

**RESPONSE:** Paragraph 20 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. The existence of both designated investment alternatives within the Plan, that have no barriers to entry and BrokerageLink, with barriers to entry, conveys to participants that a sensible fund screening process by "seasoned investment professionals" has taken place for each and every "specific" designated investment alternative.[56] Communications with Plan participants reinforced the perception that MIT monitored all designated investment alternatives in the Plan.[57] Plaintiffs otherwise do no dispute that the 401(k) Plan Enrollment Guide contained the cited language.

---

[55] Ex. P38, 2009 MIT Faculty Newsletter at 1-2, 4.
[56] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶35; *see also* Ex. P38, 2009 MIT Faculty Newsletter at 1-2, 4.
[57] Ex. P38, 2009 MIT Faculty Newsletter at 1-2, 4.

| 21. | Plaintiffs' expert Wendy Dominguez has recognized that the inclusion of brokerage windows in defined contribution plans is common and appropriate. | Barrett Decl., Ex. 11, Wendy Dominguez Report ¶¶ 21, 30 & Ex. 9; *id.*, Ex. 10, Deposition of Wendy Dominguez ("Dominguez Dep.") 113:4-20. |
| --- | --- | --- |

**RESPONSE:** Paragraph 21 is not material to Defendants' Motion for Summary Judgment because whether the use of a self-directed brokerage option is appropriate is a plan specific inquiry. In assessing the prudence of an investment decision, both "the merits of the transaction" and "the thoroughness of the [fiduciary's] investigation" must be considered. *Tibble*, 843 F.3d at 1197 (internal citations and quotation omitted). The fiduciary must also "balance the relevant factors and make a reasoned decision as to the preferred course of action" and the failure to do so is imprudent. *George v. Kraft Foods Global, Inc.,* 641 F.3d 786,796 (7th Cir. 2011). Whether the use of BrokerageLink as a stand-alone option in the Plan was appropriate in MIT's circumstances was outside the scope of Ms. Dominguez's opinions.[58] Plaintiffs otherwise deny paragraph 21. Wendy Dominguez opines that "to the extent retirement plans want to include a third tier they use a brokerage window like BrokerageLink instead of an unmonitored and unconstrained tier like the MIT Investment Window."[59] Only "some plans allow for a third-tier providing self-directed investing through a brokerage window."[60] Ms. Dominguez's whitepaper on investment menu construction, created in the course of her practice, specifically states that a self-directed brokerage option "isn't appealing to all plan sponsors[.]"[61] In MIT's specific circumstance, Ms. Dominguez opines that the use of a self-directed brokerage option alongside a large group of unmonitored investments is inappropriate.[62] Once the Plan's fiduciaries belatedly

---

[58] Doc. 207-11, ¶1; Ex. P41, Dominguez Dep. 129:3-6.
[59] Doc. 207-11, ¶21.
[60] Doc. 207-11, ¶30.
[61] Doc. 207-11, at 141 (Ex. 4).
[62] *Id*. ¶¶20-21, 28-35.

looked at MIT's specific self-directed brokerage option in 2013, they believed that the

"Brokerage Window is not a suitable option for most MIT employees."[63]

| 22. | The Oversight Committee intended the Investment Window to operate in conjunction with BrokerageLink to offer participants ready access to an expanded range of investment choices in the period relevant to this case. | *See* Barrett Decl., Ex. 6, Ruiz Dep. 117:20-118:3 ("[T]he investment window ... was an appendage to the brokerage window"). |
| --- | --- | --- |

**RESPONSE:** Paragraph 22 is not material to Defendants' Motion for Summary Judgment

because it is irrelevant to whether Defendants breached their fiduciary duties by failing to

monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A]

fiduciary initially must determine and continue to monitor the prudence of ***each*** investment

option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A

fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent

ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides

that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones."

*Tibble*, 135 S.Ct. at 1828. Once the Plan's fiduciaries belatedly looked at the issue in 2013, they

believed that the "Brokerage Window is not a suitable option for most MIT employees."[64]

---

[63] Ex. P25, Preliminary Interview Results.
[64] *Id.*

| 23. | When the Investment Window was introduced to the Plan, it included all Fidelity mutual funds available to 401(k) plans, as well as a set of non-Fidelity funds that included many funds requested by Fidelity's 401(k) plan clients. These funds were known as the "FundsNet" funds. | Declaration of Francis Petrangelo in Support of Defendants' Motion for Summary Judgment ("Petrangelo Decl.") ¶ 4; *see* Davies Decl., Ex. 30, Amended and Restated Recordkeeping Agreement Between Massachusetts Institute of Technology and Fidelity Investments Institutional Operations Company, Inc., dated October 22, 2001 ("Recordkeeping Agreement") at MIT-0117077; Barrett Decl., Ex. 7, Stone Dep. 110:18-112:3. |
|---|---|---|

**RESPONSE:** Paragraph 23 is not material to Defendants' Motion for Summary Judgment because a decision to add all then existing Fidelity funds in 2001 is irrelevant to whether Defendants breached their fiduciary duties during the class period by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of ***each*** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828.

| 24. | Fidelity is one of the most experienced fund complexes in the plan-servicing business, offering investments that are widely held in defined-contribution plans. | *See* Petrangelo Decl. ¶ 3; Wermers Decl., Ex. 1, Wermers Report ¶¶ 49-51 & Exs. 5, 6, 7A-B. |
|---|---|---|

**RESPONSE:** Paragraph 24 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. The investment management firm, the brand, like Fidelity, is not a determining factor in the performance of an investment.[65]

| | | |
|---|---|---|
| 25. | BrokerageLink provided Plan participants access to many of the same funds that were available through the Investment Window. | Davies Decl., Ex. 22, 2012 MIT 401(k) Plan Investment Structure Process Presentation at MIT-0001771, MIT-0001776-94; *see* Wermers Decl., Ex. 1, Wermers Report ¶ 61. |

**RESPONSE:** Paragraph 25 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides

---

[65] Ex. P1, Howard Dep. 109:21-110:16; Ex. P44, Wermers Dep. 59:12-60:15.

that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones."

*Tibble*, 135 S.Ct. at 1828. Plaintiffs do not otherwise dispute paragraph 25.

| | |
|---|---|
| 26.     In 2012, the Plan's third-party investment consultant, Mercer LLC ("Mercer"), determined that 64 of the funds available in both the Investment Window and BrokerageLink were available in a lower-cost share class in the Investment Window relative to the share class available through BrokerageLink. | Davies Decl., Ex. 22, 2012 MIT 401(k) Plan Investment Structure Process Presentation at MIT-0001789-93; *see* Wermers Decl., Ex. 1, Wermers Report ¶ 61. |

**RESPONSE:** Paragraph 26 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants engaged in any conduct that resulted in any individual investment in a lower cost share class for any individual fund available in both the Investment Window and BrokerageLink. In assessing the prudence of an investment decision, both "the merits of the transaction" and "the thoroughness of the [fiduciary's] investigation" must be considered. *Tibble v. Edison, Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016)(internal citations and quotation omitted). "'[T]he test of prudence—the Prudent Man Rule—is one of *conduct*, and not a test of the result.'" *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009)(alteration in original)(quoting *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir.1983)) "The fiduciaries conduct is judged based upon 'the totality of the circumstances.'" *Bunch*, 555 F.3d at 7 (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007)). Moreover, the document cited by Defendants is dated September 27, 2012, which is two years after the start of the class period, August 9, 2010.[66]

Plaintiffs otherwise deny that 64 funds available in both the Plan and Brokeragelink were available in a lower-cost share class in the Investment Window during the entire class period. Of the 64 funds cited by Defendants, 41 were in higher cost share classes of proprietary Fidelity

---

[66] Doc. 1.

investments until November 2011.[67] As of August 2010, the Plan was eligible for lower cost share classes of the proprietary Fidelity investments in the Plan, known as K shares,.[68] Over $300 million in Plan participant assets were invested in these higher cost share classes of the proprietary Fidelity funds.[69]

Plaintiffs further deny that these 64 funds were the result of any process.[70] MIT's failure to evaluate investments in the Plan resulted in several designated investment alternatives in the Plan to have even higher expense ratios than the same investment in BrokerageLink.[71] By 2012, over $9 million in plan participant assets were invested in the higher cost options in the Plan.[72] Plan fiduciaries did not know this was occurring until 2012, testifying that they "would be surprised" if that happened.[73] Once Plan fiduciaries were advised this was occurring, they did not remedy the problem with individual committee members disclaiming any personal responsibility to investigate overcharges or availability of a lower share class within the Plan.[74] By December 31, 2013, $11 million in participant assets were invested in the higher cost designated investment alternative option.[75] As of July 1, 2010, 184 designated investment alternatives in the Plan were also in BrokerageLink in the same share class with no transaction fees.[76]

[67] Ex. P5, Recordkeeping Agreement Comp. at 52-55.
[68] Ex. P3, Stone Dep. 115:4- 118:5; Ex. P45, Harrington Dep. 20:1-21:22; Ex. P46, Email Harrington to Samuelson.
[69] Ex. P45, Harrington Dep. 20:1-23:4; Ex. P46, Email Harrington to Samuelson; Doc. 207-4, 2010 Form 5500 at 155-160.
[70] Ex. P7, Ruiz Dep. 61:3-10; Ex. P10, Kelly Dep. 43:8-50:13.
[71] Doc. 208-22, at 25-28 (Janus Balance S; DWS International S; Janus Overseas; Janus Worldwide; Janus Forty; Janus Enterprise S; Alger Capital Appreciation).
[72] *Id*.
[73] Ex. P3, Stone Dep. 88:2-89:5; Ex. P21, Ratigan Dep. 59:6-61:2; Ex. P31, Email Ratigan to Davies.
[74] Ex. P1, Howard Dep. 112:17-121:14; *see also* Ex. P10, Kelly Dep. 40:4-41:6, 91:18-92:9, 93:2-95:23.
[75] Ex. P79, 2013 Form 5500 at 182.
[76] Ex. P32, Email Harrington to Samuelson; Ex. P80, MIT 401(k) Funds Ranked as of 03/30/2012.

| 27. | Plan participants investing in the Investment Window were not charged transaction fees or commissions in connection with their investments, whereas participants investing through BrokerageLink were charged transaction fees for investing in certain funds offered through that service. | Davies Decl., Ex. 1, Fidelity BrokerageLink Participant Acknowledgment Form at MIT-0008452; *id.*, Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150840; *id.*, Ex. 7, April 30, 2012 Minutes of the Meeting of the MIT Supplemental 401(k) Plan Oversight Committee at MIT-0001511; Barrett Decl., Ex. 10, Dominguez Dep. 145:10-21, 169:7-10; *see* Wermers Decl., Ex. 1, Wermers Report ¶ 61. |
|---|---|---|

**RESPONSE:** Plaintiffs dispute paragraph 27. As of July 1, 2010, 184 designated investment alternatives in the Plan were also in BrokerageLink in the same share class and did not charge transaction fees.[77]

| 28. | Plan participants are required to complete a Fidelity BrokerageLink Participant Acknowledgement Form in order to invest through BrokerageLink. | Davies Decl., Ex. 1, Fidelity BrokerageLink Participant Acknowledgment Form at MIT-0008442-52. |
|---|---|---|

**RESPONSE:** Plaintiffs do not dispute paragraph 28.

| 29. | By completing a Fidelity BrokerageLink Participant Acknowledgement Form, Plan participants agree to a series of terms and conditions which include limitations of liability, potential fees for low account activity or failure to maintain minimum account balances, and the arbitration of any disputes. | Davies Decl., Ex. 1, Fidelity BrokerageLink Participant Acknowledgment Form at MIT-0008449, MIT-0008451-52; *see also* Barrett Decl., Ex. 10, Dominguez Dep. 153:1-20, 157:14158:9, 162:21-164:1. |
|---|---|---|

---

[77] Ex. P32, Email Harrington to Samuelson; Ex. P80, MIT 401(k) Funds Ranked as of 03/30/2012.

**RESPONSE:** Plaintiffs do not dispute paragraph 29. The requirement for the BrokerageLink created hurdles that clearly communicated to participants that they were stepping outside the fiduciary environment.[78]

| 30. | By completing a Fidelity BrokerageLink Participant Acknowledgement Form, Plan participants also acknowledge that they bear the burden of notifying Fidelity of erroneous or incorrect orders. | Davies Decl., Ex. 1, Fidelity BrokerageLink Participant Acknowledgment Form at MIT-0008448-49; *see also* Barrett Decl., Ex. 10, Dominguez Dep. 158:10-161:6. |

**RESPONSE:** Plaintiffs do not dispute paragraph 30.

| 31. | As a result of the agreements and acknowledgements required to invest through BrokerageLink, participants investing through BrokerageLink who fail to immediately notify Fidelity of erroneous or inaccurate trades may not be subsequently made whole if and when they notice and later notify Fidelity of any such errors. | Davies Decl., Ex. 1, Fidelity BrokerageLink Participant Acknowledgment Form at MIT-0008448-49; *see* Barrett Decl., Ex. 10, Dominguez Dep. 158:10161:6. |

**RESPONSE:** Plaintiffs do not dispute paragraph 31.

| 32. | Participants wishing to invest their participant account balances through the Investment Window were not required to sign an acknowledgement form, nor were they otherwise required to agree to limitations of liability, potential fees for low account activity or failure to maintain minimum account balances, or the arbitration of any disputes. | Davies Decl. ¶ 7; *see* Barrett Decl., Ex. 10, Dominguez Dep. 135:21-137:23. |

**RESPONSE:** Plaintiffs do not dispute paragraph 32.

| 33. | Plaintiffs' expert Wendy Dominguez testified that the steps required to invest through brokerage windows benefit participants because they deter participants from completing them. | *See* Barrett Decl., Ex. 10, Dominguez Dep. 131:4-7, 135:21-136:15, 137:8-138:6, 154:22-155:16, 162:14-20, 164:2-11. |

---

[78] Doc. 207-11, Dominguez Rebuttal Report, ¶¶31–35.

**RESPONSE:** Paragraph 33 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of ***each*** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828.

Plaintiffs otherwise do not dispute paragraph 33. Wendy Dominguez opined that if a self-directed brokerage option is offered, it is important that participants investing in the self-directed option know they are in that option.[79] In MIT's specific circumstances, once the Plan's fiduciaries belatedly looked at MIT's specific self-directed brokerage option in 2013, they believed that the "Brokerage Window is not a suitable option for most MIT employees."[80] By late 2013, the Committee members expressed their preference that there were obstacles to Plan participants going into a self-directed option.[81]

| 34. | On a dollar-weighted basis, participants' investments in the Investment Window during the class period delivered returns that were within $395,898 of the returns participants would have achieved had they been able to make the same investment allocations directly in the funds' benchmarks, and earn the full measure of benchmark returns, instead. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶¶ 27-28 & Ex. 2. |
| --- | --- | --- |

---

[79] Ex. P41, Dominguez Dep. 126:22-127:5, 141:2-143:24, 149:11-151:23, 169:11-170:9, 185:12-186:2.
[80] Ex. P25, Preliminary Interview Results.
[81] Ex. P33, Email Ratigan to Ruiz at 1.

**RESPONSE:** Paragraph 34 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor all designated investment alternatives in the Plan causing the Plan to retain imprudent investment options. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Paragraph 34 is further irrelevant because loss is determined "by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio." *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008). *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985), provides "[w]here several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these." *Id.* at 1056 The Court should resolve "[a]ny doubt or ambiguity" regarding damages against the fiduciary. *Id.* Applying these principles, courts use the most profitable "plausible" replacement funds to calculate damages. *Id.*; *Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016). Similarly, the Pension Protection Act allows mapping of investments to "reasonably similar" investments or to the default investment option. 29 U.S.C. §1104(c)(4)(B). Moreover, paragraph 34 demonstrates loss to the Plan and creates an issue of fact. Defendants' failure to monitor investments and remove imprudent ones resulted in damages to the Plan of $over $30 million.[82]

---

[82] Ex. P49, Buetow Corrected Expert Report ¶¶24, 85-121.

| 35. | It is not possible to invest directly in a prospectus benchmark, and investing in a fund that seeks to track a benchmark index comes with investment management costs that are not accounted for in reporting the performance of the benchmark index itself. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 28. |
|---|---|---|

**RESPONSE:** Paragraph 35 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor all designated investment alternatives in the Plan causing the Plan retaining imprudent investment options. "[A] fiduciary initially must determine and continue to monitor the prudence of ***each*** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Paragraph 35 is further irrelevant because loss is determined "by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio." *Evans*, 534 F.3d at 74. *Bierwirth* provides "[w]here several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these." 754 F.2d at 1056. The Court should resolve "[a]ny doubt or ambiguity" regarding damages against the fiduciary. *Id.* Applying these principles, courts use the most profitable "plausible" replacement funds to calculate damages. *Id.*; *Trs. of the Upstate N.Y. Eng'rs Pension Fund*, 843 F.3d at 567. Similarly, the Pension Protection Act allows mapping of investments to "reasonably similar" investments or to the default investment option. 29 U.S.C. §1104(c)(4)(B).

| 36. | Participants' investments in the Investment Window funds during the class period delivered returns that exceeded the returns participants would likely have achieved had they instead invested in funds seeking to track the Investment Window funds' benchmarks, taking into the account the likely costs of investing in an actual fund tracking the benchmark. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 28. |
|---|---|---|

**RESPONSE:** Paragraph 36 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor all designated investment alternatives in the Plan causing the Plan retaining imprudent investment options. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Defendants' expert did not analyze whether each individual fund was reasonable for the Plan.[83] Plaintiffs otherwise deny paragraph 36. Defendants' citation is not supported by any evidence outside of pure speculation. Wermers' report states he believes that "incorporating these costs would result in lower—and likely *negative*—damages relative to the calculation in Exhibit 2, and therefore, the calculations show in Exhibit 2 are conservative."[84]

Paragraph 36 is further irrelevant because loss is determined "by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio." *Evans*, 534 F.3d at 74. *Bierwirth* provides "[w]here several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these." 754 F.2d at 1056. The Court should resolve "[a]ny doubt or ambiguity" regarding damages against the fiduciary. *Id.* Applying these principles, courts use the most profitable "plausible" replacement funds to calculate damages. *Id.*; *Trs. of the Upstate N.Y. Eng'rs Pension Fund*, 843 F.3d at 567. Similarly, the Pension Protection Act allows mapping of investments to "reasonably similar" investments or to the default investment option. 29 U.S.C.

---

[83] Ex. P44, Wermers Dep. 82:21-85:12.
[84] Doc. 210-2, Wermers Rebuttal Report ¶28.

§1104(c)(4)(B). Plaintiffs otherwise dispute paragraph 36. Defendants' failure to monitor investments and remove imprudent ones resulted in damages to the Plan of over $30 million.[85]

| 37. | On a dollar-weighted basis, participants' investments in the funds in the Investment Window delivered returns that were more than $40 million higher than the participants would have achieved had they been able to make the same investment allocations in a fund delivering the median returns of each Investment Window fund's peer group. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 31 & Ex. 4. |
|---|---|---|

**RESPONSE:** Paragraph 37 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor all designated investment alternatives in the Plan causing the Plan retaining imprudent investment options. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Paragraph 37 is further irrelevant because loss is determined "by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio." *Evans*, 534 F.3d at 74. *Bierwirth* provides "[w]here several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these." 754 F.2d at 1056. The Court should resolve "[a]ny doubt or ambiguity" regarding damages against the fiduciary. *Id.* Applying these principles, courts use the most profitable "plausible" replacement funds to calculate damages. *Id.*; *Trs. of the Upstate N.Y. Eng'rs Pension Fund*, 843 F.3d at 567. Similarly, the Pension Protection Act allows mapping of investments to "reasonably similar" investments or to the default investment option. 29 U.S.C. §1104(c)(4)(B).

---

[85] Ex. P49, Buetow Corrected Expert Report ¶¶24, 85-121.

Plaintiffs otherwise dispute that selecting the median return of each investments peer group is the proper measure of damages. Defendants' failure to monitor investments and remove imprudent ones resulted in damages to the Plan of over $30 million.[86]

| 38. | For each year from 2010 through 2015, the majority of the actively managed mutual funds in the Investment Window had one-, three-, and five-year returns in the top two quartiles of their respective mutual fund peer groups. | Wermers Decl., Ex. 1, Wermers Report ¶ 84 & Exs. 17A-17C. |
| --- | --- | --- |

**RESPONSE:** Paragraph 38 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor all designated investment alternatives in the Plan causing the Plan retaining imprudent investment options. "[A] fiduciary initially must determine and continue to monitor the prudence of **each** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Defendants' citation demonstrates that from 2010 through 2015, when designated investment alternatives were not being monitored, up to 44% were in the bottom two quartiles of their respective mutual fund peer groups.[87] Defendants' citation is an admission that up to 44% of the designated investment alternatives in the Plan consistently underperformed their benchmarks through the class period.

| 39. | Many of the Vanguard funds used by Plaintiffs' expert Gerald Buetow as comparators for the Investment Window options are in different asset classes than the challenged Investment Window funds. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶¶ 25-26 & Exs. 1A-1B. |
| --- | --- | --- |

**RESPONSE:** Paragraph 39 is not material to Defendants' Motion for Summary Judgment because loss is determined "by comparing the performance of the imprudent investments with

---

[86] Ex. P49, Buetow Corrected Expert Report ¶¶24, 85-121.
[87] Doc. 210-1, at 150-152 (17A-17C).

the performance of a prudently invested portfolio." *Evans*, 534 F.3d at 74. *Bierwirth* provides

"[w]here several alternative investment strategies were equally plausible, the court should

presume that the funds would have been used in the most profitable of these." 754 F.2d at 1056.

The Court should resolve "[a]ny doubt or ambiguity" regarding damages against the fiduciary.

*Id.* Applying these principles, courts use the most profitable "plausible" replacement funds to

calculate damages. *Id.*; *Trs. of the Upstate N.Y. Eng'rs Pension Fund*, 843 F.3d at 567. Similarly,

the Pension Protection Act allows mapping of investments to "reasonably similar" investments

or to the default investment option. 29 U.S.C. §1104(c)(4)(B). Once a fiduciary determines that

an inappropriate designated investment alternative should be removed from a defined

contribution plan, it is common fiduciary practice to make mapping decisions to reasonably

similar, but not the exact same, asset class based on the circumstances of the plan.[88] Had

Defendants followed any investment management process in August 2010, the Plan would not

have lost over $30 million in retirement savings.[89]

| 40. | Plaintiffs' expert Gerald Buetow has acknowledged that there was no way, at the beginning of the class period, for the Committee to identify which funds within the Investment Window would outperform their benchmarks during the class period and which funds would not. | Barrett Decl., Ex. 12, Deposition of Gerald Buetow ("Buetow Dep.") 224:18-225:23. |
|---|---|---|

**RESPONSE:** Paragraph 40 is not material to Defendants' Motion for Summary Judgment

because "'the test of prudence—the Prudent Man Rule—is one of *conduct,* and not a test of the

result.'" *Bunch*, 555 F.3d at 7 (alteration in original)(quoting *Donovan,* 716 F.2d at 1467. In

assessing the prudence of an investment decision, both "the merits of the transaction" and "the

thoroughness of the [fiduciary's] investigation" must be considered. *Tibble*, 843 F.3d at 1197

---

[88] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶¶49-50; Ex. P44, Wermers Dep. 97:23-102:5; Ex. P44, Wermers Dep. Ex. 211 at 11 (mapping sector funds to various asset classes); Ex. P54, Ellison Dep. 85:3-87:12; 89:1-18, 97:6-98:22; 100:1-102:12.
[89] Ex. P49, Buetow Corrected Expert Report ¶¶24, 85-121.

(internal citations and quotation omitted). The defined contribution portfolio management

process is put in place to prudently manage an investment lineup to meet the goals of the defined

contribution plan and prevent disaster.[90] MIT did not undertake this process, resulting in

disaster.[91] Had Defendants followed any investment management process in August 2010, the

Plan would not have lost $30 million in retirement savings.[92]

| 41. | The Oversight Committee on multiple occasions sought counsel on its fiduciary responsibilities with respect to selection and monitoring of the Plan's various investment options, including the Investment Window. | Davies Decl., Ex. 27, Letter From R. Gaudreau, Jr., to P. Callahan Fay, MIT-0123435; *id.*, Ex. 8, May 24, 2010 Minutes of the Meeting of the MIT Supplemental 401(k) Plan Oversight Committee at MIT-005196. |
|---|---|---|

**RESPONSE:** Plaintiffs do not dispute paragraph 41. Plaintiffs dispute that Defendants followed

the advice of counsel.

| 42. | In 2007, the Committee received legal advice from outside lawyers, which the outside lawyers represented to have been confirmed with the Department of Labor, stating that it had a "diluted level of fiduciary responsibility with respect to Tier 3 investment options," "significantly lower than its role with respect to Tiers 1 and 2." | Davies Decl., Ex. 27, Letter From R. Gaudreau, Jr., to P. Callahan Fay at MIT-0123439. |
|---|---|---|

**RESPONSE:** Plaintiffs state that the document cited speaks for itself and do not dispute the

quoted language in included in the cited document. The cited document also indicates that "in the

event that a large number of the funds offered by the vendor are underperforming" MIT should

select a new vendor.[93] Paragraph 42, which contains advice given by Ropes & Gray LLP in

---

[90] Ex. P86, Buetow Dep. 282:17-24; Ex. P66, *The Management of Investment Decisions* at 1-2; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26; Ex. P64, John L. Maginn, et al., *Managing Investment Portfolios: A Dynamic Process*, pp. 4-6, 10-11.
[91] Ex. P93, Email Samuelson to Harrington.
[92] Ex. P49, Buetow Corrected Expert Report ¶¶24, 85-121.
[93] Doc. 208-27, at 6.

2007, is not material to Defendants' Motion for Summary Judgment ███████████ ███████████.[94] As early as January 12, 2010, Groom advised MIT that the internally designated "Investment Window" funds needed to be monitored the same way MIT monitored the internally designated Lifecycle Funds and Asset Class Funds.[95] In March 2010, Groom attended an MIT fiduciary committee meeting and again opined that MIT must monitor all designated investment alternatives in the Plan, regardless of internal characterization.[96] By May 2010, the POC noted that there was "fiduciary responsibility for the Investment Window vs. no fiduciary responsibility for BrokerageLink."[97] Again in June 2010, MIT noted that they were not relieved from the "responsibility to select and monitor plan investment alternatives under ERISA, especially 'designated investment alternatives' (DIA)."[98] MIT immediately recognized that Groom was "extremely knowledgeable[,]"[99] and that the "quality and depth of [Groom] surpassed [Ropes & Gray]."[100] By 2012, both Mercer and Fidelity informed MIT that a group of unmonitored designated investment alternatives was an uncommon and inappropriate outlier among 401(k) plans.[101] In February 2012, Groom continued to counsel that MIT had an "ongoing fiduciary obligation to monitor the investment window funds[.]"[102] In September 2012, Mercer told MIT that "as part of its fiduciary responsibility, [MIT] needs to monitor each and every

---

[94] ████████████████████████████████████.
[95] Ex. P47, Jan. 13, 2010 Memorandum to File at 6-7; Ex. P7, Ruiz Dep. 65:2-21; Ex. P95, May 20, 2010 Investment Window Discussion.
[96] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 40-41.
[97] Ex. P11, May 10, 2010 Mtg. Min. Comp. at 45-46; Ex. P95, May 20, 2010 Investment Window Discussion.
[98] Ex. P96, June 16, 2010 Plan Oversight Subcommittee Agenda; Ex. P48, June 16, 2010 Presentation at 8-9, 10.
[99] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 41.
[100] *Id.* at 46.
[101] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 41 ("When Ms. Stone asked if MIT is the only plan sponsor to offer hundreds of investments through its platform, [Mercer] responded that beginning in 2002, plans narrowed their investment offerings."); *Id.* at 136 (Fidelity's representative "mentioned that only a few Fidelity clients have both a mutual fund window and the brokerage link and that this structure is no longer offered to new clients.").
[102] Ex. P6, Email Lofren to Chused at 1.

investment fund that is not in the Brokerage Window and should consider the costs and efforts to adequately perform the reviews."[103]

| 43. | Counsel advised that the Committee was required to ensure that the Investment Window menu was competitive with similar mutual-fund-window offerings from other vendors. | Davies Decl., Ex. 27, Letter From R. Gaudreau, Jr., to P. Callahan Fay at MIT-0123439. |
|---|---|---|

**RESPONSE:** Paragraph 43, which contains advice given by Ropes & Gray LLP in 2007, is not material to Defendants' Motion for Summary Judgment because ███████████ ███████.[104] As early as January 12, 2010, Groom advised MIT that the internally designated "Investment Window" funds needed to be monitored the same way MIT monitored the internally designated Lifecycle Funds and Asset Class Funds.[105] In March 2010, Groom attended an MIT fiduciary committee meeting and again opined that MIT must monitor all designated investment alternatives in the Plan, regardless of internal characterization.[106] By May 2010, the POC noted that there was "fiduciary responsibility for the Investment Window vs. no fiduciary responsibility for BrokerageLink."[107] Again in June 2010, MIT noted that they were not relieved from the "responsibility to select and monitor plan investment alternatives under ERISA, especially 'designated investment alternatives' (DIA)."[108] MIT immediately recognized that Groom was "extremely knowledgeable[,]"[109] and that the "quality and depth of [Groom] surpassed [Ropes & Gray]."[110] By 2012, both Mercer and Fidelity informed MIT that a group of unmonitored designated investment alternatives was an uncommon and inappropriate outlier

---

[103] Ex. P11, May 31, 2012 Mtg. Comp. at 141.

[104] ████████████████████.

[105] Ex. P47, January 13, 2010 Memorandum to File at 6-7; Ex. P7, Ruiz Dep. 65:2-21; Ex. P95, May 20, 2010 Investment Window Discussion.

[106] Ex. March 30, 2010 P11, Mtg. Min. Comp. at 40-41.

[107] *Id.* at 45-46; Ex. P95, May 20, 2010 Investment Window Discussion.

[108] Ex. P96, June 16, 2010 Plan Oversight Subcommittee Agenda; Ex. P48, June 16, 2010 Presentation at 8-9, 10.

[109] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 41.

[110] *Id.* at 46.

among 401(k) plans.[111] In February 2012, Groom continued to counsel that MIT had an "ongoing

fiduciary obligation to monitor the investment window funds[.]"[112] September 2012, Mercer told

MIT that "as part of its fiduciary responsibility, [MIT] needs to monitor each and every

investment fund that is not in the Brokerage Window and should consider the costs and efforts to

adequately perform the reviews."[113] Plaintiffs otherwise do not dispute paragraph 43.

| 44. | Counsel reported that "DOL suggested that the Oversight Committee should consider" "periodically monitoring the funds available under Tier 3 using information provided by the vendor in order to identify any funds that are underperforming," "advising participants of any funds that are underperforming," and "in the event that a large number of funds offered by the vendor are underperforming, selecting a new vendor." | Davies Decl., Ex. 27, Letter From R. Gaudreau, Jr., to P. Callahan Fay at MIT-0123439. |
|---|---|---|

**RESPONSE:** Paragraph 44, which contains advice given by Ropes & Gray LLP in 2007, is not

material to Defendants' Motion for Summary Judgment because by October 2009, ██████████

██████████.[114] As early as January 12, 2010, Groom advised MIT that the internally

designated "Investment Window" funds needed to be monitored the same way MIT monitored

the internally designated Lifecycle Funds and Asset Class Funds.[115] In March 2010, Groom

attended an MIT fiduciary committee meeting and again opined that MIT must monitor all

designated investment alternatives in the Plan, regardless of internal characterization.[116] By May

2010, the POC noted that there was "fiduciary responsibility for the Investment Window vs. no

---

[111] *Id.* at 41 ("When Ms. Stone asked if MIT is the only plan sponsor to offer hundreds of investments through its platform, [Mercer] responded that beginning in 2002, plans narrowed their investment offerings."); *Id.* at 136 (Fidelity's representative "mentioned that only a few Fidelity clients have both a mutual fund window and the brokerage link and that this structure is no longer offered to new clients.").

[112] Ex. P6, Email Lofren to Chused at 1.

[113] Ex. P11, May 31, 2012 Mtg. Min. Comp. at 141.

[114] ██████████████████████████.

[115] Ex. P47, Jan. 13, 2010 Memorandum to File at 6-7; Ex. P7, Ruiz Dep. 65:2-21; Ex. P95, May 20, 2010 Investment Window Discussion.

[116] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 40-41.

fiduciary responsibility for BrokerageLink."[117] Again in June 2010, MIT noted that they were

not relieved from the "responsibility to select and monitor plan investment alternatives under

ERISA, especially 'designated investment alternatives' (DIA)."[118] MIT immediately recognized

that Groom was "extremely knowledgeable[,]"[119] and that the "quality and depth of [Groom]

surpassed [Ropes & Gray]."[120] By 2012, both Mercer and Fidelity itself informed MIT that a

group of unmonitored designated investment alternatives was an uncommon and inappropriate

outlier among 401(k) plans.[121] In February 2012, Groom continued to counsel that MIT had an

"ongoing fiduciary obligation to monitor the investment window funds[.]"[122] In September 2012,

Mercer told MIT that "as part of its fiduciary responsibility, [MIT] needs to monitor each and

every investment fund that is not in the Brokerage Window and should consider the costs and

efforts to adequately perform the reviews."[123] Plaintiffs otherwise do not dispute paragraph 44.

| 45. | Counsel stated that "DOL's position [wa]s consistent with" the approach then followed by the Oversight Committee "of utilizing Fidelity to (1) provide information the Oversight Committee may use to monitor Tier 3 investment options, (2) help develop a 'watch list' of underperforming investment options under Tier 3 and (3) assist with notifying participants of any such underperforming investment options." | Davies Decl., Ex. 27, Letter From R. Gaudreau, Jr., to P. Callahan Fay at MIT-0123439. |

**RESPONSE:** Paragraph 45, which contains advice given by Ropes & Gray LLP in 2007, is not

material to Defendants' Motion for Summary Judgment because by October 2009, ███████

---

[117] *Id.* at 45-46; Ex. P95, May 20, 2010 Investment Window Discussion.
[118] Ex. P96, June 16, 2010 Plan Oversight Subcommittee Agenda; Ex. P48, June 16, 2010 Presentation at 8-9, 10.
[119] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 41.
[120] *Id.* at 46.
[121] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 41 ("When Ms. Stone asked if MIT is the only plan sponsor to offer hundreds of investments through its platform, [Mercer] responded that beginning in 2002, plans narrowed their investment offerings."); *Id.* at 136 (Fidelity's representative "mentioned that only a few Fidelity clients have both a mutual fund window and the brokerage link and that this structure is no longer offered to new clients.").
[122] Ex. P6, Email Lofren to Chused at 1.
[123] Ex. P11, May 31, 2012 Mtg. Min. Comp. at 141.

██████████████.[124] As early as January 12, 2010, Groom advised MIT that the internally designated "Investment Window" funds needed to be monitored the same way MIT monitored the internally designated Lifecycle Funds and Asset Class Funds.[125] In March 2010, Groom attended an MIT fiduciary committee meeting and again opined that MIT must monitor all designated investment alternatives in the Plan, regardless of internal characterization.[126] By May 2010, the POC noted that there was "fiduciary responsibility for the Investment Window vs. no fiduciary responsibility for BrokerageLink."[127] Again in June 2010, MIT noted that they were not relieved from the "responsibility to select and monitor plan investment alternatives under ERISA, especially 'designated investment alternatives' (DIA)."[128] MIT immediately recognized that Groom was "extremely knowledgeable[,]"[129] and that the "quality and depth of [Groom] surpassed [Ropes & Gray]."[130] In 2010 and 2012, both Mercer and Fidelity informed MIT that a group of unmonitored designated investment alternatives was an uncommon and inappropriate outlier among 401(k) plans.[131] In February 2012, Groom continued to counsel that MIT had an "ongoing fiduciary obligation to monitor the investment window funds[.]"[132] In September 2012, Mercer told MIT that its "fiduciary responsibility", requires monitoring of "all" funds not in the Brokerage Window.[133] Plaintiffs otherwise do not dispute paragraph 45.

| 46. | In 2010, different outside counsel advised that the Committee's fiduciary responsibility for the Investment Window required curation of individual Investment Window funds as with Tiers 1 and 2. | *See* Barrett Decl., Ex. 7, Stone Dep. 126:9-11. |
|-----|---|---|

[124] ██████████████████████████████.
[125] Ex. P47, Jan. 13, 2010 Memorandum to File at 6-7; Ex. P7, Ruiz Dep. 65:2-21.
[126] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 40-41.
[127] Ex. P11, May 10, 2010 Mtg. Min. Comp. at 45-46.
[128] Ex. P48, June 16, 2010 Presentation at 7-8,10.
[129] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 41.
[130] Ex. P11, May 10, 2010 Mtg. Min. Comp. at 46.
[131] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 41; *id.* April 30, 2012 Mtg. Min. Comp. at 136.
[132] Ex. P6, Email Lofren to Chused.
[133] Ex. P11, September 27, 2012 Mtg. Min. Comp. at 145.

**RESPONSE:** Plaintiffs do not dispute paragraph 46. Defendants immediately recognized that the different outside counsel was "extremely knowledgeable[,]"[134] and that the "quality and depth of [Groom] surpassed [Ropes & Gray]."[135]

| 47. The Committee decided to comply with this later advice, notwithstanding the conflict with earlier guidance. | *See* Barrett Decl., Ex. 7, Stone Dep. 125:11-128:8. |
|---|---|

**RESPONSE:** Plaintiffs dispute that MIT actually complied with the "later advice" to engage in "curation of individual Investment Window funds as with Tiers 1 and 2." MIT ultimately did not act on the later advice as Stone testified that "we weren't curating the investment window. And so – period."[136] Through the entire class period MIT did not monitor designated investment alternatives that it internally characterized as investment window options,[137] did not have a policy or procedure to monitor all designated investment alternatives,[138] and had no process to remove a designated investment alternative that it characterized as an investment window option.[139] MIT never removed an underperforming Fidelity designated investment alternative from the Plan, regardless of internal tier characterization, until July 2015.[140] Instead, when Mercer informed MIT that a proprietary Fidelity designated investment alternative that MIT characterized as an asset class option underperformed, MIT simply changed the internal characterization of the underperforming Fidelity designated investment alternative, labeling it an

---

[134] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 41.
[135] Ex. P11, May 10, 2010 Mtg. Min. Comp. at 46.
[136] Ex. P3, Stone Dep. 83:23-84:9.
[137] Ex. P3, Stone Dep. 74:11-24, 75:16-78:1, 83:7-8; Ex. P10, Kelly Dep. 66:18-23; Ex. P7, Ruiz Dep. 39:7-19; Ex. P11, March 30, 2010 Mtg. Min. Comp. at 40; Ex. P12, Magner Dep. 15:19-16:12, 73:11-23.
[138] Ex. P7, Ruiz Dep. 25:13-27:13, 41:22-42:9, 43:16-23, 44:13-50:19.
[139] Ex. P10, Kelly Dep. 68:22-69:1; Ex. P20, Chused Dep. 43:4-13; Ex. P7, Ruiz Dep. 52:20-53:18; Ex. P11, February 16, 2010 Mtg. Min. Comp. at 37; Ex. P12, Magner Dep. 82:2-5.
[140] Ex. P11, February 16, 2010 Mtg. Min. Comp. at 37.

39

investment window option, leaving the proprietary Fidelity products in the Plan, but discontinuing ongoing monitoring of the option.[141]

In contrast, MIT engaged Mercer to apply the industry standard process for reviewing investments in the Lifecycle Funds and Asset Class Funds and removed imprudent Asset Class Funds when necessary to fulfill MIT's fiduciary duties to monitor and remove imprudent asset class fund investments.[142] On a quarterly basis for these funds only, Mercer performed a fund-by-fund analysis for 3-month, year to date, 1-, 3- and 5-year performance against an index and median peer group, analyzed tracking error for index funds, monitored an analyzed expense ratios, monitored and evaluated investment philosophy, portfolio positioning, sector weighting, key personnel, macroeconomic conditions, and various other qualitative and quantitative measures.[143]

For the funds that MIT internally characterized as not worthy of monitoring or evaluating, MIT simply received a report from Fidelity, who solely provided performance information against unchecked benchmarks.[144] However, Fidelity expressly disclaimed any responsibility "for the selection of investment options under the Trust and [Fidelity] shall not render investment advice to any person in connection with the selection of such options."[145] On a single occasion, Mercer informed MIT that Fidelity's data included "(a) 41 funds that were performing below par; (b) 10 funds that had inappropriate benchmarks; and (c) 16 funds that did not have 5-year track record."[146] Despite being informed of this information, MIT had no process

---

[141] Ex. P55, 2011 Mercer Defined Contribution Performance Evaluation at 27; Ex. P56, Summary of 2010 Investment Structure Changes at 1, 3-5; Ex. P12, Magner Dep. 74:7-14.
[142] Ex. P12, Magner Dep. 74:15-82:13.
[143] Id.
[144] Ex. P10, Kelly Dep. 70:8-71:22; Doc.208-4, Fidelity Watch List.
[145] Ex. P4, Trust Agreement Comp. at 6; Ex. P5, Recordkeeping Agreement Comp. at 4.
[146] Ex. P11, August 10, 2010 Mtg. Min. Comp. at 58.

in place to assure the information Fidelity reported was correct,[147] had no process to remove a fund on the watch list,[148] and made no attempt to determine proper benchmarks for the funds listed on the Fidelity report, which MIT acknowledged was critical to assess performance.[149] The only action that occurred with respect to the flawed Fidelity report was that it was placed on Fidelity's very poorly organized website.[150] The Fidelity report did not adhere to industry standards for monitoring investments in a defined contribution plan.[151]

| 48. | After deciding to comply with the later advice of counsel concerning its fiduciary responsibility with respect to the Investment Window, the Committee declined to jettison the Investment Window without a well-considered plan for what structure should take its place given the advantages that menu afforded Plan participants and participants' stated interest in the expanded choices that menu provided. | *See* Barrett Decl., Ex. 7, Stone Dep. 62:15-63:16; *id.*, Ex. 6, Ruiz Dep. 68:9-69:5, 69:23-70:15. |
|---|---|---|

**RESPONSE:** Plaintiffs dispute that MIT actually complied with the "later advice" to engage in "curation of individual Investment Window funds as with Tiers 1 and 2."[152] In 2010, MIT thought about curating all the designated investment alternatives in the Plan, the same way it did for a subset of the designated investment alternatives, and sought competitive bids from three separate advisors to apply the industry standard for evaluating investments to all designated investment alternatives in the Plan.[153] One of the advisors noted that approximately 60

---

[147] Ex. P7, Ruiz Dep. 42:15-23.
[148] Ex. P10, Kelly Dep. 68:22-69:1; Ex. P20, Chused Dep. 43:4-13; Ex. P7, Ruiz Dep. 52:20-53:18; Ex. P11, February 16, 2010 Mtg. Min. Comp. at 37; Ex. P12, Magner Dep. 82:2-5.
[149] Ex. P7, Ruiz Dep. 40:11-17; Ex. P3, Stone Dep. 48:16-49:4.
[150] Ex. P7, Ruiz Dep. 30:16-31:5; Ex. P10, Kelly Dep. 66:18-22; 69:2-5; Ex. P25, Preliminary Interview Results; Ex. P26, Alden Dep. 80:13-82:21, 83:15-22.
[151] Ex. P49, Buetow Corrected Expert Report, ¶¶ 46-50; Ex. P52, CAPTRUST Due Diligence Process Proposal at 7-19; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶¶26, 27, Ex. 3 (2012 Sample Client Performance Report); Ex. P69, Mercer Presentation Understanding Fiduciary Responsibility at 34-35; Ex. P51, Fiduciary Investment Advisors Proposal at 10, 12-14; Ex. P64, at 217-218, 341-343; Ex. P12, Magner Dep. 57:14-58:11.
[152] *Supra* ¶46;
[153] Ex. P50, Mercer Investment Window Review Proposal; Ex. P51, Fiduciary Investment Advisors Proposal; Ex. P52, CAPTRUST Due Diligence Process Proposal.

designated investment alternatives that MIT had not evaluated were underperforming "relative to benchmark (2% for equity funds, 1% for bond funds) and peer groups (below median) over a five year time period."[154] MIT ultimately did not act after being informed that there were numerous inappropriate funds in the "Investment Window."[155] After receiving the investment advisor proposals in November 2010, MIT did not engage in any process or discuss eliminating or monitoring investments on a fund-by-fund level in the Plan until February 2013.[156] MIT's process to address the unmonitored designated investment alternatives did not start until February 11, 2014, when the Fund Selection Subcommittee first met.[157] The one-year delay occurred because the Fund Selection Subcommittee's Chair, Michael Howard, did not fulfill his self-described responsibilities to the Plan by missing POC meetings from May 2013 until February 2014.[158]

| | |
|---|---|
| 49. The Committee engaged in extensive deliberations about the overall structure that the Plan's investment lineup could take without the presence of the Investment Window and received input from its investment consultant, Mercer, on this subject. | Barrett Decl., Ex. 6, Ruiz Dep. 37:10-17, 63:14-64:4; *see, e.g.*, Davies Decl., Ex. 21, May 31, 2012 MIT 401(k) Plan Investment Structure Process Presentation, MIT-0001718; *id.*, Ex. 22, September 27, 2012 MIT 401(k) Plan Investment Structure Process Presentation, MIT-0001767; *id.*, Ex. 23, December 11, 2012 MIT 401(k) Plan Investment Structure Review Presentation, MIT-0000470. |

---

[154] Ex. P51, Fiduciary Investment Advisors Proposal at 9.

[155] Ex. P3, Stone Dep. 83:23-84:9.

[156] Ex. P42, Email Davies to Alden; Ex. P11, Mtg. Min. Comp. at 66-153; Ex. P3, Stone Dep. 55:19-56:5, 63:13-16; Ex. P46, Email Harrington to Samuelson.

[157] Ex. P54, Ellison Dep. 30:16-31:9, 35:1-37:11; Ex. P68, February 25, 2014 Fund Selection Process; Ex. P1, Howard Dep. 129:5-132:18; Ex. P11, February 11, 2014 Mtg. Min. Comp. at 17; Ex. P71, Email Davies to Wieand at 1-2; Ex. P72, February 25, 2014 Notes from Call.

[158] Ex. P1, Howard Dep. 117:14-18, 121:16-125:2; Ex. P11, Mtg. Min. Comp. at 161-171.

**RESPONSE:** Plaintiffs dispute that MIT engaged in extensive deliberations about the overall structure of the Plan's investment lineup prior to 2014.[159] MIT did not act and Stone testified that "we weren't curating the investment window. And so – period."[160] Defendants' first citation to a document is dated May 31, 2012, nearly two years into the class period. In that meeting, the Committee "quickly reviewed the Investment Structure materials" and Mercer reminded MIT that "the committee, as part of its fiduciary responsibility, needs to monitor each and every investment fund that is not in the Brokerage Window[.]"[161] MIT did not engage in any process or discuss eliminating or monitoring investments on a fund-by-fund level in the Plan until February 2013.[162] MIT's process to address the unmonitored designated investment alternatives did not start until February 11, 2014, when the Fund Selection Subcommittee first met.[163] The one-year delay occurred because the Fund Selection Subcommittee's Chair, Michael Howard, did not fulfill his self-described responsibilities to the Plan by missing POC meetings from May 2013 until February 2014.[164] During this entire period, MIT did not monitor designated investment alternatives that it internally characterized as investment window options,[165] did not have a policy or procedure to monitor all designated investment alternatives,[166] and had no process to

---

[159] *Supra* ¶46;
[160] Ex. P3, Stone Dep. 83:23-84:9.
[161] Ex. P11, May 31, 2012 Mtg. Min. Comp. at 141.
[162] Ex. P42, Email Davies to Alden; Ex. P11, Mtg. Min. Comp. at 66-153; Ex. P3, Stone Dep. 55:19-56:5, 63:13-16; Ex. P46, Email Harrington to Samuelson.
[163] Ex. P54, Ellison Dep. 30:16-31:9, 35:1-37:11; Ex. P68, February 25, 2014 Fund Selection Process; Ex. P1, Howard Dep. 129:5-132:18; Ex. P11, February 11, 2014 Mtg. Min. Comp. at 17; Ex. P71, Email Davies to Wieand at 1-2; Ex. P72, February 25, 2014 Notes from Call.
[164] Ex. P1, Howard Dep. 117:14-18, 121:16-125:2; Ex. P11, Mtg. Min. Comp. at 161-171.
[165] Ex. P3, Stone Dep. 74:11-24, 75:16-78:1, 83:7-8; Ex. P10, Kelly Dep. 66:18-23; Ex. P7, Ruiz Dep. 39:7-19; Ex. P11, March 30, 2010 Mtg. Min. Comp. at 40; Ex. P12, Magner Dep. 15:19-16:12, 73:11-23.
[166] Ex. P7, Ruiz Dep. 25:13-27:13, 41:22-42:9, 43:16-23, 44:13-50:19.

43

remove a designated investment alternative that it characterized as an investment window option.[167]

| 50. As part of its process for determining the structure of the Plan's investment lineup without the Investment Window, the Committee elicited feedback from members of the MIT participant community to help ensure that the Plan's offerings remained responsive to participant needs. | Davies Decl., Ex. 10, Feb. 27, 2014 Presentation on Community Feedback on the Proposal to Streamline 401(k) Plan Investment Line-up, MIT-0000541-49; *id.*, Ex. 26, MIT 401(k) Fund Investment Line-up Change Presentation, MIT-0001886; *id.*, Ex. 11, MIT 401(k) Proposed Investment Structure Feedback, MIT-0001902-05; *id.*, Ex. 12, MIT Plan Investment Line-up Change, MIT-0001914; *id.*, Ex. 13, November 21, 2013 401(k) Investment Line-up Preview Sessions, MIT-0002090-94. |
| --- | --- |

**RESPONSE:** Paragraph 50 is not material to Defendants' Motion for Summary Judgment because Plan participants are not fiduciaries. Further, Defendants' first citation began in August 2013, three years after the start of the class period. Moreover, in the feedback exercise, participants in the late 2013 focus group noted that "they believe many of the fund options have high fees."[168] MIT noted that "concern was express by some that Fidelity's on-site investment counselor may not provide independent, objective advice."[169] MIT did not engage in any process or discuss eliminating or monitoring investments on a fund-by-fund level in the Plan until February 2013.[170] MIT's process to address the unmonitored designated investment alternatives

---

[167] Ex. P10, Kelly Dep. 68:22-69:1; Ex. P20, Chused Dep. 43:4-13; Ex. P7, Ruiz Dep. 52:20-53:18; Ex. P11, February 16, 2010 Mtg. Min. Comp. at 37; Ex. P12, Magner Dep. 82:2-5.
[168] Doc. 208-10, Community Feedback on the Proposal to Streamline the 401(k) Plan Investment Line-Up at MIT-0000545.
[169] *Id.* at MIT-0000545.
[170] Ex. P42, Email Davies to Alden; Ex. P11, Mtg. Min. Comp. at 66-153; Ex. P3, Stone Dep. 55:19-56:5, 63:13-16; Ex. P46, Email Harrington to Samuelson.

did not start until February 11, 2014, when the Fund Selection Subcommittee first met.[171] The

one-year delay occurred because the Fund Selection Subcommittee's Chair, Michael Howard,

did not fulfill his self-described responsibilities to the Plan by missing POC meetings from May

2013 until February 2014.[172] During this entire period, MIT did not monitor designated

investment alternatives that it internally characterized as investment window options,[173] did not

have a policy or procedure to monitor all designated investment alternatives,[174] and had no

process to remove a designated investment alternative that it characterized as an investment

window option.[175]

| 51. Once the Committee settled on the general parameters it preferred for the Plan's investment menu going forward, it formed a Fund Selection Subcommittee of financially sophisticated Committee members and charged them with developing proposals about which specific investment options to include in the core lineup and how to map assets from funds that were being removed. | Davies Decl., Ex. 14, September 12, 2013 E-mail from K. Davies to D. Chused at MIT-0133220; Barrett Decl., Ex. 8, Ellison Dep. 36:14-38:8. |
|---|---|

**RESPONSE:** Paragraph 51 is not material to Defendants' Motion for Summary Judgment

because MIT did not engage in any process or discuss eliminating or monitoring investments on

a fund-by-fund level in the Plan until February 2013.[176] MIT's process to address the

unmonitored designated investment alternatives did not start until February 11, 2014, when the

Fund Selection Subcommittee first met.[177] The one-year delay occurred because the Fund

[171]Ex. P54, Ellison Dep. 30:16-31:9, 35:1-37:11; Ex. P68, February 25, 2014 Fund Selection Process; Ex. P1, Howard Dep. 129:5-132:18; Ex. P11, February 11, 2014 Mtg. Min. Comp. at 17; Ex. P71, Email Davies to Wieand at 1-2; Ex. P72, February 25, 2014 Notes from Call.
[172]Ex. P1, Howard Dep. 117:14-18, 121:16-125:2; Ex. P11, Mtg. Min. Comp. at 161-171.
[173] Ex. P3, Stone Dep. 74:11-24, 75:16-78:1, 83:7-8; Ex. P10, Kelly Dep. 66:18-23; Ex. P7, Ruiz Dep. 39:7-19; Ex. P11, March 30, 2010 Mtg. Min. Comp. at 40; Ex. P12, Magner Dep. 15:19-16:12, 73:11-23.
[174] Ex. P7, Ruiz Dep. 25:13-27:13, 41:22-42:9, 43:16-23, 44:13-50:19.
[175] Ex. P10, Kelly Dep. 68:22-69:1; Ex. P20, Chused Dep. 43:4-13; Ex. P7, Ruiz Dep. 52:20-53:18; Ex. P11, February 16, 2010 Mtg. Min. Comp. at 37; Ex. P12, Magner Dep. 82:2-5.
[176] Ex. P42, Email Davies to Alden; Ex. P11, Mtg. Min. Comp. at 66-153; Ex. P3, Stone Dep. 55:19-56:5, 63:13-16; Ex. P46, Email Harrington to Samuelson.
[177]Ex. P54, Ellison Dep. 30:16-31:9, 35:1-37:11; Ex. P68, February 25, 2014 Fund Selection Process; Ex. P1, Howard Dep. 129:5-132:18; Ex. P11, February 11, 2014 Mtg. Min. Comp. at 17; Ex. P71, Email Davies to Wieand at 1-2; Ex. P72, February 25, 2014 Notes from Call.

Selection Subcommittee's Chair, Michael Howard, did not fulfill his self-described responsibilities to the Plan by missing POC meetings from May 2013 until February 2014.[178] During this entire period, MIT did not monitor designated investment alternatives that it internally characterized as investment window options,[179] did not have a policy or procedure to monitor all designated investment alternatives,[180] and had no process to remove a designated investment alternative that it characterized as an investment window option.[181]

Plaintiffs otherwise do not dispute that the fund selection subcommittee started meeting in February 2014. Responding further, once the Fund Selection Subcommittee started meeting, they struggled "to stay focused on the task at hand for the subcommittee[.]"[182] By late March 2014, the Fund Selection Subcommittee had started making preliminary decisions on a passive index provider for the Plan and Howard informed Ruiz that Fidelity was a weak candidate to provide passive index funds to the Plan after consolidation.[183] After this discussion, Ruiz directed Howard stop all work on making a decision about whether to retain Fidelity as an index fund provider under Abigail Johnson's term as Chair of the MIT Sloan School of Management Visiting Committee ended.[184] In response, Howard informed Ruiz that Fidelity would only "really care about being the record keeper and keeping as much actively managed [assets under management] as possible."[185] At the same time, MIT instructed Mercer to "take no action on the

---

178 Ex. P1, Howard Dep. 117:14-18, 121:16-125:2; Ex. P11, Mtg. Min. Comp. at 161-171.
179 Ex. P3, Stone Dep. 74:11-24, 75:16-78:1, 83:7-8; Ex. P10, Kelly Dep. 66:18-23; Ex. P7, Ruiz Dep. 39:7-19; Ex. P11, March 30, 2010 Mtg. Min. Comp. at 40; Ex. P12, Magner Dep. 15:19-16:12, 73:11-23..
180 Ex. P7, Ruiz Dep. 25:13-27:13, 41:22-42:9, 43:16-23, 44:13-50:19.
181 *Id*.
182 Ex. P74, Email Howard to Ruiz at 1-2.
183 *Id.*
184 *Id.* ("On the Fidelity front, is it a well-known fact that they do not play in passive funds? I have not yet raised the topic with John and Rafael. I wanted to wait for the Sloan Visiting Committee chaired by her (she attended) [Abigail Johnson] and then think about what to do."); Ex. P1, Howard Dep. 135:23-146:7.
185 Ex. P74, Email Howard to Ruiz at 1-2.

passive manager search until they hear from [MIT] otherwise."[186] The Fund Selection

Subcommittee did not meet again until July 2014.[187] After determining there was no way to keep

all of Fidelity's proprietary products in the Plan, Ratigan wrote to Ruiz inquiring whether

Abigail Johnson or other senior Fidelity leadership should be notified of MIT's discussions

regarding potentially eliminating imprudent Fidelity funds and that MIT should avoid "any

appearance of Fidelity's exerting influence over our fund selection process."[188] Ruiz confirmed

this in an e-mail, stating "Abby Johnson has been named CEO, I am sure we will want to also

touch base with her from MIT's point of view."[189] In 2015, David Schmittlein, MIT's Dean of

the Sloan School of Management where Abigail Johnson served Chair of the MIT Sloan School

of Management Visiting Committee, wrote to Ruiz that "if we are not switching to Vanguard or

TIAA-CREF, I am going to expect something big and good coming to MIT from the Johnson

family."[190]

| 52. | The Fund Selection Subcommittee met numerous times, reviewing detailed information regarding individual investment options, including information provided by Mercer, and discussing possible mapping strategies. | Barrett Decl., Ex. 9, Ratigan Dep. 92:21-93:16; *id.*, Ex. 8, Ellison Dep. 40:5-22, 70:21-72:4, 81:7-82:2, 85:11-17; 90:7-91:2. |
|---|---|---|

**RESPONSE:** Paragraph 52 is not material to Defendants' Motion for Summary Judgment

because MIT did not engage in any process or discuss eliminating or monitoring investments on

a fund-by-fund level in the Plan until February 2013.[191] MIT's process to address the

unmonitored designated investment alternatives did not start until February 11, 2014, when the

---

[186] Ex. P19, Email Davies to Chused at 3.
[187] Ex. P11, February 25, 2014 Mtg. Min. Comp. at 173.
[188] Ex. P76 October 14, 2014 Email Ratigan to Ruiz.
[189] *Id.*
[190] Ex. P77, Email Schmittlein to Ruiz.
[191] Ex. P42, Email Davies to Alden; Ex. P11, Mtg. Min. Comp. at 66-153; Ex. P3, Stone Dep. 55:19-56:5, 63:13-16; Ex. P46, Email Harrington to Samuelson.

Fund Selection Subcommittee first met.[192] The one-year delay occurred because the Fund

Selection Subcommittee's Chair, Michael Howard, did not fulfill his self-described

responsibilities to the Plan by missing POC meetings from May 2013 until February 2014.[193]

During this entire period, MIT did not monitor designated investment alternatives that it

internally characterized as investment window options,[194] did not have a policy or procedure to

monitor all designated investment alternatives,[195] and had no process to remove a designated

investment alternative that it characterized as an investment window option.[196]

 Plaintiffs otherwise do not dispute that the fund selection subcommittee started meeting

in February 2014. Responding further, once the Fund Selection Subcommittee started meeting,

they struggled "to stay focused on the task at hand for the subcommittee[.]"[197] By late March

2014, the Fund Selection Subcommittee had started making preliminary decisions on a passive

index provider for the Plan and Howard informed Ruiz that Fidelity was a weak candidate to

provide passive index funds to the Plan after consolidation.[198] After this discussion, Ruiz

directed Howard stop all work on making a decision about whether to retain Fidelity as an index

fund provider until Abigail Johnson's term as Chair of the MIT Sloan School of Management

Visiting Committee ended.[199] In response, Howard informed Ruiz that Fidelity would only

"really care about being the record keeper and keeping as much actively managed [assets under

---

[192] Ex. P54, Ellison Dep. 30:16-31:9, 35:1-37:11; Ex. P68, February 25, 2014 Fund Selection Process; Ex. P1, Howard Dep. 129:5-132:18; Ex. P11, February 11, 2014 Mtg. Min. Comp. at 17; Ex. P71, Email Davies to Wieand at 1-2; Ex. P72, February 25, 2014 Notes from Call.

[193] Ex. P1, Howard Dep. 117:14-18, 121:16-125:2; Ex. P11, Mtg. Min. Comp. at 161-171.

[194] Ex. P3, Stone Dep. 74:11-24, 75:16-78:1, 83:7-8; Ex. P10, Kelly Dep. 66:18-23; Ex. P7, Ruiz Dep. 39:7-19; Ex. P11, March 30, 2010 Mtg. Min. Comp. at 40; Ex. P12, Magner Dep. 15:19-16:12, 73:11-23.

[195]Ex. P7, Ruiz Dep. 25:13-27:13, 41:22-42:9, 43:16-23, 44:13-50:19.

[196] Ex. P10, Kelly Dep. 68:22-69:1; Ex. P20, Chused Dep. 43:4-13; Ex. P7, Ruiz Dep. 52:20-53:18; Ex. P11, February 16, 2010 Mtg. Min. Comp. at 37; Ex. P12, Magner Dep. 82:2-5.

[197] Ex. P74, Email Howard to Ruiz.

[198] *Id.*

[199] *Id.* ("On the Fidelity front, is it a well-known fact that they do not play in passive funds? I have not yet raised the topic with John and Rafael. I wanted to wait for the Sloan Visiting Committee chaired by her (she attended) [Abigail Johnson] and then think about what to do."); Ex. P1, Howard Dep. 135:23-146:7.

management] as possible."[200] At the same time, MIT instructed Mercer to "take no action on the passive manager search until they hear from [MIT] otherwise."[201] The Fund Selection Subcommittee did not meet again until July 2014.[202] After determining there was no way to keep all of Fidelity's proprietary products in the Plan, Ratigan wrote to Ruiz inquiring whether Abigail Johnson or other senior Fidelity leadership should be notified of MIT's discussions regarding potentially eliminating imprudent Fidelity funds and that MIT should avoid "any appearance of Fidelity's exerting influence over our fund selection process."[203] Ruiz confirmed this in an e-mail stating "Abby Johnson has been named CEO, I am sure we will want to also touch base with her from MIT's point of view."[204] In 2015, David Schmittlein, MIT's Dean of the Sloan School of Management where Abigail Johnson served Chair of the MIT Sloan School of Management Visiting Committee, wrote to Ruiz that "if we are not switching to Vanguard or TIAA-CREF, I am going to expect something big and good coming to MIT from the Johnson family."[205]

---

[200] Ex. P74, Email Howard to Ruiz at 1-2.
[201] Ex. P19, Email Davies to Chused at 3.
[202] Ex. P11, February 25, 2014 Mtg. Min. Comp. at 173.
[203] Ex. P76 October 14, 2014 Email Ratigan to Ruiz.
[204] *Id*.
[205] Ex. P77, Email Schmittlein to Ruiz.

| 53. | While this process was underway, the Committee continued to monitor the Investment Window funds in the manner its prior counsel had advised was appropriate, maintaining a "watch list" of funds with potential concerns, which the Committee shared with participants on the Plan's web page. | Davies Decl. ¶ 8; *see id.*, Ex. 2, Fidelity's 2010 Second Quarter Performance Evaluation at MIT-0000775-846; *id.*, Ex. 3, Fidelity's 2010 Fourth Quarter Performance Evaluation at MIT-0001094-181; *id.*, Ex. 4, Fidelity's May 31, 2012 Performance Evaluation at MIT-0000406-65; *id.*, Ex. 5, Fidelity's May 15, 2013 Performance Evaluation at MIT-0002003-57; Barrett Decl., Ex. 6, Ruiz Dep. 27:7-17, 30:10-31:2, 93:9-22; *id.*, Ex. 15, Deposition of Martin Kelly 52:3-14. |
|-----|---|---|

**RESPONSE:** Plaintiffs dispute paragraph 53. Through the entire class period MIT did not monitor designated investment alternatives that it internally characterized as investment window options,[206] did not have a policy or procedure to monitor all designated investment alternatives,[207] and had no process to remove a designated investment alternative that it characterized as an investment window option.[208] For the funds that MIT internally characterized as not worthy of monitoring or evaluating, MIT simply received a report from Fidelity, who solely provided performance information against unchecked benchmarks.[209] However, Fidelity expressly disclaimed any responsibility "for the selection of investment options under the Trust and [Fidelity] shall not render investment advice to any person in connection with the selection of such options."[210] On a single occasion, Mercer informed MIT that Fidelity's data included "(a)

---

[206] Ex. P3, Stone Dep. 74:11-24, 75:16-78:1, 83:7-8; Ex. P10, Kelly Dep. 66:18-23; Ex. P7, Ruiz Dep. 39:7-19; Ex. P11, March 30, 2010 Mtg. Min. Comp. at 40; Ex. P12, Magner Dep. 15:19-16:12, 73:11-23.

[207] Ex. P7, Ruiz Dep. 25:13-27:13, 41:22-42:9, 43:16-23, 44:13-50:19.

[208] Ex. P10, Kelly Dep. 68:22-69:1; Ex. P20, Chused Dep. 43:4-13; Ex. P7, Ruiz Dep. 52:20-53:18; Ex. P11, February 16, 2010 Mtg. Min. Comp. at 37; Ex. P12, Magner Dep. 82:2-5.

[209] Ex. P10, Kelly Dep. 70:8-71:22; Doc.208-4, Fidelity Watch List.

[210] Ex. P4, Trust Agreement Comp. at 6; Ex. P5, Recordkeeping Agreement Comp. at 4.

41 funds that were performing below par; (b) 10 funds that had inappropriate benchmarks; and (c) 16 funds that did not have 5-year track record."[211] Despite being informed of this information, MIT had no process in place to assure the information Fidelity reported was correct,[212] had no process to remove a fund on the watch list,[213] and made no attempt to determine proper benchmarks for the funds listed on the Fidelity report, which MIT acknowledged was critical to assess performance.[214] The only action that occurred with respect to the flawed Fidelity report was that it was placed on Fidelity's very poorly organized website.[215]

The Fidelity report did not adhere to industry standards for monitoring investments in a defined contribution plan.[216] For example, the Alger Mid Cap Growth Institution Fund significantly underperformed its benchmark at the start of the class period and was on the useless "watch list" on every document cited by Defendants.[217] Total net assets in the mutual fund from all investors, not just MIT's plan participants, fell from $820 million in 2010 to $317 by 2011 and reduced to $155 million by 2014, which is economic evidence of imprudence.[218] Had MIT engaged in the accepted defined contribution plan investment management process, all of the funds on the watch lists would have been subject to removal from the Plan.[219]

---

[211] Ex. P11, August 10, 2010 Mtg. Min. Comp. at 58.
[212] Ex. P7, Ruiz Dep. 42:15-23.
[213] Ex. P10, Kelly Dep. 68:22-69:1; Ex. P20, Chused Dep. 43:4-13; Ex. P7, Ruiz Dep. 52:20-53:18; Ex. P11, February 16, 2010 Mtg. Min. Comp. at 37; Ex. P12, Magner Dep. 82:2-5.
[214] Ex. P7, Ruiz Dep. 40:11-17; Ex. P3, Stone Dep. 48:16-49:4.
[215] Ex. P7, Ruiz Dep. 30:16-31:5; Ex. P10, Kelly Dep. 66:18-22; 69:2-5; Ex. P25, Preliminary Interview Results; Ex. P26, Alden Dep. 80:13-82:21, 83:15-22.
[216] Ex. P49, Buetow Corrected Expert Report, ¶¶ 46-50; Ex. P52, CAPTRUST Due Diligence Process Proposal at 7-19; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶¶26, 27, Ex. 3, (2012 Sample Client Performance Report); Ex. P69, Mercer Presentation Understanding Fiduciary Responsibility at 34-35; Ex. P51, Fiduciary Investment Advisors Proposal at 10, 12-14; Ex. P64, at 217-218, 341-343; Ex. P12, Magner Dep. 57:14-58:11.
[217] Doc. 208-02 at MIT-0000840; Doc. 208-03, at MIT-0001175; Doc. 208-04, at MIT-0000462; Doc. 208-05, at MIT-0002036.
[218] Ex. P44, Wermers Dep. 62:14-65:7; Doc. 210-01, Wermers Expert Report at Ex. 6, p. 1.
[219] Ex. P49, Buetow Corrected Expert Report ¶38; Ex. P64, at 116-117; Ex. P81, Defined Contribution Plan IPS at 10.

| 54. | Following the completion of the Subcommittee's work, the Committee in February 2015 voted to reorganize and streamline the Plan's lineup into thirty-seven "core" investment options while eliminating the Investment Window as a separate expanded-choice menu and requiring participants seeking broader choices to pursue them through the Plan's BrokerageLink option. | Davies Decl., Ex. 9, January 20, 2015 Minutes of the Meeting of the MIT Supplemental 401(k) Plan Oversight Committee at MIT-0002406-36 (noting subsequent Feb. 12, 2015 vote to restructure investment lineup); *see generally id.*, Ex. 15, MIT 2015 401(k) Investment Transition Guide, MIT-0012173; *id.*, Ex. 16, Letter from I. Ruiz to MIT 401(k) Plan Participants, MIT-0000566. |
|---|---|---|

**RESPONSE:** Plaintiffs dispute Defendants' characterization of the investment window as an "expanded-choice menu." Plaintiffs do not otherwise dispute paragraph 54.

| 55. | Amounts the Plan had invested in each fund that was removed from the Plan as part of the 2015 redesign were "mapped" to a specified option in the new lineup, unless participants elected to reallocate their accounts differently. | *See* Davies Decl., Ex. 15, MIT 2015 401(k) Investment Transition Guide at MIT-0012182. |
|---|---|---|

**RESPONSE:** Plaintiffs do not dispute paragraph 55. Plaintiffs further state that the lineup Defendants ultimately adopted for the Plan is similar to the fund that Dr. Buetow used for his damages calculations.[220] Both primarily consist of the same low-cost, Vanguard index funds in similar asset cases.[221]

---

[220] *Compare* Ex. P83, Addendum A w*ith* Ex. P49, Corrected Expert Report of Buetow ¶86.
[221] *Id.*

| | |
|---|---|
| 56. Most of the former Investment Window options that were not carried into the core lineup remained available to participants through BrokerageLink. | Davies Decl., Ex. 22, September 27, 2012 MIT 401(k) Plan Investment Window Analysis Presentation at MIT-0001769-71, MIT-0001794 (of 320 Investment Window funds, only 25 "do not exist in BrokerageLink"); Wermers Decl., Ex. 1, Wermers Report ¶ 59 ("after the 2015 Mapping, some Plan participants chose to continue to diversify and tailor their portfolios to their individual needs and risk tolerances by using BrokerageLink to invest in funds removed from the Plan's lineup during the 2015 Mapping"). |

**RESPONSE:** Plaintiffs do not dispute paragraph 56.

| | |
|---|---|
| 57. Sector funds provide investors the ability to make targeted investments in a particular economic sector while maintaining diversification across firms in that sector. | Wermers Decl., Ex. 1, Wermers Report ¶ 55; *id.*, Ex. 2, Wermers Rebuttal Report ¶ 46; *see also* SAC ¶ 107 ("Fidelity select or sector funds focus on one particular segment of the economy and invest in securities issues by companies concentrated in that segment."). |

**RESPONSE:** Paragraph 57 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor all designated investment alternatives in the Plan causing the Plan to retain imprudent investment options. In assessing the prudence of an investment decision, both "the merits of the transaction" and "the thoroughness of the [fiduciary's] investigation" must be considered. *Tibble*,

842 F.3d at 1197 (internal citations and quotation omitted). The fiduciary must also "balance the relevant factors and make a reasoned decision as to the preferred course of action" and the failure to do so is imprudent. *George,* 641 F.3d at 796. The risk level of an investment is a relevant consideration in determining whether an investment should be retained—a decision that can only be made (i) after the investment is deemed "to further the purposes of the plan," and (ii) "*upon appropriate consideration of the surrounding facts and circumstances*" of a particular plan. *Tatum v. RJR Pension Inv. Committee*, 761 F.3d at 346, 367 (4th Cir. 2014) (emphasis in original).

| 58. | Regional funds invest in companies concentrated in a particular geographic region or country. | SAC ¶ 107 ("The Fidelity international specialty funds refer to investments that invest in companies concentrated in a particular region or country located throughout the world."). |
|---|---|---|

**RESPONSE:** Paragraph 58 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor all designated investment alternatives in the Plan causing the Plan retaining imprudent investment options. In assessing the prudence of an investment decision, both "the merits of the transaction" and "the thoroughness of the [fiduciary's] investigation" must be considered. *Tibble*, 843 F.3d at 1197 (internal citations and quotation omitted). The fiduciary must also "balance the relevant factors and make a reasoned decision as to the preferred course of action" and the failure to do so is imprudent. *George,* 641 F.3d at 796. The risk level of an investment is a relevant consideration in determining whether an investment should be retained—a decision that can only be made (i) after the investment is deemed "to further the purposes of the plan," and (ii) "*upon*

*appropriate consideration of the surrounding facts and circumstances*" of a particular plan.

*Tatum*, 761 F.3d at 367 (emphasis in original).

| 59. | Sector and regional funds like those offered through the Investment Window were common in core investment option menus offered in other defined contribution plans in the period from 2010 through 2015. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 48 & Ex. 7. |
|---|---|---|

**RESPONSE:** Paragraph 59 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor all designated investment alternatives in the Plan causing the Plan to retain imprudent investment options. In assessing the prudence of an investment decision, both "the merits of the transaction" and "the thoroughness of the [fiduciary's] investigation" must be considered. *Tibble*, 843 F.3d at 1197 (internal citations and quotation omitted). The fiduciary must also "balance the relevant factors and make a reasoned decision as to the preferred course of action" and the failure to do so is imprudent. *George,* 641 F.3d at 796. The risk level of an investment is a relevant consideration in determining whether an investment should be retained—a decision that can only be made (i) after the investment is deemed "to further the purposes of the plan," and (ii) "*upon appropriate consideration of the surrounding facts and circumstances*" of a particular plan. *Tatum*, 761 F.3d at 367 (emphasis in original).

Plaintiffs otherwise dispute paragraph 59. Defendants citation does not support its proposition. The prevalence of investments at other institutions does not indicate whether an investment is reasonable for the Plan.[222] As an MIT fiduciary testified, looking solely at prevalence "that would be – well, what's the phrase - - imprudent."[223] Wermers could not identify any other large defined contribution plan offered all of the sector funds that MIT

---

[222] Ex. P44, Wermers Dep. 69:9-75:1.
[223] Ex. P26, Alden Dep. 129:7-22; *see also* Ex. P1, Howard Dep. 111:1-23.

offered.[224] Additionally, many of these excessively priced funds retained by MIT as of 2010 or 2011 were removed as options at other large defined contribution plans.[225]

| 60. | Plaintiffs' expert Gerald Buetow testified that sector and regional funds are available to defined-contribution-plan participants through plan brokerage windows. | Barrett Decl., Ex. 12, Buetow Dep. 130:19-131:8. |
|---|---|---|

**RESPONSE:** Paragraph 60 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor all designated investment alternatives in the Plan causing the Plan to retain imprudent investment options. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. In assessing the prudence of an investment decision, both "the merits of the transaction" and "the thoroughness of the [fiduciary's] investigation" must be considered. *Tibble*, 843 F.3d at 1197 (internal citations and quotation omitted). The fiduciary must also "balance the relevant factors and make a reasoned decision as to the preferred course of action" and the failure to do so is imprudent. *George,* 641 F.3d at 796. The risk level of an investment is a relevant consideration in determining whether an investment should be retained—a decision that can only be made (i) after the investment is deemed "to further the purposes of the plan," and (ii) "*upon appropriate consideration of the surrounding facts and circumstances*" of a particular plan. *Tatum*, 761 F.3d at 367 (emphasis in original).

---

[224] Ex. P44, Wermers Dep. 72:23 – 75:15.
[225] Doc. 210-02, Wermers Expert Report at Exhibit 7 (*see e.g.*, Fidelity Select Automotive, Fidelity Select Brokerage and Investment Management Portfolio, Fidelity Select Insurance Portfolio, Fidelity Japan Fund, Fidelity Select Air Transportation, etc.).

| 61. | From August 2010 through July 2015, Plan participants' investments in the sector funds available in the Investment Window earned returns that, on a dollar- weighted basis, exceeded the returns participants would have achieved had all of their sector fund allocations instead been invested in an investment product offering exposure to all economic sectors, such as the Vanguard Total Stock Market Index Trust. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 51 & Ex. 8A. |
|---|---|---|

**RESPONSE:** Paragraph 61 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor all designated investment alternatives in the Plan causing the Plan to retain imprudent investment options. "[A] fiduciary initially must determine and continue to monitor the prudence of **each** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Paragraph 61 is further irrelevant because loss is determined "by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio." *Evans*, 534 F.3d at 74. *Bierwirth* provides "[w]here several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these." 754 F.2d at 1056. The Court should resolve "[a]ny doubt or ambiguity" regarding damages against the fiduciary. *Id.* Applying these principles, courts use the most profitable "plausible" replacement funds to calculate damages. *Id.*; *Trs. of the Upstate N.Y. Eng'rs Pension Fund*, 843 F.3d at 567. Similarly, the Pension Protection Act allows mapping of investments to "reasonably similar" investments or to the default investment option. 29 U.S.C. §1104(c)(4)(B).

Each "reasonably similar" alternative varies to most closely match the holdings of the underlying sector fund.[226] Defendants' failure to monitor sector specific or regional investments and remove imprudent ones resulted in damages to the Plan of $10,822,162.80.[227]

| | | |
|---|---|---|
| 62. | From August 2010 through July 2015, Plan participants' investments in the regional funds available in the Investment Window earned returns that, on a dollar-weighted basis, were equivalent to the returns participants would have achieved had all of their regional fund allocations instead been invested in an investment product offering exposure to all international regions, such as the Vanguard Total International Stock Index. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 51 & Ex. 8B. |

**RESPONSE:** Paragraph 62 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor all designated investment alternatives in the Plan causing the Plan to retain imprudent investment options. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Paragraph 61 is further irrelevant because loss is determined "by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio." *Evans*, 534 F.3d at 74. *Bierwirth* provides "[w]here several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these." 754 F.2d at 1056. The Court should resolve "[a]ny doubt or ambiguity" regarding damages against the fiduciary. *Id.* Applying these principles, courts use the most profitable "plausible" replacement funds to calculate damages. *Id.*; *Trs. of the Upstate N.Y. Eng'rs Pension Fund*, 843

[226] Ex. P86, Buetow Dep. 172:2-175:9.
[227] Ex. P49, Buetow Corrected Expert Report, ¶100.

F.3d at 567. Similarly, the Pension Protection Act allows mapping of investments to "reasonably similar" investments or to the default investment option. 29 U.S.C. §1104(c)(4)(B).

Each "reasonably similar" alternative varies to best match the holdings of each underlying sector fund.[228] Defendants' failure to monitor sector specific or regional investments and remove imprudent ones resulted damages to the Plan of $10,822,162.80.[229]

| 63. | Plaintiffs' expert Gerald Buetow has offered the opinion that any fund that experiences trailing three-year performance below that of its benchmark should automatically be removed from a defined-contribution-plan investment lineup, and that any fund that has experienced trailing three-year performance below that of its benchmark at any time in the prior ten years should not be considered for a defined-contribution-plan menu. | Barrett Decl., Ex. 13, Buetow Report ¶¶ 38-39; *id.*, Ex. 12, Buetow Dep. 230:2-237:4. |
| --- | --- | --- |

**RESPONSE:** Plaintiffs dispute paragraph 63. In Defendants' citation, Dr. Buetow offers the opinion that any ***actively*** managed fund that experiences trailing three-year performance below that of its benchmark should be removed from a defined contribution plan. Dr. Buetow further opines that "if there were repetitive three-year windows where they underperformed and it was systematic" he would not consider that plan for a defined-contribution plan menu.[230]

| 64. | Plaintiffs' expert Gerald Buetow admits that his proffered rule that any fund whose trailing three-year performance falls below that of its benchmark should be automatically removed from a defined contribution plan's investment lineup is not used by defined contribution plan fiduciaries to cull funds from brokerage window offerings. | Barrett Decl., Ex. 12, Buetow Dep. 127:22-128:14. |
| --- | --- | --- |

**RESPONSE:** Plaintiffs deny paragraph 64. Defendants' citation referenced monitoring funds in brokerage windows. When an actively managed fund underperforms a proper benchmark for

---

[228] Ex. P86, Buetow Dep. 172:2-175:9 (explaining that the style of underlying holdings varies).
[229] Ex. P49, Buetow Corrected Expert Report ¶100.
[230] Ex. P86, Buetow Dep. 231:17-232:13.

three-years trailing, then it is highly unlikely it will outperform in the coming years.[231]

Investments should be removed from a defined contribution plan portfolio when the fund

underperforms the proper benchmark for a three-year period.[232]

| | | |
|---|---|---|
| 65. | Plaintiffs' expert Wendy Dominguez testified that her investment consulting firm does not follow a bright-line rule of recommending removal of funds from core plan investment lineups merely because their trailing three-year performance is below their benchmarks. | Barrett Decl., Ex. 10, Dominguez Dep. 97:8-98:12. |

**RESPONSE:** Paragraph 65 is not material to Defendants' Motion for Summary Judgment

because it is irrelevant to whether Defendants breached their fiduciary duties by failing to

monitor all designated investment alternatives in the Plan causing the Plan to retain imprudent

investment options. "[A] fiduciary initially must determine and continue to monitor the prudence

of ***each*** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289

(emphasis added). ERISA provides that "a trustee has a continuing duty to monitor trust

investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Plaintiffs otherwise object

to and dispute paragraph 65. The discussion of Ms. Dominguez's processes for removing

investments was not a subject of her deposition and she testified that she could not recall

specifically what the trigger is for a performance concern or removal of an investment on the

particular manager's scorecard she reviewed in the deposition.[233] Ms. Dominguez does state that

as part of her process she reviews three-year performance against benchmarks.[234]

---

[231] Ex. P49, Buetow Expert Report ¶38; Ex. P66, at 205 ("If a manager's performance is below the median for the peer group for a three year period, the statistical odds are that the manager will not be able to improve performance to meet the 40 percent objective within the given five-year period."); Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26; Ex. P86, Buetow Dep. 250:22-251:17.

[232] Ex. P49, Buetow Corrected Expert Report ¶38; Ex. P64, at 116-117; Ex. P81, Defined Contribution Plan IPS at 10.

[233] Ex. P41, Dominguez Dep. 98:13-99:25, 102:1-13.

[234] *Id*. at 99:13-19.

| | | |
|---|---|---|
| 66. | Each of the funds that Plaintiffs' expert Gerald Buetow has identified as failing his proposed rule requiring removal whenever the funds' trailing three-year performance is below their benchmarks was offered in other defined contribution plan core lineups even through the periods of "underperformance" on which Plaintiffs focus. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 52. |

**RESPONSE:** Plaintiffs deny paragraph 66. Many of the underperforming funds identified by Dr. Buetow were not offered by any other large defined contribution plans in the United States.[235]

| | | |
|---|---|---|
| 67. | Every one of the actively managed funds included in BrightScope's 2018 list of the most popular mutual funds among 401(k) plans (measured by 401(k) assets under management) had underperformed its benchmark on a trailing three-year basis either during the class period, or at some point during the preceding ten years, and would have been disqualified from 401(k) plan investing for all or much of the class period under Dr. Buetow's three-year performance rule. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 55 & Ex. 9 & Supp. Ex. 9. |

**RESPONSE:** Paragraph 67 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828.

| | | |
|---|---|---|
| 68. | Separate accounts are investment accounts specifically created for a single plan, and have no performance history when they are added to a plan's lineup. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 58 n.95; *see* SAC ¶ 130. |

---

[235] Doc. 210-2, Wermers Rebuttal Report at Ex. 10 (*e.g.*, Aberdeen US Equity Fund Class A, Alger Small Cap Growth Institutional Fund Class I, Deutsch International Fund Class S, Invesco Value Opportunities Fund Class A, Rice Hall James Micro Cap Portfolio Institutional Class, USAA Growth Fund).

**RESPONSE:** Plaintiffs dispute paragraph 68. While investment providers creates collective trusts for specific plans, typically the only difference between a collective trust and the underlying mutual fund is the expense ratio.[236] Typically, the portfolio construction of the collective trust and the mutual fund it tracks are identical.[237] Because of this, the management history of the mutual fund the collective trust follows provides a performance history, and the collective trust is not considered a new fund but a new vehicle like a share-class.[238]

| 69. Collective trusts are investment vehicles that are open only to tax-qualified investors like 401(k) plans. For collective trusts to exist, some plans must invest in them at a point when they have less than five years of performance history. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 58 n.95; *see* SAC ¶ 137. |
|---|---|

**RESPONSE:** Plaintiffs dispute paragraph 69. While investment providers create collective trusts for specific 401(k) plans, typically the only difference between a collective trust and the underlying mutual fund is the expense ratio.[239] Typically, the portfolio construction of the collective trust and the mutual fund it tracks are identical.[240] Because of this, the management history of the mutual fund the collective trust follows provides a performance history, and the collective trust is not considered a new fund but a new vehicle like a share-class.[241]

| 70. In the absence of a significant performance history for a specific fund, investors look to the experience and qualifications of the funds' investment advisers to assess the prudence of the fund. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶¶ 58-60 & n.95. |
|---|---|

---

[236] Ex. P86, Buetow Dep. 260:2-7; Ex P49, Buetow Corrected Expert Report at n.118; Ex. P45, Harrington Dep. 32:8-21.

[237] Ex. P86, Buetow Dep. 260:2-7; Ex P49, Buetow Corrected Expert Report at n.118 Ex. P45, Harrington Dep. 32:8-21.

[238] Ex. P86, Buetow Dep. 260:2–261:16.

[239] Ex. P86, Buetow Dep. 260:2-7; Ex P49, Buetow Corrected Expert Report at n.118; Ex. P45, Harrington Dep. 32:8-21.

[240] Ex. P86, Buetow Dep. 260:2-7; Ex P49, Buetow Corrected Expert Report at n.118; Ex. P45, Harrington Dep. 32:8-21.

[241] Ex. P86, Buetow Dep. 260:2–261:16.

**RESPONSE:** Paragraph 70 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). Selection of a designated investment option for a defined contribution plan requires the performance of proper due diligence.[242] Due diligence requires a performance history long enough to perform an analysis.[243] Investment professionals require five-years of performance history before evaluating a fund for inclusion in a defined contribution plan.[244] A five-year performance history enables the defined contribution plan fiduciary to evaluate the investment process of the investment manager, risk and return characteristics of the fund, and the adherence to the fund's investment style and strategy over a full market cycle.[245]

MIT executed agreements with Fidelity on January 15, 2010 and again in November 2011 permitting all Fidelity funds to be added as designated investment alternatives to the Plan as soon as they were created without any review or any process to determine whether the designated investment alternative was appropriate for MIT's Plan.[246] Fidelity could add any fund

---

[242] Ex. P49, Buetow Corrected Expert Report, ¶39.
[243] *Id.*
[244] *Id.* ¶¶38-39, 114; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26; Ex. P64, at 13-14, 114-115 ("The money manager should provide at least five years of actual quarterly performance information"); Ex. P52, CAPTRUST Due Diligence Process Proposal at 7; Ex. P51, Fiduciary Investment Advisors Proposal at 9.
[245] Ex. P49, Buetow Corrected Expert Report, ¶39.
[246] Ex. P3, Stone Dep. 78:3-84:9, 115:4-16; Ex. P6, Email Lofren to Chused; Ex. P7, Ruiz Dep. 48:20-51:3; Ex. P8, Email from Dean; Ex. P9, Proposed Investment Lineup Changes; Ex. P4, Trust Agreement Comp. at 46, 57.

that it created for 401(k) plans as a designated investment alternative in the Plan, without MIT's approval, as they became available.[247]

Plaintiffs otherwise dispute paragraph 70. Wermers states in his report that "other considerations might lead a reasonable investor to choose a fund."[248] It is not Wermers' opinion that just because an investment is offered by a large investment manager it is automatically prudent.[249]

| 71. All of the funds challenged by Plaintiffs for lack of a five-year performance history were managed by Calvert, Fidelity, or Schroder. All three of these mutual fund complexes had a long history of providing investment management services to investors in the United States prior to the class period. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 59 & Ex. 11. |
|---|---|

**RESPONSE:** Paragraph 71 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of ***each*** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble,* 135 S.Ct. at 1829). MIT executed agreements with Fidelity on January 15, 2010 and again in November 2011 permitting all Fidelity funds to be added as designated investment alternatives to the Plan as soon as they were created without any review or any process to determine whether the designated investment alternative was appropriate for the Plan.[250] Fidelity could add any fund that it created for 401(k)

[247] Ex. P7, Ruiz Dep. 50:15-19.
[248] Doc. 210-2, Wermers Rebuttal Report ¶58.
[249] Ex. P44, Wermers Dep. 59:12-60:15.
[250] Ex. P3, Stone Dep. 78:3-84:9, 115:4-16; Ex. P6, Email Lofren to Chused; Ex. P7, Ruiz Dep. 48:20-51:3; Ex. P8, Email from Dean; Ex. P9, Proposed Investment Lineup Changes; Ex. P4, Trust Agreement Comp. at 46, 57.

plans as a designated investment alternative in the Plan, without MIT's approval, as they became available.[251] It is not Wermers' opinion that just because an investment is offered by a large investment manager it is automatically prudent.[252]

| 72. | Fidelity was one of the largest investment advisors in the world based on assets under management at the inception of the class period, with more than $1.8 trillion in worldwide assets under management as of year-end 2010. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶¶ 58-59; *see id.*, Ex. 1, Wermers Report, Ex. 5. |
|---|---|---|

**RESPONSE:** Paragraph 72 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). MIT executed agreements with Fidelity on January 15, 2010 and again in November 2011 permitting all Fidelity funds to be added as designated investment alternatives to the Plan as soon as they were created without any review or any process to determine whether the designated investment alternative was appropriate for MIT's Plan.[253] Fidelity could add any fund that it created for 401(k) plans as a designated investment alternative in the Plan, without MIT's approval, as they became available.[254] It is not Wermers' opinion that just because an investment is offered by a large investment manager it is automatically prudent.[255]

---

[251] Ex. P7, Ruiz Dep. 50:15-19.
[252] Ex. P44, Wermers Dep. 59:12-60:15.
[253] Ex. P3, Stone Dep. 78:3-84:9, 115:4-16; Ex. P6, Email Lofren to Chused; Ex. P7, Ruiz Dep. 48:20-51:3; Ex. P8, Email from Dean; Ex. P9, Proposed Investment Lineup Changes; Ex. P4, Trust Agreement Comp. at 46, 57.
[254] Ex. P7, Ruiz Dep. 50:15-19.
[255] Ex. P44, Wermers Dep. 59:12-60:15.

| 73. Calvert had $14.7 billion in worldwide assets under management as of year-end 2010. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 59; *see id.*, Ex. 1, Wermers Report, Ex. 5. |
|---|---|

**RESPONSE:** Paragraph 73 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of ***each*** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). It is not Wermers' opinion that just because an investment is offered by a large investment manager it is automatically prudent.[256]

| 74. Schroder had $307.9 billion in worldwide assets under management as of year-end 2010. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 59. |
|---|---|

**RESPONSE:** Paragraph 74 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary initially must determine and continue to monitor the prudence of ***each*** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). It is not Wermers'

---

[256] *Id.*

opinion that just because an investment is offered by a large investment manager it is automatically prudent.[257]

| 75. | The portfolio managers of the funds challenged by Plaintiffs for lack of a five-year performance history had, on average, fourteen years of experience as portfolio managers as of 2010. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 60 & Ex. 11. |
|---|---|---|

**RESPONSE:** Paragraph 75 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary ***initially must determine*** and ***continue to monitor*** the prudence of ***each*** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Defendants had no process in place to review a designated investment alternative that was added to the Plan.[258]

| 76. | During the period from August 9, 2010 to July 19, 2015, between 84.6 and 97.5 percent (depending on the year) of the funds challenged by Plaintiffs for lack of a five-year performance history were offered by at least one other large plan (*i.e.*, a plan with $1 billion or more in assets), and between 52.6 percent and 69.4 percent (depending on the year) were offered by at least three other plans with $1 billion or more in assets. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 61 & Ex. 12. |
|---|---|---|

**RESPONSE:** Paragraph 76 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to

---

[257] Ex. P44, Wermers Dep. 59:12-60:15.
[258] Ex. P3, Stone Dep. 78:3-84:9, 115:4-16.

monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A]

fiduciary **initially must determine** and **continue to monitor** the prudence of **each** investment

option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A

fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent

ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides

that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones."

*Tibble*, 135 S.Ct. at 1828. The prevalence of investments at other institutions does not indicate

whether an investment is reasonable for MIT's Plan and does not indicate if the other plan

sponsor followed a prudent process to add a particular option to the plan.[259] As an MIT fiduciary

testified, looking solely at prevalence "that would be – well, what's the phrase - - imprudent."[260]

Defendants citation raises issue of fact because many of the underperforming funds identified by

Dr. Buetow were not offered by any other large defined contribution plans in the United States

during portions of the relevant period.[261]

| 77. Prior to the 2015 reorganization of the Plan's investment lineup, there were two target-date series offered in the Plan: the Vanguard Retirement Trusts, which were the Plan's default investment options, and the Fidelity Freedom Funds, which were included in the Investment Window. | Davies Decl., Ex. 17, MIT Supplemental 401(k) Plan Enrollment Guide at MIT-0150827, MIT-0150831, MIT-0150834; *see* Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 65. |
|---|---|

**RESPONSE:** Plaintiffs do not dispute paragraph 77.

| 78. The target-date series offered by Vanguard and Fidelity are both reasonable candidates for serving as target-date funds in a defined contribution plan. | *See* Barrett Decl., Ex., 10, Dominguez Dep. 27:17-28:15. |
|---|---|

---

[259] Ex. P44, Wermers Dep. 69:9-75:1.
[260] Ex. P26, Alden Dep. 129:7-22; *see also* Ex. P1, Howard Dep. 111:1-23.
[261] Doc. 210-2, Wermers Rebuttal Report at Ex. 12 (*e.g.*, Calvert Small Cap Fund Class A, Fidelity Corporate Bond Fund, Fidelity Global Bond Fund, Fidelity Global Equity Income Fund, Fidelity International Bond Fund, etc.).

**RESPONSE:** Paragraph 78 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary *initially must determine* and *continue to monitor* the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Plaintiffs dispute that offering two sets of target date funds, one of which was not monitored, was reasonable. "There is no prudent reason to offer multiple target date fund families in a" defined contribution plan.[262] Defendants vetted and selected the Vanguard Target Retirement Trust options to be the target date fund in the Plan's lineup and the qualified default investment alternative in the Plan prior to the beginning of the class period.[263] However, Defendants allowed the Plan to include a duplicative set of target date funds, the Fidelity Freedom Funds, in the unmonitored "Investment Window."[264] At the end of July 2010, the unmonitored Fidelity Freedom Funds were significantly underperforming their vetted Vanguard alternatives.[265] As of September 2010, "[t]he relative three-year underperformance between the 2015 funds was an annualized -.63%, 2020 funds was an annualized -1.13%, 2025 funds was an annualized -.59%, 2030 fund was an annualized -1.04%, 2035 funds was an annualized -.84%, 2040 funds was an annualized -1.32%, 2045 funds was an annualized -1.45%,

---

[262] Ex. P49, Buetow Corrected Expert Report, ¶116.
[263] Ex. P11, October 22, 2009 Mtg. Min. Comp. at 27.
[264] Doc. 208-2, Fidelity Presentation, 2nd Quarter 2010 at 57-58.
[265] Ex. P49, Buetow Corrected Expert Report, ¶118.

and the 2050 fund was an annualized -2.25%."[266] The Fidelity Freedom Funds also had much higher fees than the Vanguard Target Retirement Trusts.[267] When the Defendants finally considered the Fidelity Freedom Funds, they removed them and mapped them to the Vanguard Retirement Trusts in July 2015.[268] Because of the inclusion of the duplicative and underperforming Fidelity Freedom Funds, participants lost $7,368,935.60 in retirement savings.[269]

| | |
|---|---|
| 79. As Plaintiffs' expert agrees, different target date series offered by different providers have different characteristics, including divergent glide paths, different asset allocations, and different underlying investment construction (*i.e.*, actively or passively managed underlying funds). | *See* Barrett Decl., Ex. 10, Dominguez Dep. 18:15-23:22, 27:17-28:9. |

**RESPONSE:** Paragraph 79 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary **initially must determine** and **continue to monitor** the prudence of **each** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Plaintiffs dispute that offering two sets of target date funds, one of which was not monitored, was reasonable. "There is no prudent reason to offer multiple target date fund families in a" defined contribution plan.[270] Defendants vetted and selected the

---

[266] *Id.* ¶119.
[267] *Id.* ¶120.
[268] Ex. P58, Jan. 20, 2015 Oversight Committee Resolution at 3.
[269] Ex. P49, Buetow Corrected Expert Report, ¶120.
[270] Ex. P49, Buetow Corrected Expert Report, ¶116.

Vanguard Target Retirement Trust options to be the target date fund in the Plan's lineup and the qualified default investment alternative in the Plan prior to the beginning of the class period.[271] However, Defendants allowed the Plan to include a duplicative set of target date funds, the Fidelity Freedom Funds, in the unmonitored "Investment Window."[272] At the end of July 2010, the unmonitored Fidelity Freedom Funds were significantly underperforming their vetted Vanguard alternatives.[273] As of September 2010, "[t]he relative three-year underperformance between the 2015 funds was an annualized -.63%, 2020 funds was an annualized -1.13%, 2025 funds was an annualized -.59%, 2030 fund was an annualized -1.04%, 2035 funds was an annualized -.84%, 2040 funds was an annualized -1.32%, 2045 funds was an annualized -1.45%, and the 2050 fund was an annualized -2.25%."[274] The Fidelity Freedom Funds also had much higher fees than the Vanguard Target Retirement Trusts.[275] When the Defendants finally considered the Fidelity Freedom Funds, they removed them and mapped them to the Vanguard Target Retirement Trusts in July 2015.[276] Because of the inclusion of the duplicative and underperforming Fidelity Freedom Funds, participants lost $7,368,935.60 in retirement savings.[277]

| | | |
|---|---|---|
| 80. | The Vanguard Retirement Trusts were comprised of three to five underlying funds, most of which were passively managed, did not invest in commodity sector funds, and had, relative to the Fidelity Freedom Funds, a greater glide path allocation to equities prior to the target retirement date. | *See* Barrett Decl., Ex. 10, Dominguez Dep. 27:17-28:9; Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 66 & Exs. 13A-B. |

[271] Ex. P11, October 22, 2009 Mtg. Min. Comp. at 27.
[272] Doc. 208-2, Fidelity Presentation, 2nd Quarter 2010 at 57-58.
[273] Ex. P49, Buetow Corrected Expert Report, ¶118.
[274] *Id.* ¶119.
[275] *Id.* ¶120.
[276] Ex. P58, Jan. 20, 2015 Oversight Committee Resolution at 3.
[277] Ex. P49, Buetow Corrected Expert Report, ¶120.

**RESPONSE:** Paragraph 80 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary ***initially must determine*** and ***continue to monitor*** the prudence of ***each*** investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Plaintiffs dispute that offering two sets of target date funds, one of which was not monitored, was reasonable. "There is no prudent reason to offer multiple target date fund families in a" defined contribution plan.[278] Defendants vetted and selected the Vanguard Target Retirement Trust options to be the target date fund in the Plan's lineup and the qualified default investment alternative in the Plan prior to the beginning of the class period.[279] However, Defendants allowed the Plan to include a duplicative set of target date funds, the Fidelity Freedom Funds, in the unmonitored "Investment Window."[280] At the end of July 2010, the unmonitored Fidelity Freedom Funds were significantly underperforming their vetted Vanguard alternatives.[281] As of September 2010, "[t]he relative three-year underperformance between the 2015 funds was an annualized -.63%, 2020 funds was an annualized -1.13%, 2025 funds was an annualized -.59%, 2030 fund was an annualized -1.04%, 2035 funds was an annualized -.84%, 2040 funds was an annualized -1.32%, 2045 funds was an annualized -1.45%,

---

[278] Ex. P49, Buetow Corrected Expert Report, ¶116.
[279] Ex. P11, October 22, 2009 Mtg. Min. Comp. at 27.
[280] Doc. 208-2, Fidelity Presentation, 2nd Quarter 2010 at 57-58.
[281] Ex. P49, Buetow Corrected Expert Report, ¶118.

and the 2050 fund was an annualized -2.25%."[282] The Fidelity Freedom Funds also had much

higher fees than the Vanguard Target Retirement Trusts.[283] When the Defendants finally

considered the Fidelity Freedom Funds, they removed them and mapped them to the Vanguard

Target Retirement Trusts in July 2015.[284] Because of the inclusion of the duplicative and

underperforming Fidelity Freedom Funds, participants lost $7,368,935.60 in retirement

savings.[285]

| | |
|---|---|
| 81. The Fidelity Freedom Funds were comprised of twenty-eight underlying mutual funds and asset management programs, most of which were actively managed, invested in commodity sector funds among other funds, and had, relative to the Vanguard Retirement Trusts, a smaller glide path allocation to equities prior to the target retirement date. | *See* Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 66 & Exs. 13A-B. |

**RESPONSE:** Paragraph 81 is not material to Defendants' Motion for Summary Judgment

because it is irrelevant to whether Defendants breached their fiduciary duties by failing to

monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A]

fiduciary ***initially must determine*** and ***continue to monitor*** the prudence of ***each*** investment

option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A

fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent

ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides

that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones."

*Tibble*, 135 S.Ct. at 1828 (2015). Plaintiffs dispute that offering two sets of target date funds, one

of which was not monitored, was reasonable. "There is no prudent reason to offer multiple target

---

[282] *Id.* ¶119.
[283] *Id.* ¶120.
[284] Ex. P 58, Jan. 20, 2015 MIT 401(k) Investment Oversight Committee Resolution to Change Investment Options at 3.
[285] Ex. P49, Buetow Corrected Expert Report, ¶120.

date fund families in a" defined contribution plan.[286] Defendants vetted and selected the

Vanguard Target Retirement Trust options to be the target date fund in the Plan's lineup and the

qualified default investment alternative in the Plan prior to the beginning of the class period.[287]

However, Defendants allowed the Plan to include a duplicative set of target date funds, the

Fidelity Freedom Funds, in the unmonitored "Investment Window."[288] At the end of July 2010,

the unmonitored Fidelity Freedom Funds were significantly underperforming their vetted

Vanguard alternatives.[289] As of September 2010, "[t]he relative three-year underperformance

between the 2015 funds was an annualized -.63%, 2020 funds was an annualized -1.13%, 2025

funds was an annualized -.59%, 2030 fund was an annualized -1.04%, 2035 funds was an

annualized -.84%, 2040 funds was an annualized -1.32%, 2045 funds was an annualized -1.45%,

and the 2050 fund was an annualized -2.25%."[290] The Fidelity Freedom Funds also had much

higher fees than the Vanguard Target Retirement Trusts.[291] When the Defendants finally

considered the Fidelity Freedom Funds, they removed them and mapped them to the Vanguard

Target Retirement Trusts in July 2015.[292] Because of the inclusion of the duplicative and

underperforming Fidelity Freedom Funds, participants lost $7,368,935.60 in retirement

savings.[293]

| 82. | At least 25 other large defined contribution plans (*i.e.*, plans with $1 billion or more in assets) offered Fidelity Freedom Funds in their plan investment lineups in the period from 2010 to 2014. | Wermers Decl., Ex. 1, Wermers Report, Ex. 8A. |
|---|---|---|

---

[286] Ex. P49, Buetow Corrected Expert Report, ¶116.
[287] Ex. P11, October 22, 2009 Mtg. Min. Comp. at 27.
[288] Doc. 208-2, Fidelity Presentation, 2nd Quarter 2010 at 57-58.
[289] Ex. P49, Buetow Corrected Expert Report, ¶118.
[290] *Id.* ¶118.
[291] *Id.* ¶119.
[292] Ex. P58, Jan. 20, 2015 Oversight Committee Resolution at 3.
[293] Ex. P49, Buetow Corrected Expert Report, ¶ 120.

**RESPONSE:** Paragraph 82 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by failing to monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A] fiduciary *initially must determine* and *continue to monitor* the prudence of *each* investment option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S.Ct. at 1828. Plaintiffs dispute that offering two sets of target date funds, one of which was not monitored, was reasonable. "There is no prudent reason to offer multiple target date fund families in a" defined contribution plan.[294] Defendants vetted and selected the Vanguard Target Retirement Trust options to be the target date fund in the Plan's lineup and the qualified default investment alternative in the Plan prior to the beginning of the class period.[295] However, Defendants allowed the Plan to include a duplicative set of target date funds, the Fidelity Freedom Funds, in the unmonitored "Investment Window."[296] At the end of July 2010, the unmonitored Fidelity Freedom Funds were significantly underperforming their vetted Vanguard alternatives.[297] As of September 2010, "[t]he relative three-year underperformance between the 2015 funds was an annualized -.63%, 2020 funds was an annualized -1.13%, 2025 funds was an annualized -.59%, 2030 fund was an annualized -1.04%, 2035 funds was an annualized -.84%, 2040 funds was an annualized -1.32%, 2045 funds was an annualized -1.45%,

---

[294] *Id.* ¶116.
[295] Ex. P11, October 22, 2009 Mtg. Min. Comp. at 27.
[296] Doc. 208-02, Fidelity Presentation, 2nd Quarter 2010, at 57-58.
[297] Ex. P49, Buetow Corrected Expert Report, ¶117.

and the 2050 fund was an annualized -2.25%."[298] The Fidelity Freedom Funds also had much

higher fees than the Vanguard Target Retirement Trusts.[299] When the Defendants finally

considered the Fidelity Freedom Funds in July 2015, they removed and mapped the Fidelity

Freedom Funds to the Vanguard Target Retirement Trusts.[300] Because of the inclusion of the

duplicative and underperforming Fidelity Freedom Funds, participants lost $7,368,935.60 in

retirement savings.[301]

| 83. | As of the end of 2015, more than 30 defined contribution plans with more than $1 billion in assets that were recordkept by Fidelity offered the Fidelity Freedom K series of funds as investment options in their plans. | Petrangelo Decl. ¶ 7. |

**RESPONSE:** Paragraph 83 is not material to Defendants' Motion for Summary Judgment

because it is irrelevant to whether Defendants breached their fiduciary duties by failing to

monitor each designated investment alternatives in the Plan and remove imprudent ones. "[A]

fiduciary ***initially must determine*** and ***continue to monitor*** the prudence of ***each*** investment

option available to plan participants." *Bunch*, 532 F. Supp. 2d at 289 (emphasis added). "A

fiduciary breaches its duty when it 'fails to properly monitor investments and remove imprudent

ones.'" *Velazquez*, 320 F. Supp. 3d at 259 (quoting *Tibble*, 135 S.Ct. at 1829). ERISA provides

that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones."

*Tibble*, 135 S.Ct. at 1828. Plaintiffs dispute that offering two sets of target date funds, one of

which was not monitored, was reasonable. "There is no prudent reason to offer multiple target

date fund families in a" defined contribution plan.[302] Defendants vetted and selected the

Vanguard Target Retirement Trust options to be the target date fund in the Plan's lineup and the

---

[298] *Id.* ¶118.
[299] *Id.* ¶119.
[300] Ex. P58, Jan. 20, 2015 Oversight Committee Resolution at 3.
[301] Ex. P49, Buetow Corrected Expert Report, ¶120.
[302] *Id.* ¶116.

qualified default investment alternative in the Plan prior to the beginning of the class period.[303]

However, Defendants allowed the Plan to include a duplicative set of target date funds, the

Fidelity Freedom Funds, in the unmonitored "Investment Window."[304] At the end of July 2010,

the unmonitored Fidelity Freedom Funds were significantly underperforming their vetted

Vanguard alternatives.[305] As of September 2010, "[t]he relative three-year underperformance

between the 2015 funds was an annualized -.63%, 2020 funds was an annualized -1.13%, 2025

funds was an annualized -.59%, 2030 fund was an annualized -1.04%, 2035 funds was an

annualized -.84%, 2040 funds was an annualized -1.32%, 2045 funds was an annualized -1.45%,

and the 2050 fund was an annualized -2.25%."[306] The Fidelity Freedom Funds also had much

higher fees than the Vanguard Target Retirement Trusts.[307] When the Defendants finally

considered the Fidelity Freedom Funds in July 2015, they removed and mapped the Fidelity

Freedom Funds to the Vanguard Target Retirement Trusts.[308] Because of the inclusion of the

duplicative and underperforming Fidelity Freedom Funds, participants lost $7,368,935.60 in

retirement savings.[309]

| 84. | Prior to the changes to the Plan lineup in July 2015, more Plan participants elected to invest in the Fidelity Freedom Funds than in the Vanguard Retirement Trusts, and Plan participants invested more money in the Fidelity Freedom Funds than in the Vanguard Retirement Trusts, even though the Vanguard Retirement Trusts were the default investment options. | *See* Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶¶ 67-68 & Ex. 14. |
|---|---|---|

---

[303] Ex. P11, July 28, 2011 Mtg. Min. Comp. at 117.
[304] Doc. 208-02, Fidelity Presentation, 2nd Quarter 2010, at 57-58.
[305] Ex. P49, Buetow Corrected Expert Report, ¶117.
[306] *Id.* ¶118.
[307] *Id.* ¶119.
[308] Ex. P58, Jan. 20, 2015 Oversight Committee Resolution at 3.
[309] Ex. P49, Buetow Corrected Expert Report, ¶120.

**RESPONSE:** Plaintiffs dispute paragraph 84. Defendants vetted and selected the Vanguard Target Retirement Trust options to be the target date fund in the Plan's lineup and the qualified default investment alternative in the Plan prior to the beginning of the class period.[310] However, Defendants allowed the Plan to include a duplicative set of target date funds, the Fidelity Freedom Funds, in the unmonitored "Investment Window."[311] Plan participants did not choose these funds after the switch, so assets remaining in the Fidelity Freedom Funds were a result of inertia.[312]

| 85. The Investment Window funds paid more than $21 million in revenue sharing as compensation to the Plan's recordkeeper for recordkeeping and administrative services provided to the Plan during the class period. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 36 & Ex. 5; *see also* Barrett Decl., Ex. 17, Schmidt Report ¶ 101. |
|---|---|

**RESPONSE:** Plaintiffs dispute paragraph 85. Dr. Wermers' $21 million calculation Defendants reference does not only calculate the revenue sharing compensation from the Investment Window paid to Fidelity, but applies a compounding rate of return of "the weighted average return of Dr. Buetow's alternative Plan lineup."[313] In other words, Dr. Wermers adds to the revenue sharing amount the investment gains participants would have received if they had paid reasonable recordkeeping fees and invested them in a prudent investment lineup.[314] The revenue sharing amounts in Schmidt's report speak for themselves and do not equal $21 million dollars.[315]

---

[310] Ex. P11, October 22, 2009 Mtg. Min. Comp. at 27.
[311] Doc. 208-2, Fidelity Presentation, 2nd Quarter 2010 at 57-58.
[312] Doc. 207-14, Buetow Expert Rebuttal Report ¶¶15-19.
[313] Doc. 210-2, Wermers Rebuttal Report at 107 (Exhibit 5 n. 2) ("I grow Mr. Schmidt's yearly estimates of revenue sharing at the weighted average return of Dr. Buetow's alternative Plan lineup through June 2018. The amounts paid through revenue sharing include only revenue sharing for MIT Investment Window Options.").
[314] *Id.*
[315] Doc. 207-16, Schmidt Expert Report.

| | |
|---|---|
| 86. Revenue sharing payments from the Investment Window funds exceeded the share-class-expense differences that Plaintiffs' expert Dr. Buetow identifies as "damage" to the Plan by more than $15 million. | Wermers Decl., Ex. 2, Wermers Rebuttal Report ¶ 36 & Ex. 5 (revenue sharing amounts from Investment Window options based on Schmidt analysis totaled approximately $21.5 million); Barrett Decl., Ex. 13, Buetow Report ¶ 130 (asserting $5,283,869.23 loss from share-class issue). |

**RESPONSE:** Plaintiffs dispute paragraph 86. Dr. Wermers' $21.5 million calculation Defendants reference does not only calculate the revenue sharing compensation from the Investment Window paid to Fidelity, but applies a compounding rate of return of "the weighted average return of Dr. Buetow's alternative Plan lineup."[316] In other words, Dr. Wermers adds to the revenue sharing amount the investment gains participants would have received if they had paid reasonable recordkeeping fees and invested them in a prudent investment lineup.[317] The revenue sharing amounts in Schmidt's report speak for themselves and do not equal $21.5 million dollars.[318] Thus, the difference between the revenue sharing and Dr. Buetow's share-class damages is not $15 million. Additionally, Defendants' calculation is conceptually flawed because it includes revenue sharing for every fund in the Investment Window, including those not included in Dr. Buetow's share-class calculation.[319]

---

[316] Doc. 210-2, Wermers Rebuttal Report at 107 (Exhibit 5 n. 2) ("I grow Mr. Schmidt's yearly estimates of revenue sharing at the weighted average return of Dr. Buetow's alternative Plan lineup through June 2018. The amounts paid through revenue sharing include only revenue sharing for MIT Investment Window Options.").
[317] *Id.*
[318] Doc. 207-16, Schmidt Expert Report.
[319] Doc. 210-2, Wermers Expert Rebuttal Report at 74 (Exhibit 2).

| | |
|---|---|
| 87. Up until April 2014, revenue-sharing payments from Investment Window funds were used to compensate the Plan's recordkeeper for its administrative services to the Plan, net of revenue credits that were paid by Fidelity to the Plan to defray future Plan costs. After April 2014, revenue-sharing payments from the Investment Window funds were used to offset the Plan's per-participant recordkeeping fee on a dollar-for-dollar basis, with the remainder reserved to defray future Plan costs. | *See* Wermers Decl., Ex. 1, Wermers Report ¶ 77; Barrett Decl., Ex. 17, Schmidt Report ¶ 61; *see also id.*, Ex. 6, Ruiz Dep. 138:17-21, 146:16-18. |

**RESPONSE:** Plaintiffs do not dispute that until April 2014 designated investment options characterized as investment window funds generated revenue sharing payments for Fidelity's recordkeeping and administrative services. However, Plaintiffs dispute that after April 2014 Defendants received revenue sharing payments above the per-participant recordkeeping fee to defray future Plan costs.[320]

| | |
|---|---|
| 88. Plan investments made through the brokerage window did not generate revenue-sharing credits for the Plan to be used as compensation for the Plan's recordkeeping services. | Davies Decl., Ex. 28, Trust Agreement between Massachusetts Institute of Technology and Fidelity Management Trust Company ("Trust Agreement"), Twelfth Amendment, Schedule B at MIT-0004713 ("No offsets are available for assets held in BrokerageLink."). |

**RESPONSE:** Paragraph 88 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by causing the Plan to pay unreasonable recordkeeping fees or retaining imprudent investment options.

| | |
|---|---|
| 89. Fidelity Investments ("Fidelity") has served as the Plan's recordkeeper and directed trustee since 1999. | SAC ¶ 78; Davies Decl., Ex. 30, Recordkeeping Agreement at MIT-0117066; *id.*, Ex. 28, Trust Agreement at MIT-0004624-27. |

---

[320] Ex. P53, Gissiner Dep. 164:13-165:8; Ex. P1, Howard Dep. 159:12-160:16, 163:6-164:10.

**RESPONSE:** Paragraph 89 is not material to Defendants' Motion for Summary Judgment because it is irrelevant to whether Defendants breached their fiduciary duties by causing the Plan to pay unreasonable recordkeeping fees or retaining imprudent investment options.

| 90. | MIT selected Fidelity as the Plan's recordkeeper after issuing a formal Request for Proposals and evaluating competing bids. | Barrett Decl., Ex. 6, Ruiz Dep. 121:9-18. |
|---|---|---|

**RESPONSE:** Paragraph 90 is not material to Defendants' Motion for Summary Judgment because there has been significant downward fee pressure for defined contribution plan recordkeeping services since the early 2000s and continuing through the class period,[321] and because the selection of Fidelity as the Plan's recordkeeper occurred 20 years ago.[322] Prior to the class period and continuing to today, widespread accepted industry practice in the defined contribution marketplace is to conduct a competitive bidding process for recordkeeping and administrative services, through a request for proposal, every 3 to 5 years.[323] MIT rejected Mercer's repeated recommendations in both 2009 and 2012 to conduct competitive bidding and implement its findings.[324] Since MIT retained Fidelity as a recordkeeper in 1999 to the present date, MIT has never conducted a RFP,[325] conducted a RFI,[326] completed a benchmarking study to evaluate recordkeeping services,[327] investigated how the economics of Fidelity's services are

---

[321] Doc. 207-17, Schmidt Expert Report, ¶40; Ex. P78, Delivorias Dep. 68:19-76:13; Ex. P12, Magner Dep. 53:11-55:22; Ex. P62, Email Delivorias to Walker.

[322] Ex. P5, Recordkeeping Agreement Comp.

[323] Doc. 207-17, Schmidt Expert Report, ¶45; Doc. 207-11; Ex. P64, at 239; Ex. P12, Magner Dep. 30:6-8, 35:13-36:13; Ex. P67, DC Fee Management at 4.

[324] Ex. P99, Email Harrington to Delivorias.

[325] Ex. P3, Stone Dep. 93:24–94:3; Ex. P7, Ruiz Dep. 121:12–122:1, 128:23–129:2, 177:20–178:3; Ex. P10, Kelly Dep. 38:7–16, 96:19–23; Ex. P21, Ratigan Dep. 51:1–52:4; Ex. P12, Magner Dep. 22:18–23; Ex. P54, Ellison Dep. 24:23–26:22.

[326] Ex. P3, Stone Dep. 94:7–99:7; Ex. P7, Ruiz Dep. 178:4–6, 201:11–14; Ex. P21, Ratigan Dep. 52:5–53:23; Ex. P12, Magner Dep. 22:13–14, 23:5–8, 31:11–21.

[327] Ex. P7, Ruiz Dep. 201:11–14; Ex. P10, Kelly Dep. 96:14–18,; Magner Dep. 22:11–14.

delivered or negotiated additional services ,[328] or even investigated whether other recordkeepers

exist who could provide recordkeeping services to MIT.[329]

| 91. | From the outset of the class period until 2014, the Plan had a bundled fee arrangement with Fidelity under which Fidelity received revenue sharing from the mutual funds in the Investment Window as compensation for the administrative services it provided to the Plan, in lieu of any separate or explicit charge for such services. | Barrett Decl., Ex. 6, Ruiz Dep. 104:5-18, 122:2-123:11, 138:17-21, 146:16-18; *id.*, Ex. 7, Stone Dep. 92:13-93:3, 95:15-96:1, 98:6-99:7; Davies Decl., Ex. 30, Recordkeeping Agreement at MIT-011707684. |
|---|---|---|

**RESPONSE:** Plaintiffs dispute that Defendants ever investigated moving to a fixed separate or

explicit charge for administrative services prior to October 2012.[330] Widely accepted industry

practice in the defined contribution market is that recordkeeping fees should be calculated on a

per-participant basis or have a per-participant cap.[331] This approach, unlike an asset-based or

bundled model, provides fee transparency.[332] Unbundling services in a Defined Contribution

Plan has been the trend since the late 1990s.[333] The value of a plan participant's account has no

impact on the cost to provide recordkeeping services.[334] Utilizing a bundled recordkeeping

services pricing model that is dependent on the value of plan assets arbitrarily builds in fee

increases that are not linked to the level or quality of the recordkeeper's services.[335] Plaintiffs

dispute that the Plan's fully bundled relationship ended in April 2014. As Defendants admit

above, Fidelity continued to receive revenue sharing from bundled Fidelity products after April

---

[328] Ex. P7, Ruiz Dep. 122:8-123:18, 128:23-129:19; Ex. P3, Stone Dep. 93:24-101:6, 107:22-108:7; Ex. P78, Delivorias Dep. 97:20-98:15; Ex. P70, Email Magiera to Magner at 3-4; Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 19, 22.
[329] Ex. P7, Ruiz Dep. 129:20-131:6, 183:2–184:10; Ex. P1, Howard Dep. 148:13–21, 149:13-21.
[330] Ex. P70, Email Magiera to Magner at 2-3, 5.
[331] Ex. P12, Magner Dep. 28:15-30:1, Ex. P67, DC Fee Management at 3, 5.
[332] Ex. P12, Magner Dep. 28:15-30:5, Ex. P67, DC Fee Management at 3.
[333] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26; Ex. P64, at 334, 370.
[334] Doc. 207-17, Schmidt Expert Report, ¶¶23, 26, 29; Ex. P67, DC Fee Management; Ex. P12, Magner Dep. 28:19-30:1.
[335] Ex. P67, DC Fee Management at 3; Ex. P12, Magner Dep. 28:19-30:1.

1, 2014.[336] Additionally, while the referenced contractual change to a per-participant fee was retroactively effective in April 1, 2014, it was not actually executed until October 2014.[337]

| 92. | At the beginning of the class period, Plan fiduciaries received information on the range of administrative fees borne by other defined contribution plans through consultation with Mercer, which provided an understanding of where the range of market prices was based on its client base. | Barrett Decl., Ex. 6, Ruiz Dep. 123:19–125:5. |

**RESPONSE:** Plaintiffs do not dispute that Mercer provided the Plan's fiduciaries with information on the range of administrative fees borne by other defined contribution plans in June 2009. Plaintiffs dispute that the Plan's fiduciaries took any appropriate action in response to this information. At the June 11, 2009 meeting, Mercer told the Plan's fiduciaries on the POC that "[b]ased on available information (16,500 participants), Mercer estimated that recordkeeping costs per participant is $189 (vs. industry standards of $50 to $125)."[338] MIT noted in its meeting minutes that "[t]hrough intercompany transfers, Fidelity receives fees to offset the cost of MIT's recordkeeping. Revenue is high."[339] Mercer calculated that Fidelity received a total of $6,074,402.53 in revenue from the Plan and that $3,132,940.96 was paid to Fidelity's Personal and Workplace Investing (PWI) department for recordkeeping fees.[340] Abigail Johnson headed PWI at this time.[341] As the June 11, 2009 meeting concluded, the POC Chair, Theresa Stone, commented that:

> MIT must be sensitive to two facts: (1) the Institute's 'decades long plus' relationship with Fidelity and (2) **Ms. Abigail P. Johnson** is a member of both the **MIT Corporation** and **MITIMCo's Board of Trustees**. She is Chair of the

---

[336] *See supra* ¶87.

[337] Ex. P4, Trust Agreement Comp. at 76.

[338] Ex. P11, June 11, 2009 Mtg. Min. Comp. at 14-15.

[339] *Id.* at 15; Ex. P78, Delivorias Dep. 27:10-22 ("intercompany transfer relates to crediting revenue internally between two divisions of a company, in this case asset management or investment management and recordkeeping").

[340] Ex. P34, June 11, 2009 2009 Plan Oversight Subcommittee Meeting Materials at 4-15.

[341] Ex. P35, Email Harrington to Samuelson.

> Board that oversees Fidelity's 161 fixed income and asset allocation funds which
> handle about $650 billion of the more than $1.2 trillion managed by Fidelity.[342]

Stone served on the MIT Corporation's Board of Trustees for "a couple of decades" and is currently a "life trustee."[343] During the same period that Stone served as a trustee, Abigail Johnson was a MIT Corporation trustee and is currently a life trustee.[344] While on the MIT Corporation's Board of Trustees, and prior to the class period, Stone was the person responsible for actually creating the MIT Investment Management Company ("MITIMCo") and served as chair of MITIMCo's Board of Trustees.[345] Johnson was appointed to MITIMCo's Board of Trustees.[346] Stone and Johnson served together on MITIMCo's Board of Trustees.[347] Stone described Abigail Johnson as "an *honored* member of the board and the community in which [MIT] operated."[348] Abigail Johnson is the Chairman and CEO of Fidelity.[349] Other POC members at the time Stone made her comments understood that Abigail Johnson was CEO of Fidelity and an MIT donor.[350] The POC members were appointed by Stone.[351]

Outside of MIT, Stone was a Trustee of the Museum of Fine Arts ("MFA") in Boston, which was supported by high-level Fidelity employees, including Abigail Johnson's family in 2010 and 2011.[352] During the class period, at least one discussion of Fidelity's retirement plan services to the Plan took place during an e-mail conversation regarding Fidelity's contributions

---

[342] Ex. P11, June 11, 2009 Mtg. Min. Comp. at 15. (emphasis added).
[343] Ex. P3, Stone Dep. 10:10-11:21; Ex. P36, MIT Corporation Members *available at* https://corporation.mit.edu/all-members/theresa-m-stone.
[344] Ex. P37, MIT Corporation Members *available at* https://corporation.mit.edu/all-members/abigail-p-johnson.
[345] Ex. P3, Stone Dep. 12:5-18; 120:22-121:3.
[346] Ex. P11, June 11, 2009 Mtg. Min. Comp. at 15.
[347] Ex. P3, Stone Dep. 120:22–121:8.
[348] *Id.* at 123:21–124:1. (emphasis added).
[349] Ex. P37, MIT Corporation Members *available at* https://corporation.mit.edu/all-members/abigail-p-johnson.
[350] Ex. P10, Kelly Dep. 97:4-21.
[351] Ex. P38 2009 MIT Faculty Newsletter; ████████████████████████████████
[352] Ex. P40, Email Stone to Ragnoni at 2.

to the MFA.[353] In that exchange, Stone wrote to John Ragnoni, the Executive Vice President of

Fidelity's Tax-Exempt 403(b) Market, praising Fidelity:

> We know how much Fidelity has meant to the success of the Wing, so it was special to experience and enjoy the achievement of the MFA with you, your colleagues and your good customers. You are fortunate to be part of such a high quality organization; and we are fortunate to be your partners.[354]

Fidelity's Ragnoni responded to Stone:

> As a trustee, I'm sure you are quite proud of what has been accomplished at the museum and it was wonderful to have the Johnson family have a chance to share it with so many of our valued clients. I am looking forward to seeing you next week to discuss some of our ideas around plan sponsor retirement income dynamics.[355]

From June 2009, when MIT was informed it was paying excessive recordkeeping fees

and knew it could obtain lower recordkeeping fees, to October 2012, after Stone left the EVP&T

positions, the Plan's fiduciaries completely ignored their responsibility to evaluate recordkeeping

costs, engaged in no process to evaluate recordkeeping fees, and individual committee members

testified at their deposition that they had disclaimed any personal responsibility to evaluate

recordkeeping fees.[356]

Israel Ruiz, MIT's corporate representative, testified that MIT, through Mercer,

determined that market rates for Fidelity's per participant recordkeeping fees in late 2012 were in

the mid50s with all services included, and that this would have also been the market rate for

Fidelity's recordkeeping fees from 2010 to 2013.[357] MIT paid Fidelity more than double what

---

[353] *Id.*
[354] *Id.*
[355] *Id.*
[356] Ex. P3, Stone Dep. 93:24-101:6, 107:22-108:7; Ex. P21, Ratigan Dep. 7:9-10:1, 42:10-43:16; Ex. P57, Samuelson Dep. 29:15-30:18, 81:1-82:6; Ex. P10, Kelly Dep. 39:24-41:6, 89:24-96:23; Ex. P7, Ruiz Dep. 160:8-21; Ex. P1, Howard Dep. 72:20-73:20, 116:21-121:14; Ex. P11, Mtg. Min. Comp. at 14-15; Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 4-15; Ex. P78, Delivorias Dep. 28:2-10, 51:9-52:11, 91:6-92:7; Ex. P70, Email Magiera to Magner at 2-3, 5; Ex. P62, Email Delivorias to Walker.
[357] Ex. P7, Ruiz Dep. 155:2-160:21; 196:3-198:15.

MIT believed was the market rate for recordkeeping costs from 2010 through 2012.[358] A reasonable recordkeeping fee for the Plan in 2010 and 2011 was $43 per participant.[359] A reasonable recordkeeping fee for the Plan in 2012 was $39 per participant.[360] Even Defendants' expert's analysis, which includes much smaller plans that are not comparable to MIT, concludes that MIT paid excessive recordkeeping fees in 2010 and 2011.[361]

| Year | Participants with Account Balance | Expected PPPY Fee Plaintiffs' Expert[362] | MIT's Testimony Regarding Reasonable PPPY Fee[363] | MIT Actual PPPY Fee[364] | Excess Fee based on Plaintiffs' Expert | Excess Fee based on MIT's Admission |
|---|---|---|---|---|---|---|
| 2010 | 16,443 | $43 | $55 | $127 | $345,825[365] | $1,183,896 |
| 2011 | 16,900 | $43 | $55 | $131 | $1,493,446 | $1,284,400 |
| 2012 | 17,102 | $39 | $55 | $139 | $1,706,935 | $1,433,303 |

| 93. | In 2011, Fidelity approached MIT with an offer to provide a credit, or rebate, to the Plan tied to the amount by which revenue sharing was expected to exceed a revenue target, which would reduce effective Plan administrative fees. | Davies Decl., Ex. 30, Recordkeeping Agreement, Eighth Amendment at MIT-0133378 (showing $100,000 credit); *see* Barrett Decl., Ex. 6, Ruiz Dep. 135:18-137:5. |
|---|---|---|

**RESPONSE:** Plaintiffs dispute that the $100,000 credit Fidelity unilaterally offered in 2011 was "tied to the amount by which revenue sharing was expected to exceed a revenue target[.]" Plaintiffs further dispute that Defendants actually received the 2011 credit. In 2011, with industry wide

---

[358] Ex. P7, Ruiz Dep. 155:2-160:21; 196:3-198:15; Ex. P12, Magner Dep. 42:5-23.
[359] Doc. 207-17, Schmidt Expert Report, ¶145.
[360] *Id.*
[361] Doc. 209-1, Gissiner Expert Rebuttal Report ¶¶105, 107, Exhibits 5, 6, 7, Appendix C (Comparator 2, 7; otherwise utilizing plans with less than half of MIT's participant count that are not appropriate comparators); Ex. P7, Ruiz Dep. 167:1-8.
[362] Doc. 207-17, Schmidt Expert Report, ¶145.
[363] Ex. P7, Ruiz Dep. 156:19-160:21; 196:3-198:15.
[364] Doc. 209-01 at 102 (Ex. 3).
[365] Damages would run from the date Plaintiffs filed their Complaint.

recordkeeping costs continuing to rapidly decline,[366] Fidelity offered MIT a $100,000 expense reimbursement credit.[367] However, MIT did not utilize any of the $100,000 credit and simply let it expire.[368] Neither MIT nor Mercer ever sought to negotiate the amount of the revenue credit.[369] The credit was not tied to the amount by which revenue sharing was expected to exceed a revenue target.



[372]

| 94. | During the period when MIT was negotiating a new recordkeeping fee arrangement with Fidelity, the Plan's fiduciaries were aware that the Committee was exploring a possible restructuring of the Plan's investment lineup and that such a restructuring would require close coordination with the Plan's recordkeeper and could have significant implications for the Plan's recordkeeping pricing arrangements depending on which investments remained in the lineup. | Declaration of Israel Ruiz in Support of Defendants' Motion for Summary Judgment ("Ruiz Decl.") ¶¶ 6-7. |
|---|---|---|

[366] Doc. 207-17, Schmidt Expert Report, ¶40; Ex. P78, Delivorias Dep. 68:19-76:13; Ex. P12, Magner Dep. 53:11-55:22; Ex. P62, Email Delivorias to Walker.
[367] Ex. P45, Harrington Dep. 97:14-24; Ex. P5, Recordkeeping Agreement Comp. at 52.
[368] Ex. P63, Email Harrington to Davies.
[369] Ex. P88, Email Ratigan to Davies.
[370] Ex. P65, Email Davies to Ratigan.
[371] Ex. P21, Ratigan Dep. 43:17-49:22.
[372] Ex. P91, Email Chused to Ratigan.

**RESPONSE:** Paragraph 94 is not material to Defendants' Motion for Summary Judgment because in cases where the recordkeeper offers proprietary asset management, the plan sponsor should maintain flexibility by negotiating a contractual provision that allows the continuance of more favorable recordkeeping fees in the event some or all of the recordkeeper's funds are removed from the Plan's lineup for underperformance.[373] MIT never negotiated the $53 per participant open architecture fee despite the committee discussing streamlining the investment menu to less than 30 funds by April 2014 (i.e. removing Fidelity's proprietary products) after repeated advice it should do so by its advisors ██████████████.[374]

| | | |
|---|---|---|
| 95. | In light of the potential changes to the Plan's investment lineup, MIT's overall satisfaction with Fidelity's services at the time, and the extent of Fidelity's price concessions, the Plan's fiduciaries concluded that a formal competitive bidding process was not warranted at the time. | Ruiz Decl. ¶¶ 5-9. |

**RESPONSE:** Plaintiffs dispute paragraph 95. Israel Ruiz testified that MIT's understanding was that Mercer arrived at a determination of reasonable recordkeeping fees by "looking at their universe of clients and thinking about how much plans of similar size and scope to the MIT… would be paying for recordkeeping fees" and that this only included Mercer clients.[375] Both of Mercer's investment advisors testified that Mercer never maintained a database of recordkeeping prices paid by its clients.[376] Mercer also did not use a database for recordkeeping fee benchmarking.[377] Delivorias testified that a benchmarking study would assist a plan sponsor in negotiating fees with their incumbent, and that without conducting a benchmarking study she

---

[373] Ex. P67, DC Fee Management at 3; Ex. P12, Magner Dep. 28:19-30:1.
[374] Ex. P12, Magner Dep. 49:11-23; *compare* Ex. P84, Email Maglieri to Delivorias at 2 ($53) *with* Ex. P92, Email Harrington to Davies ($53); *see* Ex. P12, Magner Dep. 23:14-24:3; Ex. P42, Email Davies to Alden; Ex. P25, Preliminary Interview Results; Ex. P43, MIT 401(k) Plan Investment Restructure Project Plan.
[375] Ex. P7, Ruiz Dep. 161:3-20.
[376] Ex. P12, Magner Dep. 32:4-7; Ex. P78, Delivorias Dep. 66:5-8; 67:2-8.
[377] Ex. P12, Magner Dep. 36:14-16.

would not know whether Fidelity's fees were in line with other vendors' fees.[378] In addition, Delivorias testified that if Mercer conducted a vendor search it would create leverage because Fidelity would have known a search of its competitors was underway, "because [Fidelity] always gets to present to the committee. So … they know that it's out on the street. So I think that's important."[379] Both of Mercer's investment advisors were unaware why MIT did not conduct Mercer's recommended RFI.[380] Since MIT retained Fidelity as a recordkeeper in 1999 to the present date, MIT has never completed any of the three steps suggested by Mercer or the type of robust competitive bidding MIT engages in for its other employee benefits and services: MIT has never conducted an RFP,[381] an RFI,[382] has never completed a benchmarking study to evaluate recordkeeping services,[383] has never investigated how the economics of Fidelity's services are delivered or negotiated additional services,[384] or even investigated whether other recordkeepers exist who could provide recordkeeping services to MIT.[385]

| 96. | In 2012, MIT retained Mercer to assist in negotiating the compensation received by Fidelity for providing recordkeeping and other administrative services to the Plan. | Ruiz Decl. ¶ 3. |
|---|---|---|

**RESPONSE:** Plaintiffs do not dispute that MIT retained Mercer in October 2012. Plaintiffs dispute that MIT permitted Mercer to conduct their standard negotiations for recordkeeping and

[378] Ex. P78, Delivorias Dep. 31:9-16; 45:18-47:3.

[379] *Id*. at 48:13-49:15.

[380] Ex. P78, Delivorias Dep. 97:20-98:1; Ex. P12, Magner Dep. 47:23-48:8.

[381] Ex. P3, Stone Dep. 93:24–94:3; Ex. P7, Ruiz Dep. 121:12–122:1, 128:23–129:2, 177:20–178:3; Ex. P10, Kelly Dep. 38:7–16, 96:19–23; Ex. P21, Ratigan Dep. 51:1–52:4; Ex. P12, Magner Dep. 22:18–23; Ex. P54, Ellison Dep. 24:23–26:22; Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 21-22.

[382] Ex. P3, Stone Dep. 94:7–99:7; Ex. P7, Ruiz Dep. 178:4–6, 201:11–14; Ex. P21, Ratigan Dep. 52:5–53:23; Ex. P12, Magner Dep. 22:13–14, 23:5–8, 31:11–21; Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 20, 22.

[383] Ex. P7, Ruiz Dep. 201:11–14, Nov. 27, 2018; Ex. P10, Kelly Dep. 96:14–18, Nov. 9, 2018; Magner Dep. 22:11–14, Nov. 27, 2018.

[384] Ex. P7, Ruiz Dep. 122:8-123:18, 128:23-129:19, Nov. 15, 2018; Ex. P3, Stone Dep. 93:24-101:6, 107:22-108:7; Ex. P78, Delivorias Dep. 97:20-98:15; Ex. P70, Email Magiera to Magner at 3-4; Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 20, 22.

[385] Ex. P7, Ruiz Dep. 129:20-131:6, 183:2–184:10, Nov. 27, 2018; Howard 148:13–21, 149:13-21, Mar. 15, 2019.

administrative services with Fidelity. After ignoring Mercer's initial proposal to conduct competitive bidding in 2009,[386] Mercer signed a statement of work with MIT in 2012 that MIT, again, did not allow for Mercer to complete.[387] According to the statement of work, Mercer would provide consulting services "to assist MIT ('plan sponsor') in potentially converting from a 'fully-bundled' recordkeeping arrangement with Fidelity Investments ('Fidelity'), the recordkeeper for MIT's 401(k) Plan, to 'fixed fee' recordkeeping-only contract."[388] The only portion of the statement of work Mercer completed was a fiduciary training session, which Mercer's Linda Delivorias conducted on December 11, 2012.[389] MIT rejected Mercer's recommendation to complete the necessary competitive bidding process for recordkeeping services that Mercer had recommend as standard practice since 2009.[390] MIT did not permit Linda Delivorias to complete the third or fourth phases of Mercer's recordkeeping consulting engagement.[391] The competitive bidding would have included conducting a "RFI" where Mercer would:

- Draft a data request for Plan years 2010-2012 that will include, among other items, Fidelity's service agreements and fee schedules; Plan participant transaction volumes; access channel utilization statistics (e.g. IVR, web, CSR); actual billings; and fee sharing disclosure statements;

---

[386] Ex. P78, Delivorias Dep. 28:2-10, 51:9-52:11, 91:6-92:7, 97:20-98:15; Ex. P70, Email Magiera to Magner at 3-4.
[387] Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 16-24; Ex. P12, Magner Dep. 16:21-24, 20:1-8, 28:6-14, 53:6-10.
[388] Ex. P70, Email Magiera to Magner at 2-3, 5.
[389] Ex. P70, at 2-4; Ex. P11, December 11, 2012 Mtg. Min. Comp. at 150; Ex. P78, Delivorias Dep. 92:8-12, 128:14-130:12.
[390] Ex. P78, Delivorias Dep. 36:11-37:12.
[391] Ex. P78, Delivorias Dep. 97:20-98:15 (Phases 3 and 4).

- Interview MIT and Fidelity service team members to understand how the 'economics' of the following plan sponsor and participant services are delivered: communications; transaction processing; administration; and compliance;

- Summarize the actual fees paid to Fidelity and outline the revenue streams from source to recipient, review current demographics, identify changes since the contract inception, and determine the impact of any changes on Fidelity's revenue; and

- Distribute benchmarking RFI to (3) vendor candidates to obtain recordkeeping-only proposals independent of investment-based revenues.[392]

MIT also did not allow Mercer to:

- Assist MIT in negotiating a fixed-fee recordkeeping-only contract and performance agreement (SLAs with fees at risk) with Fidelity;

- Review Trust Agreement amendments

- Review Schedule of Services

- Review fee schedule.[393]

MIT refused to allow Mercer to follow its common practices, utilized uniformly across Mercer's defined contribution plan clients, when evaluating the recordkeeping fees paid the Fidelity.[394] Liana Magner, Mercer's lead consultant for the Plan, testified that Mercer's most common practice of benchmarking recordkeeping fees was to conduct "a blind RFI,"[395] which may result in an RFP depending on the outcome of the project.[396]

---

[392] Ex. P70, Email Magiera to Magner at 2-4; Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 19, 22.
[393] Ex. P70, Email Magiera to Magner at 4.
[394] Ex. P78, Delivorias Dep. 36:11-37:25; Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 16-22; Ex. P97, Email Alden to Ratigan; Ex. P98, Email Chused to Ratigan at 2.
[395] Ex. P12, Magner Dep. 33:14-20.
[396] *Id*. at 36:1-13.

MIT's corporate representative testified that MIT's understanding was that Mercer arrived at a determination of reasonable recordkeeping fees by "looking at their universe of clients and thinking about how much plans of similar size and scope to the MIT one… would be paying for recordkeeping fees" and that this universe only included Mercer clients.[397] Both of Mercer's investment advisors testified that Mercer has never maintained a database of recordkeeping prices paid by its clients.[398] Mercer also did not use a database for recordkeeping fee benchmarking.[399] Delivorias testified that a benchmarking study would assist a plan sponsor in negotiating fees with their incumbent, and that without conducting a benchmarking study she would not know whether Fidelity's fees were in line with other vendors' fees.[400] In addition, Delivorias testified that if Mercer conducted a vendor search it would create leverage because Fidelity would have known a search of its competitors was underway, "because they always get to present to the committee. So … they know that it's out on the street. So I think that's important."[401] Both of Mercer's investment advisors were unaware of why MIT refused to allow Mercer to conduct its recommended industry standard RFI.[402]

| 97. | The Plan fiduciaries' communications with Mercer led them to believe that once Fidelity's compensation arrangement had been renegotiated, a competitive bidding process was not likely to result in any materially different level of fees for the administrative services the Plan required. | Ruiz Decl. ¶ 5. |
|---|---|---|

**RESPONSE:** Plaintiffs dispute paragraph 97. MIT's corporate representative testified that MIT's understanding was that Mercer arrived at a determination of reasonable recordkeeping

---

[397] Ex. P7, Ruiz Dep. 161:3-20.
[398] Ex. P12, Magner Dep. 32:4-7; Ex. P78, Delivorias Dep. 66:5-8; 67:2-8.
[399] Ex. P12, Magner Dep. 32:4-7; 36:14-16.
[400] Ex. P78, Delivorias Dep. 31:9-16; 45:18-47:3.
[401] *Id*. at 48:13-49:15.
[402] Ex. P78, Delivorias Dep. 97:20-98:1; Ex. P12, Magner Dep. 47:23-48:8.

fees by "looking at their universe of clients and thinking about how much plans of similar size and scope to the MIT one - - what would - - clients would be paying for recordkeeping fees" and that this only included Mercer clients.[403] Both of Mercer's investment advisors testified that Mercer has never maintained a database of recordkeeping prices paid by its clients.[404] Mercer also did not use a database for recordkeeping fee benchmarking.[405] Delivorias testified that a benchmarking study would assist a plan sponsor in negotiating fees with their incumbent, and that without conducting a benchmarking study she would not know whether the incumbent's fees, Fidelity's fees, were in line with other vendors' fees.[406] In addition, Delivorias testified that if Mercer conducted a vendor search it would create leverage because Fidelity would have known a search of its competitors was underway, "because they always get to present to the committee. So … they know that it's out on the street. So I think that's important."[407] Both of Mercer's investment advisors were unaware of why MIT did not conduct Mercer's recommended RFI.[408]

| | |
|---|---|
| 98.   The negotiation process resulted in confirmation of arrangements in which Fidelity agreed to rebate to the Plan revenue sharing from the Plan's mutual fund investments in amounts estimated to exceed revenue targets in a contract year, which substantially reduced Fidelity's compensation. | Ruiz Decl. ¶ 4; *see* Davies Decl., Ex. 30, Recordkeeping Agreement, Tenth Amendment at MIT-0004611 ($1.1 million credit); *id.*, Ex. 28, Trust Agreement, Twelfth Amendment at MIT-0004713 ($1.2 million credit). |

---

[403] Ex. P7, Ruiz Dep. 161:3-20.
[404] Ex. P12, Magner Dep. 32:4-7; Ex. P78, Delivorias Dep. 66:5-8; 67:2-8.
[405] Ex. P12, Magner Dep. 32:4-7; 36:14-16.
[406] Ex. P78, Delivorias Dep. 31:9-16; 45:18-47:3.
[407] *Id.* at 48:13-49:15.
[408] Ex. P78, Delivorias Dep. 97:20-98:1; Ex. P12, Magner Dep. 47:23-48:8.

**RESPONSE:** Plaintiffs do not dispute that MIT executed recordkeeping and trust amendments with Fidelity after engaging Linda Delivorias. Plaintiffs dispute that any rebates were based on "amounts estimated to exceed revenue targets in a contract year." █████████████



Despite posing these questions, Ratigan testified that she was unaware whether anyone, including herself, on the POC knew how any revenue credits were calculated or even why MIT received any revenue credits.[410] ████████████████████████████

█████████████████████████████████[411]

Plaintiffs further dispute that Defendants ever received the $1.2 million credit from Fidelity.[412]

| 99.  In addition, with Mercer's assistance, the Plan secured a new recordkeeping fee arrangement with Fidelity, effective April 2014, under which the Plan agreed to pay a flat annual rate of $33 per participant and any revenue sharing from the Plan's investment options would be applied to offset that per-participant fee and would otherwise be remitted to the Plan's expense reimbursement account to be used to defray Plan expenses or credited to participants. | Ruiz Decl. ¶ 4; Davies Decl., Ex. 30, Recordkeeping Agreement, Eleventh Amendment at MIT-0004617; *id.*, Ex. 28, Trust Agreement, Twelfth Amendment at MIT-0004709. |
|---|---|

**RESPONSE:** Plaintiffs dispute that the April 2014 amendment was timely or that the process to obtain the $33 was prudent. After MIT was informed in June 2009 that "negotiation Specialist Ms. Linda Delivorias can evaluate what the real costs to Fidelity are and what (fair)

[409] Ex. P65 Email Davies to Ratigan.
[410] Ex. P21, Ratigan Dep. 43:17-49:22.
[411] Ex. P91, Email Chused to Ratigan.
[412] Ex. P53, Gissiner Dep. 120:18-121:8, 122:1-5; Ex. P1, Howard Dep. 159:12-160:16, 163:6-164:10.

price MIT should pay,"[413] MIT did not retain Mercer's Delivorias to consult regarding recordkeeping services and costs until October 31, 2012 when MIT executed Mercer's statement of work.[414] As discussed previously, MIT refused to allow Mercer to complete the competitive bidding portion of this work.[415] On April 30, 2013, Fidelity proposed $33 per-participant fee for a fully bundled lineup and a $53 per-participant fee for an unbundled lineup.[416]

MIT never negotiated the $53 per participant fee despite the committee discussing streamlining the investment menu to less than 30 funds by April 2014 (i.e. removing Fidelity's proprietary products) after repeated advice it should do so by its advisors ▉▉▉▉▉▉▉▉.[417] By February 21, 2014, MIT had not acted on the Fidelity offer of $33 per participant and thereby missed the July 1, 2013 effective date.[418] MIT eventually executed an agreement with Fidelity on October 1, 2014 with an effective date of April 1, 2014, setting the annual participant recordkeeping fee at $33 per participant per year.[419]

| 100. Plaintiffs' expert Martin Schmidt has acknowledged that $33 per participant was a reasonable rate for the recordkeeping services provided to the Plan at that time. | Barrett Decl., Ex. 17, Schmidt Report ¶ 145. |
| --- | --- |

**RESPONSE:** Plaintiffs do not dispute paragraph 100. However, the Plan never paid $33 per participant for a full year. The agreement was signed in October 2014[420] and the per participant

---

[413] Ex. P11, June 11, 2009 Mtg. Min. Comp. at 10.
[414] Ex. P78, Delivorias Dep. 28:2-10, 51:9-52:11, 91:6-92:7; Ex. P70, Email Magiera to Magner at 2-3, 5.
[415] *See* Ex. P78, Delivorias Dep. 97:20-98:15.
[416] Ex. P99, Email Harrington to Delivorias.
[417] Ex. P12, Magner Dep. 49:11-23; *compare* Ex. P84, Email Maglieri to at 2 ($53) *with* Ex. P92, Email Harrington to Davies ($53); *see* Magner Dep. 23:14-24:3; Ex. P42, Email Davies to Alden; Ex. P25, Preliminary Interview Results; Ex. P43, MIT 401(k) Plan Investment Restructure Project Plan.
[418] Ex. P102, Email Harrington to Davies.
[419] Ex. P5, Recordkeeping Agreement Comp. at 79; Ex. P4, Trust Agreement Comp. at 77.
[420] Defendants' Statement of Undisputed Material Facts ¶99.

fee increased to $52 in October 2015.[421] This drove the pricing above $33 per participant for

2015.[422]

| 101. When the Plan's investment lineup was changed in 2015, the number of Fidelity-managed investment options was greatly reduced, which caused Fidelity's overall compensation to decline. | Davies Decl., Ex. 9, January 20, 2015 Minutes of the Meeting of the MIT Supplemental 401(k) Plan Oversight Committee at MIT-002406, MIT-002418-19 (New Core Investment Lineup), MIT-0002420-32 (mapping proposal showing old and new investment options). |
| --- | --- |

**RESPONSE:** Plaintiffs do not dispute that Fidelity's overall compensation was reduced by the

lineup change in 2015. Plaintiffs dispute that the compensation Fidelity received from 2015 to

the present was reasonable; instead of overpaying by millions, Defendants overpaid by hundreds

of thousands of dollars.  In July 2016, while MIT was paying Fidelity $52 per participant per

year, Delivorias wrote that Mercer "did not conduct a fee benchmark study" in 2013 but that

Mercer "can definitely save MIT money if we conduct one this time [in July 2016] and at a

minimum, prices have been falling and [MIT] should lock in fees prior to 1st quarter 2017."[423]

MIT testified that it believed that Harvard was a comparable plan because it was similar in plan

size, location, "similarities of the plan, the benefits and the plan participants, per se" and

believed it was "a very good benchmark for our kind of institution."[424] In particular, MIT

believed Harvard was a comparable plan "in terms of size and participant offerings" and "in

particular Harvard had done the streamlining [in the 2009 to 2010 time frame] of the lineup

---

[421] *Id*. ¶102; Doc. 208-28, at MIT-0004724.
[422] Doc. 209-01 at 102 (Ex. 3).
[423] Ex. P62, Email Delivorias to Walker; Ex. P78, Delivorias Dep. 74:2-75:3; Ex. P12, Magner Dep. 53:11-55:22.
[424] Ex. P7, Ruiz Dep. 167:1-8, 167:16-168:2.

[what MIT completed in 2015], so it was a great comparison."[425] Defendants' expert, Steven

Gissiner, determined that Harvard paid $37 per participant per year to Fidelity from 2015-

2017.[426] At the same time, MIT contractually agreed to pay Fidelity a $52 per participant per

year charge that had never been negotiated.[427] Plaintiffs' expert, Martin Schmidt, opines that a

reasonable recordkeeping fee for MIT's Plan from 2015 through 2018, based on its size and

complexity, was $37 per participant per year.[428] ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████                ████████

| Year | MIT Actual Fee[430] | Plaintiffs' Expert Expected All-In Fee for MIT[431] | ████████████ | Harvard Streamlined Fidelity Fee From Defendants' Expert Report[433] |
|---|---|---|---|---|
| 2015 | $58 | $37 | ██████ | $37 |
| 2016 | $54 | $37 | ██████ | $37 |
| 2017 | $54 | $37 | ██████ | $37 |

| 102. Under the recordkeeping contract that the Plan had with Fidelity, the Plan's annual per-participant administrative fee increased to $52 when the Plan's investment lineup was revised in 2015. | Davies Decl., Ex. 28, Trust Agreement, Thirteenth Amendment at MIT-0004724. |
|---|---|

**RESPONSE:** Plaintiffs do not dispute paragraph 102.

[425] *Id.* at 168:19-169:5; *see also* Ex. P11, August 7, 2013 Mtg. Min. Comp. at 163 (requesting staff to ask Harvard for the cost of communicating their investment lineup changes); Ex. P103, Email Bernstein to Ratigan at 2; Ex. P104, Email Ratigan to Ruiz; Ex. P29, Email Wieand to Committee Members.
[426] Doc. 209-01, Gissiner Expert Rebuttal Report, ¶¶105, 107 (Appendix D, n. 3).
[427] Ex. P4, Trust Agreement Comp. at 92.
[428] Doc. 207-17, Schmidt Expert Report, ¶¶145-159.
[429] Ex. P78, Delivorias Dep. 69:1-6, 70:16-71:16, 73:5-23, 75:4-76:13.
[430] Doc. 207-17, Schmidt Expert Report, ¶107; Doc. 209-01 at 102 (Ex. 3).
[431] *See also,* Doc. 209-1, Gissiner Rebuttal Report at Appendix E, Comparators 1, 4, 7, 9.
[432] Ex. P78, Delivorias Dep. 69:1-6, 70:16-25, 71:1-16, 73:12-23, 75:4-76:13.
[433] Doc. 209-1, Gissiner Expert Rebuttal Report, ¶¶105, 107 (Appendix D, n. 3).

| 103. The $52 per-participant per-year rate paid by the Plan from 2015 to 2018 was within market rates. | *See* Declaration of Steven K. Gissiner in Support of Defendants' Motion for Summary Judgment ("Gissiner Decl."), Ex. 1, Gissiner Rebuttal Report ¶ 105-07 & Exs. 5-7. |
| --- | --- |

**RESPONSE:** Plaintiffs dispute paragraph 103. Prudent fiduciaries should evaluate and monitor investment fees and recordkeeping fees separately.[434] In cases where the recordkeeper offers proprietary asset management, the plan sponsor should maintain flexibility by negotiating a contractual provision that allows the continuance of more favorable recordkeeping fees in the event some or all of the recordkeeper's funds are removed from the plan's lineup for underperformance.[435] MIT never negotiated the $53 per participant fee despite the committee discussing streamlining the investment menu to less than 30 funds by April 2014 (i.e. removing Fidelity's proprietary products) after repeated advice it should do so by its advisors ███████ ███████[436] Effective October 1, 2015, MIT signed a new agreement with Fidelity setting the annual per participant recordkeeping fee at the unnegotiated $52 per participant open architecture price.[437] Fidelity proactively gave a $1 reduction off of the $14 additional fee because Fidelity had "taken a small bit of administrative complexity out with the Core Bond Pool going away[.]"[438] There was no change in the level of services Fidelity provided to MIT.[439]

In July 2016, while MIT was paying Fidelity $52 per participant per year, Mercer's Linda Delivorias wrote that Mercer "did not conduct a fee benchmark study" in 2013 but that Mercer

---

[434] Ex. P67, DC Fee Management at 3; Ex. P12, Magner Dep. 28:19-30:5; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26; Ex. P64, at 241-242.
[435] Ex. P67, DC Fee Management at 3; Ex. P12, Magner Dep. 28:19-30:1.
[436] Ex. P12, Magner Dep. 23:14-24:3, 49:11-23; *compare* Ex. P84, Email Maglieri to Delivorias at 2 ($53) *with* Ex. P92, Email Harrington to Davies ($53); Ex. P42, Email Davies to Alden; Ex. P25, Preliminary Interview Results; Ex. P43, MIT 401(k) Plan Investment Restructure Project Plan.
[437] Ex. P4, Trust Agreement Comp. at 92.
[438] Ex. P92, Email Harrington to Davies.
[439] *Id.*

"can definitely save MIT money if we conduct one this time [in July 2016] and at a minimum, prices have been falling and [MIT] should lock in fees prior to 1st quarter 2017."[440] MIT testified that it believed that Harvard was a comparable plan because it was similar in plan size, location, "similarities of the plan, the benefits and the plan participants, per se" and believed it was "a very good benchmark for our kind of institution."[441] In particular, MIT believed Harvard was a comparable plan "in terms of size and participant offerings" and "in particular Harvard had done the streamlining [in the 2009 to 2010 time frame] of the lineup [what MIT completed in 2015], so it was a great comparison."[442] Defendants' expert, Gissiner, determined that Harvard paid $37 per participant per year to Fidelity from 2015-2017.[443] At the same time, MIT contractually agreed to pay Fidelity a $52 per participant per year charge that had never been negotiated.[444] Plaintiffs' expert, Schmidt, opines that a reasonable recordkeeping fee for MIT's Plan from 2015 through 2018, based on its size and complexity, was $37 per participant per year.[445] ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ ██████.[446]

---

[440] Ex. P62, Email Delivorias to Walker; Ex. 78, Delivorias Dep. 74:2-75:3; Ex. P12, Magner Dep. 53:11-55:22.
[441] Ex. P7, Ruiz Dep. 167:1-8, 167:16-168:2
[442] *Id*. at 168:19-169:5; *see also* Ex. P11, August 7, 2013 Mtg. Min. Comp. at 163 (requesting staff to ask Harvard for the cost of communicating their investment lineup changes); Ex. P103, Email Bernstein to Ratigan at 2; Ex. P104, Email Ratigan to Ruiz; Ex. P29, Email Wieand to Committee Members.
[443] Doc. 209-01, Gissiner Expert Rebuttal Report, ¶¶105, 107 (Appendix D, n. 3).
[444] Ex. P4, Trust Agreement Comp. at 92.
[445] Doc. 207-17, Schmidt Expert Report, ¶¶145-159.
[446] Ex. P78, Delivorias Dep. 69:1-6, 70:16-71:16, 73:5-23, 75:4-76:13.

| Year | MIT Actual Fee[447] | Plaintiffs' Expert Expected All-In Fee for MIT[448] | ██████ | Harvard Streamlined Fidelity Fee From Defendants' Expert Report[450] |
|---|---|---|---|---|
| 2015 | $58 | $37 | ████ | $37 |
| 2016 | $54 | $37 | ████ | $37 |
| 2017 | $54 | $37 | ████ | $37 |

| | |
|---|---|
| 104. Effective July 2018, the Plan's annual per-participant administrative fee was further reduced below the $52 per-participant rate. | Davies Decl., Ex. 29, Trust Agreement, Fourteenth Amendment at MIT-0152166. |

**RESPONSE:** Plaintiffs object to Defendants' use of MIT-0152166. Defendants did not produce this document until July 9, 2019 and have refused to produce any discovery or witnesses related to communications regarding the new fee agreement. Plaintiffs otherwise dispute paragraph 104.

████████████████████████████████████████████

████████████████████████████████ █ ████████████████

████████████████████████████████████████████

████████████ .

| | |
|---|---|
| 105. Administrative fees are often monitored by defined contribution plan fiduciaries by means other than competitive bidding. | Gissiner Decl., Ex. 1, Gissiner Rebuttal Report ¶¶ 40-44. |

**RESPONSE:** Paragraph 105 is not material to Defendants' Motion for Summary Judgment because Defendants have never undertaken any means to monitor the Plan's administrative fees. Defendants citation does not identify the other ways administrative fees are monitored. Since

---

[447] Doc. 207-17, Schmidt Expert Report, ¶107; Doc. 209-01 at 102 (Ex. 3).
[448] *See also,* Doc. 209-1, Gissiner Rebuttal Report at Appendix E, Comparators 1, 4, 7, 9.
[449] Ex. P78, Delivorias Dep. 69:1-6, 70:16-25, 71:1-16, 73:12-23, 75:4-76:13.
[450] Doc. 209-1, Gissiner Expert Rebuttal Report, ¶¶105, 107 (Appendix D, n. 3).
[451] Ex. P106, April 18, 2013 Committee Meeting Materials at 7.

MIT retained Fidelity as a recordkeeper in 1999 to the present date, MIT has never conducted an RFP,[452] an RFI,[453] has never completed a benchmarking study to evaluate recordkeeping services,[454] has never investigated how the economics of Fidelity's services are delivered or negotiated additional services ,[455] or even investigated whether other recordkeepers exist who could provide recordkeeping services to MIT.[456] Although MIT engaged Mercer's Delivorias in October 2012, this was a one-time engagement.[457] MIT did not otherwise permit Mercer to follow its common practices, utilized uniformly across Mercer's defined contribution plan clients, when evaluating the recordkeeping fees paid to Fidelity.[458] Magner, Mercer's lead consultant for the Plan, testified that Mercer's most common practice of benchmarking recordkeeping fees was to conduct "a blind RFI"[459] which may result in an RFP depending on the outcome of the project.[460] MIT's corporate representative testified that MIT's understanding was that Mercer arrived at a determination of reasonable recordkeeping fees by "looking at their universe of clients and thinking about how much plans of similar size and scope to the MIT one - - what would - - clients would be paying for recordkeeping fees" and that this only included Mercer clients.[461] Both of Mercer's investment advisors testified that Mercer has never

[452] Ex. P3, Stone Dep. 93:24–94:3; Ex. P7, Ruiz Dep. 121:12–122:1, 128:23–129:2, 177:20–178:3; Ex. P10, Kelly Dep. 38:7–16, 96:19–23; Ex. P21, Ratigan Dep. 51:1–52:4; Ex. P12, Magner Dep. 22:18–23; Ex. P54, Ellison Dep. 24:23–26:22; Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 21-22.
[453] Ex. P3, Stone Dep. 94:7–99:7; Ex. P7, Ruiz Dep. 178:4–6, 201:11–14; Ex. P21, Ratigan Dep. 52:5–53:23; Ex. P12, Magner Dep. 22:13–14, 23:5–8, 31:11–21; Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 20, 22.
[454] Ex. P7, Ruiz Dep. 201:11–14; Ex. P10, Kelly Dep. 96:14–18; Ex. P12, Magner Dep. 22:11–14.
[455] Ex. P7, Ruiz Dep. 122:8-123:18, 128:23-129:19; Ex. P3, Stone Dep. 93:24-101:6, 107:22-108:7; Ex. P78, Delivorias Dep. 97:20-98:15; Ex. P70, Email Magiera to Magner at 3-4; Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 19, 22.
[456] Ex. P7, Ruiz Dep. 129:20-131:6, 183:2–184:10; Ex. P1, Howard Dep. 148:13–21, 149:13-21.
[457] Ex. P78, Delivorias Dep. 28:2-10, 51:9-52:11, 91:6-92:7; Ex. P70, Email Magiera to Magner at 2-3, 5.
[458] Ex. P78, Delivorias Dep. 36:11-37:25; Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 16-22; Ex. P97, Email Alden to Ratigan; Ex. P98, Email Chused to Ratigan at 2.
[459] Ex. P12, Magner Dep. 33:14-20.
[460] *Id*. at 36:1-13.
[461] Ex. P7, Ruiz Dep. 161:3-20.

maintained a database of recordkeeping prices paid by its clients.[462] Mercer also did not use a database for recordkeeping fee benchmarking.[463] Delivorias testified that a RFI would assist a plan sponsor in negotiating fees with their incumbent, and that without conducting a benchmarking study she would not know whether Fidelity's fees were in line with other vendors' fees.[464] In addition, Delivorias testified that if Mercer conducted a vendor search it would create leverage because Fidelity would have known a search of its competitors was underway, "because they always get to present to the committee. So … they know that it's out on the street. So I think that's important."[465] Both of Mercer's investment advisors were unaware of why MIT did not conduct Mercer's recommended RFI.[466]

Plaintiffs otherwise dispute paragraph 105. Prior to the class period and continuing to today, widespread accepted industry practice in the defined contribution marketplace is to conduct a competitive bidding process for recordkeeping and administrative services, through a request for proposal, every 3 to 5 years.[467] In 2010 proposed regulations, the Department of Labor specifically noted "plans normally conduct requests for proposal (RFPs) from service providers at least once every three to five years."[468] Other means, such as comparing a plan's recordkeeping fees to the fees of other plans based on survey data or publicly available information does not provide accurate information on the reasonableness of a particular plan's fees because of variances in a plan's size, complexity and required level of service.[469]

---

[462] Ex. P12, Magner Dep. 32:4-7; Ex. P78, Delivorias Dep. 66:5-8; 67:2-8.
[463] Ex. P12, Magner Dep. 32:4-7; 36:14-16.
[464] Ex. P78, Delivorias Dep. 31:9-16; 45:18-47:3.
[465] *Id*. at 48:13-49:15.
[466] Ex. P78, Delivorias Dep. 97:20-98:1; Ex. P12, Magner Dep. 47:23-48:8.
[467] Doc. 207-17, Schmidt Expert Report, ¶46; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26; Ex. P64 at 239; Ex. P12, Magner Dep. 30:6-8, 35:13-36:13; Ex. P67, DC Fee Management at 4.
[468] Reasonable Contract or Arrangement Under Section 408(b)(2) - Fee Disclosure, 75 FR 41600, 41625 (July 16, 2010).
[469] Ex. P12, Magner Dep. 30:6-8, 35:13-36:13; Ex. P67, DC Fee Management at 4.

| 106. Plaintiffs' expert Martin Schmidt did not conduct a request for proposal ("RFP") or request for information ("RFI") in reaching his opinion as to what would have been a reasonable rate for recordkeeping services provided to the Plan. | Barrett Decl., Ex. 17, Schmidt Report ¶ 74; *id.*, Ex. 16, Deposition of Martin Schmidt ("Schmidt Dep.") 109:21-23. |
|---|---|

**RESPONSE:** Paragraph 106 is not material to Defendants' Motion for Summary Judgment because, as Martin Schmidt explains, he would not send out an RFP for a fake client because he "was not engaged by MIT to perform such a service and it is not realistic to perform an RFI or an RFP in hindsight [for] what the fees would have been at that time" and that as the "consultant, it is my reputation … I have to deal with all of the providers on a regular basis too."[470] Instead of doing the impossible and travelling back in time to perform an RFP 10 years ago, as Defendants contend he should have done, Schmidt based his opinion, among other things, on the process he used when conducting three requests for proposals between 2012 and 2015, along with his analysis of the plan characteristics, services, additional data points, and his over 30 years of experience.[471]

| 107. Plaintiffs' expert Martin Schmidt has admitted that he does not know of any plan with the range of investment choices offered by MIT that paid lower administrative fees than the Plan did. | Barrett Decl., Ex. 17, Schmidt Dep. 155:18-156:3. |
|---|---|

**RESPONSE:** Plaintiffs deny paragraph 107. Defendants' citation does not support paragraph 107. Schmidt testified that you have to look on a case-by-case basis and there was no perfect comparator for the Plan, or any other plan, because you have to consider the unique plan characteristics when evaluating pricing.[472] Schmidt based his opinion, among other things, on the process he used when conducting three requests for proposals between 2012 and 2015, along

---

[470] Ex. P107, Schmidt Dep. 118:3-9; 133:13-21.
[471] Doc. 207-17 ¶¶4-9, 12, 14, 85-88, 147-158; Ex. P107, Schmidt Dep. 135:1-11.
[472] Ex. P107, Schmidt Dep. 153:25-155:17.

with his analysis of the plan characteristics, services, additional data points, and his over 30 years of experience.[473]

| | |
|---|---|
| 108. Defendants' expert Steven Gissiner compared the fees paid by the Plan during the class period against a database based on numerous defined-contribution-plan benchmarking projects and determined that the Plan's administrative fees were within the range of fees paid by the comparable plans within the database and were, in many periods, well below the median. | Gissiner Decl., Ex. 1, Gissiner Rebuttal Report ¶¶ 105-06 & Exs. 5-7. |

**RESPONSE:** Plaintiffs deny paragraph 108. Defendants' expert Gissiner's benchmarking concludes that MIT paid excessive fees for recordkeeping services in 2010 and 2011.[474] Israel Ruiz, MIT's corporate representative, testified that MIT, through Mercer, determined that market rates for Fidelity's recordkeeping fees in late 2012 were in the mid-50s with all services included, and that this would have also been the market rate for Fidelity's recordkeeping fees from 2010 to 2013.[475] MIT paid Fidelity more than double what MIT believed was the market rate for recordkeeping costs from 2010 through 2012.[476] A reasonable recordkeeping fee for the Plan in 2010 and 2011 was $43 per participant.[477] A reasonable recordkeeping fee for the Plan in 2012 was $39 per participant.[478] Even Defendants' expert's analysis, which includes even much small plans that are not comparable to MIT, concludes that MIT paid excessive recordkeeping

---

[473] Doc. 207-17 ¶¶4-9, 12, 14, 85-88, 147-158; Ex. P107, Schmidt Dep. 135:1-11.
[474] Doc. 209-01 ¶107; Doc. 209-01, Gissiner Dep. 120:18-121:8, 122:1-5; Ex. P1, Howard Dep. 159:12-160:16, 163:6-164:10.
[475] Ex. P7, Ruiz Dep. 155:2-160:21; 196:3-198:15.
[476] Ex. P7, Ruiz Dep. 155:2-160:21; 196:3-198:15; Ex. P12, Magner Dep. 42:5-23.
[477] Doc. 207-17, Schmidt Expert Report, ¶145.
[478] Doc. 207-17, Schmidt Expert Report, ¶145.

fees in 2010 and 2011.[479] Plaintiffs otherwise dispute that MIT paid reasonable recordkeeping fees. MIT paid, and continues to pay, unreasonable recordkeeping fees to Fidelity:[480]

| Year | MIT Actual Fee[481] | Plaintiffs' Expert Expected All-In Fee for MIT[482] | [REDACTED] | Harvard Streamlined Fidelity Fee From Defendants' Expert Report[484] | MIT's Testimony Regarding Reasonable Fee[485] |
|---|---|---|---|---|---|
| 2010 | $127 | $43 | | No Data | $55 |
| 2011 | $131 | $43 | [REDACTED] | No Data | $55 |
| 2012 | $139 | $39 | [REDACTED] | No Data | $55 |
| 2013 | $168 | $39 | [REDACTED] | No Data | $55 |
| 2014 | $111 | $39 | [REDACTED] | No Data | No Data |
| 2015 | $58 | $37 | [REDACTED] | $37 | No Data |
| 2016 | $54 | $37 | [REDACTED] | $37 | No Data |
| 2017 | $54 | $37 | [REDACTED] | $37 | No Data |

| | |
|---|---|
| 109. Mr. Gissiner also determined, based on available data, that the Plan's fees were well below the average fees for comparable university plans and in line with those of comparable corporate plans during the 2015 to 2017 period, the only period for which public data was available. | Gissiner Decl., Ex. 1, Gissiner Rebuttal Report ¶¶ 98, 110-16. |

**RESPONSE:** Plaintiffs deny paragraph 109. Defendants' expert, Steven Gissiner, admitted that many of the underlying comparators he selected to determine his fee range were not appropriate comparators to the Plan and he did not account for factors he believed would result in higher recordkeeping fees for the comparators he selected.[486] In July 2016, while MIT was paying

---

[479] Doc. 209-1, Gissiner Expert Rebuttal Report ¶¶105, 107, Exhibits 5, 7, Appendix C (Comparator 2, 7; otherwise utilizing plans with less than half of MIT's participant count that are not appropriate comparators); Ex. P7, Ruiz Dep. 167:1-8.

[480] Doc. 207-17, Schmidt Expert Report, ¶¶11, 145, 159-164; *see also* Doc. 209-1, Gissiner Expert Rebuttal Report ¶¶105, 107, Exhibits 5, 7, Appendix C (Comparator 2, 7; otherwise utilizing plans with less than half of MIT's participant count that are not appropriate comparators); Ex. P7, Ruiz Dep. 167:1-8; Ex. P78, Delivorias Dep. 69:1–6, 70:16–71:16, 73:5–23, 75:4–76:13; Ex. P11, June 11, 2009 Mtg. Min. Comp. at 14-15.

[481] Doc. 207-17, Schmidt Expert Report, ¶107; Doc. 209-01 at 102 (Ex. 3).

[482] *See also,* Doc. 209-1, Gissiner Rebuttal Report at Appendix E, Comparators 1, 4, 7, 9.

[483] Ex. P78, Delivorias Dep. 69:1-6, 70:16-25, 71:1-16, 73:12-23, 75:4-76:13.

[484] Doc. 209-1, Gissiner Expert Rebuttal Report, ¶¶105, 107 (Appendix D, n. 3).

[485] Ex. P7, Ruiz Dep. 155:2-160:21; 196:3-198:15.

[486] Ex. P53, Gissiner Dep. 24:6-26:15, 59:21-25, 97:8-98:21.

Fidelity $52 per participant per year, Mercer's Linda Delivorias wrote that Mercer "did not conduct a fee benchmark study" in 2013 but that Mercer "can definitely save MIT money if we conduct one this time [in July 2016] and at a minimum, prices have been falling and [MIT] should lock in fees prior to 1st quarter 2017."[487] MIT testified that it believed that Harvard was a comparable plan because it was similar in plan size, location, "similarities of the plan, the benefits and the plan participants, per se" and believed it was "a very good benchmark for our kind of institution."[488] In particular, MIT believed Harvard was a comparable plan "in terms of size and participant offerings" and "in particular Harvard had done the streamlining [in the 2009 to 2010 time frame] of the lineup [what MIT completed in 2015], so it was a great comparison."[489] Defendants' expert, Steven Gissiner, determined that Harvard paid $37 per participant per year to Fidelity from 2015-2017.[490] At the same time, MIT contractually agreed to pay Fidelity a $52 per participant per year charge that had never been negotiated.[491] Plaintiffs' expert, Martin Schmidt, opines that a reasonable recordkeeping fee for MIT's Plan from 2015 through 2018, based on its size and complexity, was $37 per participant per year.[492] ███████

██████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████ ████.[493]

[487] Ex. P62, Email Delivorias to Walker; Ex. P78, Delivorias Dep. 74:2-75:3; Ex. P12, Magner Dep. 53:11-55:22.
[488] Ex. P7, Ruiz Dep. 167:1-8, 167:16-168:2.
[489] Id. at 168:19-169:5; see also Ex. P11, Mtg. Min. Comp. at 163 (requesting staff to ask Harvard for the cost of communicating their investment lineup changes); Ex. P103, Email Bernstein to Ratigan at 2; Ex. P104, Email Ratigan to Ruiz; Ex. P29, Email Wieand to Committee Members.
[490] Doc. 209-1, Gissiner Expert Rebuttal Report, ¶¶105, 107 (Appendix D, n. 3).
[491] Ex. P5, Recordkeeping Agreement Comp. at 92.
[492] Doc. 207-17, Schmidt Expert Report, ¶¶145-159.
[493] Ex. P78, Delivorias Dep. 69:1–6, 70:16–71:16, 73:5–23, 75:4–76:13.

| Year | MIT Actual Fee[494] | Plaintiffs' Expert Expected All-In Fee for MIT[495] | ██████ [496] | Harvard Streamlined Fidelity Fee From Defendants' Expert Report[497] |
|---|---|---|---|---|
| 2015 | $58 | $37 | ████ | $37 |
| 2016 | $54 | $37 | ████ | $37 |
| 2017 | $54 | $37 | ████ | $37 |

| 110. With one exception, the Plan's per-participant administrative fees have been lower than the median per-participant fees reported by the consulting firm NEPC in each year since 2012. | Gissiner Decl., Ex. 1, Gissiner Rebuttal Report ¶ 115 & Ex. 5. |
|---|---|

**RESPONSE:** Plaintiffs deny paragraph 110. In Gissiner's exhibit, MIT's per-participant administrative fees were higher than the median fees reported by NEPC in 2010, 2011 and 2013.[498] Defendants otherwise paid excessive fees during the class period.[499]

---

494 Doc. 207-17, Schmidt Expert Report, ¶107; Doc. 209-01 at 102 (Ex. 3).

495 *See also,* Doc. 209-1, Gissiner Rebuttal Report at Appendix E, Comparators 1, 4, 7, 9.

496 Ex. P78, Delivorias Dep. 69:1-6, 70:16-25, 71:1-16, 73:12-23, 75:4-76:13.

497 Doc. 209-1, Gissiner Expert Rebuttal Report, ¶¶105, 107 (Appendix D, n. 3).

498 Doc. 209-01 at Ex. 5; Doc. 209-01, Gissiner Dep. 120:18-121:8, 122:1-5, 165:2-168:20; Ex. P1, Howard Dep. 159:12-160:16, 163:6-164:10.

499 Doc. 207-17 ¶¶11, 145, 160.

| | |
|---|---|
| 111. The Plan's investment in non-mutual-fund options was expressly permitted by the Plan's fiduciaries. | *See, e.g.*, Davies Decl., Ex. 28, Trust Agreement at MIT-0004630 (listing "collective investment funds" among available investment options), MIT-0004642 (reflecting sponsor agreement to participate in Fidelity Group Trust), MIT-0004652 (including maintenance of "commingled pools" as plan investment options among administrative services to be provided by Fidelity); *id.*, Ex. 28, Trust Agreement, Fourth Amendment at MIT-0004668; *id.*, Ex. 28, Trust Agreement, Eight Amendment at MIT-0004674. |

**RESPONSE:** Plaintiffs do not dispute paragraph 111.

| | |
|---|---|
| 112. The expense ratios of the Plan's non-mutual-fund investment options were generally less than or comparable to the fees of similar investments throughout the class period. | Wermers Decl., Ex. 1, Wermers Report ¶¶ 92-95 & Exs. 20-21. |

**RESPONSE:** Plaintiffs dispute that the non-mutual-fund investment options charged the Plan

reasonable fees. The Plan's Trust Agreement sets rates for the revenue sharing from non-mutual

fund options, including commingled pools and stable value funds to pay for recordkeeping

fees.[500] These explicit charges in the Trust Agreement added to the already excessive and

unreasonable fees the Plan paid Fidelity for recordkeeping and administrative services.[501]

---

[500] Ex. P004, Trust Agt. Comp. at 28-30, 32, 39, 42, 50-51, 78, 80-81.
[501] *Id*; Doc. 207-16, Schmidt Expert Report, ¶¶11, 160.

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

### I. Background

113.    The MIT Supplemental 401(k) Plan (the "Plan") Administrator is the Massachusetts Institute of Technology.[502]

114.    The Plan Document only permits the Plan Administrator to pay reasonable administrative fees from the Plan. Thus, MIT must determine the reasonableness of fees before they are withdrawn from Plan assets.[503]

115.    Section 10.2 of the Plan Document provides that MIT may only appoint or delegate its fiduciary responsibilities in writing.[504]

116.    The MIT Supplemental 401(k) Plan Oversight Committee ("POC") was created by the MIT Executive Committee on September 4, 1998.[505] The President of MIT appointed members to the POC from senior officers, faculty, and staff of MIT.[506] The appointment gave the POC the responsibility for, among other things: selecting, engaging, and monitoring the Plan's trustee, investment managers, and investment advisors; establishing investment policies and guidelines; and establishing and implementing criteria to measure the performance of the Plan's investments.[507]

---

[502] Doc. 208-06, The Massachusetts Institute of Technology Supplemental 401(k) Plan Document 2008 Restatement at 8, 11.
[503] *Id.*
[504] Doc. 208-06, The Massachusetts Institute of Technology Supplemental 401(k) Plan Document 2008 Restatement at 32 (10.2(h)).
[505] Ex. P108, September 4, 1998 Minutes of the MIT Executive Committee at 2-3; Ex. P2, Sept. 14, 1998 Letter to Rice.
[506] Ex. P2, Sept. 14, 1998 Letter to Rice.
[507] *Id.*

117. At all relevant times, the Executive Vice President and Treasurer ("EVP&T") served as Chair of the POC.[508] Theresa Stone served as EVP&T and Chair of the POC.[509] Since November 2011, Israel Ruiz has served as EVP&T and Chair of the POC.[510]

118. MIT retained the fiduciary responsibility for the Plan's administrative services, including the fiduciary duty to monitor the Plan's recordkeeper and recordkeeping fees.[511]

119. As of December 31, 2009, the Plan had 16,365 participants with account balances and $2.1 billion in assets.[512] By December 31, 2016, the Plan had 19,812 participants with assets and $4.063 billion in assets.[513]

120. The amount of assets and number of participants make the Plan among the largest defined contribution plans (top 1%) in the country giving its bargaining power to obtain additional services and lower fees.[514]

## II. MIT Failed To Remove Proprietary Funds And Reduce Recordkeeping Fees After Learning It Would Impact Fidelity's Revenue

121. Defendants' process was driven by affirmative decisions to favor Fidelity regarding recordkeeping fees and investment selection in order to further MIT's relationship with Fidelity and Abigail Johnson.[515]

---

[508] Ex. P3, Stone Dep. 14:16-15:7; Ex. P7, Ruiz Dep. 18:18-19:14.

[509] Ex. P3, Stone Dep. 14:16-15:7; Ex. P11, September 29, 2011 Mtg. Min. Comp. at 128; Ex. P5, Recordkeeping Agreement Comp. at 52; Ex. P11, November 17, 2011 Mtg. Min. Comp. at 129; Ex. P11, January 5, 2012 Mtg. Min. Comp. at 133.

[510] Ex. P7, Ruiz Dep. 18:18-19:14.

[511] *Id.*; Ex. P7, Ruiz Dep. 107:13-19; Ex. P38, 2009 MIT Faculty Newsletter.

[512] Ex. P110, MIT 2009 Form 5500.

[513] Ex. P111, MIT 2016 Form 5500.

[514] Doc. 207-17, Schmidt Expert Report, ¶¶28-33; *see also* Ex. P112, *2013 Recordkeeping Survey – Industry Snapshot*, PlanSponsor (June 2013), https://www.plansponsor.com/research/2013-recordkeeping-survey/2/ (noting only 631 of 804,670 plans had over $1 billion in assets); Ex. P113, *2016 Recordkeeping Survey – Industry Snapshot*, PlanSponsor (June 2016), https://www.plansponsor.com/research/2013-recordkeeping-survey/2/ (noting only 788 of 836,644 plans had over $1 billion in assets).

[515] *See infra* ¶¶122-126.

122.    Accepted fiduciary processes include identifying and avoiding conflicts of interest to ensure the decision process is unbiased.[516]

123.    In 2009, Mercer told MIT and the POC that the Plan was paying Fidelity a total of $6,074,402.53 in revenue, $3,132,940.96 (more than half) of which was paid to Fidelity's Personal and Workplace Investing (PWI) department for recordkeeping fees.[517] Mercer compared the recordkeeping amount, which approximated $189 per-participant, to the market rate at that time of $50 to $125.[518] MIT understood that the Plan was paying Fidelity for recordkeeping services through intercompany transfers. MIT agreed with Mercer and understood that the amounts paid to Fidelity by the Plan was high."[519] Fidelity accounted for these intercompany payments from each fund, commonly referred to as revenue sharing, in the Plan in a spreadsheet sent to MIT and Mercer on a quarterly basis and referred to as fee transparencies.[520]

124.    Abigail Johnson headed Fidelity's PWI in 2009, later becoming Fidelity's President and Chief Executive Officer.[521]

125.    Mercer recommended that Defendants negotiate a fee schedule and service contract with Fidelity that included:

- Revenue cap based on the number of participants in the Plan;
- An ERISA expense budget that captures any excess revenue from the Plan's investments that is used to pay other Plan expenses;
- Performance guarantees with fees at risk; and
- Contractual requirements to disclose all sources of revenue.[522]

---

[516] Ex. P69, Mercer Presentation Understanding Fiduciary Responsibility at 40-41; Ex. P66, at 1-6; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26.
[517] Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 4-15.
[518] Ex. P11, June 11, 2009 Mtg. Min. Comp. at 15-16.
[519] Id. at 16; Ex. P78, Delivorias Dep. 27:10-22 ("intercompany transfer relates to crediting revenue internally between two divisions of a company, in this case asset management or investment management and recordkeeping").
[520] Ex. P.34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 5-15.
[521] Ex. P35, Email Harrington to Samuelson; Ex. P37, MIT Corporation Members *available at* https://corporation.mit.edu/all-members/abigail-p-johnson.
[522] Ex. P.34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 19.

126.     Mercer provided the Plan's fiduciaries with materials outlining the reasons to conduct competitive bidding and the projected timeline for Delivorias' competitive evaluations and subsequent negotiations of the Plan's recordkeeping fees through a blind RFI and subsequent RFP.[523] Mercer noted that "plan sponsors have a fiduciary responsibility to monitor plan fees and services to ensure the vendor's revenue derived from plan assets is commensurate with the level of services provided" and that "[f]iduciaries are required to demonstrate continued due diligence around the total scope of services to ensure excess revenue is benefiting participants rather than the service provider."[524] Mercer proposed three alternatives, one of which was to "[d]raft [a] comprehensive RFP, sent to (5) vendors, analyze responses, present findings and conduct finalist presentations and site visits."[525] The RFP was projected to take "minimum 9 weeks," result in "utiliz[ing] pricing from real-time market bids to negotiate [a] more favorable fee schedule and contract with Fidelity" with the advantage of using the RFP as "leverage for negotiations with Fidelity and evaluation of Fidelity against peers," and cost "$75,000."[526]

127.     In response to Mercer's presentation on excessive recordkeeping fees, Theresa Stone, MIT's EVP&T and Chair of the POC, reminded those present that:

> MIT must be sensitive to two facts: (1) the Institute's 'decades long plus' relationship with Fidelity and (2) **Ms. Abigail P. Johnson** is a member of both the **MIT Corporation** and **MITIMCo's Board of Trustees**. She is Chair of the Board that oversees Fidelity's 161 fixed income and asset allocation funds which handle about $650 billion of the more than $1.2 trillion managed by Fidelity.[527]

128.     Stone served on the MIT Corporation's Board of Trustees for several decades and is currently a life trustee.[528] While on the MIT Corporation's Board of Trustees, Stone created

---

[523] Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 16-18.
[524] *Id.* at 17.
[525] *Id.* at 19-21; Ex. P78, Delivorias Dep. 44:15-49:15 (discussing proposal).
[526] *Id.*
[527] Ex. P11, June 11, 2009 Mtg. Min. Comp. at 16 (emphasis added).
[528] Ex. P3, Stone Dep. 10:10-11:21; Ex. P36, MIT Corporation Members *available at* https://corporation.mit.edu/all-members/theresa-m-stone.

MIT Investment Management Company ("MITIMCo") and served as chair of MITIMCo's Board of Trustees.[529] Johnson was appointed to MITIMCo's Board of Trustees.[530] Stone and Johnson served together on both MIT and MITIMCo's Board of Trustees.[531] Stone described Abigail Johnson as "an *honored* member of the board and the community in which we operated."[532]

129.     POC members, appointed by Stone, understood that Abigail Johnson was CEO of Fidelity and an MIT donor.[533] Stone admitted that factors unrelated to the Plan, such as Abigail Johnson's membership on MITIMCo's Board of Trustees, were part of the process to evaluate recordkeeping fees and proprietary Fidelity investments. [534]

130.     After an event at Boston's Museum of Fine Arts (MFA), Stone had a follow-up meeting with Kathy Murphy, the President of Personal Investing at Fidelity who reported to Abigail Johnson, who had sat with Stone at the MFA event.[535]

131.     Fidelity personnel made sure to specifically note to MIT personnel any change in Abigail Johnson's role at MIT.[536]

132.     MIT employees, who served as day to day operation staff for the 401(k) plan, also frequently attended conferences sponsored by Fidelity.[537]

133.     According to former Fidelity executive, Michael Howard, recordkeeping was a profitable division for Fidelity and the profit margin varied from client to client due to factors

---

[529] Ex. P3, Stone Dep. 12:5-18; 120:22-121:3.
[530] Ex. P11, June 11, 2009 Mtg. Min. Comp. at 15.
[531] Ex. P3, Stone Dep. 120:22–121:8.
[532] *Id.* at 123:21–124:1.
[533] Ex. P10, Kelly Dep. 97:4-21.
[534] Ex. P3, Stone Dep. 121:9-122:24.
[535] Ex. P40, Email Stone to Ragnoni.
[536] Ex. P35, May 11, 2010 Email Harrington to Samuelson.
[537] Ex. P114, Email Samuelson to Harrington.

such as size of the plan and specific product choices in the plan.[538] In assessing the profitability of a client relationship, Fidelity took into consideration the amount of IRA rollovers, average account balances, how many people would be entering the plan every year and how many people would be leaving the plan every year and how that would impact cash flows and revenue.[539] The more Fidelity proprietary funds that were in a defined contribution plan, including Fidelity's proprietary target date funds, the more revenue Fidelity received.[540] MIT's Plan characteristics made it a highly profitable plan for Fidelity: (i) from 2010 until July 2015 MIT had over 300 Fidelity proprietary products in the Plan; (ii) since the start of the class period, the Plan's average account balance was four times higher than Fidelity's other clients;[541] and (iii) the number of participants in MIT's Plan was over three times higher than Fidelity's other clients.[542]

134.   As a result, the Plan paid Fidelity between $8 million and $11 million every year during the early part of the class period.[543]

135.   Around the same time Defendants failed to negotiate with Fidelity regarding the Plan's excessive recordkeeping fees, the Plan's new legal counsel, Groom Law Group, advised them that the unmonitored group of designated investment alternatives in the Plan known as the "Investment Window" must be monitored to comply with their fiduciary duties.[544]

136.   ███████████████████████████████████.[545] As early as January 12, 2010, Groom advised MIT that the internally designated Investment Window Funds needed to be

---

[538] Ex. P1, Howard Dep. 32:9-34:21; *Id*. at 32:9-34:21.
[539] *Id*. at 48:9-55:18.
[540] *Id*. at 44:2-18; 57:10-23.
[541] Ex. P11, December 17, 2010 Mtg. Min. Comp. at 74; Doc. 208-04, May 31, 2012 Investment Trends Presentation at 4.
[542] Ex. P1, Howard Dep. 44:2-18; 57:10-23.
[543] Ex. P87, 2011-2013 Fidelity Fee Transparency Comp. at 6, 15, 25, 34.
[544] *See infra* ¶¶134–177.
[545] ████████████████████████████████████

monitored the same way MIT monitored internally designated Lifecycle Funds and Asset Class Funds.[546]

137.     In March 2010, Groom attended an MIT fiduciary committee meeting and again opined that MIT must monitor all designated investment alternatives in the Plan, regardless of internal characterization.[547]

138.     In a discussion related to the investment window, Fidelity informed Defendants (through Mercer) in March 2010 that "the investment window contributes significantly to the revenue generated by the plan and any changes to the window will effect that arrangement."[548] MIT was cognizant regarding how changes to the investment window would affect recordkeeping fees.[549]

139.     By May 2010, the POC noted that there was "fiduciary responsibility for the Investment Window vs. no fiduciary responsibility for BrokerageLink."[550] Groom expressed a "high level of discomfort" with the investment window.[551]

140.     Fidelity representative John Harrington attended the May 2010 POC meeting, where POC members started asking him questions about the "Investment Window."[552]

141.     The next month, on June 14, 2010, John Ragnoni, the Executive Vice President of Fidelity's Tax-Exempt 403(b) Market, and Theresa Stone, attended game 5 of the NBA Finals together and discussed Abigail Johnson.[553] Ragnoni specifically noted in the email to Stone that

[546] Ex. P7, Ruiz Dep. 65:2-21; Ex. P95, May 20, 2010 Investment Window Discussion.
[547] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 40-41.
[548] Ex. P100, Email Matthews to Carroll at 2.
[549] Ex. P90, Emails Samuelson to Matthews at 2 ("Is there an impact on record-keeping fees if the investment window no longer exists").
[550] Ex. P11, May 10, 2010 Mtg. Min. Comp. at 45-46; Ex. P95, May 20, 2010 Investment Window Discussion.
[551] Ex. P11, Mtg. Min Comp. at 46.
[552] Ex. P11, Mtg. Min. Comp. at 43-45.
[553] Ex. P85, Email Ragnoni to Stone; *Celtics Handle Kobe Onslaught And Lead LA 3-2*, June 14, 2010 *available at* https://www.wbur.org/news/2010/06/14/nba-finals-2.

he "told Abby we had a good outing."[554] Stone accepting sporting event tickets from a vendor violated MIT's Policy on gifts.[555]

142.    On June 16, 2010, the Plan Oversight Subcommittee noted that they were not relieved from the "responsibility to select and monitor plan investment alternatives under ERISA, especially 'designated investment alternatives' (DIA)." MIT immediately recognized that Groom was "extremely knowledgeable[,]"[556] and that the "quality and depth of [Groom] surpassed [Rope & Gray]."[557]

143.    By July 2010, Fidelity directly informed MIT that the "[m]igration of all current investment window assets to the brokerage link would result in a significant revenue loss for Fidelity . . . ."[558]

144.    Fidelity advised MIT that if the options in the "Investment Window" were moved to brokerage link there would need to be a discussion between "leadership from Fidelity and MIT."[559]

145.    After MIT was informed that removing investments in the "Investment Window" would result in a significant revenue lost to Fidelity, necessitating a discussion between senior leadership at both organizations, MIT stopped all discussion. MIT superficially considered monitoring the hundreds of funds within the investment window, but did not move forward, leaving hundreds of unmonitored designated investment options in the Plan.[560]

---

[554] Ex. P85, Email Ragnoni to Stone.
[555] Ex. P14, 7.9—Procurement Policy on Gifts and Gratuities, (*available at* https://policies.mit.edu/policies-procedures/70-general-employment-policies/79-procurement-policy-gifts-and-gratuities) ("Institute policy *prohibits Institute employees from accepting personal gifts or gratuities of any kind* from suppliers. This includes the use of property or facilities, gift certificates, *entertainment*, or other favors of value extended to employees or their families.") (emphasis added).
[556] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 41.
[557] Ex. P11, May 10, 2010 Mtg. Min. Comp. at 46.
[558] Ex. P32, Email Harrington to Samuelson at 1; Ex. P11, November 10, 2010 Mtg. Min. Comp. at 68.
[559] *Id.*
[560] Ex. P11, November 22, 2010 Mtg. Min. Comp. at 69-70 (no further mention of proposals or any action taken).

146. In late 2010, MIT sought competitive bids from three separate advisors for evaluating all designated investment alternatives in the Plan.[561] One of the advisors noted that approximately 60 designated investment alternatives that MIT was not monitoring were underperforming.[562] MIT ultimately did nothing. Stone testified that "we weren't curating the investment window" even though outside counsel told MIT it was their fiduciary duty to do so.[563]

147. At the same time, outside of MIT, Stone was a Trustee of the Museum of Fine Arts ("MFA") in Boston, which was supported by high-level Fidelity employees, including Abigail Johnson's family.[564] The Plan was a topic of conversation during social events related to the MFA in January 2011.[565] Stone praised Fidelity when she spoke to John Ragnoni, the Executive Vice President of Fidelity's Tax-Exempt 403(b) Market: "We know how much Fidelity has meant to the success of the Wing, so it was special to experience and enjoy the achievement of the MFA with you, your colleagues and your good customers. You are fortunate to be part of such a high quality organization; and we are fortunate to be your partner."[566] Fidelity's Ragnoni responded to Stone: "As a trustee, I'm sure you are quite proud of what has been accomplished at the museum and it was wonderful to have the Johnson family have a chance to share it with so many of our valued clients. I am looking forward to seeing you next week *to discuss some of our ideas around plan sponsor retirement income dynamics*."[567] Between 2007 and January 2011, Fidelity donated over $32 million to the MFA.[568]

[561] Exs. P50-52.
[562] Ex. P51, Fiduciary Investment Advisors Proposal at 9.
[563] Ex. P3, Stone Dep. 83:23-84:9; 126:5-20.
[564] Ex. P40, Email Stone to Ragnoni.
[565] *Id*. at 2.
[566] *Id*.
[567] *Id*. (emphasis added).
[568] 2007 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2008_12_EO%2F22-3195349_990_200712; 2008 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2010_01_EO%2F22-3195349_990_200812; 2009

148. Only a few months after MIT decided to maintain the status quo against the advice of consultants and counsel, Fidelity offered MIT a "reimbursement process," which would reimburse MIT for expenses it was paying, like Pricewaterhouse Cooper's invoices.[569]

149. In 2011, with industry wide recordkeeping costs continuing to rapidly decline,[570] Fidelity offered MIT a $100,000 expense reimbursement credit.[571] However, MIT did not utilize any of the $100,000 credit and simply let it expire.[572]

150.



Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2010_12_EO%2F22-3195349_990_200912; 2010 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2011_12_EO%2F22-3195349_990_201012.

[569] Ex. P59, Email Samuelson to Harrington; Ex. P60, 2011 Form 5500; Ex. P61, Email Samuelson to Harrington.
[570] Doc. 207-17, Schmidt Expert Report, ¶40.
[571] Ex. P63, Email Harrington Davies.
[572] *Id.*
[573] Ex. P65, Email Davies to Ratigan.
[574] Ex. P21, Ratigan Dep. 43:17-49:22; Ex. P91, Email Chused to Ratigan.
[575] Ex. P27, Email Davies to Chused at 1.

153. ███████████████████████████████████████████████████████

███████████████████████████████████

154.     In 2011, after setting aside outside counsel's advice to monitor all of the designated investment alternatives in the Plan, MIT continued its practice of permitting all Fidelity funds, in existence now or in the future, to be designated investment alternatives.[577] MIT did this without any review or any process to determine whether the designated investment alternative was appropriate for the Plan.[578]

155.     By 2012, Mercer and Fidelity both informed MIT that a group of unmonitored designated investment alternatives was an uncommon and an inappropriate outlier among 401(k) plans.[579] In February 2012, Groom continued to counsel that MIT had an "ongoing fiduciary obligation to monitor the investment window funds…."[580] In May 2012, Mercer told MIT that "as part of its fiduciary responsibility, [MIT] needs to monitor each and every investment fund that is not in the Brokerage Window and should consider the costs and efforts to adequately perform the reviews."[581]

156.     In October 2012, MIT again rejected Mercer's recommendations to complete a competitive bidding process Mercer had recommended since at least 2009.[582]

---

[576] *Id.*
[577] Ex. P5, Recordkeeping Agreement Comp. at 53; Ex. P7, Ruiz Dep. 48:20-51:3; Ex. P8, Email from Dean; Ex. P9, Proposed Investment Lineup Changes at 2.
[578] *Id.*
[579] Ex. P11, March 30, 2010 Mtg. Min. Comp. at 41 ("When Ms. Stone asked if MIT is the only plan sponsor to offer hundreds of investments through its platform, [Mercer] responded that beginning in 2002, plans narrowed their investment offerings."); Ex. P11, April 30, 2012 Mtg. Min. Comp. at 136 (Fidelity's representative "mentioned that only a few Fidelity clients have both a mutual fund window and the brokerage link and that this structure is no longer offered to new clients."); Doc. 207-11, Dominguez Expert Rebuttal Report, ¶¶20, 28–35, 45.
[580] Ex. P6, Email Lofgren to Chused.
[581] Ex. P11, September 27, 2012 Mtg. Min. Comp. at 141.
[582] Ex. P78, Delivorias Dep. 97:20-98:15.

157.     Mercer's standard recommendation that requires competitive bidding to evaluate fees. Liana Magner, Mercer's lead consultant for the Plan, testified that Mercer's standard practice of benchmarking recordkeeping fees was to conduct competitive bidding first through "a blind RFI"[583] which may result in an RFP depending on the outcome of the project.[584]

158.     MIT's corporate representative testified that MIT's understanding was that Mercer arrived at a determination of reasonable recordkeeping fees by "looking at their universe of clients and thinking about how much plans of similar size and scope to the MIT one - what would - clients would be paying for recordkeeping" and that this only included Mercer clients.[585]

159.     Both of Mercer's investment advisors testified that Mercer has never maintained a database of recordkeeping prices paid by its clients.[586] Mercer also did not use a database for recordkeeping fee benchmarking.[587]

160.     Delivorias testified that competitive bidding would assist a plan sponsor in negotiating fees with their incumbent, and that without conducting a benchmarking study, she would not know whether the incumbent's fees, such as Fidelity, were in line with other vendors' fees.[588] In addition, Delivorias testified that if Mercer conducted a vendor search it would create leverage because Fidelity would have known a search of its competitors was underway, "because they also get to present to the committee. So … they, like any incumbent, know that it's out on the street. So I think that's important."[589]

161.     Without the initiation of any competitive process, Fidelity unilaterally offered MIT a new pricing model based on the number of Plan participants. Fidelity first proposed a base

---

[583] Ex. P12, Magner Dep. 33:14-20.
[584] *Id*. at 36:9-13.
[585] Ex. P7, Ruiz Dep. 161:3-20.
[586] Ex. P12, Magner Dep. 32:4-7; Ex. P78, Delivorias Dep. 66:5-8; 67:2-8.
[587] Ex. P12, Magner Dep. 32:4-7; 36:14-16.
[588] Ex. P78, Delivorias Dep. 29:7-13, 30:16-32:11; 45:18-47:3.
[589] *Id*. at 48:13-49:15.

recordkeeping fee of $24 per participant if MIT made no changes to the Plan's investments and included no addition or subtraction of services.[590] Fidelity offered a second quote of $39 per participant if MIT went to an open architecture platform [*i.e.* streamlined] but otherwise did not add to or remove from the services already being provided to MIT.[591]  Both proposals assumed an additional $14 over the base for participant transactions/loans fees ($3), custom funds and comingled pools ($12), and the on-site Fidelity representative ($9), totaling $53 per participant for an open architecture structure or $38 per participants if MIT kept all of Fidelity's proprietary products.[592]

162.    It was feasible for MIT to conduct this type of communication with Fidelity and significantly reduce its recordkeeping fees at the start of (or before) the class period.[593]

163.    Rather than accept Fidelity's offer which would benefit Plan participants with an average of 80% reduction in fees, MIT said no.[594] In 2013, MIT accepted a $3 million donation from Fidelity.[595]

164.    In March 2014, the committee was considering candidates to provide passive index funds for the Plan.[596] Howard informed Ruiz that Fidelity was a weak candidate to provide passive index funds. After this discussion, Ruiz directed Howard to stop all work on an index fund provider until Abigail Johnson's term as Chair of the MIT Sloan School of Management

---

[590] Ex. P84, Email Maglieri to Delivorias.
[591] *Id.*
[592] *Id.*
[593] Ex. P11, June 11, 2009 Mtg. Min. Comp. at 15.
[594] Fidelity's offer of $33 per participant is $135 (80%) less than what the Plan paid for 2013, $168. Doc. 209-01 at 102 (Ex. 3).
[595] 2013 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2014_10_EO%2F22-3195349_990_201312.
[596] Ex. P74, Email Howard to Ruiz.

Visiting Committee ended.[597] Howard, a former Fidelity Vice President in the Institutional Retirement division, responded to Ruiz and informed him that Fidelity only "really care[s] about being the record keeper."[598] MIT instructed Mercer to "take no action on the passive manager search until they hear from [MIT] otherwise."[599] Ruiz needed to discuss these issues with John Reed, Chairman of MIT and Rafael Reif, President of MIT.

165.    Ruiz took all possible steps to keep all Fidelity proprietary funds in the Plan.[600] Ratigan reminded Ruiz that Groom has told MIT multiple times that MIT has a fiduciary duty to monitor all funds in the Plan.[601] Groom again orally informed MIT in March 2014 that all investments in the Plan were designated investment alternatives.[602] At MIT's request, Groom again advised MIT that all investments in the Plan were designated investment alternatives for purposes of ERISA.[603]

166.    Knowing Fidelity's only concern is maintaining its recordkeeping status, MIT finally accepted Fidelity's 2012 offer on October 1, 2014, setting the annual participant recordkeeping fee at $33 per participant per year.[604]

167.    After determining there was no way to keep all of Fidelity's proprietary products in the Plan, Ratigan wrote to Ruiz, inquiring whether Abigail Johnson or other senior Fidelity leadership should be notified of MIT's discussions regarding potentially eliminating imprudent Fidelity funds and that MIT should avoid "any appearance of Fidelity's exerting influence over

---

[597] *Id.* ("On the Fidelity front, is it a well-known fact that they do not play in passive funds? I have not yet raised the topic with John and Rafael. I wanted to wait for the Sloan Visiting Committee chaired by her (she attended) [Abigail Johnson] and then think about what to do."); Ex. P1, Howard Dep. 24:15-19, 135:23-146:7.
[598] Ex. P74, Email Howard to Ruiz.
[599] Ex. P19, Email Davies to Chused.
[600] *Id.*
[601] *Id.*; Ex. P47, Jan. 13, 2010 Memorandum to File at 6-7.
[602] Ex. P19, Email Davies to Chused.
[603] Ex. P15, Groom Law Group Memorandum.
[604] Ex. P4, Trust Agreement Comp. at 6.

122

our fund selection process."[605] Ruiz confirmed this in an e-mail stating "Abby Johnson has been named CEO, I am sure we will want to also touch base with her from MIT's point of view."[606]

168.    Only after reassurances that Fidelity is most interested in recordkeeping and after clearing it at the highest levels at MIT did MIT finally remove the unmonitored investments from the Plan.[607]

169.    Effective October 1, 2015, nearly three years after receiving the $53 quote from Fidelity, MIT signed a new agreement with Fidelity setting the annual per participant recordkeeping fee at the never negotiated $52 per participant open architecture price.[608] There was no change in the level of services Fidelity provided to MIT.[609]

170.    In 2015, David Schmittlein, MIT's Dean of the Sloan School of Management where Abigail Johnson served Chair of the MIT Sloan School of Management Visiting Committee, wrote to Ruiz that "if we are not switching to Vanguard or TIAA-CREF, I am going to expect something big and good coming to MIT from the Johnson family."[610]

171.    Fidelity delivered for MIT "something big and good" - a $5 million donation, which was Fidelity's largest donation in over 15 years.[611] Since Fidelity became MIT's recordkeeper, MIT leveraged Fidelity's revenue stream from the Plan to secure over $23 million in donations from the Fidelity Foundation, including $3 million in 2009.[612]

---

[605] Ex. P76, October 14, 2014 Email Ratigan to Ruiz; Ex. P11, February 25, 2014 Mtg. Min. Comp. at 173.
[606] *Id.*
[607] Doc 208-5.
[608] Ex. P4, Trust Agreement Comp. at 101.
[609] Ex. P92, Email Harrington to Davies.
[610] Ex. P77, Email Schmittlein to Ruiz.
[611] 2016 Fidelity Non-Profit Management Foundation IRS Form 990, *available at*
http://990s.foundationcenter.org/990_pdf_archive/223/223195349/223195349_201612_990.pdf.
[612] 2001 Fidelity Non-Profit Management Foundation IRS Form 990, *available at*
https://projects.propublica.org/nonprofits/display_990/223195349/2002_07_EO%2F22-3195349_990_200112; 2002
Fidelity Non-Profit Management Foundation IRS Form 990, *available at*
https://projects.propublica.org/nonprofits/display_990/223195349/2003_11_EO%2F22-3195349_990_200212; 2003
Fidelity Non-Profit Management Foundation IRS Form 990, *available at*
https://projects.propublica.org/nonprofits/display_990/223195349/2004_12_EO%2F22-3195349_990_200312; 2004

172.    To this day, MIT has never required Fidelity to compete on the Plan's services.

## III. MIT Caused the Plan to Pay Unreasonable Recordkeeping Fees

### A.    Industry Accepted Practices Related to Defined Contribution Recordkeeping Services and Fees

#### 1.    Industry accepted practice requires competitive bidding for recordkeeping services and fees every three to five years

173.    There has been significant downward fee pressure for defined contribution plan recordkeeping services since the early 2000s and continuing through the class period.[613] Consultants routinely assist plan fiduciaries in evaluating fees and with competitive requests for proposals (RFPs).[614] Based on their knowledge in the industry and review of the unique characteristics of the particular plan, consultants have created processes for assisting clients, managing service provider relationships, and conducting searches.[615]

---

Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2005_12_EO%2F22-3195349_990_200412; 2005 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2007_02_EO%2F22-3195349_990_200512; 2006 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2008_01_EO%2F22-3195349_990_200612; 2007 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/46131201/2008_11_PF%2F04-6131201_990PF_200712https://projects.propublica.org/nonprofits/display_990/223195349/2008_12_EO%2F22-3195349_990_200712; 2008 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2010_01_EO%2F22-3195349_990_200812; 2009 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2010_12_EO%2F22-3195349_990_200912; 2010 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2011_12_EO%2F22-3195349_990_201012; 2011 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2012_12_EO%2F22-3195349_990_201112; 2012 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2014_01_EO%2F22-3195349_990_201212; 2013 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2014_10_EO%2F22-3195349_990_201312; 2014 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2015_09_EO%2F22-3195349_990_201412; 2015 Fidelity Non-Profit Management Foundation IRS Form 990, *available at* https://projects.propublica.org/nonprofits/display_990/223195349/2016_09_EO%2F22-3195349_990_201512.
[613] Doc. 207-17, Schmidt Expert Report ¶40; Ex. P62, Email Delivorias to Walker.
[614] Doc. 207-17, Schmidt Expert Report ¶41.
[615] *Id.*

174.    The most accurate measure in assessing the reasonableness of a particular defined contribution plan's recordkeeping fees is through an RFP.[616] An RFP is the only way a plan fiduciary can determine with certainty how the market will price a particular plan for administrative services.[617] An RFP performed by the plan fiduciaries allows service providers to bid their most competitive proposal to perform the solicited recordkeeping services.[618] It also sends a clear message to bidders that their services are part of a competitive process, thus creating competitive pressure.[619] Comparing a plan's recordkeeping fees to the fees of other plans based on survey data or publicly available information does not provide accurate information on the reasonableness of a particular plan's fees because of variances in a plan's size, complexity and required level of service.[620]

175.    RFPs contain detailed information about the Plan and request detailed information about the respondent, including recordkeeping capabilities and administrative services, organizational strength, commitment to the recordkeeping business, conversion services, quality standards, technology capabilities, investments, trust capabilities, liability coverage for errors in service delivery, and fees proposed for the services.[621]

176.    Plan fiduciaries and consultants use this information to understand and negotiate with service providers.[622] The diligent use of these competitive processes guarantees that the Plan receives the most competitive fees for recordkeeping services.[623]

---

[616] *Id.* ¶74.
[617] *Id.*
[618] *Id.* ¶75
[619] *Id.*
[620] Ex. P67, DC Fee Management at 4.
[621] Doc. 207-17, Schmidt Expert Report ¶43.
[622] *Id.* ¶45.
[623] *Id.*

177.     Prior to the class period and continuing to today, widespread accepted industry practice in the defined contribution marketplace is to conduct a competitive bidding process for recordkeeping and administrative services, through a request for proposal, every 3 to 5 years.[624]

178.     In 2010 proposed regulations, the Department of Labor specifically noted "plans normally conduct requests for proposal (RFPs) from service providers at least once every three to five years."[625] Numerous industry publications also recommended that a plan sponsor conduct an RFP every three to five years throughout the relevant period.[626]

179.     Additionally, Mercer repeatedly recommended that the Defendants access the reasonableness of the Plan's recordkeeping fee through competitive bidding—a RFP or request for information (RFI).[627]

180.     It was also MIT's policy to conduct RFPs when its own money was at stake rather than the participants' retirement savings.[628] MIT has a specialized team who assists the university in making purchases that comply with various federal and sponsor requirements.[629]

> Just as you wouldn't buy a car without comparing vehicles, dealers, and prices, you wouldn't want to buy goods and services for MIT without research and analysis. VPF's [Vice-President of Finance's] Strategic Sourcing team works closely with DLCs [Departments, labs, and centers] for this essential work, ensuring that purchases for goods and services-from lab coats to web developers-result in

---

[624] *Id.*

[625] Reasonable Contract or Arrangement Under Section 408(b)(2) — Fee Disclosure, 75 FR 41600, 41625 (July 16, 2010).

[626] Doc. 207-17, Schmidt Expert Report, ¶¶82-85 (citing *Including Regular RFPs as Part of a Fiduciary Liability Reduction Strategy*, NAPA Net (January 24, 2018), https://www.napa-net.org/news/technical-competence/case-of-the-week/including-regular-rfpspart- fiduciary-liability-reduction-strategy/.; *Selecting Service Providers, Competitive Bidding, & RFP's Importance in a Fiduciary Investment Process*, InHub (May 18, 2015), https://d1yoaun8syyxxt.cloudfront.net/br189-76a8e37a-950c-41a0-b246-47bb6162f4a4-v2; *Recordkeeper Search Activity Expected to Increase Within Next Two Years*, Cerulli Assoc. (January 8, 2013), http://www.401khelpcenter.com/press_2013/pr_cerulli_010813.html#.Wt5hIS7wY3E).

[627] Ex. P34, June 11, 2009 Plan Oversight Subcommittee Meeting Materials at 19-22; Ex. P78. Delivorias Dep. 29:7–31:19, 45:18–47:3, 48:13–49:15; Ex. P12, Magner Dep. 33:14–20, 35:16–36:13.

[628] Ex. P101, Fogg Dep. 38:23-39:21.

[629] Ex. P13, Strategic Sourcing Team.

competitive prices that leverage MIT's buying power, and terms that provide optimal service and protect MIT's interests.[630]

### 2. Industry accepted practice is to negotiate and evaluate recordkeeping fees on a per-participant basis.

181. There are generally two primary methods by which the recordkeeping and administrative fees for a plan are assessed: asset-based fees (hidden transfers of fees between investment managers and recordkeepers) and transparent, direct fees based on the number of accounts.[631]

182. Plan fiduciaries for large defined contribution plans understand that the accepted industry practice is to negotiate recordkeeping fees based on a per-participant cap.[632] This approach, unlike an asset-based or bundled model, provides fee transparency.[633] This transparency has been the standard for large defined contribution plans since the late 1990s.[634] Plan fiduciaries then decide how to allocate the fixed fee paid to the Plan's recordkeeper, using a fixed fee for each Plan participant or a pro-rata allocation based on the amount invested in the Plan.[635] The allocation of Plan-wide fees to participants is a separate fiduciary issue from the negotiation of fees paid to a Plan service provider.[636]

183. The dollar value of a Plan participant's account bears no relation to the cost of recordkeeping services.[637] From the recordkeeper's perspective, it costs the same to account for a participant with a $100,000 balance as it does to account for a participant with a $50 balance.[638]

---

[630] P13, VPF Strategic Sourcing Team (available at https://vpf.mit.edu/about-vpf/business-units/strategic-sourcing-and-contracts/strategic-sourcing).t
[631] Doc. 207-17, Schmidt Expert Report, ¶¶47–52.
[632] *Id.* ¶¶ 53-55; Ex. P67, DC Fee Management at 3.
[633] *Id.*
[634] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26.
[635] Ex. P107, Schmidt Dep. 64:3-65:4
[636] *Id.* at 65:5-67:21.
[637] Doc. 207-17, Schmidt Expert Report ¶¶23, 26, 29; Ex. P67, DC Fee Management at 3.
[638] Ex. P67, DC Fee Management at 3.

Utilizing a pricing model that is dependent on the value of an account balance arbitrarily builds in fee increases because the participant makes ongoing contributions that are not linked to the level or quality of the recordkeeper's services.[639]

184.    Prior to the start of the class period, Defendants' expert, Steven Gissiner, was informing clients and potential clients of the perils of uncapped, asset-based fees.[640] Gissiner advised clients and potential clients that they must "peel the onion" and evaluate investment management, recordkeeping and other fees separately.[641]

185.    Mercer agrees that per-participant pricing is the industry standard for large defined contribution plans.[642]

186.    Fidelity offered pricing for recordkeeping on a per-participant basis as early as 1996.[643]

187.    The amount of assets itself in a plan would not be a significant determining factor in the cost to Fidelity to provide recordkeeping services.[644]

### 3.    Defendants never conducted competitive bidding for the Plan's recordkeeping despite begin advised repeatedly to do so

188.    Despite knowing that the Plan was paying excessive recordkeeping fees to Fidelity, MIT did nothing. MIT ignored the Plan's consultant who repeated recommended MIT obtain competitive bids for the Plan's recordkeeping services.[645] MIT ignored its own policies requiring competitive bids from service providers.[646] MIT ignored all of these things in an effort

---

[639] *Id.*
[640] Ex. P53, Gissiner Dep. 15:6-16:16; Ex. P53, Gissiner, et al., *Are You Being Overcharged for Your Retirement Plan? Most Plan Sponsors Are!* (Nov. 8, 2007) at 10-11.
[641] *Id.* at 15.
[642] *Id.*
[643] Ex. P1, Howard Dep. 37:8-13.
[644] *Id.* at 34:22-35:8.
[645] *See supra* ¶¶ 123, 125, 126, 155-160.
[646] *See supra* ¶141.

to appease an important board member and supporter of MIT, Fidelity's CEO Abagail Johnson.[647]

189.    Despite Mercer's repeated recommendations, MIT has never conducted an RFP,[648] an RFI,[649] or a benchmarking study to evaluate recordkeeping services.[650]

190.    MIT's failure to conduct an RFP did not adhere to industry standards.[651]

191.    Further, MIT has never investigated the economics of how Fidelity's services are delivered or negotiated additional services.[652] MIT has never investigated whether other recordkeepers exist who could provide recordkeeping services to MIT.[653] Had MIT investigated alternatives to Fidelity, MIT would have discovered multiple recordkeepers with the ability to service a plan similar in size to the Plan.[654]

192.    MIT took a completely different approach to programs that were not managed by Fidelity — such as MIT's defined benefit plan which conducted robust competitive bidding for administrative or other services.[655] The competitive bidding process used for the defined benefit plan's administrative services looked at 4 to 5 vendors.[656] In that context, MIT used a self-described extensive process in which an RFP was prepared to narrow the field, with site visits conducted of the competitors.[657] The RFP sought the typical information such as vendor capabilities, prior experience with similar higher education clients, references, quality

---

[647] *See supra* ¶¶121, 124, 127-132, 141, 147, 164, 166-167, 170-171.
[648] Ex. P3, Stone Dep. 93:24–94:3; Ex. P7, Ruiz Dep. 121:12–122:1, 128:23–129:2, 177:20–178:3.
[649] Ex. P3, Stone Dep. 94:7–99:7; Ex. P7, Ruiz Dep. 178:4–6, 201:11–14.
[650] Ex. P7, Ruiz Dep. 201:11–14; Ex. P10, Kelly Dep. 96:14–18; Ex. P12, Magner Dep. 22:11–14.
[651] Doc. 207-16, Schmidt Expert Report, ¶¶11, 142.
[652] Ex. P7, Ruiz Dep. 122:8-123:18, 128:23-129:19; Ex. P3, Stone Dep. 93:24-101:6, 107:22-108:7.
[653] Ex. P7, Ruiz Dep. 129:20-131:6, 183:2–184:10; Ex. P1, Howard Dep. 148:13–21, 149:13-21.
[654] Doc. 207-17, Schmidt Expert Report, ¶46.
[655] Ex. P21, Ratigan Dep. 7:9-10:1; Ex. P10, Kelly Dep. 25:14-28:11.
[656] Ex. P21, Ratigan Dep. 10:2-24, Ex. P7, Ruiz Dep. 201:11–14; Ex. P12, Magner Dep. 22:13–14.
[657] Ex. P21, Ratigan Dep. 10:2-24.

assurances, information on data integrity processes, fees and evidence the vendor could do the work.[658] Competitive pressure and fee negotiation was a significant part of the process.[659]

193.    In other circumstances where MIT is spending its own money, or dealing with a program that is not administered by Fidelity, MIT routinely conducted robust competitive bidding for services and MIT "absolutely" was "always doing market checks" on other services to make sure the price MIT was paying was reasonable.[660] This was an "ongoing process" for other services overseen by the Director of Benefits outside of Fidelity.[661] In MIT's Director of Benefits' experience with these other services, once a competitive bid was received, there would be room for further fee negotiation at the finalist round.[662] MIT was also familiar with an RFI and its purpose.[663]

194.    In fact, MIT's own purchasing policies require price "competition," "technical evaluation and price evaluation, with clear and robust supporting documentation" for any purchase over $250,000.[664]

**B.    As a Result of Defendants' Imprudent Conduct, the Plan Paid Unreasonable Recordkeeping Fees.**

195.    The Plan paid Fidelity more than double what MIT admits it believed was the market rate for recordkeeping costs from 2010 through 2012.[665] MIT's corporate representative testified that MIT, through Mercer, determined that market rates for Fidelity's recordkeeping

---

[658] *Id*. at 11:1-23
[659] *Id*.
[660] *Id*. 24:2-25:14.
[661] *Id*.
[662] *Id*. 104:8-14.
[663] *Id*. 52:5-53:12.
[664] Ex. P89, *FAQ: Uniform Guidance Procurement Standards*, MIT Office of the Vice President for Finance (July 1, 2018), https://vpf.mit.edu/faqs-uniform-guidance-procurement-standards%E2%80%94effective-july-1-2018; Ex. P101, Fogg Dep. 38:19–39:21.
[665] Ex. P7, Ruiz Dep. 155:2-160:21; 196:3-198:15; Ex. P12, Magner Dep. 42:5-23.

fees in late 2012 were in the mid-50s with all services included, and that this would have also been the market rate for Fidelity's recordkeeping fees from 2010 to 2013.[666]

196.    Even Defendants' expert's analysis, which includes even much smaller plans that are not comparable to MIT, concludes that MIT paid excessive recordkeeping fees in 2010 and 2011.[667]

197.    Plaintiffs' expert, Martin Schmidt, opines that a reasonable recordkeeping fee for the Plan was $43 per participant in 2010 and 2011, $39 from 2012 to 2014, and $37 from 2015 through 2018, based on the Plan's size and complexity.[668]

198.    Mr. Schmidt, has advised plan sponsors on monitoring, pricing and negotiation of recordkeeping fees for over 30 years.[669]

199.    ████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████  ██████████

200.    MIT testified that it believed that Harvard was a comparable plan because it was similar in plan size, location, "similarities of the plan, the benefits and the plan participants, per se" and believed it was "a very good benchmark for our kind of institution."[671] In particular, MIT believed Harvard was a comparable plan "in terms of size and participant offerings" and "in particular Harvard had done the streamlining [in the 2009-2010 time frame] of the lineup [what MIT completed in 2015], so it was a great comparison."[672] Defendants' expert, Steven Gissiner,

[666] Ex. P7, Ruiz Dep. 155:2-160:21; 196:3-198:15.
[667] Doc. 209-1, Gissiner Expert Rebuttal Report ¶¶105, 107, Exhibits 5, 7, Appendix C (Comparator 2, 7; otherwise utilizing plans with less than half of MIT's participant count that are not appropriate comparators).
[668] Doc. 207-17, Schmidt Expert Report, ¶¶145-159.
[669] Doc. 207-17, Schmidt Expert Report, ¶¶4-9, 146.
[670] Ex. P78, Delivorias Dep. 69:1–6, 70:16–71:16, 73:5–23, 75:4–76:13.
[671] Ex. P7, Ruiz Dep. 167:1-8, 167:16-168:2.
[672] *Id*. at 168:19-169:5; *see also* Ex. P11, August 7, 2013 Mtg. Min. Comp. at 163 (requesting staff to ask Harvard for the cost of communicating their investment lineup changes).

determined that Harvard paid $37 per participant per year to Fidelity from 2015-2017.[673] At the same time, MIT contractually agreed to pay Fidelity a $52 per participant per year charge that had never been negotiated.[674]

201.    MIT paid, and continues to pay, unreasonable recordkeeping fees to Fidelity:[675]

| Year | MIT Actual Fee[676] | Plaintiffs' Expert Expected All-In Fee for MIT[677] | | Harvard Streamlined Fidelity Fee From Defendants' Expert Report[679] | MIT's Testimony Regarding Reasonable Fee[680] |
|---|---|---|---|---|---|
| 2010 | $127 | $43 | █████ | No Data | $55 |
| 2011 | $131 | $43 | ████ | No Data | $55 |
| 2012 | $139 | $39 | ████ | No Data | $55 |
| 2013 | $168 | $39 | ████ | No Data | $55 |
| 2014 | $111 | $39 | █████ | No Data | No Data |
| 2015 | $58 | $37 | ████ | $37 | No Data |
| 2016 | $54 | $37 | ████ | $37 | No Data |
| 2017 | $54 | $37 | ████ | $37 | No Data |

202.    Over the class period, MIT's lack of knowledge, care and active decisions to favor Fidelity regarding the Plan's recordkeeping fees caused the Plan a $15,773,686,25 loss.[681]

[673] Doc. 209-1, Gissiner Expert Rebuttal Report, ¶¶105, 107 (Appendix D, n. 3).

[674] Ex. P4, Trust Agreement Comp. at 92.

[675] Doc. 207-17, Schmidt Expert Report, ¶¶11, 145, 159-164; *see also* Doc. 209-1, Gissiner Expert Rebuttal Report ¶¶105, 107, Exhibits 5, 7, Appendix C (Comparator 2, 7; otherwise utilizing plans with less than half of MIT's participant count that are not appropriate comparators); Ex. P7, Ruiz Dep. 167:1-8; Ex. P78, Delivorias Dep. 69:1–6, 70:16–71:16, 73:5–23, 75:4–76:13; Ex. P11, June 11, 2009 Mtg. Min. Comp. at 14-15.

[676] Doc. 207-17, Schmidt Expert Report, ¶107; Doc. 209-01 at 102 (Ex. 3).

[677] *See also,* Doc. 209-1, Gissiner Rebuttal Report at Appendix E, Comparators 1, 4, 7, 9.

[678] Ex. P78, Delivorias Dep. 69:1-6, 70:16-25, 71:1-16, 73:12-23, 75:4-76:13.

[679] Doc. 209-1, Gissiner Expert Rebuttal Report, ¶¶105, 107 (Appendix D, n. 3).

[680] Ex. P7, Ruiz Dep. 155:2-160:21; 196:3-198:15.

[681] Doc. 207-17, Schmidt Expert Report ¶¶145-160, 162 (row 444, column V, row 465, column V).

# IV. Defendants' Imprudence Caused the Plan to Include Imprudent Investment Options

## A. Defendants Made Designated Investment Alternatives Available in the Plan and Brokerage Account Investments Available Outside of the Plan

203. From the beginning of the class period to today, MIT maintains two broad categories of investment choices for Plan participants: (1) designated investment alternatives within the Plan and (2) brokerage account investment options outside of the Plan.[682]

204. From the beginning of the class period to today, once a Plan participant joins the Plan, there were/are no additional barriers to the Plan participant investing in any of the designated investment alternatives.[683] All of the investments (whether MIT internally characterized them as residing in a different Tier) were and are listed as an option on the Plan's website that participants can invest in.[684] Throughout the class period, the display of internal MIT tier grouping and explanation of the designated investment alternatives on the Plan's Fidelity website were very poor.[685]

205. From the beginning of the class period to today, to invest in an option that was not in the Plan (not a designated investment alternative), a Plan participant faces many additional barriers after they joined the Plan.[686] A participant must open a separate brokerage account, agree to additional terms and conditions, agree to arbitration, and move money into the separate brokerage account prior to purchasing investment options.[687] With these barriers to entry, only 2-

---

[682] Ex. P15, Groom Law Group Memorandum; Ex. P16, Email Eller to Chused; Ex. P17, Plan Participant 2012 Disclosure at 2-3, 5-43; Ex. P18, Plan Participant 2013 Disclosure at 7-8; Ex. P19, Email Davies to Chused; Ex. P20, Chused Dep. 62:6-9.
[683] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶32; Ex. P3, Stone Dep. 63:23-66:14.
[684] Ratigan Dep. 20:4-9; Ex. P22, Email Davies to Ellison; Ex. P23, 2014 Screenshot of Website; Ex. P24, 2009 Participant Communication at 32.
[685] Ex. P25, Preliminary Interview Results; Ex. P19, Email Davies to Chused at 3; Ex. P26, Alden Dep. 80:13-82:21, 83:15-22; Ex. P22, Email Davies to Ellison.
[686] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶¶32-33; Ex. P57, Samuelson Dep. 50:23-52:5; Ex. P26, Alden Dep. 100:2-22.
[687] Ex. P3, Stone Dep. 89:6-20; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶33.

3% of plan participants (as measured by assets) generally elect a self-directed brokerage option when it is available.[688] At the start of the class period, only 1% of MIT Plan Participants elected the self-directed brokerage option.[689]

206.     The existence of both designated investment alternatives within the Plan, with no barriers to entry, and BrokerageLink, with barriers to entry, conveys to participants that a sensible fund screening process by "seasoned investment professionals" has taken place for each and every "specific" designated investment alternative.[690] Communications with Plan participants reinforced the perception that MIT monitored all designated investment alternatives in the Plan.[691]

207.     Even though MIT had vetted the DFA Emerging Markets Core Equity Portfolio as best in class for emerging markets,[692] MIT also retained the Templeton Development Markets Trust within the emerging markets asset class as a designated investment alternative in the Plan.[693]

208.     In its 2010 prospectus, the Templeton Development Markets Trust Class A indicated that the fund underperformed its prospectus benchmarks for the 1-, 5-, and 10-year periods, by 17.16%, 6.64% and 3.95% respectively.[694] The Templeton Developing Markets Trust Class A's prospectus benchmark is the same benchmark used by the DFA Emerging Markets Core Equity Portfolio.[695] The Templeton Developing Markets Trust Class A prospectus also

[688] Doc. 207-11, Dominguez Rebuttal Report, ¶32.
[689] Ex. P30, October 20, 2010 Fidelity Presentation at 5.
[690] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶35; *see also* Doc. 208-18; *see also* Ex. P38, 2009 MIT Faculty Newsletter at 1-2.
[691] Ex. P38, 2009 MIT Faculty Newsletter at 1-4.
[692] Ex. P11, August 9, 2011 Mtg. Min. Comp. at 120-121.
[693] Ex. P105, Fund Mapping Document at 16.
[694] Ex. P49, Buetow Corrected Expert Report ¶¶105-106.
[695] Ex. P3, Stone Dep. 71:3-73:7.

indicated that its annual operating fee was 1.90%[696] compared to the DFA Emerging Markets Core Equity Portfolio annual operating fee of 0.65%.[697] The Templeton Developing Markets Trust Class A underperformed its prospectus benchmarks for the 1-, 5- and 10-year periods in the 2009, 2008, 2007 and 2006[698] prospectuses.[699] This is the type of information that a prudent investment professional would review and take action.[700]

209.     The Templeton Developing Markets Trust Class A continued to underperform its prospectus benchmarks for the 1-, 5- and 10-year periods in its 2011, 2012, 2013, 2014 and 2015 prospectuses.[701] MIT did not remove underperforming funds like the Templeton Developing Markets Trust Class A fund from the Investment Window, instead opting to simply list underperforming funds on a website and thereafter failing to perform any additional due diligence on these underperforming funds.[702]

B.     **Industry Accepted Practices Regarding the Retention and Monitoring of Investment Options**

210.     A critical principle of the portfolio management process in defined contribution plans requires monitoring of all investment in the plan and removal of options that are not appropriate for the plan.[703] Investment performance is by far the most dominant factor in fund selection and removal by defined contribution plan fiduciaries.[704] The ongoing performance

---

[696] Ex. P49, Buetow Corrected Expert Report ¶¶105-106.
[697] *Id.*
[698] *Id.*
[699] *Id.*
[700] *Id.*
[701] *Id.*
[702] Ex. P10, Kelly Dep. 66:18-69:13; Ex. P7, Ruiz Dep. 30:16-31:5.
[703] Ex. P49, Buetow Expert Report, ¶¶29-30, 81-84; Ex. P64, at 9, 682-683 ("To monitor something means to systematically keep watch over it to collect information that is relevant to one's purpose."), 718-719 ("A typical fund sponsor would consider its investment program incomplete without a thorough and regular evaluation of the fund's performance relative to its investment objectives."); Ex. P50, Mercer Investment Window Review Proposal at 22-23; Ex. P69, Mercer Presentation Understanding Fiduciary Responsibility at 33, 39, 43; Ex. P51, Fiduciary Investment Advisors Proposal at 9; Ex. P10, Kelly Dep. 17:7-20:15, 24:6-26:5.
[704] Ex. P82, Investment Window Quantitative Screen Proposal; Ex. P90, Email Samuelson to Matthews; Ex. P51, Fiduciary Investment Advisors Proposal at 9, 14, 20-22.

measurement evaluation necessary to properly monitor and evaluate active management must be thorough, objective and disciplined.[705]

211.    Plaintiffs' expert, Dr. Gerald Buetow, and multiple investment management texts utilized in the industry, explain that when an actively managed fund underperforms a proper benchmark for three-years trailing, it is highly unlikely it will outperform in the coming years.[706] Investments should be removed from a defined contribution plan portfolio when the fund underperforms the proper benchmark for a three-year period.[707]

212.    Dr. Buetow has over 25 years of experience applying industry accepted investment management processes.[708] Dr. Buetow has a doctorate in finance and econometrics and has designed and monitored numerous portfolios of investments, including defined contribution plans.[709]

213.    One of the first steps in a define contribution plan's portfolio management process is identifying constraints faced by the fiduciary.[710] In that process, a fiduciary makes a reasoned determination about the constraints in its resources and ability to monitor different types of risk and will avoid risks that the fiduciary is unable to monitor, such as political and regulatory instability, inflationary risks, and currency devaluation risks.[711]

---

[705] Ex. P49, Buetow Corrected Expert Report, ¶ ████████████████████████████████████████████ Ex. P64, at 718-719; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26; Ex. P66, at 1-2, 5-6 103.

[706] Ex. P49, Buetow Corrected Expert Report, ¶38; Ex. P66, at 205; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26; Ex. P64, at 80-82, 205 ("If a manager's performance is below the median for the peer group for a three year period, the statistical odds are that the manager will not be able to improve performance to meet the 40 percent objective within the given five-year period."); Ex. P86, Buetow Dep. 250:22-251:17.

[707] Ex. P49, Buetow Corrected Expert Report, ¶38; Ex. P66, at 116-117; Ex. P64, at 80-82, 116; Ex. P81, Defined Contribution Plan IPS at 10; ████████████████████; *see also* Ex. P12, Magner Dep. 81:6-82:1.

[708] Ex. P49, Buetow Corrected Expert Report, ¶¶5-20.

[709] *Id.*

[710] Ex. P49, Buetow Corrected Expert Report, ¶32; Doc. 210-01, Ex. P44, Wermers Dep. 44:13-47:9; Ex. P73, MIT Investment Monitoring Best Practices at 7.

[711] Ex. P49, Buetow Corrected Expert Report, ¶¶36, 91-100; Ex. P64, Managing Investment Portfolios p. 5; *see also* Ex. P44, Wermers Dep. 44:5-45:17.

214.    During the class period, the standard process for managing defined contribution plans included having a formal written investment policy with formal procedures in place for fund selection.[712] Creating an investment policy statement is the most critical step in the portfolio management process.[713]

215.    When adding actively managed investments to a defined contribution plan, standard fiduciary practice includes engaging in a manager search process to review quantitative and qualitative criteria about the fund, including a consideration of performance, risk (including volatility and diversification), fees, style consistency, manager experience and tenure, and other additional factors selected by the specific fiduciary.[714]

216.    Once a fiduciary determines that an inappropriate designated investment alternative should be removed from a defined contribution plan, it is common fiduciary practice to make mapping decisions based on the circumstances of the plan.[715]

## C.    Defendants Failed to Monitor the Majority of Designated Investment Alternatives in the Plan and Agreed to Include New Fidelity Funds as Designated Investment Alternatives Without Any Vetting

217.    Through the entire class period MIT did not monitor designated investment alternatives that it internally characterized as investment window options,[716] did not have a policy or procedure to monitor all designated investment alternatives,[717] and had no process to remove a designated investment alternative that it characterized as an investment window option.[718] MIT never removed an underperforming Fidelity designated investment alternative from the Plan,

---

[712] Ex. P49, Buetow Expert Report, ¶¶32-36, 46-47; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
[713] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26; Ex. P66, at 106-107.
[714] Ex. P49, Buetow Corrected Expert Report, ¶¶38-43; Ex. P66, at 137-138; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26.
[715] Ex. P54, Ellison Dep. 86:11-87:12; 89:1-18, 97:6-98:22; 100:1-102:12; Ex. P44, Wermers Dep. 97:23-102:21.
[716] Ex. P3, Stone Dep. 74:11-24; Ex. P7, Ruiz Dep. 39:13-40:8.
[717] Ex. P7, Ruiz Dep. 25:13-26:20, 39:14-20.
[718] Ex. P10, Kelly Dep. 68:22-69:1; Ex. P7, Ruiz Dep. 52:23-53:19; Ex. P12, Magner Dep. 82:2-5.

regardless of internal tier characterization, until July 2015.[719] Instead, when Mercer informed MIT that a proprietary Fidelity designated investment alternative that MIT characterized as an asset class option underperformed, MIT simply changed the internal characterization of the underperforming Fidelity designated investment alternative, labeling it an investment window option, leaving the proprietary Fidelity products in the Plan, but discontinuing ongoing monitoring of the option.[720]

218.    In contrast, MIT engaged Mercer to apply the industry standard process for reviewing investments in the Lifecycle Funds and Asset Class Funds and removed imprudent Asset Class Funds when necessary to fulfill MIT's fiduciary duties to monitor and remove imprudent asset class fund investments.[721] On a quarterly basis for these funds only, Mercer performed a fund-by-fund analysis for 3-month, year to date, 1-, 3- and 5-year performance against an index and median peer group; analyzed tracking error for index funds; monitored an analyzed expense ratios; monitored and evaluated investment philosophy, portfolio positioning, sector weighting, key personnel, macroeconomic conditions, and various other qualitative and quantitative measures.[722]

219.    For the funds that MIT internally characterized as not worthy of monitoring or evaluating, MIT simply received a report from Fidelity, who solely provided performance information against unchecked benchmarks.[723] However, Fidelity expressly disclaimed any responsibility "for the selection of investment options under the Trust and [Fidelity] shall not render investment advice to any person in connection with the selection of such options."[724] On a

---

[719] Ex. P11, February 16, 2010 Mtg. Min. Comp. at 37.
[720] Ex. P55, 2011 Mercer Defined Contribution Performance Evaluation at 27; Ex. P56, Summary of 2010 Investment Structure Changes at 34.
[721] Ex. P12, Magner Dep. 74:15-82:13.
[722] *Id*.
[723] Ex. P10, Kelly Dep. 70:8-71:22; Doc. 208-4, Fidelity Watch List.
[724] Ex. P4, Trust Agreement Comp. at 6; Ex. P5, Recordkeeping Agreement Comp. at 4.

single occasion, Mercer informed MIT that Fidelity's data included "(a) 41 funds that were performing below par; (b) 10 funds that had inappropriate benchmarks; and (c) 16 funds that did not have 5-year track record."[725] Despite being informed of this information, MIT had no process in place to assure the information Fidelity reported was correct,[726] had no process to remove a fund on the watch list,[727] and made no attempt to determine proper benchmarks for the funds listed on the Fidelity report, which MIT acknowledged was critical to assess performance.[728] The only action that occurred with respect to the flawed Fidelity report was that it was placed on Fidelity's very poorly organized website.[729] The Fidelity report did not adhere to industry standards for monitoring investments in a defined contribution plan.[730]

220.    In 2010, MIT also created a vague and unusable investment policy statement to paper the file and provide fiduciary cover to try to "demonstrate [MIT was] mindful of and [was] satisfying [MIT's] fiduciary duty as the named fiduciary and plan administrator."[731]

221.    After receiving the investment advisor proposals in November 2010, MIT did not engage in any process or discuss eliminating or monitoring investments on a fund-by-fund level in the Plan until long after Stone left the Chair position.[732] As Stone testified that "we didn't have a good answer. If we had a good answer, we probably would have gotten—gone in a direction

---

[725] Ex. P11, August 10, 2010 Mtg. Min. Comp. at 58.
[726] Ex. P7, Ruiz Dep. 42:15-23.
[727] Ex. P10, Kelly Dep. 68:22-69:1; Chused Dep. 43:4-13; Ex. P7, Ruiz Dep. 52:23-53:19; Ex. P11, February 16, 2010 Mtg. Min. Comp. at 37; Ex. P12, Magner Dep. 81:2-82:55.
[728] Ex. P7, Ruiz Dep. 40:11-17; Ex. P3, Stone Dep. 48:16-49:4.
[729] Ex. P7, Ruiz Dep. 30:16-31:5; Ex. P10, Kelly Dep. 66:18-22; 69:2-5; Ex. P25, Preliminary Interview Results; Ex. P26, Alden Dep. 80:13-82:21, 83:15-22.
[730] Ex. P49, Buetow Corrected Expert Report, ¶80-83; ████████████████████; Ex. P69, Mercer Presentation Understanding Fiduciary Responsibility at 35; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26; Ex. P66, at 217-218, 341-343; Ex. P12, Magner Dep. 57:14-58:11.
[731] Ex. P47, Jan. 13, 2010 Memorandum to File at 6.
[732] Ex. P3, Stone Dep. 55:19-56:5; Ex. P46, Email Harrington to Samuelson.

more quickly."[733] Had MIT engaged in a prudent process, it would have eliminated imprudent funds in 2010.[734]

222.     During the class period, the POC engaged in the industry standard process of conducting a manager search when adding a select few designated investment alternatives to the Plan in order to make a "responsible decision with respect to these [designated investment alternatives], very simply."[735]

223.     In contrast, MIT executed agreements with Fidelity on January 15, 2010 and again in November 2011 permitting all Fidelity funds to be added as designated investment alternatives to the Plan as soon as they were created without any review or any process to determine whether the designated investment alternative was appropriate for MIT's Plan.[736]

224.     MIT's failure to follow these standard industry investment management processes caused the Plan losses of over $30 million.[737]

**D.     As a Result of Defendants' Imprudence, the Plan Retained Numerous Specific Imprudent Investment Options**

**1.     Defendants failed to remove funds from the Investment Window that it knew were imprudent**

225.     Because MIT did not evaluate investments on a fund-by-fund basis, MIT retained 58 designated investment alternatives that underperformed their respective Morningstar asset class category benchmarks.[738] These investments should have been removed at the beginning of the class period.[739]

---

[733] Ex. P3, Stone Dep. 127:21-24.
[734] Ex. P49, Buetow Corrected Expert Report, ¶¶80-121.
[735] Ex. P3, Stone Dep. 40:7-41:6, 47:10-49:21; Ex. P11, June 13, 2011 Mtg. Min Comp. at 108-122.
[736] Ex. P7, Ruiz Dep. 49:12-51:15; Ex. P5, Recordkeeping Agreement Comp. at 47, 51, 53, 61.
[737] Ex. P49, Buetow Corrected Expert Report, ¶¶85-90; Ex. P86, Buetow Dep. 139:3-140:8.
[738] Ex. P49, Buetow Corrected Expert Report, ¶109; *see* Ex. P11, October 20, 2010 Mtg. Min. Comp. at 63 (explaining that Mercer defines underperformance as "underperformed by more than 5 bps.").
[739] Ex. P49, Buetow Corrected Expert Report, ¶¶101-110.

226.     Many of the underperforming funds retained by MIT as of 2010 or 2011 were

either not offered in any other large defined contribution plan, or were offered by a very low

percentage of large plans.[740]  For example, as of the start of the class period, the Alger Mid Cap

Growth Institutional Fund Class I significantly underperformed its benchmark for the 3-year

period.[741] Total net assets in the mutual fund from all investors fell from $820 million in 2010 to

$317 million by 2011 and reduced to $155 million by 2014.[742] The two other large plans that had

the Invesco Value Opportunity Fund Class A in 2010, both removed the fund by 2011.[743] Despite

the other investors fleeing this fund, MIT retained the Fund the amount of assets invested in this

fund.[744]

227.     MIT's failure to remove these underperforming funds from the Plan caused the

Plan losses of $8,204,525.29.[745]

### 2.     Defendants failed to remove imprudent sector funds from the Investment Window

228.     Sector and region specific funds were not appropriate investments for MIT's

Plan.[746]

229.     Maureen Ratigan was MIT's Director of Benefits from November 15, 2011

through 2015.[747] The POC charged Ratigan with accurately communicating reasons for changes

to the Plan to Plan participants.[748] While Ratigan was collecting accurate descriptions of why

decisions were made to convey to plan participants, Fund Selection Subcommittee ("FSS")

---

[740] Doc. 210-2, at 125(Ex. 10).
[741] Doc. 210-02 at 126(Ex.10).
[742] Doc. 210-01 at 93(Ex.5).
[743] Doc. 210-02 at 126(Ex.10).
[744] Doc. 207-04 at 157; Ex. P115, 2012 Form 5500 at 139.
[745] Ex. P49, Buetow Corrected Expert Report, ¶110.
[746] Ex. P49, Buetow Corrected Expert Report, ¶¶37, 36 [sic]-37, 75-76, 84, 91-100; Ex. P109, Email Ratigan to Donnelly.
[747] Ex. P21, Ratigan Dep. 13:12-14:1.
[748] Ex. P21, Ratigan Dep. 18:12-19:7; 77:12-87:11.

member Pam Weldon wrote that "sector funds were off the table early on … because they tend to be more volatile … which would not assist in streamlining the core lineup."[749] The two other members of the FSS, Glen Ellison and Tom Wieand (both prominent MIT economists) concurred.[750]

230.    Ellison and Wieand observed that there were several sources of worry regarding investment in a poorly-run Chinese market, including that China is an authoritarian country and "the Chinese government could, at any point, decide to take actions that harm outside investors in Chinese companies."[751] From the start of the class period until July 2015, MIT retained an unmonitored China sector fund.[752]

231.    Ellison further testified that he preferred investments that were not heavily invested in Tesla based on the prospect for future loss.[753] From the start of the class period until July 2015, MIT retained an unmonitored automotive sector fund, the Fidelity Select Automotive Portfolio, which included Tesla Motors, Inc. as a top-ten holding.[754] Of the 10 large plans that had the Fidelity Select Automotive Portfolio in their Plan as of 2010, 7 removed it by 2014.[755]

232.    Ellison further testified about the riskiness of the technology sector and the potential for significant loss based on tech industry concentration.[756] From the start of the class period until July 2015, MIT retained an unmonitored technology sector fund.[757]

233.    Prudent fiduciaries "make a reasoned determination about the constraints in its ability to monitor different types of risks and will avoid funds with risks that the [fiduciary] is

---

[749] Ex. P109, Email Ratigan to Donnelly; Ex. P21, Ratigan Dep. 18:12-19:7; 77:12-87:11.
[750] Ex. P109, Email Ratigan to Donnelly; Ex. P21, Ratigan Dep. 83:4-84:23.
[751] Id; Ex. P54, Ellison Dep. 47:19-49:12.
[752] Doc. 207-04, at 155; Doc. 208-15, at 28.
[753] Ex. P54, Ellison Dep. 56:13-57:18.
[754] Ex. P49, Buetow Corrected Expert Report, ¶98, fn.89.
[755] Doc. 210-2 at 120(Ex.7); Ex. P44, Wermers Dep 67:25-70:25, 76:17-77:18.
[756] Ex. P54, Ellison Dep. 58:5-60:18.
[757] Doc. 207-04 at 155; Doc. 208-15 at 33.

unable to monitor, such as political and regulatory instability, inflationary risks and currency devaluation risks."[758] Prudent fiduciaries "avoid funds with performance that could depend heavily on the performance of a given industry or group of industries and could be more volatile than the performance of less concentrated funds."[759] Indeed, "exposing plan participants to these risks is anathema to the very purpose of a defined contribution plan."[760]

234.    Despite this acknowledgement of risk within the technology sector, MIT failed to monitor or evaluate the Fidelity Select Technology Portfolio, and failed to do so with all other Fidelity sector and regional funds.[761]

235.    MIT did not have the expertise to monitor the risk attributes of each sector and regional fund in the MIT Investment Window.[762]

236.    No other large defined contribution plan offered all of the sector funds that MIT offered.[763] Many of these excessively risky funds retained by MIT as of 2010 or 2011 were removed as options at other large defined contribution plans.[764]

237.    Because MIT did not evaluate investments on a fund-by-fund basis, MIT retained 58 excessively risky sector and regional funds in the Investment Window that should have been removed at the beginning of the class period.[765]

238.    MIT's failure to remove these excessively risky and inappropriate sector and regional funds from the Plan caused the Plan losses of $10.8 million.[766]

---

[758] Ex. P49, Buetow Corrected Expert Report, ¶[sic]37, p.16.
[759] Id.
[760] Id.
[761] Ex. P7, Ruiz Dep. 115:13-119:8.
[762] Ex. P54, Ellison Dep. 47:19-49:12.
[763] Ex. P44, Wermers Dep. 72:23-73:23.
[764] Doc. 210-2, at 126 (Ex. 10).
[765] Ex. P49, Buetow Corrected Expert Report, ¶¶91-100.
[766] Ex. P49, Buetow Corrected Expert Report, ¶100.

### 3. Defendants imprudently included funds without a sufficient performance history in the investment window

239.    Selection of a designated investment option for a defined contribution plan requires the performance of proper due diligence.[767] Due diligence requires a performance history long enough to perform an analysis.[768] Investment professionals require five-years of performance history before evaluating a fund for inclusion in a defined contribution plan.[769] A five-year performance history enables the defined contribution plan fiduciary to evaluate the investment process of the investment manager, risk and return characteristics of the fund, and the adherence to the fund's investment style and strategy over a full market cycle.[770]

240.    Fidelity could add any fund that it created for 401(k) plans as a designated investment alternative in the Plan, without MIT's approval, as they became available.[771]

241.    Fiduciaries that allow investment managers to serve as de facto plan sponsors are unlikely to remove underperforming proprietary funds.[772] Indeed, Ruiz testified that although MIT "always retained the option to exclude those funds," they never did so.[773]

242.    For example, MIT even allowed a commodity sector fund to be added and retained in the Plan without proper due diligence when MIT permitted Fidelity Global Commodity Stock Fund to remain in its Plan with no performance track record.[774] The fund invested in the energy, metals, and agricultural industries, which could be significantly affected

---

[767] Ex. P49, Buetow Corrected Expert Report, ¶39.
[768] Ex. P49, Buetow Corrected Expert Report, ¶39;
[769] Ex. P49, Buetow Corrected Expert Report, ¶¶38-39, 114; Doc. 207-11, Dominguez Expert Rebuttal Report ¶26; Ex. P64, at 13-14, 114-115 ("The money manager should provide at least five years of actual quarterly performance information").
[770] Ex. P49, Buetow Corrected Expert Report, ¶39. Ex. P49, Buetow Corrected Expert Report,
[771] Ex. P7, Ruiz Dep. 50:15-19.
[772] Doc. 207-14, Buetow Expert Rebuttal Report, ¶18.
[773] Ex. P7, Ruiz Dep. 50:22-51:3.
[774] Ex. P49, Buetow Corrected Expert Report ¶113.

by commodity prices.[775] MIT's failure in this regard exposed Plan participants to substantially unjustified risks.[776]

243.    Had MIT removed and/or not added funds without a five-year performance history as of September 1, 2010, the Plan, and participant retirement savings, would have been greater by $2,191,766.03, and that is the loss that the Plan suffered as a result of Defendants' actions in this case.[777]

### 4.    Defendants imprudently included a duplicative set of underperforming target date funds

244.    Target date funds offer "a multi-asset investment solution that dynamically adjusts risk exposure as a function of the investment horizon dictated by the target date."[778]

245.    "There is no prudent reason to offer multiple target date fund families in a" defined contribution plan.[779]

246.    Defendants vetted and selected the Vanguard Target Retirement Trust options to be the target date fund in Tier I of the Plan's lineup and the qualified default investment alternative in the Plan prior to the beginning of the class period.[780]

247.    However, Defendants allowed the Plan to include a duplicative set of target date funds, the Fidelity Freedom Funds, in the unmonitored "Investment Window."[781]

248.    At the end of July 2010, the unmonitored Fidelity Freedom Funds were significantly underperforming their vetted Vanguard alternatives.[782]

---

[775] *Id.*
[776] *Id.*
[777] Ex. P49, Buetow Corrected Expert Report, ¶115.
[778] *Id.*; Ex. P49, Buetow Corrected Expert Report, ¶113.
[779] *Id.*
[780] Ex. P11, October 22, 2009 Mtg. Min. Comp. at 27.
[781] Doc. 208-02, Fidelity Presentation, 2nd Quarter 2010 at 57-58.
[782] Ex. P49, Buetow Corrected Expert Report, ¶118.

249. As of September 2010, "[t]he relative three-year underperformance between the 2015 funds was an annualized -.63%, 2020 funds was an annualized -1.13%, 2025 funds was an annualized -.59%, 2030 fund was an annualized -1.04%, 2035 funds was an annualized -.84%, 2040 funds was an annualized -1.32%, 2045 funds was an annualized -1.45%, and the 2050 fund was an annualized -2.25%."[783]

250. The Fidelity Freedom Funds also had much higher fees than the Vanguard Target Retirement Trusts.[784]

251. When the Defendants finally considered the Fidelity Freedom Funds, they removed them and mapped them to the Vanguard Target Retirement Trusts in July 2015.[785]

252. Because of the inclusion of the duplicative and underperforming Fidelity Freedom Funds, participants lost $7,368,935.60 in retirement savings.[786]

## V. Defendants Failed to Adopt Identical Lower-Cost Share Classes of Funds in the Plan

253. For decades, a central investment management principal has been that cost control plays an important role in helping investors achieve their targeted returns[787] and that "[g]reat diligence and care need to be taken to ensure that all costs are disclosed and understood" by the fiduciary.[788]

254. Mutual funds often provide shares in different share classes that are the exact same underlying investment, but which deduct from those investments different level of fees.[789]

---

[783] *Id.* ¶119.
[784] *Id.* ¶120.
[785] Ex. P58, Jan. 20, 2015 Oversight Committee Resolution at 3.
[786] Ex. P49, Buetow Corrected Expert Report, ¶120.
[787] Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26; Ex. P66, at 223-225, 239; Ex. P12, Magner Dep. 30:6-8, 35:13-36:13; Ex. P67, Mercer DC Fee Management at 2-3.
[788] Ex. P66, at 225; Doc. 207-11, Dominguez Expert Rebuttal Report, ¶26.
[789] Ex. P49, Buetow Corrected Expert Report, ¶122; Doc. 208-15, Transition Guide at 2195; Ex. P12, Magner Dep. 83:20-84:24; Ex. P10, Kelly Dep. 42:19-22.

255.     MIT did not have a process in place to determine whether designated investment alternatives in the Plan were in the lowest cost share class available to the Plan.[790] This lack of process resulted in the retention of higher cost share classes in the Plan, despite the eligibility for lower cost share classes.[791]

256.     By way of example, Baron Funds "offer two classes of shares," Retail Shares and Institutional Shares, which "differ only in their ongoing fees and eligibility requirements."[792] MIT retained its higher-cost Baron Funds Retail Shares from the beginning of the class period until July 2015, despite being eligible for the lower-cost Institutional Shares.[793] If MIT had properly monitored the Baron Funds, or even simply reviewed the Baron Funds prospectus, MIT would have determined the Plan was eligible for the lower share class at the start of the class period.[794]

257.     MIT had no process in place to ensure it reviewed each prospectuses for all designated investment alternatives.[795] MIT failed to review each prospectus, although its recordkeeping contract with Fidelity stated that MIT "represents that it has accessed/will access each such prospectus at http://www.Fidelity.com or such successor website as Fidelity may notify Named Fiduciary of in writing from time to time."[796]

258.     By way of further example, as of August 2010, the Plan was eligible for lower cost share classes of the proprietary Fidelity investments in the Plan, known as K shares.[797] Over

---

[790] Ex. P7, Ruiz Dep. 61:3-10; Ex. P10, Kelly Dep. 43:8-50:13; Ex. P3, Stone Dep. 88:2-10; Samuelson Dep. 65:25-66:19; Ex. P26, Alden Dep. 28:3-29:11; Ratigan Dep. 56:2-6.
[791] Ex. P10, Kelly Dep. 42:19-51:12.
[792] *Id.*
[793] *Id.*
[794] *Id.*
[795] Ex. P7, Ruiz Dep. 41:22-42:4.
[796] Ex. P5. Recordkeeping Agreement Comp. at 58; Ex. P7, Ruiz Dep. 47:16-48:5; 52:21-54:19.
[797] Ex. P3, Stone Dep. 115:4-118:5; Ex. P45, Harrington Dep. 20:1-23:4; Ex. P46, Email Harrington to Samuelson.

$300 million in Plan participant assets were invested in these higher cost share classes of the proprietary Fidelity funds.[798] An example of these funds are listed below:[799]

| Fidelity® Fund | ➔ | Fidelity® Fund - Class K |
|---|---|---|
| Fidelity® Puritan® Fund | ➔ | Fidelity® Puritan® Fund - Class K |
| Fidelity® Balanced Fund | ➔ | Fidelity® Balanced Fund - Class K |
| Fidelity® Growth Strategies Fund | ➔ | Fidelity® Growth Strategies Fund - Class K |
| Fidelity® Blue Chip Growth Fund | ➔ | Fidelity® Blue Chip Growth Fund - Class K |
| Fidelity® Capital Appreciation Fund | ➔ | Fidelity® Capital Appreciation Fund - Class K |
| Fidelity® Contrafund® | ➔ | Fidelity® Contrafund® - Class K |
| Fidelity® Disciplined Equity Fund | ➔ | Fidelity® Disciplined Equity Fund - Class K |
| Fidelity® Diversified International Fund | ➔ | Fidelity® Diversified International Fund - Class K |
| Fidelity® Dividend Growth Fund | ➔ | Fidelity® Dividend Growth Fund - Class K |
| Fidelity® Emerging Markets Fund | ➔ | Fidelity® Emerging Markets Fund - Class K |
| Fidelity® Equity-Income Fund | ➔ | Fidelity® Equity-Income Fund - Class K |
| Fidelity® Equity-Income II Fund | ➔ | Fidelity® Equity-Income II Fund - Class K |
| Fidelity® Export and Multinational Fund | ➔ | Fidelity® Export and Multinational Fund - Class K |
| Fidelity® Growth & Income Portfolio | ➔ | Fidelity® Growth & Income Portfolio - Class K |
| Fidelity® Growth Company Fund | ➔ | Fidelity® Growth Company Fund - Class K |
| Fidelity® Growth Discovery Fund | ➔ | Fidelity® Growth Discovery Fund - Class K |
| Fidelity® Independence Fund | ➔ | Fidelity® Independence Fund - Class K |
| Fidelity® International Discovery Fund | ➔ | Fidelity® International Discovery Fund - Class K |
| Fidelity® Leveraged Company Stock Fund | ➔ | Fidelity® Leveraged Company Stock Fund - Class K |
| Fidelity® Low-Priced Stock Fund | ➔ | Fidelity® Low-Priced Stock Fund - Class K |
| Fidelity® Magellan® Fund | ➔ | Fidelity® Magellan® Fund - Class K |
| Fidelity® Mid-Cap Stock Fund | ➔ | Fidelity® Mid-Cap Stock Fund - Class K |
| Fidelity® OTC Portfolio | ➔ | Fidelity® OTC Portfolio - Class K |
| Fidelity® Overseas Fund | ➔ | Fidelity® Overseas Fund - Class K |
| Fidelity® Stock Selector All Cap Fund | ➔ | Fidelity® Stock Selector All Cap Fund - Class K |
| Fidelity® Value Fund | ➔ | Fidelity® Value Fund - Class K |
| Fidelity® Value Discovery Fund | ➔ | Fidelity® Value Discovery Fund - Class K |
| Fidelity® Value Strategies Fund | ➔ | Fidelity® Value Strategies Fund - Class K |

259.    Defendants did not adopt the identical lower-cost K share classes for any funds in the Plan until November 2011.[800]

260.    The K share classes of Fidelity funds are identical investments to retail share classes with lower fees.[801]

---

[798] Ex. P45, Harrington Dep. 20:1-23:4; Ex. P46, Email Harrington to Samuelson; Doc. 207-04, 2010 Form 5500 at 159-162.
[799] Ex. P5. Recordkeeping Agreement Comp. at 53.
[800] Id.
[801] Ex. P45, Harrington Dep. 20:1-23:4; Ex. P46, Email Harrington to Samuelson.

261.     The lower-cost K share classes of Fidelity funds continued to pay 10 basis points in revenue sharing toward Plan recordkeeping.[802]

262.     Forty-five designated investment alternatives in the Plan had no recordkeeping revenue share, only investment management revenue share.[803]

263.     MIT's failure to evaluate investments in the Plan resulted in several designated investment alternatives in the Plan to have even higher expense ratios than the same investment in BrokerageLink.[804] As of 2012, over $9 million in plan participant assets were invested in the higher cost options in the Plan.[805] Plan fiduciaries did not know this was occurring until 2012.[806] Once Defendants were advised this was occurring, they did not remedy the problem because individual committee members disclaimed any personal responsibility to investigate overcharges or availability of a lower-cost share class within the Plan.[807] By December 31, 2013, $11 million in participant assets were invested in the higher-cost designated investment alternative option.[808] As of 2012, 147 designated investment alternatives in the Plan were also in BrokerageLink in the same share class with no transaction fee.[809]

264.     Investment providers regularly waive eligibility requirements for lower-cost share classes for large retirement plans, like the Plan.[810]

265.     If Defendants had moved all the Plan's investments to lower-cost share classes on September 30, 2010, Plan participants would have $4,373,499.80 more in retirement savings.[811]

---

[802] Ex. P87, Fidelity Fee Transparency Comp. at 8-15.
[803] Id.
[804] Doc. 208-22, Mercer Investment Window Analysis at 24-27 (Janus Balance S; DWS International S; Janus Overseas; Janus Worldwide; Janus Forty; Janus Enterprise S; Alger Capital Appreciation).
[805] Id.
[806] Ex. P3, Stone Dep. 88:2-89:5; Ex. P21, Ratigan Dep. 59:6-61:2; Ex. P31, Email Ratigan to Davies.
[807] Ex. P1, Howard Dep. 112:17-121:14; Ex. P31, Email Ratigan to Davies; *see also* Ex. P10, Kelly Dep. 40:4-41:6.
[808] Ex. P79, 2013 Form 5500 at 182.
[809] Ex. P80, MIT 401(k) Funds Ranked as of 03/30/2012.
[810] Doc. 207-14, Buetow Expert Rebuttal Report ¶¶8, 55 Ex. P10, Kelly Dep. 50:14-51:2.
[811] Doc. 207-14, Buetow Expert Rebuttal Report ¶54.

August 5, 2019

/s/ Jerome J. Schlichter

SCHLICHTER BOGARD & DENTON LLP
Jerome J. Schlichter (admitted pro hac vice)
Heather Lea (admitted pro hac vice)
Joel D. Rohlf (admitted pro hac vice)
Scott T. Apking (admitted pro hac vice)
100 South Fourth Street, Suite 1200
St. Louis, MO, 63102
(314) 621-6115
(314) 621-5934 (fax)
jschlichter@uselaws.com
hlea@uselaws.com
jrohlf@uselaws.com
sapking@uselaws.com
*Lead Counsel for Plaintiffs*

Michael M. Mulder (admitted pro hac vice)
Elena N. Liveris (admitted pro hac vice)
Law Offices of Michael M. Mulder
1603 Orrington Avenue, Suite 600
Evanston, Illinois 60201
(312) 263-0272
(847) 563-2301 (fax)
mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com
*Counsel for Plaintiffs*

Stephen Churchill, BBO#564158
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3260
(617) 488-2261 (fax)
steve@fairworklaw.com
*Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 5, 2019.

/s/ Jerome J. Schlichter